45

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 1 9 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ADELA CANO, individually and on behalf of her minor son, ABRAHAM CANO | § § § | |
| VS. | § § | CIVIL ACTION NO. <u>B-01-156</u> (JURY REQUESTED) |
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT HERIBERTO VILLARREAL, AND PETER GUERRERO | § § § § § | |

**DEFENDANT HERIBERTO VILLARREAL'S MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6), and in the alternative, MOTION FOR SUMMARY JUDGMENT UNDER RULE 56**

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW HERIBERTO VILLARREAL, one of the Defendants in the above-styled and numbered cause, and files this his Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and in the alternative, Motion for Summary Judgment, and would show the Court the following:

**I.**

**STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING**

This damage claim is brought by Plaintiff alleging violations of 42 U.S.C. §1983, the Fourteenth Amendment to the United States Constitution, and Texas Education Code §22.001 *et. seq.* Plaintiff alleges that the minor Plaintiff suffers from a rare bone disease. She asserts that she informed the school district and its officials of this fact, and demanded

-1-

that her son was not to participate in any physical activity. She was asked to obtain and provide a physicians excuse to exempt her son, but never provided one. While allegedly participating in a physical education class, the minor plaintiff suffered a broken ankle and knee. Plaintiff alleges Defendants Villarreal and San Benito Consolidated Independent School District violated Abraham Cano's rights to procedural and substantive due process protected by the United States Constitution. She also alleges negligence and excessive discipline under Texas state law. This claim was filed in October, 2001.

## II.

## SUMMARY OF ARGUMENT

(1)     Plaintiff has failed to properly allege the violation of a constitutional right.

(2)     Plaintiff has failed to allege a violation of procedural due process.

(3)     Defendant Villarreal is entitled to dismissal based upon qualified and official immunity.

(4)     Plaintiff's state law claims should be dismissed because the laws of the State of Texas provide an adequate remedy.

(5)     Plaintiff failed to exhaust administrative remedies, thereby depriving this Honorable Court of subject matter jurisdiction over state law claims.

(6)     Defendant Villarreal is entitled to Summary Judgment based upon Qualified Immunity.

## III.

## SUMMARY JUDGMENT PROOF

Defendant asserts that this claim should be Dismissed based upon a failure of Plaintiff to state a cause of action against him.  However, to the extent proof is required, Defendant provides the following:

Exhibit A    Excerpts from the deposition of Adela Cano;

Exhibit B    Excerpts from the deposition of Abraham Cano;

Exhibit C    Excerpts from the deposition of Dr. Vargas;

Exhibit D    Excerpts from the deposition of Dr. Keillor;

Exhibit E    Excerpts from the deposition of Heriberto Villarreal; and.

Exhibit F    Affidavit of Heriberto E. Villarreal

## IV.

## MOTION TO DISMISS UNDER RULE 12(b)(6)

**A.    Standard for dismissal under Rule 12(b)(6).**

Plaintiff has failed to state a claim for which relief can be granted.  Accordingly, her lawsuit is ripe for dismissal under Federal Rule of Civil Procedure 12(b)(6).  Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint should be dismissed for failure to state a claim if the face of the plaintiff's pleading shows, beyond doubt, that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Garrett v. Commonwealth Mtg. Co.,* 938 F.2d 591, 594 (5th Cir. 1991).  Under this standard, a court

-3-

may dismiss a complaint if the plaintiff cannot possibly prevail on his claims. *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1973). Although the standard of Rule 12(b)(6) is stringent, "the mere fact that a standard is stringent does not suggest that it can never be met." *Mahone v. Addicks Utility Dist. of Harris County,* 836 F.2d 921, 927 (5th Cir. 1988).

**B.    Plaintiff's claims under 42 U.S.C. §1983 should be dismissed.**

**1.    Plaintiff has not properly alleged the violation of any constitutional right.**

**a.    Discipline**

To begin, Plaintiff has not alleged a violation of the Fourteenth Amendment to the United States Constitution. To state a cause of action under 42 U.S.C. §1983 for violation of the Due Process Clause, a plaintiff must show that they have asserted a recognized 'liberty or property' interest within the purview of the Fourteenth Amendment, and that they were intentionally or recklessly deprived of that interest, even temporarily, under color of state law." *Griffith v. Johnston*, 899 F.2d 1427, 1435 (5th Cir.1990), *cert. denied*, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991). Plaintiff cannot meet this burden. Plaintiff also claims that the imposition of punishment by Defendant Villarreal caused a violation of substantive and procedural due process rights. Even if Defendant Villarreal was imposing punishment, which Defendant denies, Plaintiff could not prevail.

First, the Fifth Circuit has "consistently held that, as long as the state provides an adequate remedy, a public school student cannot state a claim for denial of substantive due

-4-

process through excessive corporal punishment, whether it be against the school system, administrators, or the employee who is alleged to have inflicted the damage." *Moore v. Willis Independent School Dist.*, 233 F.3d 871, (C.A.5 (Tex.) 2000); *Fee v. Herndon*, 900 F.2d 804 (5th Cir. 1990), *cert. denied*, 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 233 (1990). This is due to the fact that educators in states that proscribe student mistreatment and provide a remedy do not act arbitrarily, which is a necessary predicate for substantive due process relief. *Moore*, 233 F.3d at 875. On facts very similar to ours, the *Moore* court held that Texas does have state law remedies for the types of violations that Plaintiff alleges. Thus Plaintiff has not properly alleged a violation of substantive due process rights under the Fourteenth Amendment.

Additionally, Plaintiff has not stated a violation of procedural due process rights. Even if we assume, as Plaintiff contends, that Abraham Cano was subjected to punishment in the form of exercise, the Supreme Court has held that subjecting students to corporal punishment without prior notice and a hearing did not violate procedural due process. *Ingraham*, 430 U.S. at 682. Thus, Plaintiff can not proceed with her Fourteenth Amendment claim and therefore, it should be dismissed.

### b.    Bodily Integrity

Plaintiff alleges a right to "bodily integrity" under *Doe v. Taylor*, 15 F.3d 443 (5th Cir. 1994)(en banc), *cert. denied*, 513 U.S. 815, 115 S.Ct 79, 130 L.Ed.2d 25 (1994). However, Plaintiff's First Amended Original Complaint sounds in tort and negligence. In order for

Plaintiff to prevail under 42 U.S.C. §1983, there must be a constitutional deprivation, not merely negligence or excessive discipline. *Daniel v. Williams*, 474 U.S. 327, 332-33, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986). Plaintiff alleges a failure to prevent Abraham Cano from participating in physical education. There is no such constitutional right under the Fourteenth Amendment. Because Plaintiff has failed to properly allege a constitutional deprivation, this case should be dismissed.

### c.    Defendant Villarreal is entitled to qualified immunity.

Defendant Villarreal is entitled to qualified immunity under Federal Law, it's State counterpart, official immunity, and Texas Education Code §22.051. Qualified immunity protects government officials who perform discretionary functions from liability "unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Gibson v. Rich*, 44 F.3d 274, 276 (C.A.5 (Tex.) 1995). "Government officials performing discretionary functions have qualified immunity from liability for actions that do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 3 L.Ed.2d 396, 410 (1982). "A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). The qualified immunity analysis is a two-step process. First, a court must determine whether the plaintiff

has alleged the violation of a constitutional right. *Hale v. Townley* 45 F.3d 914,917, (C.A.5 (La.) 1995). Second, if the plaintiff has alleged a constitutional violation, the court must decide if the conduct was objectively reasonable in light of clearly established law at the time that the challenged conduct occurred. *Id* at 917. "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Goodson v. Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000). There is no clearly established law in this regard.

As has already been shown, Plaintiff has not properly alleged the violation of a constitutional right. Further, Defendant Villarreal was at all times acting in good faith, in a reasonable manner, and within the discretionary authority of his public office. Plaintiff has alleged no facts that would overcome Defendant's qualified immunity. The Fifth Circuit has made clear that broad or conclusory allegations made against an individual defendant are not sufficient to overcome qualified immunity. Rather, a plaintiff must set forth with factual detail and particularity the basis for the claim which necessarily includes why the defendant official cannot successfully maintain the defense of immunity. *Wicks v. Mississippi State Employment Services*, 41 F.3d 991,996 (C.A.5 (Miss.) 1995). Plaintiff has not and cannot do so, therefore, the complaint should be dismissed immediately, as to do otherwise would abrogate the qualified immunity defense itself. *(See Wicks* at 996).

