# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

OCT 1 0 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ADELA CANO, Individually and on | § | |
| Behalf of her minor son, ABRAHAM CANO, | § | |
| Plaintiff | § | |
| | § | **CIVIL ACTION NO.** |
| VS. | § | |
| | § | **B - 01 - 156** |
| SAN BENITO CONSOLIDATED | § | |
| INDEPENDENT SCHOOL DISTRICT, | § | |
| HERIBERTO VILLARREAL and | § | |
| PETER GUERRERO, | § | |
| Defendants | § | |

---

## PLAINTIFF'S RESPONSE TO DEFENDANT GUERRERO'S
## RENEWED MOTION TO DISMISS

---

TO THE HONORABLE U.S. DISTRICT COURT:

COMES NOW **ADELA CANO**, *Individually and on behalf on her minor son*, **ABRAHAM CANO**, and files this her Response to Defendant Peter Guerrero's Renewed Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), and for such response would respectfully show unto the Court the following:

## I.

## SUMMARY OF RESPONSE

The minor Plaintiff, Abraham Cano, has a condition known as *osteogenesis imperfecta*, a congenital bone disease that causes the bones to become brittle. Plaintiffs' claims arose as a result of Abraham's being compelled to participate in a school sponsored physical education soccer game on November 27, 2000, the day before his 14th birthday. Although state rules would have allowed

Abraham to meet his state required physical education requirement by writing a term paper or some other form of non-physical interaction, Defendant Guerrero did not give Abraham that option on the day he was injured. Although Defendant Guerrero was already aware of Abraham's "brittle bone" or *osteogenesis imperfecta* condition, he took no action to protect him, and instead actually compelled him to participate in a physical contact sport (soccer) that led to his injuries.

Compelling Abraham to participate in this soccer game was a violation of his Fourteenth Amendment rights to substantive and procedural due process, as well as to his rights to life, liberty, health, safety and bodily integrity, protected through 42 U.S.C. §1983, because as a 13-14 year-old child, Abraham did not have the capacity to adequately evaluate his ability to participate, and when he was told by Coach Guerrero to participate in that soccer game, he did not believe he could question Coach Guerrero's authority or instruction.

The only claims filed against Defendant Guerrero were for violation of Plaintiff's rights to life, liberty, health, safety, bodily integrity and to a safe environment in a mandatory school setting, protected by the Fourteenth Amendment to the U.S. Constitution, pursuant to 42 U.S.C. §1983 and for common law negligence. Plaintiff will show that Defendant Guerrero is not immune from such claims under federal or state law, because he was aware of Abraham's condition, he was deliberately indifferent to Abraham's welfare, and the law was clearly established at the time that school children such as Abraham had a liberty interest in their bodily integrity protected by the due process clause of the Fourteenth Amendment.

## II.

## FACTUAL BACKGROUND

As early as January 10, 1997, Abraham's condition of *osteogenesis imperfecta*, a debilitating bone disease that causes his bones to become brittle, was made known to school officials, as

reflected in nurse Cornejo's notes on the back of Abraham's School Health Record. **Exhibit-10,** School Health Record. (For simplicity and ease of reference, the parties agreed during depositions to consecutively number all exhibits. As a result, some exhibits may appear to be "missing" in the index of exhibits attached hereto. When the various witnesses discussed the same numbered exhibit, therefore, they were all discussing the same document.) Other documents in Abraham's school file similarly made reference to his having the condition, and specifically describing it as "brittle bone" disease. **Exhibits-2,** Reference Form; **3,** Health Record; **15,** Nurse Referral; and **21,** Individual Education Program (IEP) Meeting form.

Principal Villarreal acknowledged that these records were in Abraham's file, and that they were accessible to any teacher or coach who would have requested to look at those records. **Exhibit-A,** Deposition of Heriberto Villarreal of 5/14/02 (hereinafter Villarreal Depo I, p.18, l.1- p.19, l.23; p.71, l.19 – p.72, l.12. **Exhibit-B,** Deposition of Heriberto Villarreal of 5/15/02 (hereinafter Villarreal Depo II), p.116, l.15 – p.117, l.24. He also agreed that *osteogenesis imperfecta* refers to somebody who is fragile. **Exhibit-A,** Villarreal Depo I, p.94, ll.1-16. In spite of this, Defendant Villarreal never provided Coach Guerrero with information on how to handle "medically fragile" students. **Exhibit-B,** Villarreal Depo II, p.116, l.15 – p.117, l.24.

In spite of Defendant Villarreal's failure to provide instruction to Defendant Guerrero, he was already somewhat familiar with Abraham's condition of *osteogenesis imperfecta*. **Exhibit-C,** Deposition of Pedro Gabriel Guerrero (hereinafter Guerrero Depo), p.44, ll.4-20. Because of his familiarity with the condition, Coach Guerrero himself went to discuss with the nurse whether Abraham should be participating in physical education activities. Coach Guerrero believed, however, that without a document from a doctor excluding him from participation in P.E. class, Abraham was required to continue participating. **Id.,** p.45, l.1 – p.47, l.9. He understood the nurse

could have excused Abraham, and that she should have written a letter or contacted the doctor to get such an excuse, but that was never done. **Id.,** p.36, l.8 – p.37, l.5. He agreed, however, that anyone with brittle bones did not belong in P.E. because he would be putting himself at risk. **Id.,** p.39, ll.9-21. Although Coach Guerrero could have simply sent Abraham to the library to do research for his P.E. grade, he chose instead not to do so. **Id.,** p.109, ll.11-24. His explanation for doing so was because Principal Villarreal and the District's policy was to simply let Abraham participate in physical activities, to the extent he, a 13-14 year-old child, felt "comfortable" doing so. **Id.,** p.109, l.25 – p.111, l.4.

Defendant Guerrero testified that he did not have any idea to what extent a 13 year-old was mature enough to determine what activities are safe enough for him to participate in. *Id.*, p.50, ll.6-15. His personal judgment seems questionable, since he had no concerns with a 13 year-old boy's maturity to determine whether it was safe to play with knives, although he would be concerned if the 13 year-old was playing with a handgun, acknowledging the child could get hurt with the handgun. **Id.,** p.50, l.6 – p.53, l.13. Like a loaded handgun, or even just a sharp knife, 13 year-old Abraham was left to determine for himself whether he might get hurt playing soccer.

Principal Villarreal agreed that "the District has a duty to protect the children from themselves in areas where they can be a danger to themselves or to others." **Exhibit-B,** Villarreal Depo II, p.165, ll.6-11. He also agreed that Mrs. Cano did everything she could to notify him and the school of Abraham's sensitive condition. **Id.,** p.151, l.9 – p.152, l.1. Although Coach Guerrero believes Abraham did not belong in P.E., he instead relied on Principal Villarreal's telling him to do whatever the nurse told him to do, and because the nurse never gave him instructions to restrict Abraham's P.E. participation, he believes he was merely "following orders" when he instructed Abraham to join the soccer game. **Exhibit-C,** Guerrero Depo, p.39, ll.9-21; p.53, l.21 – p.56, l.2.

Principal Villarreal also blames Nurse Cornejo for not following up and getting the doctor's excuse. **Exhibit-A,** Villarreal Depo I, p.49, l.9 – p.50, l.15. Nurse Cornejo agreed that either the nurse or a parent could contact a child's doctor to get an exemption from participation in P.E. activities, and in the meantime the child could be excluded from participating in contact sports. **Exhibit-D,** Deposition of Ofelia Cornejo (hereinafter Cornejo Depo), p.71, l.5 – p.75, l.16. Under other circumstances, Nurse Cornejo's principal had previously had her contact Abraham's doctor to turn over certain medical information. **Id.,** p.32, l.2 – p. 34, l.14. Under these circumstances, however, she blames the principal for not taking action to get a list of limitations or even just a note from the doctor excluding Abraham from P.E. activities. **Id.,** p.73, l.7 – p.75, l.16. Had anybody from the District ever actually contacted Dr. Vargas, he would have answered unequivocally that a patient with *osteogenesis imperfecta* should not be participating in any contact sports, including soccer. **Exhibit-E,** Deposition of Donald Vargas, M.D. (hereinafter Vargas Depo) p.71, ll.5-19.

Although Defendant argues that Abraham is primarily at fault for his own injuries because he "voluntary participated" in this soccer game, and no one else at the school knew more of his limitations and abilities than Abraham himself, Abraham explained that every time he told Coach Guerrero he did not feel comfortable participating in Physical Education that day, the coach would make him run laps, which would affect his asthma. **Exhibit-F,** Deposition of Abraham Cano (hereinafter Abraham Cano Depo), p.75, l.9 – p.76, l.9. Abraham, a 13 year-old boy, therefore had to decide between risking an injury to one of his bones and risking an asthma attack. Abraham had to make this risk assessment each time before suiting up for P.E. during the Fall of 2000, when Coach Guerrero would put him in to play football or soccer. **Id.,** p.72, l.4 – p.81, l.22. His mother, on the other hand, was not aware that he was actually participating in physical education activities, and

would complain each time she found out he was participating. **Exhibit-G**, Deposition of Adela Cano (hereinafter Adela Cano Depo), p.70, l.15 – p.73, l.23.

Perhaps because of his tender age, or because of Coach Guerrero's position of authority, Abraham did not feel he could question Coach Guerrero's authority. **Id.,** p.86, ll.2-9. Unfortunately, Abraham's luck ran out on November 27th, when Coach Guerrero put him in to play soccer, even though he had not suited up to play that day. When Coach Guerrero kicked the ball past Abraham, he turned around and began to go after the ball, but he immediately fell to the ground from his injury. **Id.,** p.106, l.2 – p.107, l.8; p.108, l.16 – p.113, l.9 There does not appear to be any dispute that Abraham's injury was severe and caused him excruciating pain. As Coach Guerrero explained, Abraham's foot looked as though it was turned around almost 180°, he was grabbing some part of his body and he looked like he was in excruciating pain. **Exhibit-C,** Guerrero Depo, p.87, l.7 – p.90, l.5.

## III.

## ARGUMENT AND AUTHORITIES

### A.    Motion to Dismiss Standard

"[T]he accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ***Conley v. Gibson***, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In reviewing a motion to dismiss, all "well pleaded facts must be accepted as true and viewed in the light most favorable to the non-movant.**" *Campbell v. City of San Antonio,*** 43 F.3d 973, 975 (5th Cir. 1995). "[T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he basis his claim. To the contrary, all the Rules require is `a short a plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993), *quoting Conley v. Gibson*, 355 U.S. at 47, 78 S.Ct. at 103.

> When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of pleadings that a recovery is very remote and unlikely but that is not the test. Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.

*Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). "In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

## B.    Qualified Immunity

Defendant Guerrero asserts his entitlement qualified immunity for his federal law claims. The first step in resolving that issue is to determine whether Plaintiff has alleged "the violation of a clearly established constitutional right." *Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). The second step would be to determine whether the Defendant's conduct alleged by the Plaintiff was objectively reasonable based on the law at the time. *See Nerren v. Livingston Police Dept.*, 86 F.3d 469, 474 (5th Cir. 1996); *Gunaca v. State of Texas*, 65 F.3d 467, 474 (5th Cir. 1995).

There should be no question that Plaintiff has alleged the violation of a clearly established constitutional right. Since at least as early as 1994, the Fifth Circuit has made clear

that "school children have a liberty interest in their bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment." *Doe v. Taylor Indep. School Dist.,* 15 F.3d 443, 450 (5th Cir. 1994)(en banc). Similarly, under no circumstances could Defendant's actions in deliberately or consciously disregarding the risk to Abraham be considered reasonable in light of the law as it had been established at the time. "The *Taylor* notice requirement does not require the alleged harm to have actually occurred previously; instead, under *Taylor,* it is enough for Plaintiffs to have alleged with sufficient detail that Defendants were on notice that such harm reasonable *could* occur and that they acted with callous indifference in failing to prevent it." *Roventini v. Pasadena Indep. Sch. Dist.,* 981 F. Supp. 1013, 1019-20 (S.D. Tex. 1997), vacated on other grounds, 183 F.R.D. (S.D. Tex. 1998).

## C.    Fourteenth Amendment Violations

Plaintiffs have alleged violations of Abraham's constitutional due process rights to life, liberty, health, safety and bodily integrity and to a safe environment in a mandatory school setting, protected by the Fourteenth Amendment to the U.S. Constitution. Specifically, Plaintiff has alleged that Defendant Guerrero was deliberately indifferent to Plaintiff's clearly established constitutional rights, of which a reasonable person would have known.

Defendant Guerrero is liable for the injuries to Plaintiff because of his failure to protect Abraham from injury, after having been specifically notified and informed of his delicate condition, particularly through his mother's instructions and requests that he not participate in physical education, all of which "manifested a deliberate indifference to the welfare of [Abraham]." *Id.* at 454, *quoting Gonzalez v. Ysleta Indep. School Dist.,* 996 F.2d 745, 760 (5th Cir. 1993). As this District has previously held, "the Constitution protects a school child from deprivation of his bodily integrity...caused by the callous indifference of public school officials," and "'if the Constitution

protects a student from physical abuse by teachers, it must also protect [a student] from being "run to death'" by his coaches in an overly strenuous football practice in which he was denied water, rest, and medical attention." *Roventini v. Pasadena Indep. School Dist.*, 981 F.Supp. 1013, 1019 (S.D.Tex. 1997), vacated on other grounds, 183 F.R.D. 500 (S.D. Tex. 1998). By assigning and requiring Abraham to participate in physical education activities after he was aware of Abraham's condition, Defendant Guerrero directly deprived Plaintiff of his right to bodily integrity, as well as his right to substantive and procedural due process and to liberty, protected by the Fourteenth Amendment's Due Process and Equal Protection Clauses.

Abraham has testified that he felt he could not question Coach Guerrero's authority when he was instructed to participate in sports. **Exhibit F**, Abraham Cano Depo, p.86, ll.2-9. Each time Coach Guerrero instructed him to participate in Physical Education activities, Abraham had the choice of risking a break to one of his bones or an asthma attack, a Hobson's choice at best. **Id.**, p.74, l.16 – p.76, l.9. Defendant Guerrero was aware, after having been provided considerable notice that Abraham had a medical condition that rendered his bones brittle and subject to easy break, yet when it came time for taking responsibility to prevent injury to him, he simply "passed the buck" to Defendant Villarreal or the school nurse. **Exhibit-C**, Guerrero Depo, p.36, l.8 – p.37, l.5; p.54, l.1 – p.56, l.2; p.108, l.22 – p.111, l.4.

Defendant Guerrero could have sent Abraham to the school nurse to call the doctor for an excuse or to write a letter, in order to keep him out of P.E. physical activities, but he never did so. **Exhibit-C**, Guerrero Depo, p.36, l.8 – p.37, l.5. Mrs. Cano explained that she believed she could not get a doctor's excuse because she owed the doctor money. **Exhibit-G**, Adela Cano Depo, p.73, l.24 – p.75, l.13. As a result, Defendant Guerrero simply left the decision of whether to participate in activities that were dangerous because of Abraham's condition to this 13 year-old child. **Exhibit-C**,

Guerrero Depo, p.47, l.24 – p.48, l.13; p.80, ll.1-23; p.110, ll.10-17.  Such conduct epitomizes Defendant's deliberate indifference to Abraham's constitutional rights to his life, his health, his safety, and his bodily integrity, for which Defendant Guerrero is liable.  Defendant Guerrero was aware of Abraham's delicate condition and could have submitted a simple instruction directing Abraham to the library where he could be protected, instead of to the sports field where he risked significant injury, yet he consciously chose not to do so, reflecting his deliberate indifference to Abraham's welfare.

Defendant Guerrero acknowledged that he was aware of Abraham's condition, and that it meant he had brittle bones, which would affect his participation in a regular P.E. class. **Exhibit-C,** Guerrero Depo, p.44, ll.4-20; p.46, ll.6-20.  He also agreed that Abraham should not have been participating in physical education activities.  **Id.,** p.39, ll.9-23; p.85, l.24 – p.86, l.39.  Having personal knowledge of Abraham's delicate medical condition, Defendant Guerrero was deliberately indifferent to Abraham's constitutional rights to bodily integrity by failing to take any action whatsoever to protect Abraham from injury.  He could have chosen to ask the school nurse to call or get an excuse from Abraham's doctor, or even simply sent Abraham to the library for his P.E. grade, or he could have taken various other actions that would have prevented Abraham from being hurt.  Just as he did not have an option to provide a loaded handgun to school children, asking Abraham to participate in physical activities was also not an option to Defendant Guerrero.  In spite of Mrs. Cano's numerous requests, Defendant Guerrero took no action to protect Abraham and instead put him in to play what was for him a dangerous sport.  Such actions constitute the deliberate indifference necessary to establish liability against him.



## D.    State Law Claim

Plaintiff has alleged a cause of action against Defendant Guerrero for negligence. Defendant attempts to invoke the protections of Texas Education Code §22.051(a), but that section only provides protection for actions that "involve the exercise of judgment or discretion on the part of the employee...." Once Defendant Guerrero was put on notice of Abraham's delicate medical condition, he did not have discretion to allow Abraham to participate in rough, contact sports in which Abraham could, and eventually did, get injured. At the very least, those actions constituted negligence, for which Defendant Guerrero is liable.

Because Defendants do not appear to be alleging that their actions were some form of discipline, Defendant's remaining contentions appear to be without merit. Interestingly, Defendant's reference to Texas Education Code §7.057 would appear to be misplaced, since that section apparently does not apply to student disciplinary actions anyway. TEX.EDUC.CODE §7.057(e)(2).

## E.    Response to Guerrero's Misleading Interpretations

Intentionally or otherwise, Defendant Guerrero attempts to characterize Plaintiff's allegations as something other than that which they are, in an attempt to build up a straw man that he could thereafter easily knock down. Defendant's characterizations do not accurately reflect Plaintiff's pleadings, however, and those arguments could therefore be disregarded.

### 1.    Punishment

Defendant attempts to characterize Plaintiff's claims as imposing "punishment in the form of exercise," or "excessive disciplinary force." Defendant then goes on to argue why such a claim cannot stand. Plaintiff's only possible reference to "punishment" arose in paragraph 12 of Plaintiff's Second Amended Original Complaint, in which Plaintiffs alleged *"to the extent that Defendants*



*allege or contend that the injuries suffered by Abraham were the result of some form of discipline,* Plaintiff would further contend that Defendants Villarreal and Guerrero are liable for subjecting Abraham to excessive force in the discipline of a student, for which they are liable pursuant to Texas Education Code §22.051." It does not now appear that Defendants Villarreal or Guerrero are alleging that their actions were some form of discipline. Accordingly, Defendant's reference to Plaintiff's alleged claims of "punishment" is merely a red herring that may be ignored.

### 2.    Constitutional Right Not to Participate in Physical Education

Defendant similarly appears to re-characterize Plaintiff's bodily integrity claim as an allegation that Abraham had a right not to participate in physical education at all. As set out above, however, Plaintiff does not allege a right not to participate in physical education, but rather a right to be protected from the dangers particular to him involving his participation in physical confrontations or contact sports. As Defendant Guerrero explained, he could have simply sent Abraham to the library to do research from his physical education grade and still met any applicable state requirements. **Exhibit-C,** Guerrero Depo, p.108, l.8 – p.109, l.22. Plaintiff is not asserting "a constitutional right not to participate in physical education in school." Nor is Plaintiff asserting a constitutional right to not provide 13 year-old children with loaded handguns or sharp knives during physical education class. Requiring Abraham to participate in physical education activities, however, where the physical education requirement could have instead been met by sending Abraham to the library, *because of his particular condition,* was tantamount to providing him with a sharp knife or a loaded handgun and asking him to make his own decision on whether it is safe enough for him to play with those items. As the Fifth Circuit has already held, individuals are liable under §1983 when their actions manifest deliberate indifference to a student's welfare. *Doe v. Taylor,* 15 F.3d at 454; *Gonzalez v. Ysleta Indep. School Dist.,* 996 F.2d at 760.

WHEREFORE, PREMISES CONSIDERED Plaintiff **ADELA CANO**, *Individually and on behalf of her minor son*, **ABRAHAM CANO**, would respectfully request that upon consideration of Defendant Peter Guerrero's Renewed Motion to Dismiss that such motion be DENIED in its entirety, that this action be allowed to proceed to trial and judgment, and that Plaintiffs be granted such other and further relief to which they may show themselves to be justly entitled, whether general or special, at law and in equity.

Signed on this the 10th day of October, 2003.

Respectfully submitted,

**LAW OFFICE**
**J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas 78520
Telephone      : (956) 504-1100
Facsimile      : (956) 504-1408

By: _____
J. Arnold Aguilar
State Bar No. 00936270
Federal Adm. No. 6822

Attorney for Plaintiff,
ADELA CANO, Individually and on Behalf
of her minor son, ABRAHAM CANO

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT PETER GUERRERO'S RENEWED MOTION TO DISMISS** has on this the 10th day of October, 2003, been forwarded via certified mail, return receipt requested to:

Mr. James E. Byrom
EWBANK & BYROM, P.C.
221 West 6th Street, Suite 900
P. O. Box 2430
Austin, TX 78768-2430

Ms. Eileen Leeds
WILLETTE & GUERRA, L.L.P.
3505 Boca Chica Blvd., Suite 460
Brownsville, TX 78521


J. Arnold Aguilar

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ADELA CANO, Individually and on | § | |
| Behalf of her minor son, ABRAHAM CANO, | § | |
| Plaintiff | § | |
| | § | CIVIL ACTION NO. |
| VS. | § | |
| | § | B - 01 - 156 |
| SAN BENITO CONSOLIDATED | § | |
| INDEPENDENT SCHOOL DISTRICT, | § | |
| HERIBERTO VILLARREAL and | § | |
| PETER GUERRERO, | § | |
| Defendants | § | |

## AFFIDAVIT OF J. ARNOLD AGUILAR

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

BEFORE ME, the undersigned official, on this day appeared J. ARNOLD AGUILAR, who is personally known to me, and first being duly sworn according to law upon his oath deposes and says:

My name is J. Arnold Aguilar, I am over 18 years of age, I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts state herein, and they are all true and correct.

As the attorney for Plaintiffs in Civil Action No. B-01-156, pending in the United States District Court for the Southern District of Texas, Brownsville Division, I attended the following depositions:

(1)     Defendant Heriberto Villarreal (Vol. I) on May 14, 2002. The excerpts attached hereto as Exhibit-A were taken from the transcript of Heriberto Villarreal's deposition testimony and are true records of the testimony provided by Heriberto Villarreal.