-7-

**C.    Plaintiff's claims under Texas Education Code §22.051 should be dismissed.**

      **1.    Defendants are immune from claims of negligence.**

Texas Education Code §22.051, states, in part:

> "(a) A professional employee of a school district in not personally liable for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee, except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students."

The "excessive force exception to immunity of professional school employees from personal liability for acts performed within the scope of employment which involve the exercise of judgment or discretion exists **only where school officials engage in disciplining students.** (emphasis added) *Spacek v. Charles,* 928 S.W. 2d 88 (Tex. App.-Houston [14th Dist.] 1996, rehearing overruled, writ dismissed w.o.j.). It is clear that if any discipline took place, Plaintiff makes no claim that Mr. Villarreal was disciplining Plaintiff at the time of the incident. Secondly, federal courts have determined that excessive punishment is not a substantive due process claim, but a state law claim for which an adequate remedy exists, and have dismissed such claims. *Moore v. Willis,* 233 F.3d 871 (Fifth Circuit 2000), rehearing and rehearing en banc denied 248 F.3d 1145). Further, the immunity afforded under §22.051 only requires that the action taken be incident to or within the scope of their employment, does not require that the professional act in good faith. *Enriquez v. Khouri,* 13 S.W. 3d 458 (Tex. App.-El Paso, 2000). Based upon these issues, Villarreal is entitled to

-8-

dismissal.

**2.    Plaintiff failed to exhaust her administrative remedies.**

Again, assuming arguendo that this incident involved excessive discipline, it should be dismissed because Plaintiff failed to exhaust her administrative remedies with the San Benito Consolidated Independent School District before filing suit, thereby depriving the court of subject matter jurisdiction to hear such claims.   See Texas Education Code §7.057, (formerly Educ. Code §11.13); *Grimes v. Stringer*, 957 S.W. 2d 865 (Tx. App. Tyler, 1997); *Friona v. King,* 15 S.W.3d 653 (Tex. App.-Amarillo, 2000); *Godley I.S.D. v. Woods,* 25 S.W.3d 656 (Tex. App.-Waco, 2000).

## V.

## MOTION FOR SUMMARY JUDGMENT

For the reasons stated above in his Motion to Dismiss, Defendant Villarreal asserts his entitlement to Summary Judgment.   Plaintiff cannot overcome Villarreal's entitlement to Qualified Immunity.   As previously noted, Plaintiff has not shown "a clearly established statutory or constitutional rights of which a reasonable person would have known."   There is no clearly established constitutional right to be exempt from physical education classes. If such did exist, Mr. Villarreal, as a reasonable person, did not know that such a right existed. *(Exhibit F)*.   On the contrary, it was his reasonable belief that physical education classes were required, unless a note from a physician was obtained. *(Exhibit F)*.   That does not mean, as Plaintiff's counsel suggests, that all forms of physical education activities would

be required of each student. Villarreal is not a physician, nor is he able to determine the capabilities and/or limitations to be placed on a student with a condition such as Osteogenesis Imperfecta (OI). *(Exhibit F)*. Dr. Keillor, Abraham Cano's treating physician, testified that Osteogenesis Imperfecta is a "pretty rare phenomena" and that since 1974, he has seen "probably five to ten" (persons with OI). *(Exhibit D, page 8, line 19-page 9, line 8)*. He further testified that persons with OI have varying degrees of abilities and limitations. *(See Exhibit D, page 14, line 21 through page 15, line 2)*. Dr. Vargas, prior treating physician of Abraham Cano, testified that Abraham Cano had a mild version of OI. *(Exhibit C, page 18, line 6-18; page 19, line 4-8)*. Dr. Keillor also testified that Abraham Cano could lift weights, run on a treadmill, or ride a stationary bicycle. *(Exhibit D, page 25, line 1-6; page 58, line 11-19; page 46, line 5-17)*. It is not the activity but the potential that Abraham Cano might fall that is the issue. *(Exhibit D, page 46, line 13-16; page 58, line 1-18)*. Dr. Keillor indicated that Abraham Cano should not be in contact sports. It is undisputed that Abraham Cano's injury did not come from any contact, but from falling on the ground. Dr. Keillor testified that Abraham Cano could participate in some physical education activities. *(Exhibit D, page 54, line 14-page 55, line 9)*. Dr. Vargas testified that "PE is just a broad term for sometimes contact sport" and that there may be things he's (Abraham Cano) able to do without much danger. *(Exhibit C, page 49, line 18-page 50, line 1)*. As stated, Mr. Villarreal asked Mrs. Cano on numerous occasions to obtain such a Physician's note, in an effort to comply with his understanding of state requirements and in the further effort to help

-10-

Mrs. Cano and her son. *(Exhibit F)*. Based upon this, it cannot be said that Defendant

Villarreal acted with deliberate indifference to the constitutional rights of Abraham Cano.

The very fact that he asked Mrs. Cano to obtain the document shows that he was not

deliberately indifferent. Villarreal would have to rely on the physician's recommendations

as to what Abraham Cano could and could not safely participate in. Mrs. Cano was told that

if she wanted her son out of physical education, she should get a form from the doctor.

*(Exhibit E, page 74, line 15-16)*. Mr. Villarreal testified that she (Mrs. Cano) told him she

would get it. *(Exhibit E, page 75, line 8-13)*. Mrs. Cano also testified that Mr. Villarreal told

her she needed an excuse. *(Exhibit A, page 73, line 24-page 74, line 3)*. She was unable (at

that time) to get one. *(Exhibit A, page 76, line 18-19)*. When asked "if you are unable to get

one, you don't expect the school to be able to get one", she stated "No"., *(Exhibit A, page 76,

line 20-22)*. Mrs. Cano testified that she was told the she needed a doctor's excuse but that

Dr. Vargas wanted her to "go in and pay $150.00 for Abraham to see the doctor, and then he

wanted $85.00 for the x-ray or whatever he needed to do and all – run the tests again. Total,

it was going to be $400.00 to give an excuse." *(Exhibit A, page 67, line 22-page 68, line 6)*.

 She never provided one until after the incident made the basis of this suit. Dr. Vargas

testified that if Mrs. Cano had asked for such a note, he would have given her one. *(Exhibit

C, page 46, line 5-9)*. Plaintiff asserts that personnel from the School District should have

obtained this documentation. Clearly, she was in the best position to do so. Plaintiff asserted

that she was unable to obtain one because she owed money to Dr. Vargas, her son's treating

physician at the time. *(Exhibit A, page 65-68)*. Dr. Vargas' testimony does not support her claim in this regard *(Exhibit C, page 38-40)*.

Further, it should be noted that Mrs. Cano herself often left the choices to Abraham Cano. *(Exhibit A, page 78-79)*. Abraham Cano himself testified that on the day in question, he "could have not made that choice" to go after the ball. *(Exhibit B, page 119)*. Clearly, Defendant Villarreal is immune from liability in this matter.

WHEREFORE, PREMISES CONSIDERED, Defendant Heriberto Villarreal, Individually and in his official capacity, pray that upon hearing this Motion, the Court dismiss Plaintiff's claims, that Plaintiff take nothing by her suit, that this Defendant recover all costs incurred herein, and that this Defendant have such other and further relief, at law or in equity, to which he may show himself to be justly entitled.

Respectfully submitted,

EWBANK & BYROM, P.C.
221 West 6th Street, Suite 900
Austin, Texas 78701
Telephone: (512) 476-1080
Facsimile: (512) 476-7770

By: _____
        JAMES E. BYROM
        State Bar No. 03568100
        Federal No. 6874

**ATTORNEYS FOR HERIBERTO VILLARREAL**

-12-

## CERTIFICATE OF SERVICE

I hereby certify by my signature below that a true and correct copy of the above and foregoing document has been served on the following attorneys of record via certified mail, return receipt requested, and or facsimile on this the 18$^h$ day of September, 2003.