Page 1 of 2



(2)    Defendant Heriberto Villarreal (Vol. II) on May 15, 2002. The excerpts attached hereto as Exhibit-B were taken from the transcript of Heriberto Villarreal's deposition testimony and are true records of the testimony provided by Heriberto Villarreal.

(3)    Defendant Pedro Gabriel Guerrero on July 15, 2002. The excerpts attached hereto as Exhibit-C were taken from the transcript of Pedro Gabriel Guerrero's deposition testimony and are true records of the testimony provided by Pedro Gabriel Guerrero.

(4)    Ofelia Cornejo on August 28, 2003. The excerpts attached hereto as Exhibit-D were taken from the transcript of Ofelia Cornejo's deposition testimony and are true records of the testimony provided by Ofelia Cornejo.

(5)    Donald Vargas, M.D., P.A. on September 25, 2002. The excerpts attached hereto as Exhibit-E were taken from the transcript of Dr. Donald Vargas' deposition testimony and are true records of the testimony provided by Dr. Donald Vargas.

(6)    Plaintiff Abraham Cano on July 16, 2002. The excerpts attached hereto as Exhibit-F were taken from the transcript of Abraham Cano's deposition testimony and are true records of the testimony provided by Abraham Cano.

(7)    Plaintiff Adela Cano on July 16, 2002. The excerpts attached hereto as Exhibit-G were taken from the transcript of Adela Cano's deposition testimony and are true records of the testimony provided by Adela Cano.

The above and foregoing is true and correct based on my personal knowledge.

_____
J. Arnold Aguilar

SUBSCRIBED AND SWORN TO BEFORE ME on the 10th day of October, 2003, to certify which witness my hand and official seal.



_____
Notary Public, State of Texas

My Commission Expires:

03-27-07

Page 2 of 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually and on     §
Behalf of her minor son, ABRAHAM CANO, §
                        Plaintiff    §
                              §          CIVIL ACTION NO.
    VS.                     §
                              §          B - 01 - 156
SAN BENITO CONSOLIDATED    §
INDEPENDENT SCHOOL DISTRICT,    §
HERIBERTO VILLARREAL and    §
PETER GUERRERO,             §
                  Defendants    §

## ORDER DENYING DEFENDANT'S (GUERRERO)
## RENEWED MOTION TO DISMISS

On the _____ day of _____, 2003, this cause came for hearing

**Defendant Peter Guerrero's Renewed Motion to Dismiss.**

After hearing the argument of counsel thereon, the Court is of the opinion that

Defendant's Renewed Motion to Dismiss should be DENIED;

IT IS THEREFORE ORDERED, ADJUDGED and DECREED that Defendant's

Renewed Motion to Dismiss is DENIED.

SIGNED on this the _____ day of _____, 2003.

_____
U. S. DISTRICT JUDGE

# EXHIBIT-2

III. (*Health Information)

ALL BLANKS MUST BE FILLED

A.    Name _Abraham C Ano_    Date of Birth _11-28-86_
      School _Ed Downs_    Present Grade _4th_

B. *VISION

    1. *Date of most recent screening _12-12-96_
    2. Results: Right eye _20/30_ Left eye _20/30_
       3. As a result of the screening, is there any indication of a need for
Y N    further assessment or adjustment?  If YES, please explain:_____

    4. Has any follow-up treatment been recommended?  If YES, please
Y N    explain:_____

C. *HEARING

    1. *Date of most recent screening _12-12-96_
    2. Results: Right Ear _passed_ Left ear _passed_
    3. As a result of the screening, is there any indication of a need for
Y N    further assessment or adjustment?  If YES, please explain?_____

    4. Has any follow up treatment been recommended?  If YES, please
Y N    explain:_____

D. *HEALTH

    1. Does student exhibit any signs of health or medical problems?  If YES,
Y N    cite observations: _Osteogenesis Imperfecta (brittle bones)_
    _fracture left elbow 5-97_.
    2. Is there a need for further medical assessment?  If YES, what type?
Y N    EXPLAIN? _under care of Dr. Vargas_,
    _Harlingen_.
    3. Is student receiving any medication at school:  If YES, specify:
Y N    _____

EXHIBIT NO. 2
5-14-02
BRYANT & STINGLEY, INC

_O. Cornejo, RN_        _School nurse_    _5/19/97_
*SIGNATURE OF PERSON COMPLETING THIS SECTION  *POSITION  *DATE

# EXHIBIT-3

SAN BENITO CISD

___Out of School Referral
___Transfer Student Referral
___Parent Referral

Referral Source: _parents_____    Phone:_____

Source of Information: _Health Information,_____

Student's Name: _Abraham C. Cano_____    DOB: _11-28-86___

Sex: _M___    Age: _11___    School: _Ed Downs_____    Grade: _4th_

Parent's Name: _Luis and Adela Cano_____    Legal Guardian _✓_Yes ___No

Address: _205 Corona Crescent_____
              (Street)
_San Benito, Tx 78586_____
              (City)

Phone:_____ Home _____Work _____Nearest Relative, etc.

Primary Home Language: English _✓_ Spanish ___

Disabling Condition: _osteogenesis Imperfecta (brittle bones)_

Comments:_____

Further Action Necessary: Yes ___    No ___

**Campus Counselor**                           **Service Needed**

PLEASE SEND REGULAR                    _✓_EDUCATION
REFERRAL INFORMATION                  ___TRANSPORTATION
AS SOON AS POSSIBLE                      _✓_HOMEBOUND
                                                    ___COMMUNITY SERVICES
                                                    ___OTHER _____

EXHIBIT NO._3_
_5-14-03_
BRYANT & STINGLEY, INC.

_____          _____  _____
Signature of Person Completing Referral      Position        Date

# EXHIBIT-10

SEVERE ASTMA

San Benito Consolidated Independent School District

# SCHOOL HEALTH RECORD

#39102

Carro Abraham Cord          11-28-84          M

| Last Name | First | MI | DOB | M/F | Phone 373- |

680 N. Crockett          Adela Carro + Luis Cano

| Address | School | Parent's Name | Lived with |

| IMMUNIZATION DATES | | | | FAMILY HEALTH HISTORY | | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | BOOSTERS | | |
| DTP | 3-2-87 | 8-17-90 | 8-25-92 | 3-2-93 | Father's Health | Occupation |
| TD | | | | | Mother's Health | Occupation |
| Tetanus | | | | | Number Siblings | |
| OPV | 3-25-87 | 8-17-90 | 8-25-92 | 3-2-93 | Familial Disorders | |
| Measles | | | | | Other Family History | |
| Mumps | | 8-12-90 | 3-2-93 | | | LIMITING HEALTH PROBLEMS |
| Rubella | | | | | Asthma | Vision |
| TB Test | 4-6-93 | | | | Cardiac | Hearing Loss |
| Other | no | | | | Diabetes | Orthopedic |
| | | | | | Seizures | Other |

MR 9-19-90

| PHYSICAL PROGRESS RECORD | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GRADE | PRE-KINDER | K | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| Date Screened | | | | | 11-7-95 | 12-2-96 | | 10-2-98 | 10-2-99 | 10-5-00 | 10-6-01 | | | |
| ABD | | | | | | | | | | | | | |
| B/P | | | | | | | | | | | | | |
| Dental | | | | | | | | | | | | | |
| ENT | | | | | | | | | | | | | |
| Height | | | | | | | | | | | | | |
| Weight | | | | | | | | | | | | | |
| Scoliosis | | | | | | | | | | | | | |
| Hearing R | | | | | FX✓ | P13 | | F | | | | | |
| L | | | | | PX✓ | P13 | | F | | | | | |
| Vision R | 20/ | 20/ | 20/ | 20/ | 20/20 | 20/70 | 20/ | 20/40 | 20/30 | 20/40 | 20/30 | 20/ | 20/ |
| L | 20/ | 20/ | 20/ | 20/ | 20/20 | 20/30 | 20/ | 20/30 | 20/25 | 20/20 | 20/20 | 20/ | 20/ |
| Physical | | | | | | | | | | | | | |

CODES:  N - Normal    AB - Abnormal Noted    R - REFERRED LIST DETACH ON BACK          SBCISD 88-89

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

EXHIBIT NO. 10
BRYANT & STINGLEY INC.

HV0001

-10-97 Enrolled from _____ville Elem.
mother gave history of congenital handicap,
osteogenesis imperfecta, Hx of fractures b.comejo,RN

2-97 I spoke to 4th grade classes - please
be careful around Abraham due to his fragile
bones. /OC

4-7-97 mrs. came had conference with mrs. _____,
RN — see doctor refer ____ attached /O.C.

5-13-97 — I spoke to his teacher, Abraham has been
absent 15 days — fell at home, has fracture
right arm — b.comejo, RN obtained release of info form

5-21-97 Home visit made - obtained release of info from
Abraham has a full length arm cast on left arm —
otherwise doing well. p. came ____ homebound services.

5-22-97 obtained doctors form for the left olecranon with
Px - avulsion fracture of the left ____ 5-3-97- Dr. Donald
disruption of free triceps ____ Vargas.
— o. comejo, RN

5/27/97 form given to mrs. cano principal who is working
with special Ed. Dept. for homebound services.
/OC

4-24-98 Abraham fell in PE — left elbow,
on left elbow. 40 1/2" skin tear — left arm sling
hurts to extend arm — Immobilize ____
mother took him to the doctor
4-30-98 Abraham is wearing ½ cast and sling — has
"small fracture"? ____ ____ to report
back to me. o. comejo, RN

8/98 ____ will ____ ____ Dr. Rolledge ____
+ prosphis + treatments ____ — write to ____
+ Dr. Bustillo ____ ____ ____ ____ — new day
____ ____ sate. 8/21/98 mom ____ ____ ____ ____
____ we are ____ ____ ____ ____ ____
10-2-98 ____ ____ heavy v.d. mom ____ ____ ____
____ spits + ____ ____ queen ____ disabled
____ pt #. ____ ____

6/25/99 20/40 20/40 for 20/40 20/30 ____ ____ home conf.
10-20-99 - Hearing - 1000 -45 R+L - 2000 ____ ____ 50 R
11-9-99 - HVS cull — will recheck 11/15/99 ____
5-15-2000-100 C —40(R) 2000 -50 R ____ 40 (R)
1000 — 40 (L) 2000 35-L ____ 35 (L)
5-15-2000 20/50 20/25 for 20/40 20/30 ____ ____ letter home
rec heavy ____ ____ V on ____ ____ ____

HV0002

# EXHIBIT-15

SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT
MAIN NURSES' OFFICE
845 Zaragosa
San Benito, Texas   78586
361-1387

*appt Monday 4-14-97 1 pm*

## SCHOOL NURSE REFERRAL

TO: _Texas Dept Human Service_          DATE: ___4/9/97___
   DOCTOR/CLINIC/PROVIDER
   _Hwy 77_
   _San Benito, Texas_

STUDENT: _Abraham Cano_          BIRTHDATE: __11-28-86__

ADDRESS: _205 Corona Crescent_     STUDENT'S SS# __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__

PARENTS: _Adela Cano_          TELEPHONE: __399-6451__

REASON FOR REFERRAL: _Hx: Osteogenesis Imperfecta since birth. Moved from Weslaco 2yrs ago. No A.F.D.C; Medicaid Foodstamps since arrived in San Benito. Child attends Ed Downs and is in need of Medical attention - disease progressing to point causing alot Pain low back and left Ankle from malformation of bone. Please evaluate and assist as soon as possible_
_____ Santa Benito RN ___ Main Nurse ___ School Office._
        SCHOOL NURSE                        SCHOOL

RESULTS OF REFERRAL: _____

_____

_____

_____

_____

_____

*Notes*

Form SN-3 Updated 5/94

EXHIBIT NO. 15
5-14-1
BRYANT & STINGLEY, INC

HV0005

# EXHIBIT-21

SPECIAL EDUCATION DEPARTMENT
240 N. Crockett St., San Benito, TX 78586
Phone (956) 361-6220  Fax (956) 361-6222

☑ Annual Review
☐ Re-evaluation
☐ Dismissal
☐ ER ARD
☐ Other

## Individual Education Program Meeting

Name of Student: _Bretan Cano_  12413 Landrum Park Rd.

Date of Birth: 11-28-86

Address: _Eden Mobile Lot #415_  Phone Number: 399-0263

Grade: _59102_  I.D. Number  School: _Berta Cabaza_  # 412.8 / 433.?

☐ YES  ☒ NO  *An interpreter was used to assist in conducting the meeting.  If YES, specify language or other mode of communication: _____

*REVIEW OF ASSESSMENT DATA AND OTHER INFORMATION  (check (✓) if applicable)

☐ Comprehensive individual assessment[1]: _10-15-98_
DATE(S) OF REPORT(S)

☐ Assessment(s) for related services.  Specify:

_____   _____
NAME OF SERVICE   DATE OF REPORT

_____   _____
NAME OF SERVICE   DATE OF REPORT

_____   _____
NAME OF SERVICE   DATE OF REPORT

☐ Functional Vocational Evaluation: _____
DATE(S) OF REPORT(S)

☐ Information from the student's Individual Transition Plan

☐ Information from the Language Proficiency Assessment Committee
   Bilingual _____   ESL _____   None _____

☐ Records from other school districts

☒ Information from parents/student  _concern about health needs and curriculum placet_

☒ Information from school personnel  _passing all subjects / low grades in_
   _reading - not comple_
   _Az reader_

☐ Information/records from other agencies or professionals

☐ YES  ☒ NO  Additional assessment is needed: _____

If YES, specify timeline for assessment to be completed[2] _____

EXHIBIT NO. 21
BRYANT & STINGLEY, INC

HV0088

[1] Assistive technology needs must be considered.
[2] If additional assessment is recommended, it must be completed according to the timeline specified.
*Denotes required items

ARD 1  8/99

*DETERMINATION OF ELIGIBILITY (check (✓) if applicable)

Based on the assessment data reviewed, the ARD committee has determined that the student:

☐   does not meet eligibility criteria to receive special education services

☑   meets eligibility criteria for: [1]

☐ learning disability          ☐ speech impairment          ☐ emotionally disturbed

☐ mental retardation          ☐ autism                     ☑ other health impaired

☐ Orthopedic impairment       ☐ traumatic brain injury      ☐ multiple disabilities

☐ visual impairment           ☐ auditory impairment         ☐ deaf-blind

☐ non-categorical

☐   meets eligibility criteria for _____ , graduating due to completing IEP goals and objectives.

DEVELOPMENT OF THE INDIVIDUAL EDUCATIONAL PLAN (IEP)

☑     ☐     The ARD committee reviewed achievement on the previous year's short-term objective
YES   NO    on the IEP.  (Applicable to all but initial ARD meetings.)

*Present Competencies: 7ᵗʰ
Approximate Math Level: 7
___   The student uses numbers to name quantities.
_✓_   The student describes order of events or objects.
_✓_   The student recognizes that there are quantities less than a whole.
_✓_   The student models ___ addition ___subtraction ___ multiplication ___ division
_✓_   The student identifies, extends and creates patterns.
_✓_   The student describes the relative position of objects.
_✓_   The student recognizes characteristics of shapes and solids.
___   The student uses attributes such as ___ length ___ weight ___ capacity to compare and order
       shapes.
___   The student uses time and temperature to compare and order events, situations, and/or objects.
_✓_   The student constructs and uses graphs of real objects or pictures to answer questions.
_✓_   The student uses attributes to identify, compare, and contrast shapes and solids.
_✓_   The student displays data in an organized form.
_✓_   The student uses information from organized data.
_✓_   The student recognizes that numbers can be represented by points on a line.
_✓_   The student uses place value to communicate ___ whole numbers ___ money ___ decimals.
_✓_   The student uses fraction names and symbols to describe fractional parts of whole objects or sets
       of objects.
_✓_   The student estimates to determine reasonable results.
_✓_   The student uses formal geometric vocabulary.
___   The student applies measurement concepts.

Approximate Social Studies Level: 7ᵗʰ⁾
_✓_   The student understands that holidays are celebrations of special events.
_✓_   The student understands the concept of location.
_✓_   The student understands chronology.
_✓_   The student understands physical and human characteristics of the environment.

---

[1] If the student is suspected of being medically fragile, the ARD/IEP Supplement:  Students Who Are Medically Fragile should be completed.
*Denotes required items                                                         ARD 2  8/99

___ The student understands that basic human needs are met in many ways.
___ The student understands important customs, symbols and celebrations that represent American beliefs and principles that contribute to our nation's identity.
___ The student understands similarities and differences among people.
___ The student understands how people learn about themselves through family customs and traditions.

Approximate Language Arts Level: _____

___ The student listens attentively and engages actively in a variety of oral language experiences.
___ The student listens and speaks to gain knowledge of his/her own culture, the culture of others and common elements.
___ The student speaks appropriately to different audiences for different purposes and occasions.
___ The student communicates clearly by putting thoughts and feelings into spoken words.
___ The student demonstrates knowledge of concepts of print.
___ The student orally demonstrates phonological awareness.
___ The student uses letter-sound knowledge to decode written language.
___ The student uses a variety of strategies to comprehend selections.
___ The student responds to various texts.
___ The student generates questions and conducts research about topics introduced through selections read aloud and from a variety of sources.
___ The student displays the foundations of writing.
___ The student composes original texts.
___ The student uses writing as a tool for learning and research.
___ The student reads widely for different purposes in varied sources.
___ The student recognizes characteristics of various types of texts.
___ The student writes for a variety of audiences and purposes and in a variety of forms.
___ The student spells proficiently.
___ The student composes meaningful texts using the conventions of written language such as capitalization and handwriting to communicate clearly.
___ The student selects and uses writing processes for self-initiated and assigned writing.
___ The student listens actively and purposefully in a variety of settings.
___ The student listens critically to analyze and evaluate a speaker's message(s).

Approximate Science Level: _____

___ The student participates in classroom and field investigations following home and school safety procedures.
___ The student develops abilities necessary to do scientific inquiry in the field and the classroom.
___ The student uses age appropriate tools and models to verify that organisms and objects and parts of organisms and objects can be observed, described and measured.
___ The student knows that organisms, objects, and events have properties and patterns.
___ The student knows that systems have parts and are composed of organisms and objects.
___ The student knows that many types of changes occur.
___ The student knows the difference between living organisms and nonliving objects.
___ The student knows that living organisms have basic needs.
___ The student knows that the natural world includes __ rocks __ soil __ water __ gases of the atmosphere.
___ The student knows that systems exist in the world.
___ The student knows that forces cause change.
___ The student knows that living organisms need __ food __ water __light __ air __ a way to dispose of waste __ an environment in which to live.
___ The student knows that the natural world includes earth materials and objects in the sky.

Approximate Developmental Level: _____         ____ Age Appropriate
___ Gross Motor: _____
___ Fine Motor: _____
___ Language Development: _____
___ Social Development: _____
___ self-help: _____
___ Household Management: _____
___ Personal Management: _____
___ Job Readiness/Work Skills: _____
___ Home/Community: _____

HV0090

☐ YES  ☐ NO   The student is capable of following the Student Code of Conduct without modification. If NO, complete ARD/IEP SUPPLEMENT: Behavior Management Plan (ARDBMP-1, -2, & -3).

**Behavioral Competencies:**

__ carries out simple commands
__ Repeats praised performance
__ Responds to and makes verbal greeting
__ Works in a small group for __ five __ ten __twenty minutes
__ Works individually with adult for __five__ten__twenty minutes
__ Awaits turn
__ Initiates peer contact
__ Raises hand for attention in group activity
__ States consequences of breaking a rule

✓ Age appropriate
__ Obeys parent and teacher request
__ Engages in cooperative play
__ Looks at speaker during 1:1 conversation
__ Conforms to game rules
__ Offers assistance to peers
__ Demonstrates respect for property
__ Waits turn for help
__ Shares idea in group setting

**Prevocational/Vocational skills which may be prerequisite to vocational education (when appropriate):**

S - Strength          W - Weakness          N/A - Due to Age

S W 1. Reading Skills      S W 5. Expressive Skills       S W 9. Verbal Comprehension
S W 2. Math Level          S W 6. Organizational Skills   S W 10. Independent Task Completion
S W 3. Job Attendance      S W 7. Social Skills           S W 11. Following Directions
S W 4. Attendance          S W 8. Personal Hygiene        S W 12. Punctuality

*Physical, as it affects participation in *instructional settings and *phsyical education:

☑ YES  ☐ NO   Student has physical condition or disability which would affect participation in regular instructional setting. If YES, describe physical condition/disability: _____

☐ regular physical education          ☑ regular physical education with modifications
☐ adapted physical education[1]       ☐ medical exemption          ☐ physical education requirements have been met

**The ARD Committee determined that the disability affects the student's involvement and progress in the general curriculum in the following manner:**

| | |
|---|---|
| ✓ Student can participate fully in the curriculum, as is, with monitoring only<br>__ Need for classroom modifications or adaptations specified within<br>__ Need for access to support as specified within<br>__ Need for assistance in the classroom<br>__ Need for modification of general curriculum (IEP attached)<br>__ Need for adapted curriculum (IEP attached)<br>__ Other: _____ | **PPCD STUDENTS:**<br>__ Participates full-time in prekindergarten program with additional supervision<br>__ Participates in specified prekindergarten activity with additional supervision as follows:<br>__ Participates in PPCD classroom with planned visitations by prekindergarten students as follows:<br>__ Participates in self-contained PPCD classroom located on a general education campus. |

ARD 4  8/99

Eligibility form required.

HV0091

*INSTRUCTIONAL ACCOMMODATIONS DETERMINED BY IEP TEAM

_____    _____
NAME OF STUDENT                          CAMPUS

The ARD committee has determined that the following modifications are necessary for the student to succeed:

SPECIAL LANGUAGE PROGRAMS[1]

☐ Bilingual
☐ ESL

| BEHAVIOR MANAGEMENT PLAN | REGULAR DISCIPLINE PLAN |
|---|---|
| ☐ YES | ☑ YES |
| ☑ NO | ☐ NO |

ASSISTIVE TECHNOLOGY DEVICES

☐ YES
☑ NO

☐ MODIFICATIONS NOT NEEDED OR NOT APPLICABLE

GOALS & OBJECTIVES/SUBJECT

**ALTER ASSIGNMENTS BY PROVIDING:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Reduced assignments | | | | | | | |
| Taped assignments | | | | | | | |
| Extra time for completing assignments | | | | | | | |
| Opportunity to respond orally | | | | | | | |
| Emphasis on major points | | | | | | | |
| Task analysis of assignments | | | | | | | |
| Special projects in lieu of assignments | | | | | | | |
| Other: | | | | | | | |
| Other: | | | | | | | |

**ADAPT INSTRUCTION BY PROVIDING:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Short instructions (1 or 2 steps) | | | | | | | |
| Opportunity to repeat and explain instructions | | | | | | | |
| Encouragement to verbalize steps needed to complete assignment/task | | | | | | | |
| Opportunity to write instructions | | | | | | | |
| Assignment notebooks | | | | | | | |
| Visual aids (pictures, flash cards, etc.) | | | | | | | |
| Auditory aids (cues tapes, etc.) | | | | | | | |
| Instructional aids | | | | | | | |
| Extra time for oral response | | | | | | | |
| Extra time for written response | | | | | | | |
| Exams of reduced length | | | | | | | |
| Oral exams | | | | | | | |
| Open book exams | | | | | | | |
| Study carrel for independent work | | | | | | | |
| Frequent feedback | | | | | | | |
| Immediate feedback | | | | | | | |
| Minimal auditory distractions | | | | | | | |
| Encouragement for classroom participation | | | | | | | |
| Peer tutoring/paired working arrangement | | | | | | | |
| Opportunity for student to dictate themes, information, answers on tape or to others | | | | | | | |
| Calculators | | | | | | | |

[1] Special language programs are required for all students who are limited English proficient.