*Via CM/RRR No.: 7002 2030 0006 2113 3974*
Mr. J. Arnold Aguilar
Law Office of J. Arnold Aguilar
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520

*Via CM/RRR No.: 7002 2030 0006 2113 4513*
Ms. Eileen M. Leeds
Willette & Guerra, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Boulevard
Brownsville, Texas 78521

**JAMES E. BYROM**

-13-

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually    )(
and on Behalf of her        )(
minor son, ABRAHAM CANO,    )(
     Plaintiff          )(
                  )(
VS.                         )(    CIVIL ACTION NO. B-01-156
                  )(
SAN BENITO CONSOLIDATED     )(
INDEPENDENT SCHOOL          )(
DISTRICT, HERIBERTO         )(
VILLARREAL and PETER        )(
GUERRERO,                   )(
     Defendants         )(

---

ORAL DEPOSITION OF
ADELA CANO
JULY 16, 2002



---

    ORAL DEPOSITION OF ADELA CANO, produced as a

witness at the instance of the DEFENDANT SAN BENITO

CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, taken in the

above styled and numbered cause on JULY 16, 2002,

reported by CORINNA N. GARCIA, Certified Court Reporter

No. 5210, in and for the State of Texas, at the Law

Office of J. Arnold Aguilar, Artemis Square, Suite H-2,

1200 Central Boulevard, Brownsville, Texas, pursuant to

the Federal Rules of Civil Procedure.

EXHIBIT
A

15:36:37 1   school after Ed Downs?

15:36:41 2     A.  After Ed Downs would have been sixth grade,

15:36:44 3   which was with Coach Banuelos.

15:36:48 4     Q.  Okay.

15:36:48 5     A.  That was the second time he hurt his -- the

15:36:51 6   other elbow.

15:36:52 7     Q.  Okay.  When did you find out he was going to be

15:36:55 8   in physical education class before sixth grade?

15:37:02 9     A.  About two or three days before school started.

15:37:05 10     Q.  Did you tell anybody at that time, "Hey, wait a

15:37:07 11   minute.  I've got this report from Dr. Vargas says he's

15:37:10 12   not supposed to be in physical education"?

15:37:13 13     A.  Yes.

15:37:13 14     Q.  And your interpretation was he was not supposed

15:37:16 15   to be in physical education class ever?

15:37:19 16     A.  Yes.

15:37:20 17     Q.  Had Dr. Vargas ever told you that?

15:37:23 18     A.  Yes.

15:37:23 19     Q.  Had he put that in writing, that he was never

15:37:26 20   supposed to be in physical education again?

15:37:28 21     A.  In that no PE excuse, yes.

15:37:32 22     Q.  Your interpretation of that no PE excuse is no

15:37:36 23   PE ever?

15:37:36 24     A.  Yes.

15:37:37 25     Q.  Did it say "ever"?

15:37:39 1      A.   It said that because he had the osteogenesis

15:37:44 2   imperfecta, which was a genetic bone disease, that

15:37:44 3   would never get better.   It said, "Osteogenesis

4   imperfecta, genetic bone disease, brittle bones."

15:37:48 5      Q.   Okay.   Did it say, "No PE ever"?

15:37:53 6      A.   It said, "No PE."

15:37:59 7      Q.   I understand that.   I'm asking you if it said

15:37:59 8   "ever"?

15:37:59 9      A.   No, it didn't say "ever" on it.

15:38:00 10      Q.   Your interpretation was "ever," right?

15:38:05 11      A.   Because I know that it's a genetic bone

15:38:08 12   disease.

15:38:09 13      Q.   Okay.   You know more about it than some people

15:38:13 14   do?

15:38:13 15      A.   But if it's genetic, it's from birth.   It's

15:38:16 16   never going to go away.

15:38:17 17      Q.   All right.   And then the next -- or two falls

15:38:21 18   later, you realize he's going to be back in PE, right?

15:38:26 19   In sixth grade?

15:38:27 20      A.   Yes.

15:38:28 21      Q.   Okay.   And your testimony is you said, "Wait a

15:38:31 22   minute.   He's not supposed to be in PE ever"?

15:38:36 23      A.   Yes.

15:38:36 24      Q.   And what were you told?

15:38:37 25      A.   That I needed a doctor's excuse.

15:38:39 1    Q.  Did you go get one?

15:38:40 2    A.  About two weeks later, yes.

15:38:43 3    Q.  Why didn't you get it the next day?

15:38:45 4    A.  Because I was working.

15:38:45 5    Q.  Okay.  Did you talk to Dr. Vargas at all about

15:38:50 6    that situation?

15:38:50 7    A.  No, I spoke to his nurse.

15:38:52 8    Q.  And did you tell Dr. Vargas's nurse, "Hey,

15:38:57 9    these people are saying that the last note wasn't good

15:39:02 10   enough.  So give us another note"?

15:39:04 11   A.  No.  I told them that San Benito Independent

15:39:07 12   School District said that it was the law that he take

15:39:10 13   physical education and that I needed an excuse.  And

15:39:13 14   she said she would talk to the doctor and call me back.

15:39:17 15   Q.  Okay.

15:39:17 16   A.  When she called back, she said that Dr. Vargas

15:39:21 17   had said that what part of that they didn't understand,

15:39:24 18   that this was a genetic bone disease, and that it was

15:39:29 19   never going to get better.  In fact, it might get

15:39:32 20   worse.  So that he didn't need to be giving them an

15:39:35 21   excuse all the time.

15:39:37 22   Q.  So the doctor was refusing to give you an

15:39:40 23   excuse?

15:39:40 24   A.  No, he wasn't refusing.  He wanted me to go in

15:39:43 25   and pay $150 for Abraham to see the doctor, and then he

15:39:48  1    wanted $85 for the x-ray or whatever he needed to do

15:39:52  2    and all -- run the tests again.  Total, it was going to

15:39:56  3    be $400 to give an excuse.

15:39:58  4        Q.  So Dr. Vargas told you that he would provide

15:40:01  5    another PE excuse, but it was going to cost you $400?

15:40:04  6        A.  The nurse did.

15:40:07  7        Q.  So how did you get another excuse?

15:40:10  8        A.  When Abraham broke his elbow about -- I don't

15:40:16  9    remember how many weeks into that, then he gave us

15:40:19 10    another excuse.

15:40:22 11        Q.  Did you say anything to him at that time about

15:40:24 12    not giving you an excuse before?

15:40:27 13        A.  No.

15:40:33 14        Q.  So your testimony is the reason you didn't have

15:40:39 15    an excuse at the beginning of the school year is

15:40:39 16    because it was going to cost you $400?

15:40:42 17        A.  Yes, sir.

15:40:46 18        Q.  Did the excuse you got from Dr. Vargas after

15:40:49 19    the sixth grade incident say, "No PE ever"?

15:40:54 20        A.  No.  Again, it said, "No PE."

15:40:57 21        Q.  Okay.  Do you have a copy of it?

15:40:59 22        A.  No.

15:41:00 23        Q.  Have you ever asked Dr. Vargas for a copy of

15:41:03 24    it?

15:41:04 25        A.  They don't keep copies.

```
15:46:15  1      A.  Mr. Villarreal from the beginning was very
15:46:19  2   rude.  He would say stuff like, "Well, maybe you should
15:46:23  3   just take him to South Texas since he does have all
15:46:27  4   these problems," just -- every time I left
15:46:34  5   Mr. Villarreal's office, I was crying.
15:46:37  6      Q.  Were you ever rude to Mr. Villarreal?
15:46:39  7      A.  Yes, I was.
15:46:40  8      Q.  Did it at times get heated?
15:46:46  9      A.  Yes.
15:46:46 10      Q.  Both sides?
15:46:46 11      A.  Yes, but he's supposed to be the -- you know, I
15:46:49 12   would think he's supposed to be the professional.
15:46:51 13      Q.  So it's okay for you, but not him?
15:46:54 14      A.  Oh, no, but the thing was that he was
15:46:56 15   aggressive.
15:46:57 16      Q.  Okay.  So it was Mr. Villarreal you're talking
15:47:01 17   to in sixth grade?
15:47:02 18      A.  Yes.
15:47:02 19      Q.  Saying he's not supposed to be playing?
15:47:05 20      A.  Yes.
15:47:06 21      Q.  What did he tell you?
15:47:09 22      A.  That maybe I should just take Abraham out to
15:47:14 23   South Texas.
15:47:14 24      Q.  Did he tell you that they needed a doctor's
15:47:17 25   excuse?
```

15:47:17  1    A.  Yes.