*Denotes required items

HV0092                    ARD 5  3/99

\*INSTRUCTIONAL MODIFICATIONS/SUPPORTS DETERMINED BY ARD COMMITTEE, continued

_____          _____
NAME OF STUDENT                           CAMPUS

GOAL & OBJECTIVE/SUBJECT

**ADAPT MATERIALS BY PROVIDING:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Peer to read materials | | | | | | | |
| Tape recording of required readings | | | | | | | |
| Highlighted materials for emphasis | | | | | | | |
| Altered format of materials | | | | | | | |
| Study aids/manipulatives | | | | | | | |
| ESL materials | | | | | | | |
| Large print materials | | | | | | | |
| Braille materials | | | | | | | |
| Color transparencies | | | | | | | |
| Other: | | | | | | | |
| Other: | | | | | | | |

**MANAGE BEHAVIOR BY PROVIDING:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Clearly defined limits | | | | | | | |
| Frequent reminders of rules | | | | | | | |
| Positive reinforcement | | | | | | | |
| Frequent eye contact/proximity control | | | | | | | |
| Frequent breaks | | | | | | | |
| Private discussion about behavior | | | | | | | |
| In-class time-out | | | | | | | |
| Opportunity to help teacher | | | | | | | |
| Seat near the teacher | | | | | | | |
| Supervision during transition activities | | | | | | | |
| Implementation of behavior contract | | | | | | | |
| Other: | | | | | | | |
| Other: | | | | | | | |

**REQUIRED EQUIPMENT/ASSISTIVE TECHNOLOGY DEVICES:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Word processors | | | | | | | |
| Augmentative communication device | | | | | | | |
| Note taker/note taking paper | | | | | | | |
| Interpreter | | | | | | | |
| Decoders for TV and films | | | | | | | |
| Access to equipment | | | | | | | |
| Other: | | | | | | | |

ARD

**\*Criterion referenced assessment (TAAS)[1]:**

| YES | NO | | | |
|---|---|---|---|---|
| ☐ | ☐ | | will take reading | If NO, alternative assessment to be given: |
| YES | NO | | | |
| ☐ | ☐ | | will take mathematics | If NO, alternative assessment to be given: |
| YES | NO | NA | | |
| ☐ | ☐ | ☐ | will take writing | If NO, alternative assessment to be given: |
| YES | NO | NA | | |
| ☐ | ☐ | ☐ | will take social studies | If NO, alternative assessment to be given: |
| YES | NO | NA | | |
| ☐ | ☐ | ☐ | will take science | If NO, alternative assessment to be given: |

Modifications as defined in test administration materials:

_____    TAAS not offered for this student's grade placement

---

**End-of-Course Examinations[2]:**

| YES | NO | NA | | |
|---|---|---|---|---|
| ☐ | ☐ | ☑ | will take Algebra 1 | If NO, alternative assessment to be given: |
| YES | NO | NA | | |
| ☐ | ☐ | ☑ | will take Biology 1 | If NO, alternative assessment to be given: |
| YES | NO | NA | | |
| ☐ | ☐ | ☑ | will take U.S. History | If NO, alternative assessment to be given: |
| YES | NO | NA | | |
| ☐ | ☐ | ☑ | will take English II | If NO, alternative assessment to be given: |

Modifications as defined in test administration materials:

---

**District wide Assessments:**

| YES | NO | | |
|---|---|---|---|
| ☑ | ☐ | will take district wide assessments | If NO, alternative assessment to be given: |

Modifications as defined in test administration materials:

---

**\*If student is exempted from the administration of any assessment instrument above, it is because:**

\_\_\_\_    a. The student's individualized education program does not include instruction in the essential knowledge and skills at any grade level.

OR

\_\_\_\_    b. The assessment instrument, even with allowable modifications, would not provide an appropriate measure of the student's achievement as determined by the student's ARD committee.

HV0094

---

[1] Until Spanish TAAS tests are available, LEP students exempt from the English TAAS must be tested with alternative measures of accountability.
[2] The only students not required to test are students receiving content modifications resulting in an IST on the transcript as stated in test administration materials. These materials also provide information about testing these students for local purposes.
\*Denotes required items

ARD 7  8/99

**TRANSITION PLANNING BY AGE 14:** (Transition Related Content Supplement)
Transition Planning is required for all students beginning by age 14 and required to be updated
annually and must have "course of study".

Graduation       ☒ Applicable       ☐ Not Applicable _____

Expected date of graduation is _____

Graduation Plan Option:

_____   **ACADEMIC PLAN:** Student must have satisfactorily completed the minimum academic
credit requirements for graduation, including satisfactory performance on the exit level
assessment instrument.

_____   **WORK-STUDY PLAN:** Student has completed requirements specified in the IEP which
resulted in one of the following:

- Full time employment in addition to sufficient self-help skills to enable the student to
maintain employment without direct and ongoing educational support of the school district.

- Demonstrate mastery of specific employability skills and self-help skills which do not require
direct ongoing educational support of the school district.

- Access to services which are not within the legal responsibility of public education or
employment, or educational options for which the student has been prepared by his
academic program.

_____   **SPECIAL EDUCATION PLAN:** Student no longer meets age eligibility requirements and has
completed the requirements specified in the IEP.

**\*SERVICE ALTERNATIVES**

*Identify the general and special education alternatives and supplementary aids and services provided,
tried, or considered. Place key letter (p, t, c) in space next to all that apply:

| | |
|---|---|
| _____ General education classroom | _____ Alternative education program |
| _____ Modifications in general education and/or curriculum, instruction testing procedures, and/or physical arrangements (including vocational education and nontraditional instructional programs) | _____ Assistive technology (e.g., communication devices, slant top table) |
| | _____ Resource classroom |
| | _____ Self-contained classroom |
| | _____ Separate special education campus |
| _____ Special education supplementary aids and services | _____ Nonpublic day school placement |
| | _____ Residential placement** |
| _____ Title I Part A/Accelerated Instruction | _____ Other: _____ |
| _____ English as a Second Language (ESL) | _____ Other: _____ |
| _____ Bilingual classes | |
| _____ Pre-K program | |

*Results                                    *If efforts not successful, provide reason(s)

PASSING ALL SUBJECTS

☐       ☐       ☐    **Parents of students who meet eligibility criteria for visual or auditory impairments or
YES    NO     NA    deafblindness have been given written information, within the past year, about
programs offered by the Texas School for the Blind and Visually Impaired or Texas
School for the Deaf, including eligibility and admissions and the rights of students
related to admission.

*Denotes required items

*CONSIDERATIONS OF LEAST RESTRICTIVE ENVIRONMENT

☐   Based on ARD committee review of assessment data, new IEP goals and objectives, instructional modifications/supports necessary to implement the content of the IEP, and previous efforts/considerations, the committee recommends that this student receive all instruction and services in general education. If selected, go to the SCHEDULE OF SERVICES section.

OR

☐   Based on ARD committee review of assessment data, new IEP goals and objectives, instructional modifications/supports necessary to implement the content of the IEP. and previous efforts/considerations, the committee recommends that this student receive part of or all instruction and services in a special education setting. If selected, complete either the Removal from General Education Classroom or the Removal from General Education Campus sections that follow. The Opportunity to Participate and Consideration of Potential Harmful Effects sections must also be completed.

*Removal from General Education Classroom

☐   Placement in the general education classroom prohibits the student from achieving the goals and objectives contained in the IEP even though supplementary aids and services are used.

☐   The modifications required for the student to achieve the goals and objectives in the IEP cannot be implemented in the general education classroom without eliminating essential components of the regular curriculum/activity.

☐   Implementing the student's behavior management plan means that other students would not benefit satisfactorily from academic instruction or nonacademic activities.

☐   Other: _____
    _____

☐   Other: _____
    _____

OR

*Removal from General Education Campus

☐   Services and/or therapies in the student's IEP cannot be provided on a general education campus.

☐   The behavior management plan contained in the student's IEP cannot be implemented on a general education campus.

☐   The student's behavior is so dangerous that it cannot be controlled without intense supervision and a closed environment.

☐   The student had a previously unsuccessful placement on a general education campus. If selected, list instructional and related service goals and objectives and modification/support services that address returning the student to the general education campus. _____
    _____

☐   Student is being serviced at general education campus, and is not removed from general education campus.

*Denotes required items

*Opportunity to Participate

*In removing this student from the general education classroom/campus, will the student have the opportunity to participate with students without disabilities in all nonacademic and extracurricular activities?

☐    ☐          N/A
YES   NO

If NO, describe the nonacademic and extracurricular activities in which the student will not have an opportunity to participate:

☐ Meals                    ☐ Yearbook/newspaper         ☐ General education routines
☐ Field trips              ☐ Recess periods                (homeroom assignments,
☐ Fund raising activities  ☐ Choral group/debate           lockers, study hall, class
☐ Regular transportation   ☐ Assemblies                    changes, social)
☐ Sports/cheerleading      ☐ Band                       ☐ Other: _____
☐ Student council          ☐ Graduation exercises       ☐ Other: _____

*If any of the above items are checked, explain why this student is unable to participate:

N/A

*Consideration of Potential Harmful Effects

*In removing this student from the general education classroom/campus, what are the potential harmful effects on the student and on the quality of services which the student needs?

☐ None anticipated

☐ Lack of opportunity for appropriate role        ☐ Decreased access to the instructional
   models                                             opportunities available in integrated settings
☐ Stigmatization                                  ☐ Diminished access to full range of curriculum
☐ Isolation from peers                            ☐ Lack of opportunity for social interaction
☐ Other: _____                 ☐ Decreased student self-esteem
☐ Other: _____                 ☐ Other: _____
☐ Other: _____                 ☐ Other: _____

Activities to Facilitate Movement Toward General Education Settings

☐ Conference with general education teacher/other personnel: _____
☐ Conference with parent
☐ Provide general education assignments to student while receiving services in a special education
   setting
☐ Gradual transition into general class.
☐ Special education teacher and student visit the general education class.

*Denotes required items

HV0097                    ARD 10  8/99

*SCHEDULE OF SERVICES

| INSTRUCTION | | MIN/WK | | Progress/Grade | | |
|---|---|---|---|---|---|---|
| Year _____ Semester _____ Course/Curriculum Area | Gen. Ed. modified Yes No | Gen. Ed. Time | Spe. Ed. Time | Determined by: Gen. Ed. | Spe. Ed. | Joint |
| MATH | ✓ | 225 | | ✓ | | |
| READ | ✓ | 225 | | ✓ | | |
| LANG | ✓ | 225 | | ✓ | | |
| S. STUDIES | ✓ | 225 | | ✓ | | |
| SCI | ✓ | 225 | | ✓ | | |
| ELECTICS | ✓ | 450 | | ✓ | | |
| | | | | | | |
| | | | | | | |

| RELATED SERVICES | *TIME PER WK. |
|---|---|
| Occupational Therapy | |
| Physical Therapy | |
| Counseling | |
| | |
| | |

| INSTRUCTION | | MIN/WK | | Progress/Grade | | |
|---|---|---|---|---|---|---|
| Year _____ Semester _____ Course/Curriculum Area | Gen. Ed. modified Yes No | Gen. Ed. Time | Spe. Ed. Time | Determined by: Gen. Ed. | Spe. Ed. | Joint |
| MATH | ✓ | 225 | | ✓ | | |
| READ | ✓ | 225 | | ✓ | | |
| LANG | ✓ | 225 | | ✓ | | |
| S. STUDIES | ✓ | 225 | | ✓ | | |
| SCI | ✓ | 225 | | ✓ | | |
| ELECTICS | ✓ | 450 | | ✓ | | |
| | | | | | | |
| | | | | | | |

Parents will be notified of student's progress by:

☑ Report Card
☑ Parent/Teacher Conference
☑ Progress Report
☐ Portfolio
☐ Other: _____

EXTENDED YEAR SERVICES

recommended:

☐ YES   ☑ NO   If YES, see attached ARD/IEP Supplement

☐ ☒ Special Transportation   If YES, give justification:
YES NO
   ☐ Physical/Motor      ☐ Cognitive
   ☐ Emotional/Behavioral Factors   ☐ Other: _____
   ☐ Appropriate setting not available at home school

*PLACEMENT DETERMINATION
*The ARD committee determined that services will be provided at:

BERTA GARZA
NAME OF SCHOOL CAMPUS

RESOURCE P MAINSTREAM
NAME OF INSTRUCTIONAL ARRANGEMENT

| Qtr. | Instr. Arr. |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |

FOR HIGH SCHOOL ONLY

HV0098

*Enter instructional arrangement that meets requirements listed in the *Student Attendance Accounting Handbook.*
*Denotes required items

ARD 11  8/99

| | | |
|---|---|---|
| ☐ | ☐ | \*This is the campus the student would attend if not disabled. If NO, identify  (list or describe) the services which cannot reasonably be provided on the student's home campus. |
| YES | NO | |
| ☐ | ☐ | \*This is the campus which is as close as possible to the student's home.  If NO, justify: |
| YES | NO | |

ASSURANCES (Initial by representative of school district)

_____    \*The ARD committee assures that this student is being educated with student's his/her age who do not have disabilities to the maximum extent appropriate to his/her overall educational needs (including academic and developmental areas such as language and socialization).

_____    \*The committee assures that all instruction and related services specified in the IEP will be  provided to the student at no cost.  Fees normally charged to students without disabilities or their parents as part of the general education program may be charged (i.e., art or laboratory fees).

*NOTE:* IF APPROPRIATE, COMPLETE ARD/IEP SUPPLEMENT:  OUT-OF-DISTRICT PLACEMENT VERIFICATION (ARD SUP-OD) OR REFERRAL TO A REGIONAL DAY SCHOOL PROGRAM FOR THE DEAF (ARD SUP-RDSPD).

\*SUPPLEMENTS:

☐    For students graduating in the coming year, attach ARD/IEP Supplement:  Graduation Requirements

☐    For Visually impaired students, attach ARD/IEP Supplement Visually Impaired Form

☐    For Autistic students attach ARD/IEP Supplement Autistic Form

☐    For Auditorially Impaired, attach ARD/IEP Supplement:  Communication Needs of Deaf or Hard of Hearing Students

☐    ITP Supplement

☐    ARD/IEP SUPPLEMENT:  Behavioral Intervention Plan

☐    EYS Supplement

☐    Consent for initial placement

\*Your rights were explained to you a year prior to reaching age of majority.  (If student is not present, refer to procedural safeguards).

Date  given: _____    To:_____

NAME

\*Denotes required items

HV0099

ARD 12  8/99

*SIGNATURES OF COMMITTEE MEMBERS AND OTHER PARTICIPANTS

| SIGNATURES AND TITLE MEMBERS: | POSITION: | AGREE: | DISAGREE: |
|---|---|---|---|
| | Parent(s)/Adult Student[1] | ✓ | |
| | Administrator | ✓ | |
| | General Education Teacher | ✓ | |
| | Special Education Teacher | ✓ | |
| | Assessment[2] | | |
| OTHER PARTICIPANTS: | | | |
| | Representative of LPAC[3] | | |
| | Vocational | | |
| | Interpreter, if used | | |
| | | | |
| | | | |
| | | | |

My signature indicates that I was present at the ARD meeting, participated in the discussion, and understand what was discussed.

☐ The committee mutually agreed to implement the services reflected in these proceddings.

OR

☐ The members of this ARD committee have not reached mutual agreement. The school has offered and the parent has agreed to a recess of not more than 10 school days. During the recess the members shall consider alternatives, gather additional data, and/or obtain additional resource persons to enable them to reach mutual agreement. This recess does not apply if the student presents a danger of physcial harm to himself or herself or others, or if the student has committed an expellable offense. The committee will reconvene on [4]

_____ at _____
        DATE                      PLACE AND TIME

Information explaining why mutual agreement has not been reached may be attached.

[1] Parental consent for initial placement is required before services begin.
[2] Assessment personnel are required when assessment issues are included in the ARD committee's deliberations.
[3] LPAC representative is required at ARD of any student who is limited English proficient.
[4] Include documentation concerning the reconvened ARD committee meeting.
Denotes required items

HV0100

ARD 13  8/99

# EXHIBIT-A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually    )(
and on Behalf of her minor )(
son, ABRAHAM CANO,          )(
        Plaintiff           )(
                            )(
VS.                         )(    CIVIL ACTION NO. B-01-156
                            )(
SAN BENITO CONSOLIDATED     )(
INDEPENDENT SCHOOL          )(
DISTRICT, HERIBERTO         )(
VILLARREAL and PETER        )(
GUERRERO,                   )(
        Defendants          )(

---

ORAL DEPOSITION OF
HERIBERTO VILLARREAL
MAY 14, 2002
VOLUME 1

# ORIGINAL

---

ORAL DEPOSITION OF HERIBERTO VILLARREAL,

produced as a witness at the instance of the PLAINTIFF,

taken in the above styled and numbered cause on MAY 14,

2002, reported by DONNA McCOWN, Certified Court

Reporter No. 6625, in and for the State of Texas, at

the San Benito Consolidated Independent School District

Administrative Building, 240 North Crockett Street, San

Benito, Texas, pursuant to the Texas Rules of Civil

Procedure.

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

15:24:40 1    Q.  Okay.  Who has access to his health records?

15:24:43 2    A.  The nurse.

15:24:45 3    Q.  Who else?

15:24:45 4    A.  Administration, parents.

15:24:49 5    Q.  Does the ARD committee?

15:24:51 6    A.  ARD committees, if requested.

15:24:56 7    Q.  Only if requested?

15:24:57 8    A.  Only if requested.

15:24:58 9    Q.  Is --

15:24:59 10   A.  Because --

15:25:01 11   Q.  I'm sorry.  Go ahead.

15:25:02 12   A.  In a referral packet, there is a health form in

15:25:05 13   there.  So everything that is part of a referral

15:25:08 14   process, there is a health form in there where there is

15:25:12 15   documentation for that by the nurse.  So there's no

15:25:15 16   need for this unless it's specifically requested.

15:25:18 17   Q.  Okay.  There's no need to look at this

15:25:19 18   particular document unless it's particularly requested?

15:25:23 19   A.  Exactly.

15:25:24 20   Q.  But you said the ARD committee does have access

15:25:26 21   to it?

15:25:27 22   A.  If requested, yes.

15:25:28 23   Q.  And from what you were telling me, at these

15:25:30 24   seminars, that would be part of -- in trying to meet

15:25:35 25   the specific needs of students, it might be important

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

15:25:39  1   for the ARD committee to look at these things, correct?

15:25:43  2       A.  Again, if it's requested, yes.

15:25:45  3       Q.  No.  I'm just asking if it might be important

15:25:48  4   for the ARD committee to look at it, not whether

15:25:50  5   they're requesting it or not.

15:25:51  6       A.  If the ARD committee requests it, they deem

15:25:54  7   it's important enough for them to request it, yes.

15:25:57  8       Q.  Do you think this would have been something

15:25:59  9   that the ARD committee should have looked at at any

15:26:02  10  point during -- this particular -- this document --

15:26:05  11  this particular document refers to Abraham Cano,

15:26:08  12  correct?

15:26:09  13      A.  It could have been, yes.

15:26:10  14      Q.  No.  I mean, it does relate to Abraham Cano,

15:26:12  15  right?

15:26:12  16      A.  Yes.

15:26:13  17      Q.  Is this something that you think the ARD

15:26:14  18  committee might or should have looked at?

15:26:17  19      A.  Sure, yes.

15:26:18  20      Q.  Okay.  This document particularly identifies

15:26:20  21  his history of osteogenesis imperfecta since birth,

15:26:24  22  right?

15:26:25  23      A.  Correct.

15:26:26  24      Q.  If you go down a couple of lines, it talks

15:26:28  25  about him attending Ed Downs, one of your elementary

BRYANT & STINGLEY, INC.
McAllen        Harlingen       Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

16:10:44 1    release records from Dr. Vargas to the school district,

16:10:49 2    correct?  That's your understanding?

16:10:51 3        A.  If I look at this correctly, Ms. Cornejo on May

16:10:57 4    21st, '97, was asking Ms. Cano to take this form over

16:11:03 5    to Dr. Vargas to release any medical records to the

16:11:07 6    district.

16:11:07 7        Q.  Okay.

16:11:08 8        A.  Now, whether we received them or not --

16:11:10 9        Q.  That was going to be my question.  It seems to

16:11:12 10   me that what they're doing here is trying to get

16:11:15 11   records from Dr. Vargas.

16:11:16 12       A.  Exactly.

16:11:16 13       Q.  I'm not aware of any records that have been

16:11:18 14   provided to me through y'all from Dr. Vargas.

16:11:22 15       A.  Right.

16:11:22 16       Q.  Are you aware of any?

16:11:23 17       A.  I'm not aware.  When I went through -- this is

16:11:26 18   a health services department form, so that would have

16:11:28 19   been the nurse trying to gather this information.  This

16:11:32 20   was not attached to his medical records.

16:11:36 21       Q.  You couldn't --

16:11:36 22       A.  The only thing I could assume is that we never

16:11:38 23   received them.

16:11:41 24       Q.  Do you feel there would have been a duty on the

16:11:41 25   part of somebody at the school district to make sure

16:11:44 1    that something was received?

16:11:45 2              MR. BYROM:  Objection, form.

16:11:48 3              THE WITNESS:  I can't speak for Ed Downs.

16:11:51 4        Q.  I'm just --

16:11:52 5        A.  Or you know --

16:11:53 6        Q.  What I'm saying is --

16:11:54 7        A.  If Ms. Cornejo is the one that was requesting

16:11:56 8    this information, I would assume that she'd be the one

16:11:59 9    to follow up to say, "Okay.  Well, where is this

16:12:01 10   information?"