15:47:17  2    Q.  Did you try to get one?

15:47:18  3    A.  Yes.

15:47:19  4    Q.  Same issue, tried to get one and Dr. Vargas

15:47:23  5    said, "You're going to have to come in and pay $400"?

15:47:28  6    A.  Yes.

15:47:28  7    Q.  At that time did you owe him money?

15:47:30  8    A.  Yes.

15:47:30  9    Q.  How much?  Do you know?

15:47:31 10    A.  About $1,000.

15:47:34 11    Q.  Did he ever say to you, "I'm not going to treat

15:47:37 12    your son anymore until you pay me"?

15:47:41 13    A.  No.

15:47:42 14    Q.  Did he ever insinuate that?

15:47:43 15    A.  Not the doctor, but the clerks.

15:47:46 16    Q.  The clerks insinuated that to you?  Or at least

15:47:49 17    that's the meaning you took from what they were saying?

15:47:49 18    A.  That we needed to pay something on the account.

15:47:53 19    At least bring it -- pay half to be able to --

15:47:55 20    Q.  So were you aware of any other place you could

15:47:59 21    have taken Abraham to get an excuse?

15:48:02 22    A.  No.

15:48:02 23    Q.  Any charity hospital anywhere?

15:48:04 24    A.  No.

15:48:05 25    Q.  Do you know any doctors that you could have

15:49:00 1      A.  He was the emergency room doctor.

15:49:00 2      Q.  So you just didn't --

15:49:00 3      A.  He was in and out.

15:49:02 4      Q.  Okay.  Did he ever ignore you when you tried to

15:49:06 5  tell him something?

15:49:07 6      A.  We weren't even there when he was there, when

15:49:10 7  the patient -- when he's going to look at the patient,

15:49:12 8  he asks us to step out.

15:49:15 9      Q.  So you never had a conversation with him about

15:49:16 10  the toe or anything else?

15:49:18 11      A.  No, we were just told that that was Dr. Keillor

15:49:21 12  and that he was seeing Abraham.

15:49:24 13      Q.  Okay.  How many times during the 19 -- or

15:49:32 14  during your son's sixth grade year did you try to get a

15:49:33 15  doctor's excuse from Dr. Vargas keeping your son

16:04:42  1      Q.  -- San Benito Consolidated?

16:04:44  2      A.  Yes.

16:04:45  3      Q.  How old was he before he came to San Benito

16:04:48  4   Consolidated Independent School District?

16:04:50  5      A.  Rangerville Elementary is part of the San

16:04:54  6   Benito School District.

16:04:54  7      Q.  And did this occur at Rangerville?

16:04:57  8      A.  Yes.

16:04:59  9      Q.  Or while he was in Rangerville?

         10      A.  Yes.

16:04:59 11      Q.  How old was he is my -- is where I'm trying to

16:05:02 12   get to.

16:05:04 13      A.  Like seven.

16:05:05 14      Q.  Okay.  So at age seven you said to him, "Be

16:05:08 15   careful"?

16:05:09 16      A.  Yes.

16:05:09 17      Q.  So even at age seven you were leaving some of

16:05:12 18   those decisions up to him?

16:05:15 19      A.  Yes.

16:05:17 20      Q.  And I assume what you were trying to do was to

16:05:21 21   help teach him what he could and couldn't do?

16:05:26 22      A.  Yes.

16:05:26 23      Q.  And he's going to have to spend his life making

16:05:28 24   these kind of choices, right?

16:05:31 25      A.  When they're his choices to be made.

16:05:33 1      Q.  Right.  He's going to have to make them.  And

16:05:35 2  sometimes he's going to make right choices and

16:05:38 3  sometimes he's going to make wrong ones?

16:05:41 4      A.  Right.

16:05:41 5      Q.  And what you were trying to help him do was to

16:05:44 6  be responsible in making those choices, right?

16:05:47 7      A.  Actually, this accident happened at Rangerville

16:05:50 8  the school too.

16:05:54 9      Q.  But after it was over, you said "Be careful"?

16:05:56 10     A.  Yes.

16:05:56 11     Q.  You didn't say, "Don't do this anymore"?

16:06:03 12     A.  No.

16:06:03 13     Q.  So even then you were leaving the choice to

16:06:03 14  him?

16:06:04 15     A.  It wasn't his choice.  They were playing in PE.

16:06:09 16     Q.  Is it your testimony as you sit here today that

16:06:11 17  he was made to get out and catch the football?

16:06:14 18     A.  He wasn't made.  He was told.

16:06:17 19     Q.  Who told you that?

16:06:20 20     A.  Everybody goes out to PE, and the coach will

16:06:23 21  tell them to play.

16:06:24 22     Q.  Who told you it was in PE?

16:06:26 23     A.  Abraham.

16:06:28 24     Q.  Did he tell you they were throwing a Nerf ball

16:06:32 25  in PE?