16:12:02 11             MR. BYROM:  Objection, nonresponsive.

16:12:05 12             THE WITNESS:  The only thing I'm saying

16:12:06 13   is, that if this student -- and I'm not sure what grade

16:12:10 14   he was in here, fourth, fifth grade, somebody --

16:12:15 15   Ms. Cornejo should have followed up.

16:12:18 16       Q.  And that's what I was going to ask.

16:12:21 17       A.  Either that or Ms. Cano should have provided

16:12:23 18   the forms.

16:12:23 19       Q.  Ms. Cornejo or somebody -- you would have

16:12:24 20   expected Ms. Cornejo or somebody at the district at

16:12:27 21   least to follow up?

16:12:29 22             MR. BYROM:  Objection, form.

16:12:30 23       Q.  Either to get the records or to note something

16:12:32 24   in her file saying, "Hey, where are those records,"

16:12:36 25   something like that at the very least, right?

| | | |
|---|---|---|
| 16:38:01 | 1 | Q.  Now it's a different nurse. |
| 16:38:01 | 2 | A.  It's a different nurse now. |
| 16:38:03 | 3 | Q.  Does this authorization follow through with the |
| 16:38:05 | 4 | patient -- I'm sorry, with the student? |
| 16:38:07 | 5 | A.  I don't know. |
| 16:38:08 | 6 | Q.  Okay.  This stays in his file obviously because |
| 16:38:11 | 7 | you provided it for us. |
| 16:38:13 | 8 | A.  Right. |
| 16:38:13 | 9 | Q.  So this would have been in the file, so |
| 16:38:16 | 10 | couldn't Ms. Kennedy have used this to get the records |
| 16:38:20 | 11 | that she was looking for from the doctor? |
| 16:38:23 | 12 | MR. BYROM:  Objection, form. |
| 16:38:23 | 13 | Q.  Assuming the doctor was cooperating. |
| 16:38:26 | 14 | MR. BYROM:  Thank you.  Finally. |
| 16:38:28 | 15 | THE WITNESS:  I would assume so. |
| 16:38:37 | 16 | Q.  But in any case, she tried calling the doctor |
| 16:38:40 | 17 | from what you understand. |
| 16:38:40 | 18 | A.  From what I understand, and I -- |
| 16:38:47 | 19 | Q.  Why was she trying to get the release? |
| 16:38:49 | 20 | A.  I believe -- because Ms. Cano did meet with me |
| 16:38:53 | 21 | early in sixth grade.  She came by.  We visited.  She |
| 16:38:59 | 22 | informed me about Abraham's condition. |
| 16:39:06 | 23 | At that point, I took her to the team.  We |
| 16:39:08 | 24 | met with his teachers, and I sat in in that meeting, |
| 16:39:12 | 25 | and we, you know, discussed his condition, you know, |

16:39:16 1    and I said, "I'll accept it, you know." He was in P.E.

16:39:22 2    the whole year in sixth grade until he broke his elbow.

16:39:27 3        Q.  In P.E.?

16:39:28 4        A.  I believe so.

16:39:29 5             MR. BYROM:  Objection, form.

16:39:29 6             THE WITNESS:  Based on these notes.  So at

16:39:36 7    that point when I was made aware of his condition and

16:39:40 8    after we met with the teachers, I asked the nurse, you

16:39:43 9    know, "Tell me about him.  What does his record say?"

16:39:46 10            And that's when she shared with me what

16:39:48 11   she knew based on what was passed on from Ed Downs to

16:39:52 12   us.

16:39:53 13       Q.  And that would have been at the end of the

16:39:54 14   school year in 1997, basically, May of 1997?

16:40:01 15       A.  See --

16:40:01 16       Q.  Let me put it in perspective for you --

16:40:03 17       A.  Okay.  4-98.  Okay.  Yes, this is in fifth

16:40:05 18   grade.

16:40:05 19       Q.  This was in fifth grade.

16:40:07 20       A.  Right.

16:40:07 21       Q.  In fifth grade is when he broke his arm at

16:40:10 22   home.

16:40:11 23       A.  Right.

16:40:11 24       Q.  In sixth grade, '97 to '98 school year, April

16:40:14 25   of '98, is when he broke his arm at the -- during P.E.

1          <u>SIGNATURE OF HERIBERTO VILLARREAL</u>

2          I have read the foregoing transcript of my

3    deposition and it is a true and accurate record of my

4    testimony given on MAY 14, 2002, except as to any

5    corrections I have listed on page 101 herein.

6                                        _____

7                                        HERIBERTO VILLARREAL

8

9    THE STATE OF TEXAS

10   COUNTY OF CAMERON

11              SUBSCRIBED AND SWORN TO BEFORE ME, the

12   undersigned authority on this the  20th  day of

13   _____June_____, 2002.

14

15                                       _____

16                                       Notary Public in and for
                                         The State of Texas

17   My commission expires:

18   __3│15│06__

19

20          REBECCA MISHAL SMITH
            MY COMMISSION EXPIRES
21            March 15, 2006.

22

23

24

25



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
ADELA CANO, Individually  )(
and on Behalf of her minor)(
son, ABRAHAM CANO,        )(
         Plaintiff        )(
                          )(
VS.                       )(    CIVIL ACTION NO. B-01-156
                          )(
SAN BENITO CONSOLIDATED   )(
INDEPENDENT SCHOOL        )(
DISTRICT, HERIBERTO       )(
VILLARREAL and PETER      )(
GUERRERO,                 )(
         Defendants       )(
```

REPORTER'S CERTIFICATE

I, Donna McCown, Certified Court Reporter, certify that the witness, HERIBERTO VILLARREAL, was duly sworn by me, and that the deposition is a true and correct record of the testimony given by the witness on MAY 14, 2002; that the deposition was reported by me in stenograph and was subsequently transcribed under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on this the 31st day of _____May_____, 2002.

_____
DONNA McCOWN, CSR NO. 6625
Expiration Date: 12/31/03
Bryant & Stingley, Inc.
2010 East Harrison
Harlingen, Texas  78550
(956)428-0755

# EXHIBIT-B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually    )(
and on Behalf of her        )(
minor son, ABRAHAM CANO     )(
                            )(
        Plaintiff           )(
                            )(
VS.                         )(    CIVIL ACTION NO.
                            )(      B - 01 - 156
SAN BENITO CONSOLIDATED     )(
INDEPENDENT SCHOOL DISTRICT,)(
HERIBERTO VILLARREAL and    )(
PETER GUERRERO              )(
                            )(
        Defendants          )(

---

ORAL DEPOSITION OF
HERIBERTO VILLARREAL
VOLUME 2
MAY 15, 2002

# ORIGINAL

---

ORAL DEPOSITION OF HERIBERTO VILLARREAL,

produced as a witness at the instance of the PLAINTIFF,

taken in the above styled and numbered cause on MAY 15,

2002, reported by JODY McWHORTER, Certified Court

Reporter No. 6095, in and for the State of Texas, at

the offices of San Benito CISD Administrative Building,

240 North Crockett Street, San Benito, Texas, pursuant

to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached therein.

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

09:32  1    nurse, that she had told him he had to go through light

09:32  2    duty -- that Abraham should only be doing like light

09:32  3    duty activities -- she gave him a list of people that

09:32  4    needed special attention.

09:32  5        A.  Uh-huh.

09:32  6        Q.  Anything more than that that he told you?

09:32  7        A.  No, sir.

09:32  8            MR. BYROM:  Can I -- just for clarity's

09:32  9    sake, you said -- you may want to ask if the list was

09:32  10   given at that time she talked to him or at a different

09:32  11   time.

09:32  12       A.  The list was given at the beginning of the

09:32  13   school year.

09:32  14       Q.  That's what I figured.

09:32  15           What I was going to ask you is, when did

09:32  16   she actually meet with Coach Guerrero?

09:32  17       A.  Right when he got the list, I presume.  I

09:32  18   wasn't --

09:32  19       Q.  When would that have been?  August?  September?

09:32  20       A.  August.

09:33  21       Q.  Okay.  August of 2000?

09:33  22       A.  Yes, sir.

09:33  23       Q.  And, at that time, do you know, did he mention

09:33  24   to you whether he made an effort to go look at

09:33  25   Abraham's school records or medical records?

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually      )(
and on Behalf of her          )(
minor son, ABRAHAM CANO       )(
                              )(
        Plaintiff             )(
                              )(
VS.                           )(    CIVIL ACTION NO.
                              )(      B - 01 - 156
SAN BENITO CONSOLIDATED       )(
INDEPENDENT SCHOOL DISTRICT,  )(
HERIBERTO VILLARREAL and      )(
PETER GUERRERO                )(
                              )(
        Defendants            )(

---

ORAL DEPOSITION OF
HERIBERTO VILLARREAL
VOLUME 2
MAY 15, 2002        ORIGINAL

---

ORAL DEPOSITION OF HERIBERTO VILLARREAL,

produced as a witness at the instance of the PLAINTIFF,

taken in the above styled and numbered cause on MAY 15,

2002, reported by JODY McWHORTER, Certified Court

Reporter No. 6095, in and for the State of Texas, at

the offices of San Benito CISD Administrative Building,

240 North Crockett Street, San Benito, Texas, pursuant

to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached therein.

09:32  1    nurse, that she had told him he had to go through light

09:32  2    duty -- that Abraham should only be doing like light

09:32  3    duty activities -- she gave him a list of people that

09:32  4    needed special attention.

09:32  5        A.  Uh-huh.

09:32  6        Q.  Anything more than that that he told you?

09:32  7        A.  No, sir.

09:32  8            MR. BYROM:  Can I -- just for clarity's

09:32  9    sake, you said -- you may want to ask if the list was

09:32  10   given at that time she talked to him or at a different

09:32  11   time.

09:32  12       A.  The list was given at the beginning of the

09:32  13   school year.

09:32  14       Q.  That's what I figured.

09:32  15           What I was going to ask you is, when did

09:32  16   she actually meet with Coach Guerrero?

09:32  17       A.  Right when he got the list, I presume.  I

09:32  18   wasn't --

09:32  19       Q.  When would that have been?  August?  September?

09:32  20       A.  August.

09:33  21       Q.  Okay.  August of 2000?

09:33  22       A.  Yes, sir.

09:33  23       Q.  And, at that time, do you know, did he mention

09:33  24   to you whether he made an effort to go look at

09:33  25   Abraham's school records or medical records?

09:33  1    A.  Via the nurse.  I mean --

09:33  2    Q.  Did he go look with his eyes at --

09:33  3    A.  I don't know.

09:33  4    Q.  You don't know about that one way or the other?

09:33  5    A.  I don't know.

09:33  6    Q.  Okay.  Did the nurse tell him he should?

09:33  7    A.  I don't know.

09:33  8    Q.  Did you tell him he should?

09:33  9    A.  No.

09:33  10   Q.  Did you, the nurse, or anybody else notify him

09:33  11   that he should look into the ARDs and the prior

09:33  12   discussions that the child's parents or parent had had

09:33  13   with the ARD committee?

09:33  14   A.  No.

09:33  15   Q.  Okay.  So, at that point, basically he was

09:33  16   given a list of people needing special attention, so he

09:33  17   goes to the nurse and says, "What do you mean?"

09:33  18   Something like that?

09:33  19   A.  Yes.

09:33  20   Q.  Okay.  And then the nurse says, "Well, you

09:33  21   know, he needs special attention, you need to be

09:33  22   careful with him," something like that?

09:33  23        MR. BYROM:  Objection, form.

09:33  24   A.  Right.

09:33  25   Q.  To the extent that's what you recall he told

10:35  1    Q.  And, as we discussed yesterday, the district

10:35  2    never took any action to determine what the limitations

10:35  3    of that condition were by contacting any doctor,

10:35  4    correct?

10:35  5         MR. BYROM:  Objection, form.

10:35  6    A.  We contacted the mom to bring us that

10:35  7    information.  Yes, we did.

10:35  8         MR. AGUILAR:  Objection, nonresponsive.

10:35  9    Q.  My question was, you and the district didn't

10:35  10   contact any doctor?

10:35  11   A.  No.

10:35  12   Q.  That's correct, right?

10:35  13        MR. BYROM:  Objection, form.

10:35  14   A.  That's correct.

10:35  15   Q.  To try to determine that information, right?

10:35  16        MR. BYROM:  Objection, form.

10:35  17   A.  Right.

10:35  18   Q.  However, the district was aware prior to this

10:35  19   time, prior to Abraham's incident, that he had, quote,

10:35  20   "brittle bones," correct?

10:36  21        MR. BYROM:  Objection, form.

10:36  22   A.  Based on parent information, yes.

10:36  23   Q.  Based on the information.  In other words, the

10:36  24   parent did everything she could to tell you herself

10:36  25   that he had a sensitive condition?

10:36  1     A.   Correct.

10:36  2     Q.   Okay.  And you go on, "Further, Abraham Cano

10:36  3   knew of his condition and its ramifications and

10:36  4   voluntarily participated."  What do you mean by

10:36  5   "voluntarily participated"?

10:36  6          MR. BYROM:  I want to object to the form

10:36  7   of the question, and I've already stated on the record

10:36  8   that these were also -- the lawyer is involved in the

10:36  9   answering of these questions just like you will be

10:36  10  involved in the answering of your client's

10:36  11  interrogatories.

10:36  12         MR. AGUILAR:  Objection to the sidebar.

10:36  13         MR. BYROM:  Well, it is improper to

10:36  14  attempt to use -- if you want to challenge the

10:36  15  discovery responses, then challenge them in court.  I

10:36  16  think it's improper for you now to try to challenge

10:36  17  interrogatory answers and make them as if every word of

10:36  18  it was only his direct quote, because that's not what

10:36  19  interrogatories are.

10:36  20         MR. AGUILAR:  Hey, he swore to the truth

10:36  21  of these.

10:37  22         MR. BYROM:  You know what I'm talking

10:37  23  about, Mr. Aguilar.

10:37  24         MR. AGUILAR:  He swore to the truth of

10:37  25  these.

10:47  1      A.   Right, and take disciplinary action.

10:47  2      Q.   Other disciplinary action, as well.  And one of

10:47  3  the reasons you do that is because they can be a danger

10:47  4  to themselves or others, right?

10:47  5      A.   Right.

10:47  6      Q.   Do you agree the district has a duty to protect

10:47  7  children from themselves in areas where they can be a

10:47  8  danger to themselves or to others?

10:47  9              MR. MOORE:  Objection, form.

10:47  10             MR. BYROM:  Objection, form.

10:47  11     A.   Yes.

10:47  12     Q.   Even if the kids don't recognize the danger

10:47  13  themselves?

10:47  14             MR. BYROM:  Objection, form.

10:47  15     Q.   I would presume every one of the kids who shows

10:47  16  up with a knife or gun and starts playing with it, at

10:47  17  least in the elementary level, they don't recognize the

10:47  18  dangers that could be inherent in playing with those

10:47  19  items?

10:47  20             MR. BYROM:  Objection, form.

10:47  21     Q.   Is that your understanding?

10:47  22     A.   Could you restate that?

10:47  23     Q.   Sure.  In other words, when kids bring knives

10:47  24  and guns to school, is it your understanding that -- I

10:47  25  mean, aside from the occasional psychotic who wants to

```
 1              SIGNATURE OF HERIBERTO VILLARREAL

 2       I have read the foregoing transcript of my

 3   deposition and it is a true and accurate record of my

 4   testimony given on MAY 15, 2002, except as to any

 5   corrections I have listed on Page 187 herein.

 6

 7                            _____
                                   HERIBERTO VILLARREAL
 8

 9   THE STATE OF TEXAS

10   COUNTY OF CAMERON

11                   SUBSCRIBED AND SWORN TO BEFORE ME, the

12   undersigned authority on this the  20th  day of

13   _____June_____, 2002.

14

15                            _____
                                 Notary Public in and for
16                               The State of Texas

17   My commission expires:
           3-15-06
18

19

20             REBECCA MISHAL SMITH
               MY COMMISSION EXPIRES
               March 15, 2006
21

22

23

24

25
```

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755     (956) 542-1020

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
ADELA CANO, Individually      ) (
and on Behalf of her          ) (
minor son, ABRAHAM CANO       ) (
                              ) (
         Plaintiff            ) (
                              ) (
VS.                           ) (   CIVIL ACTION NO.
                              ) (     B - 01 - 156
SAN BENITO CONSOLIDATED       ) (
INDEPENDENT SCHOOL DISTRICT,  ) (
HERIBERTO VILLARREAL and      ) (
PETER GUERRERO                ) (
                              ) (
         Defendants           ) (
```

REPORTER'S CERTIFICATE

I, JODY McWHORTER, Certified Court Reporter, certify that the witness, HERIBERTO VILLARREAL, was duly sworn by me, and that the deposition is a true and correct record of the testimony given by the witness on MAY 15, 2002; that the deposition was reported by me in stenograph and was subsequently transcribed under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on this ___30____ day of _____, 2002.

JODY McWHORTER, Texas CSR 6095
Expiration Date: 12-31-02
Bryant & Stingley, Inc.
4900 North 10th, Building A, Suite 3
McAllen, Texas  78504
(956) 618-2366