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
ADELA CANO, Individually    )(
and on Behalf of her        )(
minor son, ABRAHAM CANO,    )(
        Plaintiff           )(
                            )(
VS.                         )(   CIVIL ACTION NO. B-01-156
                            )(
SAN BENITO CONSOLIDATED     )(
INDEPENDENT SCHOOL          )(
DISTRICT, HERIBERTO         )(
VILLARREAL and PETER        )(
GUERRERO,                   )(
        Defendants          )(
```

---

ORAL DEPOSITION OF
ABRAHAM CANO
JULY 16, 2002



---

ORAL DEPOSITION OF ABRAHAM CANO, produced as a witness at the instance of the DEFENDANT SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, taken in the above styled and numbered cause on JULY 16, 2002, reported by CORINNA N. GARCIA, Certified Court Reporter No. 5210, in and for the State of Texas, at the Law Office of J. Arnold Aguilar, Artemis Square, Suite H-2, 1200 Central Boulevard, Brownsville, Texas, pursuant to the Federal Rules of Civil Procedure.

EXHIBIT
B

11:41:33 1      A.   I didn't hear him.

11:41:35 2      Q.   -- even before he kicked it?

11:41:36 3      A.   No.

11:41:37 4      Q.   Okay.   So the act of turning and going to get

11:41:39 5   the ball was a choice you made?

11:41:41 6      A.   Yes.

11:41:41 7      Q.   And you could have not made that choice?

11:41:43 8      A.   Yes.

11:41:43 9      Q.   Okay.   Did Coach Guerrero ever get angry with

11:41:54 10  you?

11:41:57 11     A.   Not that I can remember.

11:41:58 12     Q.   Okay.   Except for this incident, as a person do

11:42:03 13  you like him okay?

11:42:05 14     A.   Not really.

11:42:07 15     Q.   Did you not like him because you didn't like

11:42:10 16  him from the very first day?

11:42:12 17     A.   Yeah.

11:42:13 18     Q.   Okay.   Do you like any coaches?

11:42:14 19     A.   Yes.

11:42:14 20     Q.   Okay.   What was it about Coach Guerrero you

11:42:17 21  didn't like?

11:42:19 22     A.   Nothing in particular.

11:42:21 23     Q.   It wasn't because he was mean to you or treated

11:42:23 24  you badly.   You just didn't like him?

11:42:26 25     A.   Yes.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually  )(
and on Behalf of her minor)(
son, ABRAHAM CANO,        )(
        Plaintiff         )(
                          )(
VS.                       )(    CIVIL ACTION NO. B-01-156
                          )(
SAN BENITO CONSOLIDATED   )(
INDEPENDENT SCHOOL        )(
DISTRICT, HERIBERTO       )(
VILLARREAL and PETER      )(
GUERRERO,                 )(
        Defendants        )(

---

ORAL DEPOSITION OF
DONALD VARGAS, M.D., P.A.
SEPTEMBER 25, 2002

---

ORAL DEPOSITION OF DONALD VARGAS, M.D., P.A.,
produced as a witness at the instance of the DEFENDANTS
SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT AND
HERIBERTO VILLARREAL, taken in the above styled and
numbered cause on SEPTEMBER 25, 2002, reported by DONNA
McCOWN, Certified Court Reporter No. 6625, in and for
the State of Texas, at the offices of Valley Orthopedic
Clinic, 1901 Pease Street, Harlingen, Texas, pursuant
to the Federal Rules of Civil Procedure.



BRYANT & STINGLEY, INC.
McAllen          Harlingen         Brownsville
(956)618-2366   (956)428-0755    (956)542-1020

EXHIBIT
C

17:02:35 1    and one of the things that they would expect is that

17:02:38 2    their medical records and communications would be

17:02:41 3    treated as confidential.  Is that something that's

17:02:43 4    important to you?

17:02:44 5        A.  Yes.

17:02:54 6        Q.  Okay.  Based on your description of mild,

17:02:57 7    moderate, and severe, Abraham Cano certainly would not

17:03:01 8    have been severe, right?

17:03:01 9        A.  No, he wouldn't.

17:03:02 10       Q.  That's correct.  Okay.  And are you aware of

17:03:06 11   how many breaks he had by the time he had come to see

17:03:10 12   you?

17:03:11 13       A.  Maybe three.  I don't remember.

17:03:12 14       Q.  You don't know?

17:03:13 15       A.  No.

17:03:14 16       Q.  Were you able to determine moderate or mild as

17:03:17 17   far as Abraham Cano?

17:03:19 18       A.  I would say mild.

17:03:22 19       Q.  Okay.  Does that -- does mild or the

17:03:26 20   determination of mild osteogenesis imperfecta result in

17:03:33 21   different restrictions of activities than moderate

17:03:38 22   would?  Does that question make sense to you?

17:03:41 23       A.  The moderate usually are very handicapped.

17:03:46 24       Q.  Okay.

17:03:46 25       A.  So I wouldn't compare the moderate and mild.  I

17:03:51 1  would say the mild, if we can consider maybe ten

17:03:56 2  children that are mild, they all would have some

17:03:58 3  restrictions, you know.

17:04:01 4      Q.  Okay.  But based on the diagnostic criteria you

17:04:06 5  talked to me a while ago, the stature and the number of

17:04:09 6  breaks and those things, it's your opinion that Abraham

17:04:17 7  Cano had a mild form of osteogenesis imperfecta?

17:04:19 8      A.  Yes.  I would say mild.

17:04:23 9      Q.  Okay.  Let's look at your records.  I've got

17:04:25 10 here Exhibit 43.

17:04:27 11     A.  Mr. Byrom, could I just make a phone call to

17:04:29 12 the emergency room?

17:04:31 13     Q.  Absolutely you can.

17:04:31 14          (Brief recess)

17:06:18 15     Q.  Dr. Vargas, I want to talk to you about your

17:06:23 16 records.  You've got a file in front of you.  Is that

17:06:25 17 also what is contained in Exhibit 43?

17:06:27 18     A.  Yes.

17:06:28 19     Q.  Okay.  If you will open up that -- your file

17:06:31 20 there, and what I want to ask you first is, when is the

17:06:34 21 first time you saw Abraham Cano?

17:06:39 22     A.  It was in May of '97.

17:06:41 23     Q.  And that was a time when he injured his left

17:06:45 24 elbow, correct?

17:06:47 25     A.  Yes.

17:30:51 1          A.   The last time I saw this gentleman was on

17:30:54 2    November 23rd, 1998.

17:31:00 3          Q.   And that was after the surgery on his right

17:31:04 4    elbow?

17:31:04 5          A.   Correct.

17:31:07 6          Q.   Has anybody ever told you what Ms. Cano says

17:31:11 7    about why she didn't come back to see you?

17:31:14 8          A.   No, sir.

17:31:15 9          Q.   I will assert to you that one of the things she

17:31:18 10   said was that -- and I can find it from her deposition,

17:31:23 11   but she said that she owed you money.

17:31:26 12         A.   Okay.

17:31:26 13         Q.   Would you ever refuse to see a patient like

17:31:30 14   Abraham Cano because his mother owed you money?

17:31:33 15         A.   No.  I don't refuse them.

17:31:35 16         Q.   Would you have told your staff to tell Ms. Cano

17:31:41 17   that if she wanted you to see Abraham again she needed

17:31:45 18   to bring some money?

17:31:47 19         A.   I don't know what the staff would have said,

17:31:49 20   but it's customary for us to see a patient until we

17:31:55 21   finish the -- in other words, it isn't appropriate from

17:31:57 22   my point of view whether they have money or not.  I

17:32:00 23   need to see them until they're --

17:32:01 24         Q.   And that's what I assumed.  You're not going to

17:32:04 25   tell somebody, "I'm not going see you unless you bring

17:32:07  1    me money"?

17:32:08  2        A.  No, I've never done that.

17:32:10  3        Q.  That would just not be something you would do?

17:32:12  4        A.  No.

17:32:13  5        Q.  Okay.  I've asked you -- I think I asked you

17:32:25  6    this a second ago, but I want to make sure.  Of all the

17:32:27  7    documents you ever sent to the school district, did you

17:32:30  8    ever send them a document saying Abraham Cano should

17:32:33  9    not be in physical activity?

17:32:36 10        A.  I don't have any documents here.

17:32:38 11        Q.  If they're not in your file, you would assume

17:32:41 12    you would not have sent them anything, correct?

17:32:43 13        A.  Nothing in writing, no, sir.

17:32:44 14        Q.  Did you ever talk to any of them on the phone?

17:32:46 15        A.  I don't remember.

17:32:47 16        Q.  If you had talked to somebody from the school

17:32:49 17    district on the phone to tell them that Abraham Cano

17:32:54 18    should be exempt from PE, do you think you would have

17:32:55 19    noted that in your records?

17:32:59 20        A.  Well, if they ask me specific in writing, I

17:33:04 21    would have it in writing.  Phone calls, I don't -- I

17:33:07 22    don't usually dictate them, you know.

17:33:13 23            It isn't practice, and I don't have --

17:33:15 24    maybe I should do it, but I don't have the time to

17:33:20 25    record every little single conversation, so I don't

17:33:24 1    remember if I did or not.

17:33:25 2        Q.  Okay.  That's what I was going to say.  You

17:33:27 3    don't have any recollection one way or the other about

17:33:30 4    talking to the school district?

17:33:32 5        A.  Correct.

17:33:33 6        Q.  If the school district called you on the phone

17:33:35 7    and tried to ask you a question about a student's

17:33:38 8    medical condition, would you tell them?

17:33:41 9        A.  It depends on what they ask.