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755      (956)542-1020

# EXHIBIT-C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
ADELA CANO, Individually    )(
and on Behalf of her        )(
minor son, ABRAHAM CANO,    )(
        Plaintiff           )(
                            )(
VS.                         )(   CIVIL ACTION NO. B-01-156
                            )(
SAN BENITO CONSOLIDATED     )(
INDEPENDENT SCHOOL          )(
DISTRICT, HERIBERTO         )(
VILLARREAL and PETER        )(
GUERRERO,                   )(
        Defendants          )(
```

---

ORAL DEPOSITION OF
PEDRO GABRIEL GUERRERO
JULY 15, 2002

# ORIGINAL

---

ORAL DEPOSITION OF PEDRO GABRIEL GUERRERO,

produced as a witness at the instance of the PLAINTIFF,

taken in the above styled and numbered cause on

JULY 15, 2002, reported by CORINNA N. GARCIA, Certified

Court Reporter No. 5210, in and for the State of Texas,

at the offices of Willette & Guerra, L.L.P.,

International Plaza, 3505 Boca Chica Boulevard, Suite

460, Brownsville, Texas, pursuant to the Federal Rules

of Civil Procedure.

14:54:20  1    excuse them from PE.

14:54:23  2        Q.  So if a student has a condition that would

14:54:25  3    exclude them from PE but they don't have a doctor's

14:54:33  4    excuse, you believe they should be sent to the nurse?

14:54:33  5             MR. BYROM:  Objection, form.

14:54:35  6        Q.  Correct?

14:54:35  7        A.  What was that again?

14:54:36  8        Q.  If a student comes in, they have a condition or

14:54:37  9    a problem that they're telling you they can't be in PE

14:54:43 10    and you just don't have a doctor's excuse, you believe

14:54:46 11    that what should be done is they should be sent to the

14:54:49 12    nurse?

14:54:49 13        A.  Yes, sir, for the nurse to write a letter.

14:54:53 14        Q.  And then the nurse would be the one who would

14:54:55 15    get you the doctor's excuse or get you some type of

14:54:58 16    excuse for the child, even if it's from her?

14:55:02 17        A.  Yes, sir.

14:55:02 18        Q.  And is it your understanding that the nurse can

14:55:04 19    excuse a student from physical education activities?

14:55:07 20        A.  Yes, sir.

14:55:07 21        Q.  Okay.  Even without -- I mean, she could do

14:55:10 22    whatever she needs to do, call the doctor, do whatever

14:55:13 23    she needs to do, and then if she gets satisfied that

14:55:16 24    this student shouldn't be in PE, all she does is tell

14:55:20 25    you, "Keep this student out of PE," whether it's

| | |
|---|---|
| 14:55:23 | 1 | written or verbal, and that's good enough for you? |
| 14:55:26 | 2 | MR. BYROM:  Objection, form. |
| 14:55:27 | 3 | A.  Yes, sir. |
| 14:55:27 | 4 | Q.  Was that ever done for Abraham? |
| 14:55:29 | 5 | A.  No. |
| 14:55:30 | 6 | Q.  To the best of your knowledge, it was not? |
| 14:55:33 | 7 | A.  No, sir. |
| 14:55:34 | 8 | Q.  I mean, that's correct, right? |
| 14:55:35 | 9 | A.  Yes, sir. |
| 14:55:51 | 10 | Q.  I may have asked you this already, but do you |
| 14:55:55 | 11 | remember talking to Principal Villarreal about Abraham |
| 14:55:58 | 12 | before the incident of November 27, 2000? |
| 14:56:03 | 13 | A.  No, sir. |
| 14:56:04 | 14 | Q.  Okay.  Handing you what was previously marked |
| 14:56:06 | 15 | as Exhibit 2, have you ever seen that document before? |
| 14:56:58 | 16 | A.  I'm not too sure. |
| 14:57:00 | 17 | Q.  I'm sorry? |
| 14:57:00 | 18 | A.  I'm not too sure. |
| 14:57:01 | 19 | Q.  You might have seen it before? |
| 14:57:03 | 20 | A.  I might have. |
| 14:57:04 | 21 | Q.  Let me put it this way, did you ever see this |
| 14:57:07 | 22 | document before November 27, 2000? |
| 14:57:12 | 23 | A.  I'm not too sure. |
| 14:57:12 | 24 | Q.  You might have seen it, you might not? |
| 14:57:15 | 25 | A.  I might have.  I might not. |

14:58:14 1    Q.  You don't remember?

14:58:14 2    A.  I'm not too sure, no, sir.

14:58:17 3    Q.  If you had seen it and you had -- you would

14:58:20 4  have been aware that Abraham has brittle bones, right?

14:58:28 5            MR. MOORE:  Objection, calls for

14:58:28 6  speculation.

14:58:29 7    Q.  It says brittle bones?

14:58:32 8    A.  Yes.

14:58:33 9    Q.  If a student has brittle bones, how would you

14:58:36 10 interpret that?

14:58:37 11   A.  Myself?  That he doesn't belong in PE.

14:58:40 12   Q.  Why?

14:58:40 13   A.  Because he's got brittle bones.

14:58:43 14   Q.  I'm asking the obvious, but I just need for you

14:58:45 15 to explain to me why.

14:58:47 16   A.  He would be putting himself at risk.

14:58:50 17   Q.  Obviously, a student would be putting himself

14:58:52 18 at risk by engaging in physical activities if he has

14:58:55 19 brittle bones?

14:58:57 20           MR. BYROM:  Objection, form.

14:58:58 21   A.  Yes, sir.

14:58:58 22   Q.  That's your understanding at least, right?

14:59:01 23   A.  Yes, sir.

14:59:01 24   Q.  Hand you what was previously marked as Exhibit

14:59:04 25 3.  Have you ever seen that document before?

15:03:14 1    A.   Yes, sir.

15:03:15 2    Q.   And did it also say the brittle bones part?

15:03:17 3    A.   I'm not too sure.  I don't know.

15:03:19 4    Q.   Well, put it this way.  Before meeting Abraham,

15:03:20 5  had you ever heard the term osteogenesis imperfecta?

15:03:25 6    A.   Yes, sir.  As a matter of fact, I had just seen

15:03:28 7  a movie about it.  That's how I knew about it.

15:03:30 8    Q.   Unbreakable?

15:03:33 9    A.   Yes, sir.

15:03:33 10    Q.   So you knew what the term meant?

15:03:34 11    A.   Yes, sir.

15:03:34 12    Q.   And you knew what the condition meant?

15:03:36 13    A.   Yes, sir.

15:03:36 14    Q.   Basically you get this document saying "Abraham

15:03:39 15  has osteogenesis imperfecta," and the first thing you

15:03:46 16  thought was, "Hey, just like the guy in the movie"?

15:03:46 17    A.   Yes, sir.

15:03:46 18    Q.   So you already knew it meant that he has

15:03:49 19  brittle bones?

15:03:50 20    A.   Yes, sir.

15:03:51 21    Q.   So you didn't need to go back to the nurse and

15:03:52 22  say, "Hey, does that mean he's got brittle bones?"  In

15:03:52 23  other words, you didn't have to go try to get more

15:03:54 24  information from the nurse?

15:03:56 25    A.   Well, I didn't have to, but I did go back.

15:03:59 1    Q.   Okay.  And what did you go back for?

15:04:03 2    A.   I went for -- to ask the nurse if Abraham

15:04:08 3 really belonged in my class.

15:04:11 4    Q.   And what did she say?

15:04:12 5    A.   She said that he did belong there because they

15:04:14 6 did not have any documentation from a doctor excluding

15:04:19 7 him from participation in PE class.

15:04:23 8    Q.   She said -- the nurse told you that Abraham had

15:04:25 9 to stay in your class because there was no doctor's

15:04:29 10 excuse?

15:04:30 11    A.   Yes, sir.

15:04:30 12    Q.   So what did you --

15:04:32 13    A.   They were pending something from the doctor to

15:04:35 14 remove him from PE class.

15:04:37 15    Q.   Okay.  And what did you tell her?

15:04:38 16    A.   I said -- I went and asked what -- if that was

15:04:43 17 a good idea to keep him in there because, PE, you know,

15:04:46 18 you get a grade during participation and stuff, and she

15:04:50 19 said that they were still waiting for a doctor's --

15:04:53 20 that Ms. Cano had never brought anything back to them.

15:04:57 21    Q.   Okay.  Did -- it sounds like what you were

15:05:00 22 telling the nurse was, "Look, I don't care if he

15:05:03 23 doesn't have a piece of paper that says he can't do it.

15:05:05 24 It doesn't sound like a very smart idea to let him do

15:05:09 25 it anyway."  Is that what you were trying to tell them?

15:05:14 1          MR. MOORE:  Objection, misquotes the

15:05:14 2    witness.

15:05:17 3          Q.  You can answer.  They might object to different

15:05:18 4    things, but you can answer the question.

15:05:18 5          A.  What was the question?

15:05:20 6          Q.  I'll try it again.  It sounded to me like what

15:05:21 7    you were saying was, "Look, whether he has a piece of

15:05:24 8    paper from the doctor or not, it doesn't sound like

15:05:27 9    it's a very smart idea to put him in to play PE" --

15:05:31 10         A.  Yes, sir.

15:05:33 11         Q.  -- "whether he has a paper or not."

15:05:35 12         MR. MOORE:  Objection, misquotes the

15:05:36 13   witness.

15:05:36 14         A.  Yes, sir.

15:05:37 15         Q.  That was basically what you understood, what

15:05:52 16   you were thinking at the time?

15:06:07 17         A.  Yes, sir.

15:06:08 18         Q.  Okay.  You were concerned that if Abraham did

15:06:10 19   participate in sports that he could be injured?

15:06:14 20         A.  Yes, sir, I was concerned.

15:06:15 21         Q.  But the nurse said there wasn't a piece of

15:06:18 22   paper yet that said he could -- he was excused from PE?

15:06:22 23         A.  Yes, sir.

15:06:22 24         Q.  Okay.  So as far as the nurse was concerned,

15:06:27 25   you understood she was saying "Put him into play

15:06:29 1    anyway"?

15:06:32 2                    MR. BYROM:  Objection, form.

15:06:32 3         Q.  I'm asking what you understood --

15:06:34 4         A.  Yes, sir.

15:06:34 5         Q.  -- she was saying.

15:06:35 6         A.  Yes, sir.

15:06:37 7                    MR. BYROM:  Objection, form.

15:06:37 8         Q.  That's what you understood she was saying?

15:06:39 9         A.  Yes, sir.

15:06:42 10        Q.  Okay.  So then you went along.  Did you

15:06:44 11   actually -- I'm not asking about on the 20th -- I'm

15:06:52 12   sorry, the 27th.  I'm asking about before the injury

15:06:52 13   itself.  Did you put him into play?  In other words,

15:06:54 14   what type of activities did you do for eighth graders?

15:06:58 15        A.  Well, we would go break down skills, which

15:07:01 16   would be if we were doing basketball, it would be

15:07:04 17   dribbling, shooting.  We'd go into the history of the

15:07:08 18   game, and then we would actually go out and play and do

15:07:11 19   it.

15:07:11 20        Q.  Okay.  And that would be on the basketball

15:07:15 21   court, I presume?

15:07:15 22        A.  Basketball court or soccer field.  It depends.

15:07:18 23   Whatever we were doing.

15:07:18 24        Q.  Did you put Abraham out to do that, play

15:07:21 25   basketball, for example?

15:07:22 1      A.  After I discussed --

15:07:23 2      Q.  After talking to the nurse.

15:07:24 3      A.  After talking to the nurse, no, I didn't.  I

15:07:27 4  went back and spoke with him.

15:07:29 5      Q.  Okay.

15:07:30 6      A.  And I just -- I didn't feel -- I didn't feel

15:07:34 7  comfortable with the situation.

15:07:36 8      Q.  Okay.

15:07:36 9      A.  So I let Abraham -- I told Abraham to

15:07:39 10  participate in what he felt he could participate in.

15:07:53 11      Q.  Okay.  You left it up to him to participate to

15:07:57 12  whatever extent --

15:07:58 13      A.  He felt comfortable.

15:07:59 14      Q.  -- he felt comfortable doing.  Okay.  Do you

15:08:00 15  remember when you talked to the nurse?  School year

15:08:05 16  started --

15:08:06 17      A.  I want to say it was the same day that -- it

15:08:07 18  was either one or --

15:08:09 19      Q.  The day that you got this document?

15:08:11 20      A.  Yes, sir.

15:08:11 21      Q.  But what I meant was was it at the beginning of

15:08:14 22  the school year, was it --

15:08:15 23      A.  I wanted --

15:08:16 24      Q.  Hang on.  Let me finish my question.  The

15:08:18 25  school year started in August.  Do you remember if it

15:09:33  1        Q.  Okay.  Abraham at that point was how old?

15:09:37  2        A.  I'm not too sure, sir.

15:09:38  3        Q.  About 14?  Actually, if I'm not mistaken, he

15:09:46  4   was injured on the day before his 14th birthday.

15:09:49  5        A.  Yes, sir.

15:09:49  6        Q.  So at this time prior to that, he would have

15:09:52  7   been 13.  To what extent do you think a 13-year-old has

15:09:58  8   enough maturity to determine what is safe enough or

15:10:02  9   what activities are safe enough for him to participate

15:10:05 10   in?

15:10:05 11        A.  I don't know.

15:10:06 12             MR. MOORE:  Objection, calls for

15:10:07 13   speculation.

15:10:08 14        Q.  You don't have any idea?

15:10:09 15        A.  I don't have any idea.

15:10:10 16        Q.  For example -- let's put it in perspective a

15:10:13 17   little bit.  Playing with knives.  You and I can hold a

15:10:14 18   knife, juggle it if we want to.  It might be stupid,

15:10:18 19   but we can do it.  And we're supposed to have the

15:10:21 20   maturity to be able to know what we're doing and to

15:10:25 21   understand the risks, right?

15:10:26 22        A.  Yes, sir.

15:10:27 23        Q.  Do you think a 13-year-old like Abraham would

15:10:30 24   have that maturity?

15:10:31 25             MR. BYROM:  Objection, form.

15:10:33 1          MR. MOORE:  Objection, calls for

15:10:34 2  speculation.

15:10:35 3      A.  Yes, sir.

15:10:38 4      Q.  You think he would?

15:10:38 5      A.  Yes, sir.

15:10:39 6      Q.  You would let a 13-year-old play with knives?

15:10:42 7          MR. BYROM:  Objection.

15:10:42 8      A.  Depends.  In my classroom or --

15:10:45 9      Q.  Anywhere.

15:10:47 10          MR. BYROM:  Same objection.

15:10:49 11      Q.  Let's say it's in your classroom first.

15:10:53 12      A.  No.

15:10:53 13      Q.  Why not?

15:10:54 14      A.  Because, first of all, knives are against

15:10:56 15  school policy.  I'd have to take the knife away.

15:10:57 16      Q.  So if the child was doing it after school just

15:11:00 17  a couple of steps outside of the school campus, do you

15:11:03 18  think that's okay?

15:11:05 19          MR. BYROM:  Objection, form.

15:11:06 20          MR. MOORE:  Objection, calls for

15:11:07 21  speculation.

15:11:09 22      A.  If it was outside of school, I wouldn't.

15:11:10 23      Q.  You wouldn't get involved?

15:11:11 24      A.  I wouldn't get involved, sir.

15:11:13 25      Q.  And the only reason you would get involved in

15:11:16 1    school was because it's against school policy, right?

15:11:19 2       A.  Yes, sir.

15:11:19 3       Q.  But, otherwise, you don't think there would be

15:11:21 4    anything wrong with a 13-year-old playing with knives,

15:11:24 5    right?  .

15:11:25 6                MR. BYROM:  Objection, form.

15:11:27 7                MR. MOORE:  Objection, calls for

15:11:27 8    speculation.

15:11:28 9       A.  No, sir.

15:11:28 10      Q.  I mean, you agree with that, right?

15:11:30 11      A.  Yes, sir.

15:11:30 12      Q.  What about a handgun?

15:11:32 13                MR. BYROM:  Objection, form.

15:11:33 14      Q.  Go ahead.

15:11:34 15      A.  A what?

15:11:34 16      Q.  Handgun, .38 special.

15:11:37 17      A.  No.

15:11:38 18      Q.  Do you think a 13-year-old is mature enough

15:11:40 19   to --

15:11:40 20      A.  No, sir.

15:11:41 21                MR. BYROM:  Objection, form.

15:11:42 22      Q.  That's obviously a dangerous weapon, and he can

15:11:44 23   get hurt?

15:11:45 24      A.  Yes, sir.

15:11:46 25      Q.  Okay.  So, to some extent, you think a

15:11:49  1    13-year-old might be smart enough to know how to handle

15:11:53  2    a dangerous item and to some extent not?

15:11:56  3        A.  Yes, sir.

15:11:56  4        Q.  And, similarly, to be able to understand the

15:11:59  5    danger to himself?

15:12:02  6                MR. MOORE:  Objection, calls for

15:12:03  7    speculation.

15:12:03  8        A.  Yes, sir.

15:12:04  9        Q.  Because, for example, the handgun could be used

15:12:06 10    not just to accidentally shoot somebody else, but could

15:12:09 11    accidentally go off and shoot yourself or himself,

15:12:15 12    correct?

15:12:15 13        A.  Yes, sir.

15:12:15 14        Q.  All right.  Other than talking to the nurse

15:12:17 15    that one time and getting that document, did you talk

15:12:21 16    to the nurse any more about Abraham before the

15:12:24 17    incident?

15:12:28 18        A.  Not that I can remember, sir.

15:12:30 19        Q.  Okay.  Did you talk to anybody else about

15:12:31 20    Abraham's condition prior to the incident?  Let's do it

15:12:39 21    one at a time.  Did you ever talk to the principal?

15:12:41 22        A.  Yes, sir.

15:12:43 23        Q.  When did you talk to Mr. Villarreal?

15:12:44 24        A.  It was at the hall, but I don't remember what

15:12:46 25    day.

15:12:48  1    Q.  Let me try to put it in perspective then.

15:12:49  2  School year started August.  About when --

15:12:53  3    A.  It was when I talked to the nurse.  It was

15:12:55  4  about that -- around that time period, because I was

15:12:58  5  sort of uncomfortable with the situation.

15:13:00  6    Q.  Late September, early October?

15:13:02  7    A.  Yes, sir.

15:13:03  8    Q.  And what did you all talk about?

15:13:04  9    A.  I just basically asked the situation with

15:13:10 10  Abraham in PE class, and the response that Ms. -- I

15:13:14 11  believe it was Kennedy.

15:13:22 12    Q.  Was the nurse Ms. Kennedy?

15:13:23 13    A.  Yes.

15:13:24 14    Q.  And what did you all talk about?

15:13:28 15    A.  Basically what -- how to go about the

15:13:30 16  situation.

15:13:30 17    Q.  What to do?

15:13:31 18    A.  Yes, sir.

15:13:31 19    Q.  And what did he tell you?

15:13:33 20    A.  He said just to talk to Ms. Kennedy about the

15:13:36 21  situation because she had the paperwork and everything

15:13:38 22  and she knew what to do since she was -- it was a

15:13:42 23  health-related deal.

15:13:43 24    Q.  Okay.  His response was, "Do whatever the nurse

15:13:47 25  tells you"?

15:13:47  1        A.   Yes, sir.

15:13:48  2        Q.   "She's the one -- I'm tendering whatever

15:13:50  3   responsibility I have in making this decision over to

15:13:53  4   her because she's the nurse"?

15:13:54  5             MR. BYROM:  Objection, form.

15:13:55  6        Q.   Is that the understanding you got?

15:13:58  7        A.   Yes, sir.

15:14:04  8        Q.   So did you talk any more about that situation

15:14:08  9   at that time?

15:14:09 10        A.   No, sir.

15:14:11 11        Q.   Did you talk to the principal anymore after

15:14:12 12   that about Abraham?

15:14:14 13        A.   No, sir.

15:14:14 14        Q.   Okay.  So what happens is you talked to the

15:14:19 15   nurse, you talked to the principal, the principal says

15:14:22 16   "Do whatever the nurse says," and the nurse says, "Put

15:14:25 17   him into play."

15:14:26 18             MR. BYROM:  Objection, form.

15:14:27 19        Q. , Is that right?

15:14:27 20        A.   Yes, sir.

15:14:28 21        Q.   So from your understanding, based on talking to

15:14:30 22   everybody so far, your understanding is that the school

15:14:32 23   district was telling you, "Put Mr. -- put Abraham into

15:14:36 24   play"?

15:14:37 25             MR. BYROM:  Objection, form.

15:14:38  1      Q.  Is that your understanding?

15:14:39  2      A.  Yes, sir.

15:14:41  3      Q.  Okay.  Did you talk to anybody else about

15:14:48  4  Abraham prior to this incident?

15:14:51  5      A.  No, sir.

15:14:51  6      Q.  Any assistant principal, any other teacher,

15:14:55  7  anybody outside the school?

15:14:57  8      A.  No, sir.

15:14:57  9      Q.  You didn't -- I assume you didn't try to call

15:14:59 10  up Abraham's doctor?

15:15:04 11      A.  No, sir.

15:15:04 12      Q.  That's correct, right?

15:15:04 13      A.  Yes, sir.

15:15:05 14      Q.  So, otherwise, you didn't talk to anybody else?

15:15:09 15      A.  No, sir.

15:15:09 16      Q.  Okay.  During this time, early September --

15:15:13 17  late September/early October until November, during

15:15:17 18  that time period Abraham participated in some of the PE

15:15:21 19  activities?

15:15:21 20      A.  Yes, sir.

15:15:22 21      Q.  Which activities?

15:15:22 22      A.  I cannot recall.  I do remember sometimes him

15:15:28 23  dribbling the ball.  During the lecture part he would

15:15:32 24  do the written work.  But other than that, I just -- I

15:15:35 25  wouldn't be able -- I can't remember what exactly it

15:42:40 1      Q.  Okay.  And up to that point -- or prior to that

15:42:43 2  time you already knew about Abraham's condition, right,

15:42:46 3  the osteogenesis imperfecta?

15:42:46 4      A.  Yes, sir.

15:42:46 5      Q.  And you knew how dangerous it could be for

15:42:49 6  somebody with that condition if they were to fall down,

15:42:51 7  if they were to run into another student, anything that

15:42:54 8  might cause any sudden impact to a student with brittle

15:42:58 9  bones, right?

15:42:59 10          MR. MOORE:  Objection, calls for

15:43:00 11  speculation.

15:43:05 12          MR. BYROM:  Objection, form.

15:43:05 13      A.  Yes, sir.

15:43:05 14      Q.  At the same time, you didn't tell Abraham,

15:43:08 15  "Look, get out of the game," correct?

15:43:10 16      A.  No, sir.

15:43:10 17      Q.  In other words, you let him continue playing?

15:43:13 18          MR. BYROM:  Objection, form.

15:43:15 19      A.  Yes.

15:43:16 20      Q.  At that point you were just leaving it up to

15:43:19 21  Abraham to decide when it was safe enough for him to

15:43:22 22  play or not to play?

15:43:23 23      A.  Yes, sir.

15:43:24 24      Q.  Okay.  As far as where the ball went, you said

15:43:27 25  it went out of bounds?

15:47:41  1     Q.   Okay.

15:47:42  2     A.   And I had first aid training, which is required

15:47:45  3   when you coach, but that's about it.

15:47:47  4     Q.   Did they ever provide you with any training on

15:47:49  5   what to do with a student who might be medically

15:47:52  6   fragile --

15:47:53  7     A.   No, sir.

15:47:53  8     Q.   -- like a student who is subject to epileptic

15:47:56  9   attacks or a student who, like Abraham, who has this

15:48:00 10   special condition?

15:48:01 11     A.   No, sir.

15:48:02 12     Q.   Anything else like that?

15:48:03 13     A.   No, sir.

15:48:04 14          MR. BYROM:   Objection, form.

15:48:10 15     Q.   Do you agree that Abraham should not have been

15:48:12 16   allowed to participate in any physical education

15:48:15 17   activities, correct?

15:48:17 18          MR. BYROM:   Objection, form.

15:48:19 19          MR. MOORE:   Objection, misquotes the

15:48:22 20   witness.

15:48:22 21     Q.   Do you agree with that?

15:48:22 22          MR. BYROM:   Same objection.

15:48:23 23          MR. MOORE:   Same objection.

15:48:25 24     Q.   Do you agree that abraham should not have been

         25   allowed to participate in any physical education

15:48:27  1    activities?

15:48:27  2              MR. BYROM:  Objection, form.

15:48:27  3        A.  Yes.

15:48:28  4        Q.  He was 14 years old.  Or just before he was 14

15:48:31  5    years old at that time, right?

15:48:32  6        A.  Yes, sir.

15:48:33  7        Q.  Do you agree that kids at that age, basically

15:48:36  8    they like to play?

15:48:37  9        A.  Yes, sir.

15:48:37 10        Q.  They want to play?

15:48:38 11        A.  Yes, sir.

15:48:39 12        Q.  That they could play all day instead of going

15:48:41 13    to class?  They'd probably prefer to do that, wouldn't

15:48:45 14    they?

15:48:45 15        A.  Yes, sir.

15:48:45 16        Q.  A lot of times they don't know their own

15:48:48 17    limitations.  Would you agree with that?

15:48:50 18        A.  Yes, sir.

15:49:01 19        Q.  Okay.  At the time Abraham was injured, he was

15:49:04 20    under your care and supervision, right?

15:49:06 21        A.  Yes, sir.

15:49:07 22        Q.  He was required to attend school?

15:49:11 23        A.  Yes, sir.

15:49:11 24        Q.  He was required to attend physical education?

15:49:13 25        A.  Yes, sir.

15:49:15 1    Q.  And, basically, the school district didn't give

15:49:21 2    him any choice in not doing that, right?

15:49:24 3    MR. BYROM:  Objection, form.

15:49:26 4    MR. MOORE:  Objection, misquotes the

15:49:27 5    witness.

15:49:28 6    A.  As far as I know.

15:49:28 7    Q.  So he falls down, you run over to him.

15:49:31 8    A.  Yes, sir.

15:49:31 9    Q.  What do you see when you get there?

15:49:33 10   A.  I see that his injuries -- at first when I

15:49:37 11   started going over, I thought he had sprained his

15:49:40 12   ankle, but when I got there, it was more severe.  I

15:49:43 13   went with him and got the students to sit down, and I

15:49:49 14   got one student to go and get the nurse, and I stayed

15:49:54 15   there with him.

15:49:54 16   Q.  Okay.  What did you see when you approached

15:49:57 17   Abraham?

15:49:57 18   A.  I saw his ankle was misplaced.

15:50:01 19   Q.  How was it misplaced?

15:50:03 20   A.  It was turned to one side.

15:50:04 21   Q.  How much to one side?  In other words, the

15:50:09 22   normal positioning of an ankle with the foot here and

15:50:12 23   the leg here, ankle here, this would be the normal

15:50:16 24   positioning of the foot.  Was it at 90 degrees or less?

15:50:24 25   A.  I'm not going to lie to you.  I know it was

88

15:50:27  1  bad.  That's why I got the nurse.

15:50:29  2      Q.  The foot was actually turned around almost 180

15:50:31  3  degrees, wasn't it?  In other words, the toes, instead

15:50:34  4  of pointing directly forward, were actually turned and

15:50:39  5  pointing almost completely and directly back, weren't

15:50:44  6  they?

15:50:44  7      A.  Pretty close, yes, sir.

15:50:45  8      Q.  That was on his left foot, right?

15:50:48  9      A.  I'm not too sure.  I don't remember.

15:50:50  10     Q.  On one foot?

15:50:51  11     A.  Yes, sir.

15:50:52  12     Q.  Did you look at the other foot or the other

15:50:54  13  knee?

15:50:54  14     A.  No, sir.

15:50:56  15     Q.  Do you remember if Abraham was grabbing his

15:51:00  16  knee?

15:51:00  17     A.  He was grabbing I believe it was his ankle.

15:51:02  18     Q.  You believe he was reaching all the way over to

15:51:06  19  grab his ankle?

15:51:08  20     A.  Yes, sir.  It was -- I don't know.

15:51:09  21     Q.  You're not sure, are you?

15:51:11  22     A.  I'm not too sure.

15:51:12  23     Q.  You remember he was grabbing something?

15:51:14  24     A.  Yes, sir.

15:51:14  25     Q.  Could you tell he was in pain?

15:51:16 1    A.  Yes, sir.

15:51:16 2    Q.  Did it look like he was in pain?

15:51:19 3    A.  Yes, sir.

15:51:19 4    Q.  Did it look like he was in excruciating pain?

15:51:22 5    A.  Yes, sir.

15:51:22 6    Q.  His foot was turned back almost 180 degrees.

15:51:26 7  He was grabbing some part of his body.  Did you

15:51:29 8  actually see his knee?

15:51:30 9    A.  No, sir.

15:51:30 10   Q.  Do you remember seeing his knee?

15:51:32 11   A.  No, sir.

15:51:33 12   Q.  Okay.  Do you know what ultimately happened to

15:51:35 13 his knee?

15:51:36 14   A.  No, sir.

15:51:37 15   Q.  Okay.  You saw him grabbing some part of his

15:51:39 16 body, the student runs and calls the nurse.  What

15:51:43 17 happens next?

15:51:43 18   A.  I stayed there with Abraham trying to make the

15:51:46 19 situation -- trying to console him, telling him to hang

15:51:51 20 in there, that help was coming.

15:51:52 21   Q.  Was Abraham conscious or unconscious, or could

15:51:55 22 you tell?

15:51:56 23   A.  Conscious, yes.

15:51:58 24   Q.  Was he twisting and turning?

15:52:01 25   A.  He was on the ground, yes, sir.

15:52:03 1    Q.  Kind of --

15:52:04 2    A.  Yeah.

15:52:04 3    Q.  Did you understand he was twisting and turning

15:52:09 4    because of the pain?

15:52:09 5    A.  Yes, sir.

15:52:09 6    Q.  Okay.  So you're trying to tell Abraham, "Hang

15:52:13 7    in there.  The nurse is coming"?

15:52:15 8    A.  Yes, sir.

15:52:15 9    Q.  What do you remember happening next?

15:52:17 10   A.  I remember the kids sitting down.  I told the

15:52:21 11   kids to sit down.  One of the students went and got the

15:52:25 12   nurse.  The PE teacher, other PE teacher came over

15:52:30 13   because I sent one of the students to call him over

15:52:33 14   also.  He came over and the nurse got there, and she's

15:52:36 15   the one who started putting ice on it.  She called the

15:52:41 16   principal and the emergency vehicle to come over.

15:52:43 17   Q.  So the nurse brings ice and calls EMS?

15:52:47 18   A.  Yes, sir.

15:52:48 19   Q.  And the principal?

15:52:48 20   A.  The assistant principal.

15:52:50 21   Q.  Who is the assistant principal?

15:52:52 22   A.  I'm going to say Mr. Rojas or Rosas, something

15:52:56 23   like that.

15:52:56 24   Q.  Rojas or Rosas?

15:52:58 25   A.  It's the same person.  I just don't remember if

BRYANT & STINGLEY, INC.
RECEIVED

8-16-02
DATE

TN-1581
DDB-8/29/02