17:33:43 10       Q.  Okay.

17:33:44 11       A.  For example, if it is an athlete that is

17:33:46 12   playing football and the coach knows what they have, I

17:33:50 13   know what they have, and they say, "Can this student

17:33:54 14   play football," and I will tell them, you know.

17:33:57 15           So in other words, when we say

17:34:01 16   confidential, it's confidential as long as you're

17:34:04 17   protecting the patient's confidentiality, but if it is

17:34:09 18   to help or protect a student from any potential injury,

17:34:12 19   then, obviously, you do discuss that with the coach or

17:34:16 20   the teacher as long we all in conjunction work with the

17:34:25 21   idea of protecting the student.

17:34:27 22       Q.  How often do you get phone calls from a school

17:34:31 23   asking about the physical condition of one of the

17:34:33 24   students?

17:34:35 25       A.  Not very often.

17:41:50  1    Q.  Okay.  So because the treatment itself didn't

17:41:53  2    end in the fashion that you usually would do, you just

17:41:58  3    never got to that point of sending a secondary note?

17:42:02  4    A.  That would be most likely the reason.

17:42:07  5    Q.  But still if Ms. Cano had come to you and

17:42:09  6    specifically asked for one, you would have given some

17:42:12  7    kind of note to the school saying no physical -- no

17:42:16  8    contact sports?

17:42:18  9    A.  Yes, if she would have requested, yes.

17:42:39  10   Q.  Okay.  Do you have any contact with looking at

17:42:42  11   the financial records what a patient might owe you or

17:42:47  12   anything like that, or is that done by somebody else in

17:42:50  13   your office?

17:42:50  14   A.  Yeah.  Somebody else does it.

17:42:52  15   Q.  You don't deal with the money issues other than

17:42:54  16   you put down on the sheet what you've done, and the

17:42:57  17   billing department takes care of the rest?

17:42:59  18   A.  Correct.

17:43:00  19   Q.  So if somebody owed you money, you wouldn't

17:43:03  20   even necessarily know it?

17:43:04  21   A.  No.  Most of the time I do not.

17:43:09  22   Q.  Okay.  Your expertise and your gift is in the

17:43:12  23   medicine, right?

17:43:14  24   A.  Yes.

17:43:14  25   Q.  And so you don't concern yourself -- I mean

17:46:08 1          And this was before the soccer incident.

17:46:10 2  You understand that in a soccer incident he hurt

17:46:14 3  himself?

17:46:15 4      A.  Yes, I understand that.

17:46:16 5      Q.  The question I asked him was, "Had you ever

17:46:17 6  seen a doctor's note saying you should be exempt from

17:46:20 7  PE before the soccer incident?"

17:46:23 8          He said, "Yes."

17:46:24 9          I said, "Who signed it?"

17:46:25 10         He said, "Dr. Vargas."

17:46:28 11         Have you ever seen a document like that

17:46:30 12  with your signature on it?

17:46:31 13     A.  No, I haven't.

17:46:39 14     Q.  Did you ever tell Abraham Cano, if you recall,

17:46:45 15  that he should not ever be in PE again?

17:46:52 16     A.  Very likely that I did tell him based on the

17:46:57 17  type of illness.

17:46:59 18     Q.  Okay.  You were saying earlier that at least in

17:47:02 19  part it might depend on what would go on in PE.

17:47:07 20     A.  Yeah, right.  Exactly.  We mentioned that PE is

17:47:12 21  just a broad term for sometimes contact sport.

17:47:15 22     Q.  Right.  There may be things he's able to do --

17:47:18 23     A.  Yes.

17:47:19 24     Q.  -- without much danger, and there may be things

17:47:21 25  that he wouldn't be.

17:47:22 1      A.  Right.

17:47:22 2      Q.  And the way you delineated that, at least for

17:47:25 3  today's purposes, is contact sports?

17:47:28 4      A.  Right.

17:47:29 5      Q.  So some of the noncontact activities that might

17:47:32 6  go on in PE, Abraham Cano should be able to do?

17:47:37 7      A.  Yeah.  Obviously, I would have to see the list

17:47:39 8  of those, you know, but some things he could do.

17:47:43 9      Q.  Okay.  So I guess that's what I'm asking.

17:47:47 10 Based on that, would you have said to him the blanket

17:47:50 11 statement, "You should be exempt from PE forever"?

17:47:59 12     A.  I don't remember.  I'm just guessing that --

17:48:03 13 that I would be very conservative with -- especially

17:48:08 14 after '98, the second break.  So to answer your

17:48:15 15 question, I don't remember really.

17:48:16 16     Q.  Okay.  Would it be unusual for a young man 10-,

17:48:22 17 11-, 12-year range to have two breaks in 18 months?

17:48:29 18     A.  No, not necessarily.

17:48:30 19     Q.  That's not an unusually high number in and of

17:48:33 20 itself?

17:48:34 21     A.  No, not two breaks in 18 months.  You said 18

17:48:38 22 months?

17:48:38 23     Q.  Yes, sir.

17:48:39 24     A.  Okay.

17:48:40 25     Q.  Or 12 months even.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually      ) (
and on behalf of her minor    ) (
son, ABRAHAM CANO             ) (
        Plaintiff             ) (
                              ) (
VS.                           ) (  CIVIL ACTION NO. B-01-156
                              ) (
SAN BENITO CONSOLIDATED       ) (
INDEPENDENT SCHOOL            ) (
DISTRICT, HERIBERTO           ) (
VILLARREAL, AND PETER         ) (
GUERRERO                      ) (
        Defendants            ) (

---

ORAL AND VIDEOTAPED DEPOSITION OF
HERMAN J. KEILLOR, M.D.
AUGUST 27, 2003

---

ORAL AND VIDEOTAPED DEPOSITION OF HERMAN J.

KEILLOR, M.D., produced as a witness at the instance of

the DEFENDANTS, taken in the above styled and numbered

cause on AUGUST 27, 2003, reported by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at the Bone & Joint Clinic, P.A., 1801 North

Ed Carey, Suite A, Harlingen, Texas, pursuant to the

Federal Rules of Civil Procedure.



EXHIBIT

D

16:43:44 1    injury somewhere along the line.

16:43:47 2        Q.  Okay.

16:43:47 3        A.  I believe.  I don't know for certain, but I

16:43:49 4    just vaguely remember a toe injury sometime.

16:43:55 5        Q.  Okay.  You are an orthopedic surgeon; is that

16:43:58 6    correct?

16:43:59 7        A.  Yes.

16:44:00 8        Q.  How long have you been an orthopedic surgeon?

16:44:01 9        A.  Since 1994 officially.

16:44:04 10        Q.  Okay.

16:44:05 11        A.  I was an orthopedic surgeon while I was in

16:44:07 12    training.  They consider a resident doctor an

16:44:09 13    orthopedic surgeon, so it goes back to 1970.  And I was

16:44:12 14    fully -- completed my training in 1974.

16:44:18 15        Q.  All right.  Just to clarify for my -- my own

16:44:25 16    sake here, you said in '94 was when you were -- when

16:44:26 17    you became an orthopedic surgeon.  What did you do

16:44:28 18    during that interim period?

16:44:29 19        A.  Oh, excuse me.  I said '74.

16:44:31 20        Q.  '74.  I'm sorry.

16:44:33 21        A.  Took a long vacation there.

16:44:35 22        Q.  Yeah.  No kidding.  Okay.

16:44:36 23        A.  '74.

16:44:37 24        Q.  Okay.  I'm with you now.

16:44:39 25            During that time, do you have any estimate

16:44:43  1   as to how many patients you have seen that have

16:44:43  2   osteogenesis imperfecta?

16:44:48  3      A.  Yes.  It's a pretty rare phenomena.  I would

16:44:50  4   think that I have seen probably five to ten.

16:44:55  5      Q.  Okay.  Currently, do you have patients that

16:44:57  6   have osteogenesis?

16:44:59  7      A.  He's my only patient with osteogenesis

16:45:02  8   imperfecta.

16:45:05  9      Q.  All right.  Have you done any specific studies

16:45:15 10   on osteogenesis imperfecta yourself?

16:45:17 11      A.  No.

16:45:18 12      Q.  What training and experience -- well, let's

16:45:20 13   start with training.  What training do you have

16:45:22 14   regarding osteogenesis imperfecta?

16:45:26 15      A.  Basically, I started out as a pediatric

16:45:29 16   orthopedic surgeon, so this is the area that gets the

16:45:39 17   most training among all orthopedic surgeons.  I was in

16:45:39 18   a residency that was approximately 40 percent pediatric

16:45:39 19   orthopedic surgery, as was Dr. Vargas.  We were in the

16:45:42 20   same residency.

16:45:43 21      So basically, if you're going to be

16:45:45 22   trained in this disease, it's in a pediatric residency,

16:45:49 23   which is an orthopedic program directed towards

16:45:52 24   children, 40 percent-wise.

16:45:54 25      Q.  Okay.

16:50:25 1    A.  Some people don't have blue sclera.  He has

16:50:29 2    the -- our patient has a great deal of blue sclera.  So

16:50:32 3    does his mother, so --

16:50:33 4    Q.  Right.  I'm going to come to Abraham in a

16:50:34 5    minute, but I -- I'm just talking about in general

16:50:36 6    right now if we can do that.

16:50:39 7        Osteogenesis imperfecta, you've told me so

16:50:42 8    far that you determined severity of the four types that

16:50:47 9    you brought up by history, by anatomical findings.  Is

16:50:51 10   there any -- anything else that goes into that?

16:50:55 11   A.  No.  I think basically the -- you -- the