```
1              ERRATA SHEET/SIGNATURE PAGE

2    PAGE LINE   CHANGE                        REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14      I, PEDRO GABRIEL GUERRERO, have read the foregoing
     deposition and hereby affix my signature that same is
15   true and correct, except as noted above.

16                              PEDRO GABRIEL GUERRERO

17   THE STATE OF TEXAS

     COUNTY OF CAMERON
18
        BEFORE ME, Pedro Gabriel Guerrero       , on this day
19   personally appeared PEDRO GABRIEL GUERRERO, known to me
     or proved to me to be the person whose name is
20   subscribed to the foregoing instrument and acknowledged
     to me that said witness executed the same for the
21   purposes and consideration therein expressed.

22      Given under my hand and seal of office this  14th
     day of    August          , 2002.
23
                         Chris D. Gonzalez
24   _____
     Notary Public in and for the State of Texas

25
```

CHRIS D. GONZALEZ
MY COMMISSION EXPIRES
March 12, 2006

ORIGINAL

BRYANT & STINGLEY, INC.

McAllen              Harlingen            Brownsville
(956) 618-2366     (956) 428-0755      (956) 542-1020

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   ADELA CANO, Individually  )(
     and on Behalf of her       )(
 4   minor son, ABRAHAM CANO,   )(
             Plaintiff          )(
 5                              )(
     VS.                        )(   CIVIL ACTION NO. B-01-156
 6                              )(
     SAN BENITO CONSOLIDATED    )(
 7   INDEPENDENT SCHOOL         )(
     DISTRICT, HERIBERTO        )(
 8   VILLARREAL and PETER       )(
     GUERRERO,                  )(
 9           Defendants         )(

10                    REPORTER'S CERTIFICATE

11              I, CORINNA N. GARCIA, Certified Court
     Reporter, certify that the witness, PEDRO GABRIEL
12   GUERRERO, was duly sworn by me, and that the deposition
     is a true and correct record of the testimony given by
13   the witness on JULY 15, 2002; that the deposition was
     reported by me in stenograph and was subsequently
14   transcribed under my supervision.
                I FURTHER CERTIFY that I am not a
15   relative, employee, attorney or counsel of any of the
     parties, nor a relative or employee of such attorney or
16   counsel, nor am I financially interested in the action.
                WITNESS MY HAND on this the 29th day of
17   ___July_____ , 2002.

18              Corinna N. Garcia
                CORINNA N. GARCIA, CSR NO. 5210
19              Expiration Date: 12/31/03
                Bryant & Stingley, Inc.
20              2010 East Harrison
                Harlingen, Texas  78550
21

22

23

24

25
```

# EXHIBIT-D

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually     )(
and on behalf of her minor   )(
son, ABRAHAM CANO            )(
          Plaintiff          )(
                             )(
VS.                          )(   CIVIL ACTION NO. B-01-156
                             )(
SAN BENITO CONSOLIDATED      )(
INDEPENDENT SCHOOL           )(
DISTRICT, HERIBERTO          )(
VILLARREAL, AND PETER        )(
GUERRERO                     )(
          Defendants         )(

---

ORAL DEPOSITION OF
OFELIA CORNEJO
AUGUST 28, 2003

---

ORAL AND VIDEOTAPED DEPOSITION OF OFELIA

CORNEJO, produced as a witness at the instance of the

PLAINTIFF, taken in the above styled and numbered cause

on AUGUST 28, 2003, reported by DONNA McCOWN, Certified

Court Reporter No. 6625, in and for the State of Texas,

at the San Benito Consolidated Independent School

District Administrative Building, 240 North Crockett

Street, San Benito, Texas, pursuant to the Federal

Rules of Civil Procedure.

ORIGINAL

09:12:35  1    A.  No.

09:12:39  2    Q.  Okay.  I'm handing you what was marked as

09:12:41  3  Exhibit 5.

09:12:49  4          Do you recognize that document?

09:12:51  5    A.  Yes, I do.  This is where Mrs. Cano gave

09:12:54  6  permission for Dr. Vargas to release the diagnosis, the

09:12:58  7  information to the school district.

09:13:04  8    Q.  Okay.  At this point, did you believe Abraham

09:13:07  9  could participate in regular physical education

09:13:10 10  activities?

09:13:11 11          MR. BYROM:  Objection, calls for

09:13:11 12  speculation.

09:13:15 13          MS. LEEDS:  Join.

09:13:15 14    Q.  This is dated May 21, '97, right?

09:13:19 15    A.  Yes, it's dated 5-21-97.

09:13:24 16    Q.  Okay.  And who fills out this form?  Is it

09:13:26 17  somebody at the school, or does Mrs. Cano?

09:13:34 18    A.  It looks like Mrs. Cano's writing.  I don't

09:13:37 19  know.

09:13:38 20    Q.  Okay.  And then what happens with the form?

09:13:41 21  Once she fills out the form, does she give it to

09:13:45 22  somebody at the school?

09:13:45 23    A.  (Moving head up and down)

09:13:46 24    Q.  Who does she give it to?

09:13:47 25    A.  She was supposed to take this to the doctor,

09:13:49 1    but I went ahead and delivered it to Dr. Vargas.

09:13:53 2        Q.  You took it to Dr. Vargas?

09:13:55 3        A.  This is because of the time frame, that it was

09:13:59 4    towards the end of the school year.  We were trying to

09:14:09 5    get all the papers ready so that he would be on

09:14:09 6    homebound.

09:14:09 7        Q.  Okay.  So either the parent or the nurse or

09:14:11 8    somebody else at the school could deliver it over to

09:14:14 9    the doctor, right?

09:14:15 10               MR. BYROM:  Objection, form.

09:14:17 11               MS. LEEDS:  Objection, form.

09:14:18 12               THE WITNESS:  It's supposed to be the

09:14:19 13   parent --

09:14:19 14       Q.  Okay.

09:14:19 15       A.  -- to go get the information.

09:14:21 16       Q.  That's what the school prefers?

09:14:23 17               MS. LEEDS:  Objection, form.

09:14:24 18               MR. BYROM:  Objection, form.

09:14:25 19       Q.  Go ahead.

09:14:26 20       A.  I don't know.

09:14:27 21       Q.  Okay.  Well, in this particular circumstance,

09:14:29 22   you delivered it over to the doctor.

09:14:32 23       A.  Mr. Cano requested that I --

09:14:34 24       Q.  Your principal?

09:14:35 25       A.  -- deliver it.

09:14:36 1                 The principal requested that I deliver it.

09:14:37 2      Q.  Okay.  So the principal can ask the nurse to go

09:14:41 3  deliver it to the doctor to try get the information you

09:14:43 4  need --

09:14:44 5      A.  Yes, sir.

09:14:44 6      Q.  -- in certain circumstances?

09:14:46 7      A.  In certain circumstances.

09:14:48 8      Q.  Okay.  And in this particular circumstance, he

09:14:50 9  did?

09:14:50 10     A.  Yes.

09:14:52 11     Q.  Okay.  And this is authorizing Dr. Vargas to

09:14:54 12  turn over medical information to you -- I'm sorry, to

09:14:56 13  the school.

09:14:56 14     A.  To the school.

09:14:59 15     Q.  Do you remember whether you stayed there and

09:15:01 16  waited for the information, or did you just drop this

09:15:04 17  off and come back later?

09:15:06 18     A.  I don't remember.

09:15:08 19     Q.  Okay.  Do you remember what happened when you

09:15:10 20  did take it over?

09:15:13 21     A.  I don't remember.

09:15:24 22     Q.  Okay.  As of this time, Abraham had -- May 21

09:15:28 23  of '97, Abraham had just broken his arm.

09:15:31 24     A.  According to the record, yes.

09:15:33 25     Q.  Okay.  So I presume you did not feel he should

09:56:25  1     Q.  Who makes that decision?

09:56:26  2     A.  The parent and doctor.

09:56:28  3     Q.  Okay.  If the parent --

09:56:28  4     A.  Especially the doctor.

09:56:30  5     Q.  If the parent says that they don't want him

09:56:34  6  participating in contact activities and the nurse

09:56:37  7  agrees he shouldn't be in contact activities, what

09:56:41  8  should happen at that point?

09:56:48  9     A.  After the parent has brought something from the

09:56:49 10  doctor?

09:56:50 11     Q.  No.  Is that what happens next?  Is that --

09:57:00 12  you're saying what should happen then is they should

09:57:00 13  contact the doctor?

09:57:00 14     A.  Yes, contact the doctor.

09:57:00 15     Q.  Now, either the nurse or the parent can contact

09:57:00 16  the doctor, right?

09:57:00 17             MR. BYROM:  Objection, form.

09:57:02 18             THE WITNESS:  Preferably the parent.

09:57:02 19     Q.  Right.  But the nurse can do it also, right?

09:57:03 20             MR. BYROM:  Objection, form.

09:57:04 21             THE WITNESS:  I don't know.

09:57:06 22     Q.  You were given permission to contact the doctor

09:57:09 23  earlier by your principal, right?

09:57:12 24     A.  Yes, sir.

09:57:13 25     Q.  Okay.  So the nurse can contact the doctor in

09:57:16 1    some circumstances.

09:57:17 2        A.  But it was for release -- I mean, getting a

09:57:20 3    diagnosis for homebound.

09:57:23 4        Q.  Okay.

09:57:23 5        A.  It was not a release for medical information.

09:57:27 6        Q.  Right.  Okay.  But to get that, if you got the

09:57:32 7    mother's permission, filled out a similar form --

09:57:33 8        A.  Release of information.

09:57:34 9        Q.  -- like you have here in Exhibit -- what is

09:57:35 10   that?  5?

09:57:36 11       A.  Uh-huh.

09:57:37 12       Q.  You could have done the same thing, right?

09:57:39 13       A.  Yes.

09:57:41 14       Q.  Okay.  And a nurse can do that is what I'm

09:57:43 15   asking.

09:57:44 16       A.  I believe so.

09:57:48 17       Q.  Okay.  Without that doctor's excuse, are you

09:57:50 18   saying the student has to participate in contact

09:57:54 19   physical activities --

09:57:55 20           MR. BYROM:  Objection, form.

09:57:57 21           MS. LEEDS:  Object to form.

09:57:58 22       Q.  -- without that doctor's excuse?

09:57:59 23       A.  It may take a few days to get a doctor's

09:57:59 24   appointment.

09:58:02 25       Q.  Right.

09:58:03 1    A.  So common sense would tell you.

09:58:05 2    Q.  He shouldn't be participating?

09:58:07 3         MR. BYROM:  Objection, form.

09:58:08 4         THE WITNESS:  He should be in PE, but

09:58:10 5    maybe -- I don't know.  It depends on what the parent

09:58:12 6    wants too.

09:58:13 7    Q.  If the parent doesn't want him to participate

09:58:15 8    in any --

09:58:16 9    A.  Then you don't sent him to PE.

09:58:16 10   Q.  He just should not be sent to PE?

09:58:18 11        MR. BYROM:  Objection, form.

09:58:18 12        THE WITNESS:  Until --

09:58:20 13   Q.  Until you straighten out the issue?

09:58:22 14   A.  You know what?  I would let the principal

09:58:23 15   handle it.  We would have a conference.

09:58:23 16   Q.  Okay.

09:58:25 17   A.  You know, "What are we going to do here?"

09:58:28 18   Q.  Okay.  That's what should happen is you just

09:58:28 19   approach the principal?

09:58:29 20   A.  Yes.  I mean, I cannot make a decision on the

09:58:32 21   child being absent from PE.  That's one of the required

09:58:34 22   courses.

09:58:35 23   Q.  Okay.  So you think the proper procedure would

09:58:38 24   be contact the principal --

09:58:39 25   A.  Contact the principal.

09:58:42  1    Q.  -- and say, "Look, we don't have a doctor's

09:58:43  2    excuse, but at the same time we know he's got this

09:58:46  3    condition where he shouldn't be having contact

09:58:49  4    activities"?

09:58:49  5    A.  Yes, sir.

09:58:50  6    Q.  And at that point, leave it up to the principal

09:58:52  7    to decide yes or no?

09:58:54  8            MR. BYROM:  Objection, form.

09:58:55  9            MS. LEEDS:  Join.

09:58:55 10    Q.  Or to do something?

09:58:56 11            MR. BYROM:  Same objection.

09:58:58 12            MS. LEEDS:  Same objection.

09:58:59 13    A.  To do something.  I don't know what they do.

09:59:02 14            MR. AGUILAR:  I'll go ahead and pass the

09:59:02 15    witness.

09:59:02 16            Thank you.

09:59:02 17                    EXAMINATION

09:59:04 18    BY MS. LEEDS:

09:59:04 19    Q.  I just have one question to fix thing -- to

09:59:08 20    clarify something.

09:59:09 21            Mr. Aguilar was asking you about, you

09:59:13 22    know, going to a doctor and getting a doctor's excuse

09:59:15 23    as to what the limitations could be, right?

09:59:18 24    A.  Yes.

09:59:18 25    Q.  This document, document No. 5, which he kept

09:59:22 1   referring to that Mrs. Cano could have signed that

09:59:25 2   document, that document will only get records that

09:59:28 3   already exist, right?

09:59:31 4        A.   They already exist where?

09:59:33 5        Q.   In the doctor's office.

09:59:33 6        A.   In the doctor's office, yes.

09:59:35 7        Q.   That document will not get a list of

09:59:37 8   limitations from the doctor.

09:59:39 9        A.   Not this one, no.

09:59:41 10       Q.   Okay.  So that even if you go to Mrs. Cano and

09:59:43 11  have her fill out one little document there, that's not

09:59:45 12  enough to get a list of limitations.

09:59:47 13       A.   No.  There's a different form.

09:59:49 14       Q.   Okay.

09:59:50 15       A.   Or even just a prescription pad from the doctor

09:59:52 16  or something in writing from the doctor.

09:59:54 17       Q.   Okay.  But you need something from the doctor

09:59:57 18  that says, "This is what he can and this is what he

09:59:59 19  cannot do"?

10:00:00 20       A.   That's correct.

10:00:01 21       Q.   And it's the parent's responsibility.

10:00:04 22            MR. AGUILAR:  Objection, leading.

10:00:05 23            THE WITNESS:  It's the parent's

10:00:06 24  responsibility.

10:00:07 25            MS. LEEDS:  Okay.  Thank you.

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                    BROWNSVILLE DIVISION

3   ADELA CANO, Individually   )(
    and on behalf of her minor )(
4   son, ABRAHAM CANO          )(
            Plaintiff          )(
5                              )(
    VS.                        )( CIVIL ACTION NO. B-01-156
6                              )(
    SAN BENITO CONSOLIDATED    )(
7   INDEPENDENT SCHOOL         )(
    DISTRICT, HERIBERTO        )(
8   VILLARREAL, AND PETER      )(
    GUERRERO                   )(
9           Defendants        )(

10              REPORTER'S CERTIFICATE

11      I, Donna McCown, Certified Court Reporter, certify
    that the witness, OFELIA CORNEJO, was duly sworn by me,
12  and that the deposition is a true and correct record of
    the testimony given by the witness on AUGUST 28, 2003;
13  that the deposition was reported by me in stenograph
    and was subsequently transcribed under my supervision.

14
        I FURTHER CERTIFY that I am not a relative,
15  employee, attorney or counsel of any of the parties,
    nor a relative or employee of such attorney or counsel,
16  nor am I financially interested in the action.

17              WITNESS MY HAND on this the  2   day of
    September          , 2003.
18

19

20  DONNA McCOWN, CSR NO. 6625
    Expiration Date: 12/31/03
21  Bryant & Stingley, Inc.
    2010 East Harrison
22  Harlingen, Texas  78550
    (956) 428-0755
23

24

25
```

# EXHIBIT-E

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
ADELA CANO, Individually  )(
and on Behalf of her minor)(
son, ABRAHAM CANO,        )(
       Plaintiff          )(
                          )(
VS.                       )(   CIVIL ACTION NO. B-01-156
                          )(
SAN BENITO CONSOLIDATED   )(
INDEPENDENT SCHOOL        )(
DISTRICT, HERIBERTO       )(
VILLARREAL and PETER      )(
GUERRERO,                 )(
       Defendants         )(
```

---

ORAL DEPOSITION OF
DONALD VARGAS, M.D., P.A.
SEPTEMBER 25, 2002

---

ORAL DEPOSITION OF DONALD VARGAS, M.D., P.A.,

produced as a witness at the instance of the DEFENDANTS

SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT AND

HERIBERTO VILLARREAL, taken in the above styled and

numbered cause on SEPTEMBER 25, 2002, reported by DONNA

McCOWN, Certified Court Reporter No. 6625, in and for

the State of Texas, at the offices of Valley Orthopedic

Clinic, 1901 Pease Street, Harlingen, Texas, pursuant

to the Federal Rules of Civil Procedure.



18:17:05 1    And I've been in this 30 years.  It's an unusual break.

18:17:07 2        Q.  So seeing an avulsion fracture indicates to you

18:17:11 3    a higher likelihood of something like osteogenesis?

18:17:15 4        A.  Yes.

18:17:21 5        Q.  Okay.  If a patient had osteogenesis

18:17:25 6    imperfecta, you would not recommend that they

18:17:27 7    participate in any contact sports, I'd presume?

18:17:31 8        A.  Yes.  I think I answered that question before.

18:17:33 9    Contact sports should not be done on children with

18:17:37 10   osteogenesis imperfecta.

18:17:39 11       Q.  And that includes sports such as soccer?

18:17:41 12       A.  Yes.

18:17:42 13               MR. BYROM:  Objection, form.  Calls for

18:17:44 14   speculation.

18:17:45 15       Q.  Do you believe a child with osteogenesis

18:17:48 16   imperfecta should participate in soccer?

18:17:54 17       A.  No.  I think soccer as it's played now is a

18:17:57 18   contact sport, so I don't think I would let him play

18:18:00 19   soccer.

18:18:03 20       Q.  Okay.  Did Abraham -- anybody from Abraham's

18:18:06 21   school ever try to contact you to ask whether it's okay

18:18:09 22   for Abraham to play baseball, soccer, basketball, or

18:18:15 23   any of these other contact sports?

18:18:18 24       A.  I don't remember if they did or not.

18:18:20 25       Q.  If they had, would you have made a note in your

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3   ADELA CANO, Individually  )(
     and on Behalf of her minor)(
 4   son, ABRAHAM CANO,         )(
             Plaintiff          )(
 5                              )(
     VS.                        )(   CIVIL ACTION NO. B-01-156
 6                              )(
     SAN BENITO CONSOLIDATED    )(
 7   INDEPENDENT SCHOOL         )(
     DISTRICT, HERIBERTO        )(
 8   VILLARREAL and PETER       )(
     GUERRERO,                  )(
 9           Defendants         )(

10                   REPORTER'S CERTIFICATE

11      I, Donna McCown, Certified Court Reporter, certify
     that the witness, DONALD VARGAS, M.D., P.A., was duly
12   sworn by me, and that the deposition is a true and
     correct record of the testimony given by the witness on
13   SEPTEMBER 25, 2002; that the deposition was reported by
     me in stenograph and was subsequently transcribed under
14   my supervision.

15      I FURTHER CERTIFY that I am not a relative,
     employee, attorney or counsel of any of the parties,
16   nor a relative or employee of such attorney or counsel,
     nor am I financially interested in the action.
17
                 WITNESS MY HAND on this the 27th day of
18   September        , 2002.