16:51:00 12   history would speak for itself.

16:51:02 13   Q.  Okay.

16:51:02 14   A.  And that's generally how we first get a patient

16:51:05 15   with having had many breaks or few breaks.

16:51:09 16   Q.  Okay.  Is it -- is it your understanding that

16:51:13 17   osteogenesis imperfecta affects different people in

16:51:16 18   different ways?

16:51:16 19   A.  Oh, yes, because of the degree of penetrance of

16:51:21 20   the genetic thing that makes up the disease.

16:51:22 21   Q.  And is -- is it also your understanding that

16:51:24 22   there's a wide range of abilities among osteogenesis

16:51:35 23   imperfecta sufferers?

16:51:35 24   A.  Yes, there is a very wide range.

16:51:35 25   Q.  Is there also a wide range of limitations

16:51:36 1    between different patients?

16:51:36 2        A.  Yes.

16:51:38 3        Q.  Okay.  You, as a physician, as an orthopedic

16:51:41 4    surgeon, would be able to determine what those

16:51:46 5    limitations or abilities in a given patient might be.

16:51:51 6        A.  By history.  If you never had a break, you

16:51:54 7    would tend not to limit them as much.

16:51:56 8        Q.  Okay.

16:51:57 9        A.  If they -- conversely, if they've had many

16:51:59 10   breaks, you'd limit them more.

16:52:01 11       Q.  Okay.  When you use the term "many," what do

16:52:03 12   you mean?

16:52:04 13       A.  Five, six, seven.

16:52:06 14       Q.  Okay.

16:52:06 15       A.  With severe being 30 to 40.

16:52:06 16       Q.  Sure.

16:52:09 17       A.  You'd limit that patient tremendously.

16:52:12 18       Q.  All right.  Let's talk then about Abraham Cano

16:52:26 19   now specifically.  Let -- let me ask you this:  Have

16:52:28 20   you ever treated his mother?

16:52:30 21       A.  Not that I know of.

16:52:31 22       Q.  Okay.

16:52:31 23       A.  She looks familiar to me, but I don't remember

16:52:34 24   treating her.

16:52:34 25       Q.  And you are aware that she has osteogenesis

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

17:02:00 1    do things.  So I want him to be able to swim, and we

17:02:03 2    went into even a little bit of weightlifting.

17:02:05 3        Q.  Okay.  I noted in the records before you had

17:02:08 4    said he could do some weightlifting.

17:02:09 5        A.  He wants to do that.  He's doing it, and he's

17:02:11 6    getting strong.

17:02:12 7        Q.  And --

17:02:17 8        A.  A 15-year-old needs it at this time of his

17:02:21 9    life.

17:02:21 10       Q.  Sure.  But what you're describing is -- what

17:02:23 11   you're trying to help him -- you're trying to help him

17:02:27 12   with his osteogenesis imperfecta issues.

17:02:29 13       A.  No.  I'm trying to help him be a 15-year-old

17:02:32 14   boy.

17:02:33 15       Q.  Okay.

17:02:33 16       A.  And the osteogenesis imperfecta doesn't allow

17:02:35 17   him to be a wild 15-year-old boy like I'm sure you were

17:02:40 18   and I was.

17:02:40 19       Q.  Okay.

17:02:40 20       A.  So he's got -- he's got to slow down somewhat.

17:02:43 21       Q.  All right.  He would have had to do that

17:02:47 22   whether he had been injured at the school or not; isn't

17:02:48 23   that right?

17:02:49 24       A.  Yes.

17:02:50 25       Q.  Okay.  His -- his condition would have caused

17:22:10 1    didn't turn out.

17:22:12 2        Q.  All right.  This is one of the good news

17:22:13 3    stories.

17:22:14 4        A.  That's the good news, yes.

17:22:16 5        Q.  All right.  Will he be able to ride a bike?

17:22:21 6        A.  Yes.

17:22:22 7        Q.  Okay.

17:22:23 8        A.  A stationary bicycle.  I told him that today.

17:22:26 9    Stationary bicycle.

17:22:27 10       Q.  What would be the problem with one -- an

17:22:29 11   unstationary?  He might fall off?

17:22:29 12       A.  Yes.

17:22:30 13       Q.  Okay.  But it's not the riding itself.  It's

17:22:32 14   what would happen if, in fact, he fell over?

17:22:34 15       A.  Yeah.  That's right.  You want to stay away

17:22:36 16   from possibles.  But -- for exercise, a stationary bike

17:22:39 17   is going to be wonderful.

17:22:56 18       Q.  Okay.  Your records do indicate at various

17:22:59 19   times that appointments were -- were missed by Abraham

17:23:03 20   Cano.  Are you aware of that?

17:23:05 21       A.  Yes, I was aware that this last important one

17:23:07 22   that he didn't -- he missed several appointments to

17:23:11 23   find out how he was doing.  So I told him as of two

17:23:14 24   days ago to get in right away so we would know whether

17:23:16 25   he was developing severe arthritis or not so I'd be

17:30:27 1     Q.  Okay.

17:30:28 2     A.  Sometimes we will forget to tell them no PE or

17:30:30 3  rough activity, especially when the cast is on and they

17:30:32 4  just had an operation.

17:30:33 5     Q.  Okay.  Are you -- yeah.  I mean, I understand.

17:30:36 6     A.  That's why I talk about the prudent man.

17:30:37 7     Q.  Let's talk about today.

17:30:38 8     A.  Okay.

17:30:39 9     Q.  Are there certain -- do you know what specific

17:30:44 10  activities occur in the physical education class at San

17:30:48 11  Benito Independent School District?

17:30:49 12     A.  It's variable depending upon what the coaches

17:30:51 13  want to do.

17:30:53 14     Q.  Okay.  Would -- would there be some things that

17:30:55 15  could be done in a physical education class that

17:30:57 16  Abraham Cano could do and some that he could not?

17:31:00 17     A.  Sure.

17:31:01 18     Q.  You certainly wouldn't want him to be in a

17:31:03 19  contact football, basketball type thing, right?

17:31:07 20     A.  That's right.

17:31:12 21     Q.  Okay.  Have you exempted him from all PE?

17:31:14 22     A.  No.

17:31:15 23     Q.  Okay.

17:31:16 24     A.  Today I said -- you read my mind.

17:31:18 25     Q.  Good.  Okay.

17:31:19 1    A.  No contact sports or rough activity.  That's --

17:31:22 2  you know, when you say, "Can he do this?  Can he do

17:31:25 3  that?"  There's 1,000 questions.  He's got to be taught

17:31:29 4  no inertial activities, no contact, no high risk, no

17:31:34 5  ice skating, roller skating.

17:31:36 6    Q.  So even before this incident occurred, there

17:31:40 7  would have been some things in the physical education

17:31:42 8  he could do and some he could not.

17:31:46 9    A.  Yes.

17:31:46 10    Q.  Okay.  And in this note that you're providing

17:31:48 11  now that you said you provided today, you're indicating

17:31:51 12  sort of a dividing line between what he can do and what

17:31:54 13  he can't do.

17:31:55 14    A.  I -- I went -- took time with him.

17:31:59 15    Q.  Okay.

17:32:00 16    A.  For many reasons.  The last visit in two years

17:32:02 17  and I thought he needed a little -- I didn't want him

17:32:06 18  to think he was a wreck.

17:32:07 19    Q.  Sure.  But what I'm saying is, you -- you have,

17:32:09 20  as a physician, painted sort of a line between what he

17:32:15 21  can do and he cannot do when you said no contact

17:32:18 22  sports.

17:32:19 23    A.  Yeah.

17:32:20 24    Q.  Is that how -- is that the best way you can

17:32:21 25  think of to delineate what he's able to do and what

17:34:24 1    that's what caused his ankle to break?

17:34:29 2        A.   I just had here "while running."

17:34:32 3        Q.   Okay.

17:34:32 4        A.   "He fell while running today injuring his right

17:34:36 5    knee and left ankle."

17:34:36 6        Q.   Okay.

17:34:37 7        A.   He fell while running.

17:34:38 8        Q.   Can he run today?

17:34:41 9        A.   As long as he doesn't fall.  I would recommend

17:34:43 10   he jog -- not even jog.  Walk.

17:34:47 11       Q.   Okay.  Your recommendation would be that he

17:34:49 12   would walk.  I guess my question to you -- and it may

17:34:51 13   be the same answer, so that's fine.  But my question to

17:34:53 14   you is, based on his current physical condition, could

17:34:56 15   he run?

17:34:58 16                MR. AGUILAR:  Objection, specificity.

17:35:00 17                THE WITNESS:  He's able to run.  It's just

17:35:01 18   not wise to run if you're going to fall.  So if he's

17:35:03 19   going to run, jog on a treadmill.

17:35:05 20       Q.   Let me -- and let ask it this way.

17:35:07 21       A.   It's highly controlled.  If he's going to jog a

17:35:09 22   little bit, use a treadmill mill and a -- don't take

17:35:12 23   everything away from the young man, but he can't run

17:35:14 24   out on a field.  He shouldn't.

17:35:15 25       Q.   Let me clarify it this way, and I think I

1

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
                   BROWNSVILLE DIVISION

ADELA CANO, Individually  )(
and on Behalf of her minor)(
son, ABRAHAM CANO,        )(
        Plaintiff         )(
                          )(
                          )(
VS.                       )(     CIVIL ACTION NO. B-01-156
                          )(
SAN BENITO CONSOLIDATED   )(
INDEPENDENT SCHOOL        )(
DISTRICT, HERIBERTO       )(
VILLARREAL and PETER      )(
GUERRERO,                 )(
        Defendants        )(
```