19
                          _____
20                        DONNA McCOWN, CSR NO. 6625
21                        Expiration Date: 12/31/03
                          Bryant & Stingley, Inc.
22                        2010 East Harrison
                          Harlingen, Texas  78550
23                        (956)428-0755

24

25
```

# EXHIBIT-F

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually   )(
and on Behalf of her       )(
minor son, ABRAHAM CANO,   )(
        Plaintiff          )(
                           )(
VS.                        )(   CIVIL ACTION NO. B-01-156
                           )(
SAN BENITO CONSOLIDATED    )(
INDEPENDENT SCHOOL         )(
DISTRICT, HERIBERTO        )(
VILLARREAL and PETER       )(
GUERRERO,                  )(
        Defendants         )(

---

ORAL DEPOSITION OF
ABRAHAM CANO
JULY 16, 2002



---

        ORAL DEPOSITION OF ABRAHAM CANO, produced as a

witness at the instance of the DEFENDANT SAN BENITO

CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, taken in the

above styled and numbered cause on JULY 16, 2002,

reported by CORINNA N. GARCIA, Certified Court Reporter

No. 5210, in and for the State of Texas, at the Law

Office of J. Arnold Aguilar, Artemis Square, Suite H-2,

1200 Central Boulevard, Brownsville, Texas, pursuant to

the Federal Rules of Civil Procedure.

10:58:49  1    A.  I don't remember.

10:58:49  2    Q.  You don't remember.  But you didn't play?

10:58:52  3    A.  No.

10:58:52  4    Q.  Okay.  Prior to soccer, did you participate in

10:58:57  5  the PE class in terms of actually playing the games?

10:59:01  6    A.  Sometimes.

10:59:02  7    Q.  Sometimes.  Who decided when you played and

10:59:04  8  when you didn't?

10:59:06  9    A.  No.

10:59:06 10    Q.  Who did?  Who made that decision?

10:59:09 11    A.  Coach Guerrero.

10:59:11 12    Q.  Okay.  He would actually tell you, "Sit down"

10:59:12 13  or "Don't play" or "Don't" --

10:59:15 14    A.  No, it's when I -- I wouldn't dress out

10:59:17 15  sometimes just so I wouldn't have to play.

10:59:20 16    Q.  Okay.  Who made the decision of you not

10:59:22 17  dressing out?

10:59:24 18    A.  I did.

10:59:24 19    Q.  Okay.  I'm going to come back to that in just a

10:59:27 20  second.  Let me ask you specifically how did the day

10:59:30 21  start in PE?  What class was it?

10:59:33 22    A.  Second period.

10:59:34 23    Q.  Okay.  Did you all do block scheduling so it

10:59:37 24  rotated every day or was it always the second period?

10:59:38 25    A.  Always the same.

10:59:41 1    Q.  And tell me what would happened when you got to

10:59:43 2   class.

10:59:43 3    A.  We would go into the locker room and change

10:59:46 4   into our PE clothes and wait for him to tell us what to

10:59:51 5   do.

10:59:51 6    Q.  Okay.  And what you're saying is there were

10:59:52 7   times that you would come in and not dress out?

10:59:55 8    A.  Yes.

10:59:56 9    Q.  And that meant you weren't going to participate

10:59:58 10  in the actual game?

11:00:03 11   A.  Yes.

11:00:03 12   Q.  Okay.  How often did that happen that you

11:00:03 13  didn't dress out?

11:00:05 14   A.  Often, pretty often.

11:00:07 15   Q.  As many as 10 or 15 times that fall?

11:00:11 16   A.  Maybe more.

11:00:12 17   Q.  Maybe more?

11:00:12 18   A.  Yes.

11:00:13 19   Q.  What's your best estimate?

11:00:16 20   A.  I don't know.

11:00:16 21   Q.  And would you know before you got to class what

11:00:22 22  you were going to do for that day?

11:00:22 23   A.  No.

11:00:23 24   Q.  How would you know that you wanted to sit out

11:00:25 25  on a particular day?

11:00:27 1      A.  I wouldn't.  I just --

11:00:33 2      Q.  I misunderstood.  I thought the first thing you

11:00:35 3  all did was dress out.

11:00:37 4      A.  Yes.

11:00:40 5      Q.  Okay.  How would you know -- and you said the

11:00:41 6  days you didn't dress out, you wouldn't play.

11:00:45 7      A.  Yes.

11:00:45 8      Q.  Okay.  How would you know before you got

11:00:46 9  there --

11:00:47 10      A.  It was like you said at the beginning, the

11:00:50 11  pinkton, it would -- for two or three weeks we'd do the

11:00:54 12  same thing.

11:00:54 13      Q.  Got you.  So because of what -- you would sort

11:00:57 14  of know what was coming ahead a little bit?

11:00:59 15      A.  Yes.

11:00:59 16      Q.  Okay.  On what occasions did you then decide

11:01:03 17  not to dress out?  What was going on on those

11:01:06 18  particular days?

11:01:09 19      A.  I don't remember.

11:01:10 20      Q.  Do you remember why you would have chosen not

11:01:13 21  to dress out?

11:01:14 22      A.  Yes.

11:01:15 23      Q.  Why?

11:01:15 24      A.  I didn't want to play.

11:01:16 25      Q.  Is it because you didn't want to play or

11:01:19 1   because you were afraid you were going to be hurt?

11:01:21 2       A.  Both.

11:01:22 3       Q.  Sometimes is it just because you didn't like

11:01:25 4   the game?

11:01:26 5       A.  No.

11:01:26 6       Q.  Okay.  Was it always related to your physical

11:01:29 7   condition?

11:01:29 8       A.  Yes.

11:01:30 9       Q.  All right.  Would you go to Coach Guerrero and

11:01:34 10  say, "I'm not going to play today"?

11:01:35 11      A.  Yes.

11:01:35 12      Q.  And he would say?

11:01:38 13      A.  Nothing.  Told me to -- if I wouldn't dress

11:01:42 14  out, he would tell me to run laps.

11:01:44 15      Q.  Okay.

11:01:45 16      A.  Yes.

11:01:46 17      Q.  So you didn't want to run laps?

11:01:47 18      A.  No.

11:01:48 19      Q.  Is that because of your physical condition or

11:01:51 20  because you just don't like to run laps?

11:01:53 21      A.  Both.

11:01:54 22      Q.  Okay.  Did it hurt you?

11:01:56 23      A.  Yes.

11:01:56 24      Q.  What did it hurt when you ran laps?

11:01:58 25      A.  My asthma.



11:02:00   1      Q.  Okay.  Well, let me go back a step.  I

11:02:02   2   appreciate you clearing that up.  You didn't want to

11:02:05   3   run laps, not because of the osteogenesis imperfecta,

11:02:08   4   but because of the asthma?

11:02:09   5      A.  Yes.

11:02:10   6      Q.  Okay.  So if you dressed out and said, "I'm not

11:02:12   7   going to play," you were concerned "He's going to make

11:02:15   8   me run laps, and my asthma will act up"?

11:02:18   9      A.  Yes.

11:02:18  10      Q.  Okay.  So you would -- when you anticipated

11:02:22  11   something was coming that you didn't want to do, you

11:02:25  12   would just not dress out?

11:02:27  13      A.  Yes.

11:02:27  14      Q.  Okay.  And what -- let me ask it again, and I

11:02:30  15   hope that I'm not repeating myself, but was it always

11:02:33  16   that you were -- that it was related to your

11:02:38  17   osteogenesis imperfecta, or sometimes you just didn't

11:02:40  18   want to play?

11:02:42  19      A.  About all the time it was osteogenesis

11:02:44  20   imperfecta.

11:02:44  21      Q.  Okay.  And you would say -- you would make the

11:02:50  22   decision, "I don't think I ought to do this today

11:02:53  23   because of my condition"?

11:02:54  24      A.  Yes.

11:02:57  25      Q.  And Coach Guerrero honored that?



11:03:00  1     A.   Sometimes.

11:03:01  2     Q.   Okay.  If you were dressed out, you still had

11:03:03  3  to do laps?

11:03:04  4     A.   Yes.

11:03:05  5     Q.   Okay.  Was there anything else you ever did

11:03:06  6  when you were dressed out?

11:03:08  7     A.   When I did dress out for PE, sometimes he would

11:03:10  8  make me play.

11:03:11  9     Q.   Okay.  I'm going to get to that in a minute.

11:03:14 10  What else would you do when you weren't playing when

11:03:16 11  you were dressed out?

11:03:17 12     A.   He would just have me sit, and then when we'd

11:03:19 13  get back to the locker room, do push-ups or sit-ups.

11:03:24 14     Q.   Okay.  Are push-ups or sit-ups a problem

11:03:26 15  because of your condition?

11:03:27 16     A.   I don't know.

11:03:27 17     Q.   Not so you could tell?

11:03:29 18     A.   No.

11:03:29 19     Q.   Okay.  And so maybe 20 times you didn't even

11:03:42 20  dress out at all, right?

11:03:43 21     A.   Yes.

11:03:44 22     Q.   Okay.  And that would be based on your

11:03:47 23  decision?

11:03:48 24     A.   Yes.

11:03:49 25     Q.   Okay.  And when you didn't dress out and you

11:03:55  1  said to Coach Guerrero, "I'm not going to do this

11:03:58  2  today," would he say, "Okay.  Don't"?

11:04:03  3      A.  When I wouldn't dress out?

11:04:06  4      Q.  Yes.

11:04:06  5      A.  Yes.

11:04:06  6      Q.  Okay.  He never made you dress out when you

11:04:08  7  said, "I'm not going to dress out today"?

11:04:10  8      A.  Sometimes he would say that he would give me a

11:04:13  9  referral.

11:04:13  10     Q.  A referral?

11:04:14  11     A.  Yes.

11:04:14  12     Q.  Where would you go?

11:04:17  13     A.  Excuse me?

11:04:17  14     Q.  What is a referral?

11:04:18  15     A.  A referral is a paper that they give you to

11:04:20  16  take to the office.

11:04:21  17     Q.  Okay.  And what did that referral say?

11:04:24  18     A.  You have detention.

11:04:25  19     Q.  Okay.  Did you have detention?

11:04:26  20     A.  No.

11:04:29  21     Q.  Okay.  Did you ever have detention because you

11:04:31  22  sat out of PE class?

11:04:33  23     A.  No.

11:04:34  24     Q.  How many times did you get a referral from

11:04:35  25  Coach Guerrero?

11:04:36  1      A.  None.

11:04:37  2      Q.  None?

11:04:37  3      A.  No.

11:04:39  4      Q.  I misunderstood you then.  I thought you said

11:04:42  5  he gave you --.

11:04:42  6      A.  No, I said he said that he would.

11:04:44  7      Q.  Oh, I'm sorry.  He said he would give you a

11:04:47  8  referral, but he never did?

11:04:47  9      A.  No.

11:04:48 10      Q.  Okay.  Are you saying that he said he would

11:04:52 11  give you a referral, and so, based on that, you suited

11:04:56 12  out?

11:04:56 13      A.  Yes.

11:04:56 14      Q.  Okay.  How many times did that happen, as best

11:04:58 15  you can remember?

11:05:02 16      A.  I don't remember.

11:05:03 17      Q.  Okay.  On those occasions did you end up having

11:05:09 18  to do laps?

11:05:10 19      A.  No, I ended up having to play.

11:05:12 20      Q.  Okay.  And -- but you don't remember how many

11:05:16 21  times that happened?

11:05:16 22      A.  No.

11:05:17 23      Q.  Do you remember what games it was?

11:05:20 24      A.  Football.  That's the only one I remember.

11:05:29 25      Q.  Okay.  Is it your testimony that you all played

11:05:29 1  football in the fall of 2000?

11:05:31 2      A.  Yes.

11:05:31 3      Q.  Before the soccer?

11:05:33 4      A.  Yes.

11:05:33 5      Q.  Okay.  And when you played football, what did

11:05:38 6  you do?

11:05:39 7      A.  Excuse me?

11:05:41 8      Q.  When you played football, what did you do?

11:05:44 9  What position were you?  What did you do?

11:05:45 10     A.  Nothing.  They just left it up to us what

11:05:49 11 position we wanted to play.

11:05:50 12     Q.  And what would you say?

11:05:51 13     A.  Excuse me?

11:05:51 14     Q.  What would you say if you were asked, "What

11:05:54 15 position do you want to play?"

11:05:55 16     A.  They wouldn't ask me.  They just put it in and

11:05:58 17 play.

11:05:59 18     Q.  Okay.  And where would you play when you did

11:06:01 19 play?

11:06:02 20     A.  When?

11:06:02 21     Q.  Where?  What position would you play when you

11:06:06 22 played?

11:06:08 23     A.  Anything that didn't involve doing much.

11:06:11 24     Q.  Okay.  So you would make sure even out in the

11:06:13 25 field you were taking care of yourself?

11:06:15 1      A.  Yes.

11:06:15 2      Q.  Would that ordinarily be a lineman or a

11:06:20 3   receiver or a --

11:06:24 4      A.  A receiver.

11:06:24 5      Q.  Okay.  You'd run out for the passes?

11:06:27 6      A.  Yes.

11:06:27 7      Q.  And would they throw them to you?

11:06:30 8      A.  No.

11:06:30 9      Q.  Okay.  Did they not throw them to you because

11:06:33 10  of your condition?

11:06:34 11     A.  Yes.

11:06:34 12     Q.  Did you say, "Don't throw it to me"?

11:06:37 13     A.  Yes.

11:06:37 14     Q.  Okay.  And how many times did that occur that

11:06:42 15  Coach Guerrero made you suit up and then you played?

11:06:48 16     A.  I don't remember.

11:06:50 17     Q.  When he told you to suit up and you didn't want

11:06:54 18  to play because you were concerned about your

11:06:56 19  condition, what did you say to him?

11:07:00 20     A.  I told him that I couldn't, but he really

11:07:06 21  didn't say much.  He just told us he would deal with it

11:07:11 22  outside, when we get outside.

11:07:15 23     Q.  Okay.  Have the doctors told you it's important

11:07:18 24  for you to stay active?

11:07:19 25     A.  Can you repeat the question?

11:10:49 1    A.  Football.

11:10:50 2    Q.  Okay.  There were times he said, "Go in the

11:10:52 3  game"?

11:10:52 4    A.  Yes.

11:10:53 5    Q.  What did you say?

11:10:54 6    A.  I didn't tell him anything.

11:10:56 7    Q.  Why not?

11:10:58 8    A.  I didn't feel like I could question his

11:11:01 9  authority.

11:11:01 10    Q.  But you knew you'd already had a conversation

11:11:03 11  with him?

11:11:03 12    A.  Yes.

11:11:06 13    Q.  And you many times sat out because of your

11:11:14 14  condition?

11:11:14 15    A.  Yes.

11:11:14 16    Q.  Based on your own choice?

11:11:14 17    A.  Yes.

11:11:15 18    Q.  And you knew you had the opportunity to tell

11:11:17 19  him again, "I have this condition.  I can't play"?

11:11:22 20    A.  Yes.

11:11:23 21    Q.  But what you're saying is you didn't?

11:11:25 22    A.  No.

11:11:26 23    Q.  Okay.  He had told you at the beginning of the

11:11:35 24  year he would be careful?

11:11:37 25    A.  Yes.

1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF TEXAS
2                        BROWNSVILLE DIVISION

3   ADELA CANO, Individually  )(
    and on Behalf of her       )(
4   minor son, ABRAHAM CANO,   )(
            Plaintiff           )(
5                               )(
    VS.                         )(     CIVIL ACTION NO. B-01-156
6                               )(
    SAN BENITO CONSOLIDATED     )(
7   INDEPENDENT SCHOOL          )(
    DISTRICT, HERIBERTO         )(
8   VILLARREAL and PETER        )(
    GUERRERO,                   )(
9           Defendants          )(

10                      REPORTER'S CERTIFICATE

11          I, CORINNA N. GARCIA, Certified Court
    Reporter, certify that the witness, ABRAHAM CANO, was
12  duly sworn by me, and that the deposition is a true and
    correct record of the testimony given by the witness on
13  JULY 16, 2002; that the deposition was reported by me
    in stenograph and was subsequently transcribed under my
14  supervision.
            I FURTHER CERTIFY that I am not a
15  relative, employee, attorney or counsel of any of the
    parties, nor a relative or employee of such attorney or
16  counsel, nor am I financially interested in the action.
            WITNESS MY HAND on this the __29th__ day of
17  _____July_____, 2002.

18                      _Corinna N. Garcia_
                        CORINNA N. GARCIA, CSR NO. 5210
19                      Expiration Date: 12/31/03
                        Bryant & Stingley, Inc.
20                      2010 East Harrison
                        Harlingen, Texas  78550

21

22

23

24

25

# EXHIBIT-G

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually    )(
and on Behalf of her        )(
minor son, ABRAHAM CANO,    )(
        Plaintiff           )(
                            )(
VS.                         )(    CIVIL ACTION NO. B-01-156
                            )(
SAN BENITO CONSOLIDATED     )(
INDEPENDENT SCHOOL          )(
DISTRICT, HERIBERTO         )(
VILLARREAL and PETER        )(
GUERRERO,                   )(
        Defendants          )(

---

ORAL DEPOSITION OF
ADELA CANO
JULY 16, 2002



---

        ORAL DEPOSITION OF ADELA CANO, produced as a

witness at the instance of the DEFENDANT SAN BENITO

CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, taken in the

above styled and numbered cause on JULY 16, 2002,

reported by CORINNA N. GARCIA, Certified Court Reporter

No. 5210, in and for the State of Texas, at the Law

Office of J. Arnold Aguilar, Artemis Square, Suite H-2,

1200 Central Boulevard, Brownsville, Texas, pursuant to

the Federal Rules of Civil Procedure.

15:42:23  1          MR. AGUILAR:  Objection, argumentative.

15:42:33  2      Q.  Have you ever seen any of Dr. Vargas's records

15:42:36  3  at all of any kind?

15:42:38  4      A.  Yes, I saw his x-rays.  I saw what he would

15:42:43  5  write down when Abraham would go in.

15:42:47  6      Q.  So then in -- after the elbow incident in sixth

15:42:57  7  grade when you went back to Dr. Vargas after trying to

15:43:00  8  get something to get him out of PE --

15:43:03  9      A.  Yes.

15:43:03  10     Q.  -- and then ultimately getting something to get

15:43:06  11  him out of PE, as you understand it, only because he

15:43:08  12  got hurt and had to go back to the doctor anyway,

15:43:11  13  right?

15:43:11  14     A.  Yes.

15:43:12  15     Q.  Were you aware of whether or not Abraham

15:43:15  16  participated in physical education at all during that

15:43:18  17  school year?

15:43:22  18     A.  From what I understand from talking to Coach

15:43:27  19  Banuelos and Abraham, that's the school year that he

15:43:30  20  was sent to the library.

15:43:32  21     Q.  Okay.  And did he get credit for --

15:43:34  22     A.  Yes.

15:43:35  23     Q.  -- PE?  Okay.  Anybody at the district say,

15:43:37  24  "Oh, no, he shouldn't get credit for PE because he's

15:43:41  25  not actually out in the game?

15:43:47 1      A.  No.

15:43:47 2      Q.  Nobody ever gave you any problem about that,

15:43:47 3  did they?

15:43:55 4      A.  It was an ongoing discussion all the time.  So

15:43:58 5  I'm not -- I don't know how to answer that.  This was

15:44:00 6  an ongoing problem all the time.

15:44:04 7      Q.  Was that an accommodation that the district was

15:44:06 8  willing to make apparently for your son?

15:44:09 9      A.  Sometimes.

15:44:11 10     Q.  During that sixth grade school year at all do

15:44:13 11 you know if he ever suited up and participated in

15:44:17 12 physical activity or physical education?

15:44:19 13     A.  I know he suited out because I bought the

15:44:23 14 uniform.

15:44:23 15     Q.  Okay.  Did he actually play in any of the

15:44:25 16 games?

15:44:27 17     A.  I don't know.

15:44:27 18     Q.  Isn't that something you would want to know?

15:44:31 19     A.  There is so many ways that he participated, but

15:44:34 20 not in the actual game.  So I'm not --

15:44:37 21     Q.  I agree.

15:44:38 22     A.  He would participate in some things and didn't

15:44:41 23 participate in others.

15:44:42 24     Q.  Okay.  I agree with you.  There is a difference

15:44:45 25 between definitions of participate and play, okay?  I

15:44:49 1    understand that.  Are you aware of any time in sixth

15:44:53 2    grade after the elbow injury that your son played in a

15:44:56 3    game in PE?

15:44:59 4         A.  I'm sure there was.  I'm thinking about a time

15:45:08 5    that Abraham said that everybody sat on the floor and

15:45:11 6    threw balls back and forth and that's -- I'm sure that

15:45:15 7    Abraham throughout that school year was very -- I know

15:45:19 8    he didn't have lots of problems with that coach.

15:45:23 9         Q.  Okay.  I guess my question is if he was playing

15:45:27 10   games in PE, were you concerned he might hurt himself?

15:45:34 11        A.  Yes, I was.  I was always concerned.

15:45:36 12        Q.  Did you go up and complain to the school

15:45:39 13   district during his sixth grade year, "Hey, he's still

15:45:43 14   in PE"?

15:45:44 15        A.  Yes, I did.

15:45:44 16        Q.  Did you call Dr. Vargas' office and say, "Hey,

15:45:49 17   your note isn't keeping him out of PE"?

15:45:52 18        A.  No.

15:45:53 19        Q.  Why not?

15:45:53 20        A.  Again, every time you talk to a doctor he wants

15:45:57 21   money.  We don't have any health insurance, Medicaid.

15:46:03 22   We don't have any type of health.

15:46:05 23        Q.  When you went to the school and said, "Hey,

15:46:10 24   he's still participating in games" in sixth grade, what

15:46:14 25   did they say to you?

15:46:15 1    A.  Mr. Villarreal from the beginning was very

15:46:19 2 rude.  He would say stuff like, "Well, maybe you should

15:46:23 3 just take him to South Texas since he does have all

15:46:27 4 these problems," just -- every time I left

15:46:34 5 Mr. Villarreal's office, I was crying.

15:46:37 6    Q.  Were you ever rude to Mr. Villarreal?

15:46:39 7    A.  Yes, I was.

15:46:40 8    Q.  Did it at times get heated?

15:46:46 9    A.  Yes.

15:46:46 10    Q.  Both sides?

15:46:46 11    A.  Yes, but he's supposed to be the -- you know, I

15:46:49 12 would think he's supposed to be the professional.

15:46:51 13    Q.  So it's okay for you, but not him?

15:46:54 14    A.  Oh, no, but the thing was that he was

15:46:56 15 aggressive.

15:46:57 16    Q.  Okay.  So it was Mr. Villarreal you're talking

15:47:01 17 to in sixth grade?

15:47:02 18    A.  Yes.

15:47:02 19    Q.  Saying he's not supposed to be playing?

15:47:05 20    A.  Yes.

15:47:06 21    Q.  What did he tell you?

15:47:09 22    A.  That maybe I should just take Abraham out to

15:47:14 23 South Texas.

15:47:14 24    Q.  Did he tell you that they needed a doctor's

15:47:17 25 excuse?

15:47:17  1      A.   Yes.

15:47:17  2      Q.   Did you try to get one?

15:47:18  3      A.   Yes.

15:47:19  4      Q.   Same issue, tried to get one and Dr. Vargas

15:47:23  5  said, "You're going to have to come in and pay $400"?

15:47:28  6      A.   Yes.

15:47:28  7      Q.   At that time did you owe him money?

15:47:30  8      A.   Yes.

15:47:30  9      Q.   How much?  Do you know?

15:47:31 10      A.   About $1,000.

15:47:34 11      Q.   Did he ever say to you, "I'm not going to treat

15:47:37 12  your son anymore until you pay me"?

15:47:41 13      A.   No.

15:47:42 14      Q.   Did he ever insinuate that?

15:47:43 15      A.   Not the doctor, but the clerks.

15:47:46 16      Q.   The clerks insinuated that to you?  Or at least

15:47:49 17  that's the meaning you took from what they were saying?

15:47:49 18      A.   That we needed to pay something on the account.

15:47:53 19  At least bring it -- pay half to be able to --

15:47:55 20      Q.   So were you aware of any other place you could

15:47:59 21  have taken Abraham to get an excuse?

15:48:02 22      A.   No.

15:48:02 23      Q.   Any charity hospital anywhere?

15:48:04 24      A.   No.

15:48:05 25      Q.   Do you know any doctors that you could have

15:48:07 1    taken him to?

15:48:09 2        A.  Not orthopedic doctors.

15:48:13 3        Q.  Okay.  So it was going to be Dr. Vargas giving

15:48:16 4    the excuse or nothing?

15:48:17 5        A.  Or Dr. Keillor.

15:48:22 6        Q.  Dr. Keillor's stay out of PE came after the

15:48:27 7    soccer incident, didn't it?

15:48:29 8        A.  Yes.

15:48:30 9        Q.  Did you see Dr. Keillor before the soccer

15:48:34 10   incident?

15:48:35 11       A.  No.

15:48:36 12       Q.  Ever?

15:48:36 13       A.  No.

15:48:36 14       Q.  Okay.  You had said something about he had been

15:48:38 15   hurt and been seen by Dr. Keillor because he was the

15:48:42 16   doctor on call.

15:48:44 17       A.  At the emergency room.

15:48:45 18       Q.  Which time?

15:48:46 19       A.  When the broken toe.

15:48:48 20       Q.  Which was before the incident?

21       A.  Yes.

15:48:51 22       Q.  Okay.  Did you talk to Dr. Keillor at all at

15:48:53 23   that time about physical education?

15:48:57 24       A.  No.

15:48:58 25       Q.  Why not?



16:13:20 1      A.   That the coach had put Abraham in to play and

16:13:23 2  that the -- somebody had kicked the ball to the coach

16:13:28 3  and the coach kicked it and it passed Abraham, and

16:13:31 4  Abraham says he turned and looked and he was the

16:13:35 5  closest to the ball, so he was about to turn, and

16:13:38 6  that's when it happened.

16:13:39 7      Q.   Okay.  So what John Joe told you was virtually

16:13:42 8  identical to what Abraham said sitting right here

16:13:47 9  earlier today?

16:13:47 10     A.   Yes.

16:13:47 11     Q.   And is that exactly how Abraham had described

16:13:48 12 it to you before?

16:13:49 13     A.   Yes.

16:13:50 14     Q.   When did you first ask Abraham what had

16:13:52 15 happened?

16:13:57 16     A.   That night at the hospital.

16:14:01 17     Q.   And what did he tell you then, same thing?

16:14:02 18     A.   Yes.

16:14:03 19     Q.   Were there any differences to what he told you?

16:14:08 20     A.   No, just he would -- he remembered a little bit

16:14:11 21 more than at the beginning.

16:14:13 22     Q.   When you got to the hospital, did they have his

16:14:17 23 clothes?

16:14:19 24     A.   They were cutting his pants.

16:14:23 25     Q.   So your recollection of the -- that he was in

16:40:31 1  writing on there.  I'll assert to you that, as I

16:40:34 2  understand it, these came from the doctor in just that

16:40:38 3  form, okay?

16:40:38 4      A.  Okay.

16:40:38 5      Q.  I don't believe I or anybody from my office put

16:40:42 6  those marks on there.  But within the circled part it's

16:40:46 7  talking about 7:17, which would be 17 minutes after

16:40:53 8  7:00 in the morning on the 28th, right, or is it the

16:40:58 9  27th?  Look at the date under your fingers.

16:41:00 10     A.  28th.

16:41:01 11     Q.  28th?  Would you have been there at that point?

16:41:04 12     A.  Yes.

16:41:04 13     Q.  Okay.  And that document, Exhibit 36, has

16:41:12 14 000093 at the top and 0247 at the bottom, right?  Just

16:41:17 15 for identification, at the very bottom.

16:41:19 16     A.  Yes.

16:41:20 17     Q.  Okay.  And it says in the last four lines of

16:41:24 18 that circled part, "Parents encouraged to keep ice on

16:41:30 19 as directed along with keeping foot of bed elevated

16:41:34 20 with teaching as to why."  Do you see that?

16:41:36 21     A.  Yes.

16:41:37 22     Q.  Do you recall discussions with the nurses about

16:41:41 23 keeping the foot elevated?

16:41:43 24     A.  Yes.

16:41:43 25     Q.  And keeping the ice on?

16:41:45 1    A.  Uh-huh.

16:41:45 2    Q.  Was there ever a time that you lowered your

16:41:48 3    son's feet or -- first of all, that you ever lowered

16:41:55 4    his feet?

16:41:55 5    A.  No.

16:41:55 6    Q.  Okay.  Was there ever a time you took the ice

16:41:59 7    packs off?

16:41:59 8    A.  We helped with doing everything for Abraham.

16:42:02 9    Q.  Is there any time that you took them off

16:42:04 10   against their instructions?

16:42:06 11   A.  No, sir.

16:42:07 12   Q.  Okay.  So if that's what these mean, that

16:42:10 13   that's what you were doing, that's just wrong?

16:42:12 14   A.  Yes, it was wrong.

16:42:13 15   Q.  Okay.  And you said you complained to

16:42:17 16   Dr. Keillor?

16:42:18 17   A.  Yes.

16:42:18 18   Q.  Do you -- was it before -- well, let me start

16:42:23 19   over with this question.  How soon after this -- these

16:42:27 20   incidents occurred where they were -- they let the

16:42:30 21   water get on your son and lowered his feet and the

16:42:34 22   doctor came in, how soon after that did you complain to

16:42:37 23   him, right then?

16:42:38 24   A.  When he came in, yes.

16:42:39 25   Q.  Okay.  And they are talking about a date of

16:42:43 1   November 28th that all that occurred, right?

16:42:46 2       A.  Yes.

16:42:47 3       Q.  So as of November 28th, Dr. Keillor knew that

16:42:51 4   that's what you were saying had occurred?

16:42:54 5       A.  Yes.

16:42:55 6       Q.  And then looking back at Exhibit 32,

16:43:02 7   Dr. Keillor's specific report, that's dated November

16:43:07 8   30th, isn't it?

16:43:11 9       A.  Yes.

16:43:11 10      Q.  There is nothing in there that talks about your

16:43:15 11  complaint, is there?

16:43:30 12      A.  Not that I see.

16:43:31 13      Q.  Okay.  I'm not going to ask that a copy be made

16:43:34 14  of this one because it's just taking more time, but

16:43:38 15  there is a note, and I'll be glad to show it to you,

16:43:41 16  but it's dated January 11th of 2001, where they were

16:43:46 17  taking more x-rays.  And it says, "They demonstrate

16:43:51 18  excellent ongoing" --

16:43:54 19          MR. AGUILAR:  Hang on.  If you're going to

16:44:00 20  be talking to her about it, let's go ahead and make a

16:44:00 21  copy of it.

16:44:00 22          MR. BYROM:  Okay.

16:44:00 23          MR. MOORE:  I was just going to say if you

16:44:01 24  could at least read in the Bates stamp.

25          MR. BYROM:  Yeah, 0013.  But that's fine.

16:44:04  1        MR. AGUILAR:  Any others?  If you're going

16:44:05  2   to be asking her about specific documents, I'd

16:44:07  3   rather -- so that we can know what you're talking about

16:44:10  4   later, instead of just your internal Bates numbering.

16:44:13  5        MR. BYROM:  That's fine.

16:44:14  6        MR. AGUILAR:  Any others?

16:44:16  7        MR. BYROM:  I'm trying to make sure I

16:44:17  8   don't have anymore.  And that's what I -- yeah, let me

16:44:20  9   do one last one, and I promise that's all that's on

16:44:26 10   this list.  And let's go off the record while we're

16:44:28 11   doing this and not waste time.

16:45:49 12        (Brief recess).

16:45:51 13   Q.  Ms. Cano, are you able to continue?  Are you

16:45:55 14   okay?

16:45:55 15   A.  Yes.

16:45:55 16   Q.  Okay.  I'm going to show you three more,

16:45:59 17   Exhibits 37, 38 and 39.  I'm going to hand them to you

16:46:05 18   one at a time.  But Exhibit 37 is Bates stamped 0013 at

16:46:10 19   the bottom.  Do you see that one?

16:46:15 20   A.  Yes.

16:46:16 21   Q.  Okay.  And on that document at the very top you

16:46:24 22   can -- it's kind of cut off a little bit, but you can

16:46:27 23   see it says Harlingen Bone and Joint Clinic.  Is

         24   that --

16:46:30 25   A.  Yes.

16:46:31 1    Q.  Okay.  That's Dr. Keillor's group?

16:46:33 2    A.  Yes.

16:46:33 3    Q.  And it's dated -- the first entry there is

16:46:36 4  dated January 11th, 2001, right?

16:46:41 5    A.  Yes.

16:46:42 6    Q.  And where it starts saying "x-rays" in that

16:46:44 7  paragraph, would you just read that portion to me until

16:46:46 8  I tell you to -- until I ask you to stop?

16:46:48 9    A.  "The patient was injured on November the 27th

16:46:51 10 and underwent manipulative reduction of severe ankle

16:46:57 11 multiple fractures, trimalleolar.  X-rays taken today

16:47:01 12 approximately six weeks later demonstrate excellent

16:47:04 13 ongoing healing of the ankle."

16:47:07 14   Q.  Okay.  Stop right there.  Understanding he's

16:47:11 15 the doctor, was it your impression that your son's

16:47:14 16 fracture, at least of his ankle, was going pretty well

16:47:22 17 as of January of 2001?

16:47:25 18   A.  Yes.

16:47:25 19   Q.  Okay.  So you don't have any reason to dispute

16:47:28 20 that that finding was correct based on what you saw?

16:47:33 21   A.  Yes.

16:47:34 22   Q.  Am I correct?

16:47:35 23   A.  Yes.

16:47:35 24   Q.  Okay.  There was still going to be the

16:47:39 25 immobilization of the knee?



16:47:40  1       A.   Yes.

16:47:40  2       Q.   Okay.   Then look at this one, if you would.

16:47:45  3   Exhibit 38, which is at the bottom 000 -- I'm sorry,

16:47:50  4   0015.

16:47:51  5       A.   Yes.

16:47:52  6       Q.   And that entry says there in that third line,

16:48:02  7   "The ankle is now doing well," correct?

16:48:04  8       A.   Yes.

16:48:05  9       Q.   And that's dated March the 2nd of 2001?

16:48:09 10       A.   Yes.

16:48:09 11       Q.   And, in fact, it even says, "X-rays demonstrate

16:48:13 12   perfect healing," doesn't it?

16:48:15 13       A.   Yes.

16:48:17 14       Q.   Then if you'll look at where it says "Problem

16:48:22 15   No. 2," talking about the right knee, I'm assuming,

16:48:24 16   right there.

16:48:24 17       A.   Yes.

16:48:24 18       Q.   About the fourth line down it says, "He has

16:48:26 19   been going to therapy, but he is not moving enough."

16:48:29 20   Did the doctor ever tell you that your son was not

16:48:32 21   moving enough?

16:48:36 22       A.   He was talking about the range of motion.

16:48:37 23       Q.   Okay.   Well, it says, "X-rays of the knee

16:48:40 24   operated on on the 12th of December now demonstrate

16:48:44 25   complete healing," right?

16:48:46 1      A.  Yes.

16:48:46 2      Q.  So the knee was completely healed?

16:48:49 3              MR. AGUILAR:  Objection, mischaracterizing

16:48:50 4      the doctor's testimony.

16:48:55 5      Q.  The x-rays of the knee demonstrated complete

16:48:58 6      healing.  Isn't that what it says?

16:49:01 7      A.  That's what it says.

16:49:01 8      Q.  Okay.  And then it says, "It is time that he

16:49:04 9      start walking on this and moving the knee."  Do you

16:49:07 10     remember the doctor telling you that he needed to --

16:49:11 11     A.  Yes.

16:49:12 12     Q.  -- start walking on this and get the knee

16:49:16 13     moving?  Do you recall that?

16:49:22 14     A.  He was going to therapy, and he was standing,

16:49:24 15     but he was not yet walking.  He -- they -- when he

16:49:29 16     started walking, he was in the pool.

16:49:31 17     Q.  Okay.  But the doctor is telling him he needs

16:49:34 18     to do more, right?

16:49:36 19     A.  Yeah, but the doctor is not the one in pain.

16:49:38 20     Abraham was in a lot of pain.

16:49:41 21     Q.  So do you disagree with the doctor or not?

16:49:43 22             MR. AGUILAR:  With what?

16:49:44 23     A.  I don't know.

16:49:45 24             MR. AGUILAR:  Hang on a second.

16:49:46 25     Objection, specificity.

16:49:46 1    Q.  Do you disagree with the doctor saying he needs

16:49:48 2    to push harder?

16:49:53 3    A.  I don't disagree with what the doctor is

16:49:56 4    saying.  I'm just -- I just know what Abraham is going

16:50:01 5    through because I've been through it.

16:50:04 6    Q.  Okay.  So your -- your belief as to what

16:50:09 7    Abraham ought to be able to do and not do is based at

16:50:13 8    least in part on what you've been through?

16:50:15 9    A.  Yes.

16:50:15 10    Q.  And did you sometimes not follow the doctors

16:50:19 11    orders because of that?

16:50:21 12    A.  Abraham did what he could to the extent where

16:50:24 13    he was in pain.

16:50:27 14    Q.  Okay.  And did that mean sometimes he didn't

16:50:34 15    follow what the doctor told him to do?

16:50:35 16    A.  No, he -- he did what the doctor told him to do

16:50:39 17    to the extent where he was in pain.

16:50:41 18    Q.  Okay.  And then the doctor does say, or at

16:50:49 19    least the report says, "He will have intermittent

16:50:52 20    problems the rest of his life."  Right, it says that in

16:50:54 21    that last paragraph?

16:50:55 22    A.  Yes.

16:50:55 23    Q.  And then it says, "He just has to be careful."

16:50:58 24    A.  Yes.

16:50:58 25    Q.  Right?  And that's exactly what you've told

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF TEXAS
 2                      BROWNSVILLE DIVISION

 3   ADELA CANO, Individually  )(
     and on Behalf of her      )(
 4   minor son, ABRAHAM CANO,   )(
              Plaintiff         )(
 5                              )(
     VS.                        )(    CIVIL ACTION NO. B-01-156
 6                              )(
     SAN BENITO CONSOLIDATED    )(
 7   INDEPENDENT SCHOOL         )(
     DISTRICT, HERIBERTO        )(
 8   VILLARREAL and PETER       )(
     GUERRERO,                  )(
 9          Defendants          )(

10                   REPORTER'S CERTIFICATE

11               I, CORINNA N. GARCIA, Certified Court
     Reporter, certify that the witness, ADELA CANO, was
12   duly sworn by me, and that the deposition is a true and
     correct record of the testimony given by the witness on
13   JULY 16, 2002; that the deposition was reported by me
     in stenograph and was subsequently transcribed under my
14   supervision.
                 I FURTHER CERTIFY that I am not a
15   relative, employee, attorney or counsel of any of the
     parties, nor a relative or employee of such attorney or
16   counsel, nor am I financially interested in the action.
                 WITNESS MY HAND on this the 29th day of
17   _____July_____, 2002.

18                              _____
                                CORINNA N. GARCIA, CSR NO. 5210
19                              Expiration Date: 12/31/03
                                Bryant & Stingley, Inc.
20                              2010 East Harrison
                                Harlingen, Texas  78550
21

22

23

24

25
```