---

                    ORAL DEPOSITION OF
                   HERIBERTO VILLARREAL
                      MAY 14, 2002           
                       VOLUME 1

---

        ORAL DEPOSITION OF HERIBERTO VILLARREAL,

produced as a witness at the instance of the PLAINTIFF,

taken in the above styled and numbered cause on MAY 14,

2002, reported by DONNA McCOWN, Certified Court

Reporter No. 6625, in and for the State of Texas, at

the San Benito Consolidated Independent School District

Administrative Building, 240 North Crockett Street, San

Benito, Texas, pursuant to the Texas Rules of Civil

Procedure.

                    BRYANT & STINGLEY, INC.
       McAllen            Harlingen           Brownsville
   (956)618-2366       (956)428-0755       (956)542-1020

EXHIBIT
E

16:41:35 1   to me was that they would not release anything or they

16:41:38 2   didn't have anything.  I'm not sure.

16:41:40 3       Q.  She wasn't getting cooperation from the doctor?

16:41:42 4       A.  She wasn't getting cooperation from the doctor.

16:41:45 5       Q.  At the very least, though, at that point,

16:41:48 6   everyone understood that Abraham should not be

16:41:51 7   participating in physical education.

16:41:52 8           MR. BYROM:  Objection, form.

16:41:53 9           THE WITNESS:  That wasn't indicated.

16:41:55 10  Ms. Cano never told me, "I do not want my son in P.E."

16:42:02 11      Q.  What did she tell you?

16:42:04 12      A.  She said -- she told me that he does have this,

16:42:07 13  you know, and that he needs to be very careful.  And I

16:42:09 14  told her I would modify the physical education class

16:42:13 15  for him, and I did tell her, "Now, if you do want him

16:42:19 16  out of P.E., get me the form."

16:42:23 17          And she made -- I think she attempted to

16:42:26 18  get the form.  She did say that, you know, so long as

16:42:32 19  he's in P.E., so long as it's light exercises, you

16:42:36 20  know, little activity, he can stay there.

16:42:39 21      Q.  Actually, wasn't it, "Look, as long as he's

16:42:43 22  only doing like taking out bases and balls" --

16:42:45 23      A.  Minimal activities.

16:42:47 24          MR. BYROM:  Let him finish his question,

16:42:50 25  and then you can answer.  That way you're not talking

16:42:51 1   at the same time.

16:42:52 2       Q.  Didn't she say, "As long as he's only going to

16:42:54 3   be taking out the bases and balls not doing anything,

16:42:56 4   that would be okay," something like that?

16:43:00 5       A.  I don't recall those exact words.  The exact

16:43:04 6   words that I recall is minimal activity, you know, very

16:43:08 7   little activity, physical activity, I should say.

16:43:16 8       Q.  You said she had tried to get the excuse from

16:43:20 9   the doctor?

16:43:20 10      A.  She told me she would get it.

16:43:27 11      Q.  So you understood from her that she was going

16:43:30 12  to try to get it?

16:43:43 13      A.  That the attempt would be made, yes.

16:43:43 14      Q.  And the reason for getting that was so that he

16:43:43 15  does not participate in P.E.  That's what the purpose

16:43:43 16  of the excuse would be.

16:43:43 17              MR. BYROM:  Objection, form.

16:43:43 18              MR. MOORE:  Objection, form.

16:43:43 19              THE WITNESS:  Possibly.  In sixth grade.

16:43:45 20  All of this was in sixth grade.

16:44:08 21      Q.  Okay.  May 22 of '97, the nurse's notes

16:44:11 22  indicate, "A form is given to Ms. Cano, and the

16:44:16 23  principal who is working with the special ed department

16:44:19 24  for homebound services."  Is that we were just talking

16:44:24 25  about, getting the form to her so he doesn't

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ADELA CANO, individually and on behalf of her minor son, ABRAHAM CANO | § § § § | |
| VS. | § § | CIVIL ACTION NO. B-01-156 (JURY REQUESTED) |
| SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT HERIBERTO VILLARREAL, AND PETER GUERRERO | § § § § § | |

## AFFIDAVIT OF HERIBERTO VILLARREAL

STATE OF TEXAS          §
                        §
COUNTY OF CAMERON       §

BEFORE ME, the undersigned authority, on this day personally appeared Heriberto E. Villarreal, and who being by me duly sworn on oath stated:

"My name is Heriberto Villarreal. I am over the age of eighteen and have never been convicted of any felony or crime of moral turpitude. I have been employed by the San Benito Consolidated Independent School District from 1996 to the present, including times relevant to this lawsuit. I was the Principal of Berta Cabaza Middle School from 1996 to 2001, including the time when Abraham Cano was a student there. I am currently employed with the district as the Associate Advisor for Federal Programs. My duties also currently include Principal of the 9th Grade Academy. I have personal knowledge of the facts stated in this affidavit, and they are true and correct.

I have reviewed the allegations contained in Plaintiff's First Amended Complaint filed in this cause, and am generally familiar with the facts of the case.

I have no training or expertise in medical issues, and certainly no expertise in Osteogenesis Imperfecta. I would have to rely on a physician to determine the capabilities and limitations of a person with this disease.

-1-

EXHIBIT

F

Abraham Cano enrolled in Berta Cabaza Middle School for the 2000-2001 school year. He had been a student in the San Benito Consolidated Independent School District in previous years. During this time, Adela Cano had informed the District that her son suffered from Osteogenesis Imperfecta, and should be excused from participation in Physical Education classes.

In the fall semester of 2000, it was my understanding that in order for a student to be exempt from Physical Education requirements of state law, the parent and/or the student was required to provide a note from a physician indicating that the student should not participate in Physical Education classes. In an effort to fulfill this requirement, at the beginning of the 2000-2001 school year I asked Mrs. Adela Cano to obtain such a note from her son's treating physician. It was my understanding at that time that Mrs. Kennedy, the school nurse, also requested that Mrs. Cano obtain such a note. Despite numerous requests, Mrs. Cano did not provide such a note to myself or anyone else in the District for that school year. Therefore, Abraham Cano was not exempt from Physical Education classes for the school year 2000-2001.

No action or inaction on my part was deliberately indifferent toward Abraham Cano or his rights. In requesting that Mrs. Cano obtain a note from her son's treating physician, I was attempting to follow the law as I understood it, while attempting to help Mrs. Cano and Abraham Cano. If Mrs. Cano had provided such a note from her son's physician, indicating that he should be excused from Physical Education classes for the 2000-2001 school year, the San Benito Consolidated Independent School District would have complied with the physician's directive.

I am not a policy maker for the San Benito Consolidated Independent School District. As I understand it, school policy is made by the Board of Trustees and carried out by the Superintendent. I do not have the authority to make policy for the District.

FURTHER AFFIANT SAYETH NOT.

_____
Heriberto E. Villarreal

SWORN TO AND SUBSCRIBED before me by Heriberto E. Villarreal, on this 18th day of September, 2003.

_____
Notary Public, State of Texas
Printed Name:

My Commission Expires: _____12-19-2005_____

-2-


MARIA Y. SALAZAR
Notary Public, State of Texas
My Commission Expires
12-19-2005