LAW OFFICE
# J. ARNOLD AGUILAR

J. ARNOLD AGUILAR
Board Certified - Personal Injury Trial Law
Texas Board of Legal Specialization

Board Certified - Civil Trial Law Advocate
National Board of Trial Advocacy

October 10, 2003

(956) 504-1100
Fax: (956) 504-1408
e-mail:aguilarlaw@aol.com

Mr. Butch Barbosa, Deputy Clerk
U.S.D.C - Brownsville Division
United States Courthouse
600 E. Harrison
Brownsville, Texas   78520

Re:   Civil Action No. B-01-156
      Adela Cano, et al.  vs.  San Benito C.I.S.D., et al.
      U.S.D.C. - McAllen Division
      Our File No. 217-01

Dear Mr. Barbosa:

Enclosed herewith for your filing with the Court regarding the above styled and numbered cause, please find one (1) original and one (1) copy of the following:

1.   **Plaintiff's Response to Defendant Guerrero's Renewed Motion to Dismiss; and,**

2.   **proposed Order denying same.**

By copy of this correspondence, all counsel of record are receiving a duplicate of this filing.

Mr. Butch Barbosa, Deputy Clerk
U.S.D.C - Brownsville Division
October 10, 2003
Page -2-

Thank you for your assistance in this matter.

Very truly yours,

**LAW OFFICE**
**J. ARNOLD AGUILAR**

By: _____
                    J. Arnold Aguilar

JAA.fp
*Encls.

xc:    Mr. James E. Byrom
       EWBANK & BYROM, P.C.
       221 West 6th Street, Suite 900
       P. O. Box 2430
       Austin, TX  78768-2430

       Ms. Eileen Leeds
       WILLETTE & GUERRA, L.L.P.
       3505 Boca Chica Blvd., Suite 460
       Brownsville, TX 78521

LAW OFFICE
# J. ARNOLD AGUILAR

J. ARNOLD AGUILAR
Board Certified - Personal Injury Trial Law
Texas Board of Legal Specialization

Board Certified - Civil Trial Law Advocate
National Board of Trial Advocacy

October 9, 2003

(956) 504-1100
Fax: (956) 504-1408
e-mail:aguilarlaw@aol.com

Mr. Butch Barbosa, Deputy Clerk
U.S.D.C - Brownsville Division
United States Courthouse
600 E. Harrison
Brownsville, Texas   78520

Re:    Civil Action No. B-01-156
       Adela Cano, et al.  vs.  San Benito C.I.S.D., et al.
       U.S.D.C. - McAllen Division
       Our File No. 217-01

Dear Mr. Barbosa:

        Enclosed herewith for your filing with the Court regarding the above styled and numbered cause, please find one (1) original and one (1) copy of the following:

1.     **Plaintiff's Response to Defendant Villarreal's Motion to Dismiss
       and in the alternative Motion for Summary Judgment; and,**

2.     **proposed Orders denying same.**

        By copy of this correspondence, all counsel of record are receiving a duplicate of this filing.

Artemis Square, Suite H-2  •  1200 Central Blvd.  •  Brownsville, Texas 78520

Mr. Butch Barbosa, Deputy Clerk
U.S.D.C - Brownsville Division
October 9, 2003
Page -2-

Thank you for your assistance in this matter.

Very truly yours,

**LAW OFFICE
J. ARNOLD AGUILAR**

By: _____
                J. Arnold Aguilar

JAA.fp
*Encls.

xc:    Mr. James E. Byrom
       EWBANK & BYROM, P.C.
       221 West 6th Street, Suite 900
       P. O. Box 2430
       Austin, TX  78768-2430

       Ms. Eileen Leeds
       WILLETTE & GUERRA, L.L.P.
       3505 Boca Chica Blvd., Suite 460
       Brownsville, TX 78521

LAW OFFICE
# J. ARNOLD AGUILAR

---

J. ARNOLD AGUILAR
Board Certified - Personal Injury Trial Law
Texas Board of Legal Specialization

Board Certified - Civil Trial Law Advocate
National Board of Trial Advocacy

October 9, 2003

(956) 504-1100
Fax: (956) 504-1408
e-mail:aguilarlaw@aol.com

Mr. Butch Barbosa, Deputy Clerk
U.S.D.C - Brownsville Division
United States Courthouse
600 E. Harrison
Brownsville, Texas    78520

Re:    Civil Action No. B-01-156
       Adela Cano, et al.  vs.  San Benito C.I.S.D., et al.
       U.S.D.C. - McAllen Division
       Our File No. 217-01

Dear Mr. Barbosa:

Enclosed herewith for your filing with the Court regarding the above styled and numbered cause, please find one (1) original and one (1) copy of the following:

1.     **Plaintiff's Response to Defendant's (SBCISD) Motion to Dismiss; and,**

2.     **proposed Order denying same.**

By copy of this correspondence, all counsel of record are receiving a duplicate of this filing.

Artemis Square, Suite H-2   •   1200 Central Blvd.   •   Brownsville, Texas 78520

Mr. Butch Barbosa, Deputy Clerk
U.S.D.C - Brownsville Division
October 9, 2003
Page -2-

Thank you for your assistance in this matter.

Very truly yours,

**LAW OFFICE
J. ARNOLD AGUILAR**

By: _____
       J. Arnold Aguilar

JAA.fp
*Encls.

xc:    Mr. James E. Byrom
       EWBANK & BYROM, P.C.
       221 West 6th Street, Suite 900
       P. O. Box 2430
       Austin, TX  78768-2430

       Ms. Eileen Leeds
       WILLETTE & GUERRA, L.L.P.
       3505 Boca Chica Blvd., Suite 460
       Brownsville, TX 78521