

United States District Court
Southern District of Texas
FILED

OCT 1 0 2003

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ADELA CANO, Individually and on | § | |
| Behalf of her minor son, ABRAHAM CANO, | § | |
| | § | **CIVIL ACTION NO.** |
| VS. | § | |
| | § | **B - 01 - 156** |
| SAN BENITO CONSOLIDATED | § | |
| INDEPENDENT SCHOOL DISTRICT, | § | |
| HERIBERTO VILLARREAL and | § | |
| PETER GUERRERO | § | |

---

## PLAINTIFF'S RESPONSE TO DEFENDANT'S (S.B.C.I.S.D.) MOTION TO DISMISS

---

TO THE HONORABLE U.S. DISTRICT COURT:

COMES NOW **ADELA CANO**, *Individually and on behalf on her minor son*, **ABRAHAM CANO**, and file this their Response to Defendant San Benito Consolidated Independent School District's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), and for such response would respectfully show unto the Court the following:

### I.

### SUMMARY OF RESPONSE

The minor Plaintiff, Abraham Cano, has a condition known as *osteogenesis imperfecta*, a congenital bone disease that causes the bones to become brittle. Plaintiffs' claims arose as a result of Abraham's being compelled to participate in a school sponsored physical education soccer game on November 27, 2000, the day before his 14th birthday.

Although state rules would have allowed Abraham to meet his state required physical education requirement by writing a term paper or some other form of non-physical interaction, as part of Defendant San Benito Consolidated Independent School District's (hereinafter SBCISD) adopted custom or policy he was not given that option on the day he was injured.  Although the Coach, Principal, Nurse and every one of Abraham's teachers were already aware of Abraham's "brittle bone" or *osteogenesis imperfecta* condition, no one took action to protect him, and instead they actually compelled him to participate in a physical contact sport (soccer) that led to his injuries.

Compelling Abraham to participate in this soccer game was a violation of his Fourteenth Amendment rights to substantive and procedural due process as well as to his rights to life, liberty, health, safety and bodily integrity, protected through 42 U.S.C. §1983, because as a 13-14 year-old child, Abraham did not have the capacity to adequately evaluate his ability to participate, and when he was told by Coach Guerrero to participate in that soccer game, he did not believe he could question Coach Guerrero's authority or instruction.  The District is responsible for those injuries because its supervisory personnel who were supposed to protect Abraham, including the principal, coach and nurse, were aware of his "brittle bone" condition, yet in reflecting the accepted custom or policy of SBCISD took no action whatsoever to protect Abraham or to prevent the injuries to him.

## II.

## FACTUAL BACKGROUND

As early as January 10, 1997, SBCISD was aware of Abraham's condition of *osteogenesis imperfecta*, a debilitating bone disease that causes his bones to become brittle,

as reflected in nurse Cornejo's notes on the back of Abraham's School Health Record. **Exhibit-10**, School Health Record. (For simplicity and ease of reference, the parties agreed during depositions to consecutively number all exhibits. As a result, some exhibits may appear to be "missing" in the index of exhibits attached hereto. When the various witnesses discussed the same numbered exhibit, therefore, they were all discussing the same document.) Other documents in Abraham's school file similarly made reference to his having the condition, and specifically describing it as "brittle bone" disease. **Exhibits-2**, Reference Form; **3**, Health Record; **15**, Nurse Referral; and **21**, Individual Education Program (IEP) Meeting form.

Principal Villarreal acknowledged that he had personally met with Mrs. Cano on various occasions to discuss Abraham's condition, that these records were in Abraham's file, and that they were accessible to the ARD committee, as well as to any teacher or coach who would have requested to look at those records. **Exhibit-A**, Deposition of Heriberto Villarreal of 5/14/02 (hereinafter Villarreal Depo I, p.18, l.1 - p. 19, l.23; p.71, l.19 – p.72, l.12. **Exhibit-B**, Deposition of Heriberto Villarreal of 5/15/02 (hereinafter Villarreal Depo II), p.116, l.15 – p.117, l.24. He also agreed that *osteogenesis imperfecta* refers to somebody who is fragile. **Exhibit-A**, Villarreal Depo I, p.94, ll.1-16. In spite of this, no one at the District ever provided Coach Guerrero with information on how to handle "medically fragile" students. **Exhibit-B**, Villarreal Depo II, p.116, l.15 – p.117, l.24.

In spite of Defendant Villarreal's failure to provide instruction to Defendant Guerrero, he was already somewhat familiar with Abraham's condition of *osteogenesis imperfecta*. **Exhibit-C**, Deposition of Pedro Gabriel Guerrero (hereinafter Guerrero Depo), p.44, ll.4-20. Because of his familiarity with the condition, Coach Guerrero himself went to discuss with the nurse whether Abraham should be participating in physical education activities. Coach Guerrero believed, however, that without a document from a doctor excluding him from participation in P.E. class, Abraham was required to continue participating. **Id.**, p.45, l.1 – p.47, l.9. He understood the nurse could have excused Abraham, and that she should have written a letter or contacted the doctor to get such an excuse, but that was never done. **Id.**, p.36, l.8 – p.37, l.5. He agreed, however, that anyone with brittle bones did not belong in P.E. because he would be putting himself at risk. **Id.**, p.39, ll.9-21. Although Coach Guerrero could have simply sent Abraham to the library to do research for his P.E. grade, he chose instead not to do so. **Id.**, p.109, ll.11-24. His explanation for doing so was because Principal Villarreal and the District's policy was to simply let Abraham participate in physical activities, to the extent he, a 13-14 year-old child, felt "comfortable" doing so. **Id.**, p.109, l.25 – p.111, l.4.

Perhaps indicative of how Defendant SBCISD failed to train its teachers and coaches in protecting the safety of its students, Defendant Guerrero did not have any idea to what extent a 13 year-old was mature enough to determine what activities are safe enough for him to participate in. *Id.*, p.50, ll.6-15. His personal judgment seems questionable, since he had no concerns with a 13 year-old boy's maturity to determine

whether it was safe to play with knives, although he would be concerned if the 13 year-old was playing with a handgun, acknowledging the child could get hurt with the handgun. **Id.**, p.50, l.6 – p.53, l.13. Like a loaded handgun, or even just a sharp knife, 13 year-old Abraham was left to determine for himself whether he might get hurt playing soccer.

On one hand, Principal Villarreal agreed that "the District has a duty to protect the children from themselves in areas where they can be a danger to themselves or to others." **Exhibit-B,** Villarreal Depo II, p.165, ll.6-11. He also agreed that Mrs. Cano did everything she could to notify him and the school of Abraham's sensitive condition. **Id.,** p.151, l.9 – p.152, l.1. On the other hand, Principal Villarreal and the District left the entire decision on whether Abraham participated in physical activities entirely up to Abraham. **Id.,** p.157, l.24 – p.158, l.23. Even though the District and Principal Villarreal had plenty of indication and notice of Abraham's condition, including an authorization to release records from his doctor, and even though they were aware that Abraham's condition or disability would affect his participation in regular Physical Education, no ARD/IEP Supplement to restrict that participation was ever filled out for Abraham, no modifications for his participation were ever developed, and the District simply left Abraham, a 13-14 year old  child, to make his own medical decisions. **Exhibit-A**, Villarreal Depo I, p.94, l.1 – p.99, l.4.

Although Coach Guerrero believes Abraham did not belong in P.E., he instead relied on Principal Villarreal's telling him to do whatever the nurse told him to do, and because the nurse never gave him instructions to restrict Abraham's P.E. participation, he believes he was merely "following orders" when he instructed Abraham to join the soccer

game.  **Exhibit-C,** Guerrero Depo, p.39, ll.9-21; p.53, l.21 – p.56, l.2.  Principal

Villarreal also blames Nurse Cornejo for not following up and getting the doctor's excuse.

 **Exhibit-A,** Villarreal Depo I, p.49, l.9 – p.50, l.15.  Nurse Cornejo agreed that either the

nurse or a parent could contact a child's doctor to get an exemption from participation in

P.E. activities, and in the meantime the child could be excluded from participating in

contact sports.  **Exhibit-D,** Deposition of Ofelia Cornejo (hereinafter Cornejo Depo),

p.71, l.5 – p.75, l.16.  Under other circumstances, Nurse Cornejo's principal had

previously had her contact Abraham's doctor to turn over certain medical information.

**Id.**, p.32, l.2 – p. 34, l.14.  Under these circumstances, however, she blames the principal

for not taking action to get a list of limitations or even just a note from the doctor

excluding Abraham from P.E. activities.  **Id.,** p.73, l.7 – p.75, l.16.  Had anybody from

the District ever actually contacted Dr. Vargas, he would have answered unequivocally

that a patient with *osteogenesis imperfecta* should not be participating in any contact

sports, including soccer.  **Exhibit-E,** Deposition of Donald Vargas, M.D. (hereinafter

Vargas Depo) p.71, ll.5-19.

Although Defendants argue that Abraham is primarily at fault for his own injuries

because he "voluntary participated" in this soccer game, and no one else at the school

knew more of his limitations and abilities than Abraham himself, Abraham explained that

every time he told Coach Guerrero he did not feel comfortable participating in Physical

Education that day, the coach would make him run laps, which would affect his asthma.

**Exhibit-F,** Deposition of Abraham Cano (hereinafter Abraham Cano Depo), p.75, l.9 –

p.76, l.9.  Abraham, a 13 year-old boy, therefore had to decide between risking an injury

to one of his bones and risking an asthma attack. Abraham had to make this risk assessment each time before suiting up for P.E. during the Fall of 2000, when Coach Guerrero would put him in to play football or soccer. **Id.,** p.72, 1.4 – p.81, 1.22.

Perhaps because of his tender age, or because of Coach Guerrero's position of authority, Abraham did not feel he could question Coach Guerrero's authority. **Id.,** p.86, ll.2-9. Unfortunately, Abraham's luck ran out on November 27th, when Coach Guerrero put him in to play soccer, even though he had not suited up to play that day. When Coach Guerrero kicked the ball past Abraham, he turned around and began to go after the ball, but he immediately fell to the ground from his injury. **Id.,** p.106, 1.2 – p.107, 1.8; p.108, 1.16 – p.113, 1.9   There does not appear to be any dispute that Abraham's injury was severe and caused him excruciating pain. As Coach Guerrero explained, Abraham's foot looked as though it was turned around almost 180°, he was grabbing some part of his body and he looked like he was in excruciating pain. **Exhibit-C,** Guerrero Depo, p.87, 1.7 – p.90, 1.5.

## III.

## ARGUMENT AND AUTHORITIES

A.   **Motion to Dismiss Standard**

"[T]he accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ***Conley v. Gibson,*** 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In reviewing a motion to dismiss, all "well pleaded facts must be accepted as true and viewed in the light most favorable to the

non-movant." *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995).

"[T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he basis his claim. To the contrary, all the Rules require is `a short a plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993), *quoting Conley v. Gibson*, 355 U.S. at 47, 78 S.Ct. at 103.

> When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of pleadings that a recovery is very remote and unlikely but that is not the test. Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.

*Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). "In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

## B.    Fourteenth Amendment Violations

Plaintiffs have alleged violations of Abraham's constitutional due process rights to life, liberty, health, safety and bodily integrity and to a safe environment in a mandatory school setting, protected by the Fourteenth Amendment to the U.S. Constitution.



Specifically, Plaintiff has alleged that Defendant SBCISD had a custom and policy of failing to implement sufficient safeguards to prevent injury to Abraham and others like him, maintaining a physical education staff that was not sufficiently trained to recognize the risk of injury to persons such as Abraham, failing to adequately train physical education staff to recognize and prevent possible injuries such as that which occurred to Abraham, failing to adequately train and supervise physical education staff to conduct physical education activities, or to avoid those activities, maintaining inadequate screening and safety policies and customs for conducting physical education activities, maintaining a physical education staff unable or unwilling to provide safety precautions for medically sensitive students, and failing to implement adequate procedures to gather necessary medical documentation to exempt students from physical education activities where appropriate.

At the time of Abraham's injuries, the law was well established that the San Benito Consolidated Independent School District could be "liable under §1983 if it supervise its employees in a manner that manifests deliberate indifference to the constitutional rights of [students]." *Doe. v. Taylor*, 15 F.3d at 453. Defendant SBCISD is liable for the injuries to Plaintiff because of its failure to protect Abraham from injury, after having been specifically notified and informed of his delicate condition, particularly through his mother's instructions and requests that he not participate in physical education, all of which "manifested a deliberate indifference to the welfare of [Abraham]." *Id.* at 454, quoting *Gonzalez v. Ysleta Indep. School Dist.*, 996 F.2d 745, 760 (5th Cir. 1993). As this District has previously held, "the Constitution protects a school child from deprivation

of his bodily integrity...caused by the callous indifference of public school officials," and "'if the Constitution protects a student from physical abuse by teachers, it must also protect [a student] from being "run to death"' by his coaches in an overly strenuous football practice in which he was denied water, rest, and medical attention." *Roventini v. Pasadena Indep. School Dist.*, 981 F.Supp. 1013, 1019 (S.D.Tex. 1997), vacated on other grounds, 183 F.R.D. 500 (S.D. Tex. 1998). By assigning and requiring Abraham to participate in physical education activities, Defendant SBCISD directly deprived Plaintiff of his right to bodily integrity, as well as his right to substantive and procedural due process and to liberty, protected by the Fourteenth Amendment's Due Process and Equal Protection Clauses.

Abraham has testified that he felt he could not question Coach Guerrero's authority when he was instructed to participate in sports. **Exhibit F**, Abraham Cano Depo, p.86, ll.2-9. Each time Coach Guerrero instructed him to participate in Physical Education activities, Abraham had the choice of risking a break to one of his bones or an asthma attack, a Hobson's choice at best. **Id.**, p.74, l.16 – p.76, l.9. The District was aware, after having been provided considerable notice through Principal Villarreal, Coach Guerrero and Nurse Cornejo, that Abraham had a medical condition that rendered his bones brittle and subject to easy break, yet when it came time for taking responsibility to prevent injury to him, each simply "passed the buck" to someone else. **Exhibit-A,** Villarreal Depo, p.49, l.24 – p.50, l.15; **Exhibit-C,** Guerrero Depo, p.108, l.22 – p.111, l.4; **Exhibit-D,** Cornejo Depo, p.71, l.5 – p.75, l.16.

Alternatively, Defendant Principal Villarreal could have instructed the attending nurse, as other principals had done before, to simply contact Abraham's doctor and ask him to submit a "list of limitations" or "even just a prescription pad" limiting Abraham's activities. **Exhibit-D**, Cornejo Depo, p.75, ll.10-16. Mrs. Cano explained that she believed she could not get such a note because she owed the doctor money. **Exhibit-G**, Deposition of Adela Cano of 7/16/02 (hereinafter Adela Cano Depo I), p.73, 1.24 – p.75, 1.13. As a result, Defendant SBCISD simply left the decision of whether to participate in activities that were dangerous because of Abraham's condition to this 13 year-old child. **Exhibit-B**, Villarreal Depo II, p.156, 1.19 – p.158, 1.23. Such conduct epitomizes the District's actions in supervising its employees manifested deliberate indifference to Abraham's constitutional rights to his life, his health, his safety, and his bodily integrity, for which Defendant SBCISD is liable. Every one of those actors were aware of Abraham's delicate condition and could have submitted a simple instruction directing Abraham to the library where he could be protected, instead of to the sports field where he risked significant injury, yet each consciously chose not to do so, reflecting the deliberate indifference to Abraham's welfare. Had the policy been otherwise, action would have been taken to correct the situation, but no action was taken whatsoever to prevent future incidents such as this, thus further reflecting the District's custom or policy. **Exhibit-B**, Villarreal Depo II, p.177, 1.10 – p.178, 1.15; p.184, 1.10 – p.186, 1.7.



## C.    Response to SBCISD's Misleading Interpretations

Intentionally or otherwise, Defendant SBCISD attempts to characterize Plaintiff's allegations as something other than that which they are, in an attempt to build up a straw man that it could thereafter easily knock down. Defendant's characterizations do not accurately reflect Plaintiff's pleadings, however, and those arguments could therefore be disregarded.

### 1.    Punishment

Defendant attempts to characterize Plaintiff's claims as "the imposition of punishment by Defendant Villarreal [that] caused a violation of [his] substantive and procedural due process rights." Defendant then goes on to argue why such a claim cannot stand. Plaintiff's only possible reference to "punishment" arose in paragraph 12 of Plaintiff's Second Amended Original Complaint, in which Plaintiffs alleged *"to the extent that Defendants allege or contend that the injuries suffered by Abraham were the result of some form of discipline,* Plaintiff would further contend that Defendants Villarreal and Guerrero are liable for subjecting Abraham to excessive force in the discipline of a student, for which they are liable pursuant to Texas Education Code §22.051." That claim was not being submitted, even alternatively, against Defendant SBCISD, and it does not now appear that Defendants Villarreal or Guerrero are alleging that their actions were some form of discipline anyway. Accordingly, Defendant's reference to Plaintiff's alleged claims of "punishment" is merely a red herring that may be ignored.



## 2.    Constitutional Right Not to Participate in Physical Education

Defendant similarly appears to re-characterize Plaintiff's bodily integrity claim as an allegation that Abraham had a right not to participate in physical education at all. As set out above, however, Plaintiff does not allege a right not to participate in physical education, but rather a right to be protected from the dangers particular to him involving his participation in physical confrontations or contact sports. As Defendant Guerrero explained, he could have simply sent Abraham to the library to do research from his physical education grade and still met any applicable state requirements. **Exhibit-C,** Guerrero Depo, p.108, l.8 – p.109, l.22. Plaintiff is not asserting "a constitutional right not to participate in physical education in school." Nor is Plaintiff asserting a constitutional right to not provide 13 year-old children with loaded handguns or sharp knives during physical education class. Requiring Abraham to participate in physical education activities, however, where the physical education requirement could have instead been met by sending Abraham to the library, *because of his particular condition,* was tantamount to providing him with a sharp knife or a loaded handgun and asking him to make his own decision on whether it is safe enough for him to play with those items. As the Fifth Circuit has already held, districts are liable under §1983 when their actions manifest deliberate indifference to a student's welfare. *Doe v. Taylor,* 15 F.3d at 454; *Gonzalez v. Ysleta Indep. School Dist.,* 996 F.2d at 760.

## 3.    Texas Education Code Claims

Texas Education Code §22.051 applies only to the actions of individual employees, and not to the actions of Defendant SBCISD. Because Plaintiff does not make any

allegation that Defendant SBCISD violated §22.051, it is unclear why Defendant would ask that it be dismissed as against SBCISD. In addition, since Defendants do not appear to be alleging that their actions were some form of discipline, Defendant's remaining contentions appear to be without merit. Interestingly, Defendant's reference to Texas Education Code §7.057 would appear to be misplaced, since that section apparently does not apply to student disciplinary actions anyway. TEX.EDUC.CODE §7.057(e)(2).

WHEREFORE, PREMISES CONSIDERED Plaintiff **ADELA CANO**, *Individually and on behalf of her minor son*, **ABRAHAM CANO**, would respectfully request that upon consideration of Defendant San Benito Consolidated Independent School District's Motion to Dismiss that such motion be DENIED in its entirety, that this action be allowed to proceed to trial and judgment, and that Plaintiff be granted such other and further relief to which she may show herself to be justly entitled, whether general or special, at law and in equity.

Signed on this the 9th day of October, 2003.

Respectfully submitted,

**LAW OFFICE**
**J. ARNOLD AGUILAR**
Artemis Square, Suite H-2
1200 Central Boulevard
Brownsville, Texas  78520
Telephone     :  (956) 504-1100
Facsimile      :  (956) 504-1408

By: _____
J. Arnold Aguilar
State Bar No. 00936270
Federal Adm. No. 6822

Attorney for Plaintiff,
ADELA CANO, Individually and on Behalf
of her minor son, ABRAHAM CANO

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT'S (SAN BENITO C.I.S.D.) MOTION TO DISMISS** has on this the 10th day of October, 2003, been forwarded via certified mail, return receipt requested to:

Mr. James E. Byrom
EWBANK & BYROM, P.C.
221 West 6th Street, Suite 900
P. O. Box 2430
Austin, TX 78768-2430

Ms. Eileen Leeds
WILLETTE & GUERRA, L.L.P.
3505 Boca Chica Blvd., Suite 460
Brownsville, TX 78521


_____
J. Arnold Aguilar

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually and on      §
Behalf of her minor son, ABRAHAM CANO,§
                          Plaintiff   §
                                      §          CIVIL ACTION NO.
    VS.                               §
                                      §          B - 01 - 156
                                      §
SAN BENITO CONSOLIDATED               §
INDEPENDENT SCHOOL DISTRICT,          §
HERIBERTO VILLARREAL and              §
PETER GUERRERO,                       §
                          Defendants  §

---

## AFFIDAVIT OF J. ARNOLD AGUILAR

---

STATE OF TEXAS                §
                              §
COUNTY OF CAMERON             §

BEFORE ME, the undersigned official, on this day appeared J. ARNOLD AGUILAR, who is personally known to me, and first being duly sworn according to law upon his oath deposes and says:

My name is J. Arnold Aguilar, I am over 18 years of age, I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts state herein, and they are all true and correct.

As the attorney for Plaintiffs in Civil Action No. B-01-156, pending in the United States District Court for the Southern District of Texas, Brownsville Division, I attended the following depositions:

(1)     Defendant Heriberto Villarreal (Vol. I) on May 14, 2002. The excerpts attached hereto as Exhibit-A were taken from the transcript of Heriberto Villarreal's deposition testimony and are true records of the testimony provided by Heriberto Villarreal.

Page 1 of 2



(2)    Defendant Heriberto Villarreal (Vol. II) on May 15, 2002.  The excerpts attached hereto
       as Exhibit-B were taken from the transcript of Heriberto Villarreal's deposition testimony
       and are true records of the testimony provided by Heriberto Villarreal.

(3)    Defendant Pedro Gabriel Guerrero on July 15, 2002.  The excerpts attached hereto as
       Exhibit-C were taken from the transcript of Pedro Gabriel Guerrero's deposition
       testimony and are true records of the testimony provided by Pedro Gabriel Guerrero.

(4)    Ofelia Cornejo on August 28, 2003.  The excerpts attached hereto as Exhibit-D were
       taken from the transcript of Ofelia Cornejo's deposition testimony and are true records
       of the testimony provided by Ofelia Cornejo.

(5)    Donald Vargas, M.D., P.A. on September 25, 2002.  The excerpts attached hereto as
       Exhibit-E were taken from the transcript of Dr. Donald Vargas' deposition testimony and
       are true records of the testimony provided by Dr. Donald Vargas.

(6)    Plaintiff Abraham Cano on July 16, 2002.  The excerpts attached hereto as Exhibit-F
       were taken from the transcript of Abraham Cano's deposition testimony and are true
       records of the testimony provided by Abraham Cano.

(7)    Plaintiff Adela Cano on July 16, 2002.  The excerpts attached hereto as Exhibit-G were
       taken from the transcript of Adela Cano's deposition testimony and are true records of
       the testimony provided by Adela Cano.

       The above and foregoing is true and correct based on my personal knowledge.


                                                     J. Arnold Aguilar

       SUBSCRIBED AND SWORN TO BEFORE ME on the 9th day of October, 2003, to
certify which witness my hand and official seal.

                                        Frances Peña
                                        Notary Public, State of Texas

                                        My Commission Expires:

                                        03 - 27 — 07


                                                            Page 2 of 2



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually and on §
Behalf of her minor son, ABRAHAM CANO, §
Plaintiff §
§          CIVIL ACTION NO.
VS. §
§          B - 01 - 156
SAN BENITO CONSOLIDATED §
INDEPENDENT SCHOOL DISTRICT, §
HERIBERTO VILLARREAL and §
PETER GUERRERO, §
Defendants §

---

## ORDER DENYING DEFENDANT'S (SBCISD)
## MOTION TO DISMISS

---

On the _____ day of _____, 2003, this cause came for hearing

**Defendant San Benito Consolidated Independent School District's Motion to Dismiss.**

After hearing the argument of counsel thereon, the Court is of the opinion that

Defendant's Motion to Dismiss should be DENIED;

IT IS THEREFORE ORDERED, ADJUDGED and DECREED that Defendant's Motion

to Dismiss is DENIED.

SIGNED on this the _____ day of _____, 2003.

_____
U. S. DISTRICT JUDGE

# EXHIBIT-2

III. (*Health Information)

## ALL BLANKS MUST BE FILLED

A. Name _Abraham Cano_ Date of Birth _11-28-86_

School _Ed Downs_ Present Grade _4th_

B. **\*VISION**

1. *Date of most recent screening _12-12-96_
2. Results: Right eye _20/30_ Left eye _20/30_

   Y __ N _✓_
3. As a result of the screening, is there any indication of a need for further assessment or adjustment? If YES, please explain:_____

   Y __ N _✓_
4. Has any follow-up treatment been recommended? If YES, please explain:_____

C. **\*HEARING**

1. *Date of most recent screening _12-12-96_
2. Results: Right Ear _passed_ Left ear _passed_

   Y __ N _✓_
3. As a result of the screening, is there any indication of a need for further assessment or adjustment? If YES, please explain?_____

   Y __ N _✓_
4. Has any follow up treatment been recommended? If YES, please explain:_____

D. **\*HEALTH**

   Y _✓_ N __
1. Does student exhibit any signs of health or medical problems? If YES, cite observations: _Osteo genesis Imperfecta (brittle bones) fracture left elbow 5-97._

   Y __ N _✓_
2. Is there a need for further medical assessment? If YES, what type? EXPLAIN? _under care of Dr. Vargas, Harlingen_

   Y __ N _✓_
3. Is student receiving any medication at school: If YES, specify:_____

EXHIBIT NO. _2_
5-14-02
BRYANT & STINGLEY, I.C.

_O. Cornejo, RN_ _School nurse_ _5/19/97_

**\*SIGNATURE OF PERSON COMPLETING THIS SECTION** **\*POSITION** **\*DATE**

SB0084

# EXHIBIT-3

## SAN BENITO CISD

___Out of School Referral
___Transfer Student Referral
___Parent Referral

Referral Source: _parents_ Phone:_____

Source of Information: _Health Information,_____

Student's Name: _Abraham C. Cano_ DOB: _11-28-86_

Sex: _M_ Age: _11_ School: _Ed Downs_ Grade: _4th_

Parent's Name: _Luis and Adela Cano_ Legal Guardian _✓_Yes ___No

Address: _205 Corona Crescent_
(Street)
_San Benito, Tx 78586_
(City)

Phone:_____ Home _____Work _____Nearest Relative, etc.

Primary Home Language: English _✓_ Spanish ___

Disabling Condition: _osteogenesis Imperfecta (brittle bones)_

Comments:_____

Further Action Necessary: Yes ___ No ___

<u>Campus Counselor</u>

PLEASE SEND REGULAR
REFERRAL INFORMATION
AS SOON AS POSSIBLE

<u>Service Needed</u>

_✓_EDUCATION
___TRANSPORTATION
_✓_HOMEBOUND
___COMMUNITY SERVICES
___OTHER _____

EXHIBIT NO. 3
5-14-03
BRYANT & STINGLEY, INC.

_____      _____  _____
Signature of Person Completing Referral      Position      Date

# EXHIBIT-10

San Benito Consolidated Independent School District

## SCHOOL HEALTH RECORD

#59102

| Last Name | First | MI | DOB | M/F | Phone 372-0 |
|---|---|---|---|---|---|
| Caaro Abraham Cord | | | 11-28-84 | M | |

| Address | School | Parent's Name | Lives with |
|---|---|---|---|
| 680 N. Crockett | NS | Adela Caro & Luis Coro | Pineda |

| IMMUNIZATION DATES | | | | | FAMILY HEALTH HISTORY | |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | BOOSTERS | | |
| DTP | 3-5-87 | 8-17-70 | 8-25-92 | 3-2-93 | Father's Health | Occupation |
| TD | | | | | Mother's Health | Occupation |
| Tetanus | | | | | Number Siblings | |
| OPV | 3-25-87 | 8-17-40 | 8-25-92 | 3-2-93 | Familial Disorders | |
| Measles | | | | | Other Family History | |
| Mumps | | 8-12-90 | 3-2-93 | | LIMITING HEALTH PROBLEMS | |
| Rubella | | | | | Asthma | Vision |
| TB Test | 4-6-93 | | | | Cardiac | Hearing Loss |
| Other | no | | | | Diabetes | Orthopedic |
| HIB | 9-19-90 | | | | Seizures | Other |

| PHYSICAL PROGRESS RECORD | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GRADE | PRE-KINDER | K | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| Date Screened | | | | | 11-7-93 | 12-2-56 | | 10-2-94 | 10-3-94 | 10-5-40 | 10-6-91 | | | |
| ARD | | | | | | | | | | | | | | |
| B/P | | | | | | | | | | | | | | |
| Dental | | | | | | | | | | | | | | |
| ENT | | | | | | | | | | | | | | |
| Height | | | | | | | | | | | | | | |
| Weight | | | | | | | | | | | | | | |
| Scoliosis | | | | | | | | | | | | | | |
| Hearing R | | | | | PX4 | P9 | | | | | | | | |
| L | | | | | PX4 | P8 | | | | | | | | |
| Vision R | 20/ | | 20/ | 20/ | 20/ | 20/30 | 20/40 | 20/30 | 20/40 | 20/30 | 20/ | 20/ |
| L | 20/ | | 20/ | 20/ | 20/ | 20/30 | 20/ | 20/20 | 20/25 | 20/20 | 20/30 | 20/ | 20/ |
| Physical | | | | | | | | | | | | | | |

CODES:  **N** - Normal     **AB** - Abnormal Noted     **R** - REFERRED LIST DETAIL ON BACK       SBCISD 88-89

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

EXHIBIT NO. 10
BRYANT & STINGLEY, INC.

HV0001

1-10-97 Enrolled from Rangerville Elem.
mother gave history of congenital (radiology)
Osteogenesis imperfecta, Hx of fracture. b. conejo,
2-97 I spoke to 4th grade classes — please
be careful around Abraham due to his fragile
bones. /O.C.
4-9-97 mrs. Cano had conference with Mrs. Sanita,
RN — see doctor referral attached. /O.C.
• 5-13-97 — I spoke to his teacher, Abraham has been
absent 15 days — fell at home, has fracture
right arm. — b. conejo, RN
5-21-97 Home visit made — obtained relieve of info from
Abraham has a full length arm cast on left arm —
otherwise doing well. b. conejo — homebound services.
5-22-97 obtained doctors form for left olecranon —
PX — avulsion fracture of the left olecranon 5-3-97 — Dr. Donald
disruption of free try. ___ Vargas
— b. conejo, RN to mrs. cano, principal who is working
5/22/97 form given to special Ed. Dept. for homebound services.
with special Ed. Dept. for /OC

4-24-98 Abraham fell in PE ___ ___ left elbow,
on left elbow. 1/2" skin tear ___ 5/1/98
hurts to extend arm — Immobilize ___
mother took him to the doctor ___ sling, has report
4-30-98 Abraham is wearing ___ cast and ___ report
11 small fractures? — b. conejo, RN
back to me.
8/98 ___ just ___ ___ ___ Dr. Melody Nhi
+ ___ + Treatments ___ ___ — ___
+ Dr. Costello Nhi ___ ___ ___ ___
___ stay same ___ ___ ___ ___
+ ___ we are ___ ___ ___ ___
10-2-98 ___ & hearing ___ ___ ___
___ ___ & ___ refilling RN
children ph #. ___ RN
___ little time one
6/23/99   20/40  20/30 for  20/40  20/30 near  ___ ___ 50 L
10-20-99 — Hearing — 1000 — 45 R&L, 2000 ___ ___ ___
11-9-99 — HAS Cold — will recheck 11/15/99 ___
5-15-___ -100L — 60(R)   2000 — 50 R    4m — 45 (R)
       1m — 40 (L)   2m 35 — L   4m 35 (L)
5-15-___ 20/50  20/25 fn  20/40  20/30 near ___ little home
rec hearing ___ V ___ ___ ___

# EXHIBIT-15

SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT
MAIN NURSES' OFFICE
845 Zaragosa
San Benito, Texas  78586
361-1387

*appt.*
*mon 4.14.97*
*1 pm*

## SCHOOL NURSE REFERRAL

TO: _Texas Dept Human Service_    DATE: _4/9/97_
DOCTOR/CLINIC/PROVIDER
_Hwy 77_
_San Benito, Texas_

STUDENT: _Abraham Cano_    BIRTHDATE: _11-28-86_

ADDRESS: _205 Corona Crescent_    STUDENT'S SS# _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_

PARENTS: _Adela Cano_    TELEPHONE: _399-6451_

REASON FOR REFERRAL: _Hx: osteogenesis imperfecta since birth. Moved from Weslaco 2yrs ago. No A.F.D.C; Medicaid Foodstamps since arrived in San Benito. Child attends Ed Downs and is in need of Medical attention - disease progressing to point causing alot pain low back and left ankle from malformation of bone. Please evaluate and asist as soon as possible._

_Santa Benita RN_    _Main Nurse_
SCHOOL NURSE    SCHOOL Office

RESULTS OF REFERRAL: _____

_____

_____

_____

_____

_____

Notes

Form SN-3 Updated 5/94

EXHIBIT NO. _15_
5-14-1
BRYANT & STINGLEY, INC

HV0005

# EXHIBIT-21

**San Benito Consolidated Independent School District**

*SPECIAL EDUCATION DEPARTMENT*

240 N. Crockett St., San Benito, TX 78586

Phone (956) 361-6220  Fax (956) 361-6222

*Date of Meeting:* _____

☐ Admission
☑ Annual Review
☐ Re-evaluation
☐ Dismissal
☐ ER ARD
☐ Other

## Individual Education Program Meeting

| | |
|---|---|
| Abraham Cano | 12413 Landrum Park Rd |
| Name of Student | Date of Birth  11-28-86 |
| Address   Robin Hood Lane Lot #415 | 361-0263 |
| | Phone Number |
| Grade 7    I.D. Number 59102 | School  Berta Cabaza |

☐ YES   ☒ NO   *An interpreter was used to assist in conducting the meeting. If YES, specify language or other mode of communication: _____

*REVIEW OF ASSESSMENT DATA AND OTHER INFORMATION   (check (✓) if applicable)

☑ Comprehensive individual assessment[1]: _____10·15·98_____
DATE(S) OF REPORT(S)

☐ Assessment(s) for related services. Specify:

_____        _____
NAME OF SERVICE                DATE OF REPORT

_____        _____
NAME OF SERVICE                DATE OF REPORT

_____        _____
NAME OF SERVICE                DATE OF REPORT

☐ Functional Vocational Evaluation: _____
DATE(S) OF REPORT(S)

☐ Information from the student's Individual Transition Plan
☐ Information from the Language Proficiency Assessment Committee
   Bilingual _____    ESL _____    None _____
☐ Records from other school districts
☑ Information from parents/student   Concern about health needs and curriculum placement
☑ Information from school personnel   Passing all subjects / low grades in
☐ Information/records from other agencies or professionals   reading - not comple at reader

☐ YES   ☒ NO   Additional assessment is needed: _____

If YES, specify timeline for assessment to be completed[2] _____

EXHIBIT NO. 21

BRYANT & STINGLEY, INC

HV0088

[1] Assistive technology needs must be considered.
[2] If additional assessment is recommended, it must be completed according to the timeline specified.
*Denotes required items

ARD 1  8/99

**\*DETERMINATION OF ELIGIBILITY** (check (✓) if applicable)

Based on the assessment data reviewed, the ARD committee has determined that the student:

☐   does not meet eligibility criteria to receive special education services

☑   meets eligibility criteria for: [1]

☐ learning disability         ☐ speech impairment         ☐ emotionally disturbed

☐ mental retardation        ☐ autism                       ☑ other health impaired

☐ Orthopedic impairment     ☐ traumatic brain injury      ☐ multiple disabilities

☐ visual impairment         ☐ auditory impairment         ☐ deaf-blind

☐ non-categorical

☐   meets eligibility criteria for _____ , graduating due to completing IEP goals and objectives.

**DEVELOPMENT OF THE INDIVIDUAL EDUCATIONAL PLAN (IEP)**

☑       ☐       The ARD committee reviewed achievement on the previous year's short-term objective
YES     NO      on the IEP.  (Applicable to all but initial ARD meetings.)

**\*Present Competencies:**  7th
**Approximate Math Level:** 7th
_____   The student uses numbers to name quantities.
  ✓     The student describes order of events or objects.
  ✓     The student recognizes that there are quantities less than a whole.
  ✓     The student models ___ addition ___subtraction ___ multiplication ___ division
  ✓     The student identifies, extends and creates patterns.
  ✓     The student describes the relative position of objects.
  ✓     The student recognizes characteristics of shapes and solids.
_____   The student uses attributes such as ___ length ___ weight ___ capacity to compare and order shapes.
_____   The student uses time and temperature to compare and order events, situations, and/or objects.
  ✓     The student constructs and uses graphs of real objects or pictures to answer questions.
  ✓     The student uses attributes to identify, compare, and contrast shapes and solids.
  ✓     The student displays data in an organized form.
  ✓     The student uses information from organized data.
  ✓     The student recognizes that numbers can be represented by points on a line.
  ✓     The student uses place value to communicate ___ whole numbers ___ money ___ decimals.
  ✓     The student uses fraction names and symbols to describe fractional parts of whole objects or sets of objects.
  ✓     The student estimates to determine reasonable results.
  ✓     The student uses formal geometric vocabulary.
_____   The student applies measurement concepts.

**Approximate Social Studies Level:** 7th-1
  ✓     The student understands that holidays are celebrations of special events.
  ✓     The student understands the concept of location.
  ✓     The student understands chronology.
  ✓     The student understands physical and human characteristics of the environment.

---

[1] If the student is suspected of being medically fragile, the ARD/IEP Supplement: Students Who Are Medically Fragile should be completed.
\*Denotes required items                                                ARD 2  8/99

The student understands that basic human needs are met in many ways.
The student understands important customs, symbols and celebrations that represent American beliefs and principles that contribute to our nation's identity.
The student understands similarities and differences among people.
The student understands how people learn about themselves through family customs and traditions.

Approximate Language Arts Level: _____

____ The student listens attentively and engages actively in a variety of oral language experiences.
____ The student listens and speaks to gain knowledge of his/her own culture, the culture of others and common elements.
____ The student speaks appropriately to different audiences for different purposes and occasions.
____ The student communicates clearly by putting thoughts and feelings into spoken words.
____ The student demonstrates knowledge of concepts of print.
____ The student orally demonstrates phonological awareness.
____ The student uses letter-sound knowledge to decode written language.
____ The student uses a variety of strategies to comprehend selections.
____ The student responds to various texts.
____ The student generates questions and conducts research about topics introduced through selections read aloud and from a variety of sources.
____ The student displays the foundations of writing.
____ The student composes original texts.
____ The student uses writing as a tool for learning and research.
____ The student reads widely for different purposes in varied sources.
____ The student recognizes characteristics of various types of texts.
____ The student writes for a variety of audiences and purposes and in a variety of forms.
____ The student spells proficiently.
____ The student composes meaningful texts using the conventions of written language such as capitalization and handwriting to communicate clearly.
____ The student selects and uses writing processes for self-initiated and assigned writing.
____ The student listens actively and purposefully in a variety of settings.
____ The student listens critically to analyze and evaluate a speaker's message(s).

Approximate Science Level: _____

____ The student participates in classroom and field investigations following home and school safety procedures.
____ The student develops abilities necessary to do scientific inquiry in the field and the classroom.
____ The student uses age appropriate tools and models to verify that organisms and objects and parts of organisms and objects can be observed, described and measured.
____ The student knows that organisms, objects, and events have properties and patterns.
____ The student knows that systems have parts and are composed of organisms and objects.
____ The student knows that many types of changes occur.
____ The student knows the difference between living organisms and nonliving objects.
____ The student knows that living organisms have basic needs.
____ The student knows that the natural world includes __ rocks __ soil __ water __ gases of the atmosphere.
____ The student knows that systems exist in the world.
____ The student knows that forces cause change.
____ The student knows that living organisms need __ food __ water __light __ air __ a way to dispose of waste __ an environment in which to live.
____ The student knows that the natural world includes earth materials and objects in the sky.

Approximate Developmental Level: _____        ____ Age Appropriate
____ Gross Motor: _____
____ Fine Motor: _____
____ Language Development: _____
____ Social Development: _____
____ self-help: _____
____ Household Management: _____
____ Personal Management: _____
____ Job Readiness/Work Skills: _____
____ Home/Community: _____

ARD 3  8/99

HV0090

☒ YES    ☐ NO    The student is capable of following the Student Code of Conduct without modification. If NO, YES complete ARD/IEP SUPPLEMENT: **Behavior Management Plan (ARDBMP-1, -2, & -3).**

**Behavioral Competencies:**

__ carries out simple commands
__ Repeats praised performance
__ Responds to and makes verbal greeting
__ Works in a small group for __ five __ ten __twenty minutes
__ Works individually with adult for __five__ten__twenty minutes
__ Awaits turn
__ Initiates peer contact
__ Raises hand for attention in group activity
__ States consequences of breaking a rule

✓ Age appropriate
__ Obeys parent and teacher request
__ Engages in cooperative play
__ Looks at speaker during 1:1 conversation
__ Conforms to game rules
__ Offers assistance to peers
__ Demonstrates respect for property
__ Waits turn for help
__ Shares idea in group setting

**Prevocational/Vocational skills which may be prerequisite to vocational education (when appropriate):**

S - Strength        W - Weakness        N/A - Due to Age

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| S | W | 1. Reading Skills | S | W | 5. Expressive Skills | S | W | 9. Verbal Comprehension |
| S | W | 2. Math Level | S | W | 6. Organizational Skills | S | W 10. | Independent Task Completion |
| S | W | 3. Job Attendance | S | W | 7. Social Skills | S | W 11. | Following Directions |
| S | W | 4. Attendance | S | W | 8. Personal Hygiene | S | W 12. | Punctuality |

*Physical, as it affects participation in *instructional settings and *phsyical education:

☒ YES    ☐ NO    Student has physical condition or disability which would affect participation in regular instructional setting. If YES, describe physical condition/disability: ~~STENOSIS~~ INDOLEC

☐ regular physical education
☐ adapted physical education[1]
☒ regular physical education with modifications
☐ medical exemption
☐ physical education requirements have been met

**The ARD Committee determined that the disability affects the student's involvement and progress in the general curriculum in the following manner:**

| | |
|---|---|
| ✓ Student can participate fully in the curriculum, as is, with monitoring only<br>__ Need for classroom modifications or adaptations specified within<br>__ Need for access to support as specified within<br>__ Need for assistance in the classroom<br>__ Need for modification of general curriculum (IEP attached)<br>__ Need for adapted curriculum (IEP attached)<br>__ Other: _____ | **PPCD STUDENTS:**<br>__ Participates full-time in prekindergarten program with additional supervision<br>__ Participates in specified prekindergarten activity with additional supervision as follows:<br>__ Participates in PPCD classroom with planned visitations by prekindergarten students as follows:<br>__ Participates in self-contained PPCD classroom located on a general education campus. |

ARD 4  8/99

'Eligibility form required.

## *INSTRUCTIONAL ACCOMMODATIONS DETERMINED BY IEP TEAM

Arzatadi Cano                          Boca Cabeza

NAME OF STUDENT                        CAMPUS

The ARD committee has determined that the following modifications are necessary for the student to succeed:

SPECIAL LANGUAGE PROGRAMS[1]

☐ Bilingual   N/A
☐ ESL

| BEHAVIOR MANAGEMENT PLAN | REGULAR DISCIPLINE PLAN |
|---|---|
| ☐ YES | ☑ YES |
| ☑ NO | ☐ NO |

ASSISTIVE TECHNOLOGY DEVICES

☐ YES        ☑ MODIFICATIONS NOT NEEDED OR NOT APPLICABLE
☑ NO

| ALTER ASSIGNMENTS BY PROVIDING: | | | | | | GOALS & OBJECTIVES/SUBJECT | | |
|---|---|---|---|---|---|---|---|---|
| Reduced assignments | | | | | | | | |
| Taped assignments | | | | | | | | |
| Extra time for completing assignments | | | | | | | | |
| Opportunity to respond orally | | | | | | | | |
| Emphasis on major points | | | | | | | | |
| Task analysis of assignments | | | | | | | | |
| Special projects in lieu of assignments | | | | | | | | |
| Other: | | | | | | | | |
| Other: | | | | | | | | |

| ADAPT INSTRUCTION BY PROVIDING: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Short instructions (1 or 2 steps) | | | | | | | | |
| Opportunity to repeat and explain instructions | | | | | | | | |
| Encouragement to verbalize steps needed to complete assignment/task | | | | | | | | |
| Opportunity to write instructions | | | | | | | | |
| Assignment notebooks | | | | | | | | |
| Visual aids (pictures, flash cards, etc.) | | | | | | | | |
| Auditory aids (cues tapes, etc.) | | | | | | | | |
| Instructional aids | | | | | | | | |
| Extra time for oral response | | | | | | | | |
| Extra time for written response | | | | | | | | |
| Exams of reduced length | | | | | | | | |
| Oral exams | | | | | | | | |
| Open book exams | | | | | | | | |
| Study carrel for independent work | | | | | | | | |
| Frequent feedback | | | | | | | | |
| Immediate feedback | | | | | | | | |
| Minimal auditory distractions | | | | | | | | |
| Encouragement for classroom participation | | | | | | | | |
| Peer tutoring/paired working arrangement | | | | | | | | |
| Opportunity for student to dictate themes, information, answers on tape or to others | | | | | | | | |
| Calculators | | | | | | | | |

---

[1] Special language programs are required for all students who are limited English proficient.
*Denotes required items

\*INSTRUCTIONAL MODIFICATIONS/SUPPORTS DETERMINED BY ARD COMMITTEE, continued

_Adrian Cano_
NAME OF STUDENT

_Besta Casada_
CAMPUS

_None Needed_

| GOAL & OBJECTIVE/SUBJECT | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

**ADAPT MATERIALS BY PROVIDING:**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Peer to read materials | | | | | | | | | |
| Tape recording of required readings | | | | | | | | | |
| Highlighted materials for emphasis | | | | | | | | | |
| Altered format of materials | | | | | | | | | |
| Study aids/manipulatives | | | | | | | | | |
| ESL materials | | | | | | | | | |
| Large print materials | | | | | | | | | |
| Braille materials | | | | | | | | | |
| Color transparencies | | | | | | | | | |
| Other: | | | | | | | | | |
| Other: | | | | | | | | | |

**MANAGE BEHAVIOR BY PROVIDING:**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Clearly defined limits | | | | | | | | | |
| Frequent reminders of rules | | | | | | | | | |
| Positive reinforcement | | | | | | | | | |
| Frequent eye contact/proximity control | | | | | | | | | |
| Frequent breaks | | | | | | | | | |
| Private discussion about behavior | | | | | | | | | |
| In-class time-out | | | | | | | | | |
| Opportunity to help teacher | | | | | | | | | |
| Seat near the teacher | | | | | | | | | |
| Supervision during transition activities | | | | | | | | | |
| Implementation of behavior contract | | | | | | | | | |
| Other: | | | | | | | | | |
| Other: | | | | | | | | | |

**REQUIRED EQUIPMENT/ASSISTIVE TECHNOLOGY DEVICES:**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Word processors | | | | | | | | | |
| Augmentative communication device | | | | | | | | | |
| Note taker/note taking paper | | | | | | | | | |
| Interpreter | | | | | | | | | |
| Decoders for TV and films | | | | | | | | | |
| Access to equipment: | | | | | | | | | |
| Other: | | | | | | | | | |

ARD 6

HV0093

*Criterion referenced assessment (TAAS)[1]:

| | | | | |
|---|---|---|---|---|
| ☐ YES | ☐ NO | | will take reading | If NO, alternative assessment to be given: |
| ☐ YES | ☐ NO | | will take mathematics | If NO, alternative assessment to be given: |
| ☐ YES | ☐ NO | ☐ NA | will take writing | If NO, alternative assessment to be given: |
| ☐ YES | ☐ NO | ☐ NA | will take social studies | If NO, alternative assessment to be given: |
| ☐ YES | ☐ NO | ☐ NA | will take science | If NO, alternative assessment to be given: |

Modifications as defined in test administration materials:

_____    TAAS not offered for this student's grade placement

---

**End-of-Course Examinations[2] :**

| | | | | |
|---|---|---|---|---|
| ☐ YES | ☐ NO | ☐ NA | will take Algebra 1 | If NO, alternative assessment to be given: |
| ☐ YES | ☐ NO | ☐ NA | will take Biology 1 | If NO, alternative assessment to be given: |
| ☐ YES | ☐ NO | ☐ NA | will take U.S. History | If NO, alternative assessment to be given: |
| ☐ YES | ☐ NO | ☐ NA | will take English II | If NO, alternative assessment to be given: |

Modifications as defined in test administration materials:

---

**District wide Assessments:**

| | | | |
|---|---|---|---|
| ☐ YES | ☐ NO | will take district wide assessments | If NO, alternative assessment to be given: |

Modifications as defined in test administration materials:

---

*If student is exempted from the administration of any assessment instrument above, it is because:

_____    a. The student's individualized education program does not include instruction in the essential knowledge and skills at any grade level.

OR

_____    b. The assessment instrument, even with allowable modifications, would not provide an appropriate measure of the student's achievement as determined by the student's ARD committee.

HV0094

---

[1] Until Spanish TAAS tests are available, LEP students exempt from the English TAAS must be tested with alternative measures of accountability.
[2] The only students not required to test are students receiving content modifications resulting in an IST on the transcript as stated in test administration materials. These materials also provide information about testing these students for local purposes.
*Denotes required items

ARD 7   8/99

**TRANSITION PLANNING BY AGE 14: (Transition Related Content Supplement)**
Transition Planning is required for all students beginning by age 14 and required to be updated annually and must have "course of study".

Graduation        ☒ Applicable        ☒ Not Applicable _____

Expected date of graduation is _____

Graduation Plan Option:

___    **ACADEMIC PLAN:**  Student must have satisfactorily completed the minimum academic credit requirements for graduation, including satisfactory performance on the exit level assessment instrument.

___    **WORK-STUDY PLAN:**  Student has completed requirements specified in the IEP which resulted in one of the following:

   • Full time employment in addition to sufficient self-help skills to enable the student to maintain employment without direct and ongoing educational support of the school district.

   • Demonstrate mastery of specific employability skills and self-help skills which do not require direct ongoing educational support of the school district.

   • Access to services which are not within the legal responsibility of public education or employment, or educational options for which the student has been prepared by his academic program.

___    **SPECIAL EDUCATION PLAN:**  Student no longer meets age eligibility requirements and has completed the requirements specified in the IEP.

**\*SERVICE ALTERNATIVES**

\*Identify the general and special education alternatives and supplementary aids and services provided, tried, or considered.  Place key letter (**p, t, c**) in space next to all that apply:

| | |
|---|---|
| _P_ General education classroom | ___ Alternative education program |
| ___ Modifications in general education and/or curriculum, instruction testing procedures, and/or physical arrangements (including vocational education and nontraditional instructional programs) | ___ Assistive technology (e.g., communication devices, slant top table) |
| | ___ Resource classroom |
| | ___ Self-contained classroom |
| | ___ Separate special education campus |
| ___ Special education supplementary aids and services | ___ Nonpublic day school placement |
| | ___ Residential placement\*\* |
| ___ Title I Part A/Accelerated Instruction | ___ Other: _____ |
| ___ English as a Second Language (ESL) | ___ Other: _____ |
| ___ Bilingual classes | |
| ___ Pre-K program | |

\*Results                                        \*If efforts not successful, provide reason(s)

PASSING ALL SUBJECTS

☐       ☐       ☐       \*\*Parents of students who meet eligibility criteria for visual or auditory impairments or
YES    NO    NA       deafblindness have been given written information, within the past year, about programs offered by the Texas School for the Blind and Visually Impaired or Texas School for the Deaf, including eligibility and admissions and the rights of students related to admission.

\*Denotes required items

HV0095                                        ARD 8  3/99

**\*CONSIDERATIONS OF LEAST RESTRICTIVE ENVIRONMENT**

☐   Based on ARD committee review of assessment data, new IEP goals and objectives, instructional modifications/supports necessary to implement the content of the IEP, and previous efforts/considerations, the committee recommends that this student receive all instruction and services in general education.  If selected, go to the **SCHEDULE OF SERVICES** section.

OR

☐   Based on ARD committee review of assessment data, new IEP goals and objectives, instructional modifications/supports necessary to implement the content of the IEP, and previous efforts/considerations, the committee recommends that this student receive part of or all instruction and services in a special education setting.  If selected, complete either **the Removal from General Education Classroom** or the **Removal from General Education Campus** sections that follow.  The **Opportunity to Participate** and **Consideration of Potential Harmful Effects** sections must also be completed.

**\*Removal from General Education Classroom**

☐   Placement in the general education classroom prohibits the student from achieving the goals and objectives contained in the IEP even though supplementary aids and services are used.

☐   The modifications required for the student to achieve the goals and objectives in the IEP cannot be implemented in the general education classroom without eliminating essential components of the regular curriculum/activity.

☐   Implementing the student's behavior management plan means that other students would not benefit satisfactorily from academic instruction or nonacademic activities.

☐   Other: _____

☐   Other: _____

OR

**\*Removal from General Education Campus**

☐   Services and/or therapies in the student's IEP cannot be provided on a general education campus.

☐   The behavior management plan contained in the student's IEP cannot be implemented on a general education campus.

☐   The student's behavior is so dangerous that it cannot be controlled without intense supervision and a closed environment.

☐   The student had a previously unsuccessful placement on a general education campus.  If selected, list instructional and related service goals and objectives and modification/support services that address returning the student to the general education campus. _____

☐   Student is being serviced at general education campus, and is not removed from general education campus.

**\*Opportunity to Participate**

\*In removing this student from the general education classroom/campus, will the student have the opportunity to participate with students without disabilities in all nonacademic and extracurricular activities?

☐ ☐        N/A
YES  NO

If NO, describe the nonacademic and extracurricular activities in which the student will not have an opportunity to participate:

☐ Meals                    ☐ Yearbook/newspaper      ☐ General education routines
☐ Field trips              ☐ Recess periods             (homeroom assignments,
☐ Fund raising activities  ☐ Choral group/debate        lockers, study hall, class
☐ Regular transportation   ☐ Assemblies                 changes, social)
☐ Sports/cheerleading      ☐ Band                    ☐ Other: _____
☐ Student council          ☐ Graduation exercises    ☐ Other: _____

\*If any of the above items are checked, explain why this student is unable to participate:

N/A

**\*Consideration of Potential Harmful Effects**

\*In removing this student from the general education classroom/campus, what are the potential harmful effects on the student and on the quality of services which the student needs?

☐ None anticipated

☐ Lack of opportunity for appropriate role       ☐ Decreased access to the instructional
  models                                            opportunities available in integrated settings
☐ Stigmatization                                 ☐ Diminished access to full range of curriculum
☐ Isolation from peers                           ☐ Lack of opportunity for social interaction
☐ Other: _____                ☐ Decreased student self-esteem
☐ Other: _____                ☐ Other: _____
☐ Other: _____                ☐ Other: _____

**Activities to Facilitate Movement Toward General Education Settings**

☐ Conference with general education teacher/other personnel: _____
☐ Conference with parent
☐ Provide general education assignments to student while receiving services in a special education
  setting
☐ Gradual transition into general class.
☐ Special education teacher and student visit the general education class.

\*Denotes required items

HV0097                                    ARD 10  8/99

**\*SCHEDULE OF SERVICES**

| INSTRUCTION | MIN/WK | | | | Progress/Grade Determined by: | | |
|---|---|---|---|---|---|---|---|
| Year 19-00  Semester ___ | Gen. Ed. modified | | Gen. Ed. Time | Spe. Ed. Time | Gen. Ed. | Spe. Ed. | Joint |
| Course/Curriculum Area | Yes | No | | | | | |
| MATH | | ✓ | 225 | | ✓ | | |
| READ | | ✓ | 225 | | ✓ | | |
| LANG | | ✓ | 225 | | ✓ | | |
| S.STUDIES | | ✓ | 225 | | ✓ | | |
| SCI | | ✓ | 225 | | ✓ | | |
| ELECTICS | | ✓ | 450 | | ✓ | | |
| | | | | | | | |
| | | | | | | | |

| RELATED SERVICES | \*TIME PER WK. |
|---|---|
| Occupational Therapy | — |
| Physical Therapy | |
| Counseling | 1X |
| | |

| INSTRUCTION | MIN/WK | | | | Progress/Grade Determined by: | | |
|---|---|---|---|---|---|---|---|
| Year ___  Semester ___ | Gen. Ed. modified | | Gen. Ed. Time | Spe. Ed. Time | Gen. Ed. | Spe. Ed. | Joint |
| Course/Curriculum Area | Yes | No | | | | | |
| MATH | | ✓ | 225 | | ✓ | | |
| READ | | ✓ | 225 | | ✓ | | |
| LANG | | ✓ | 225 | | ✓ | | |
| S.STUDIES | | ✓ | 225 | | ✓ | | |
| SCI | | ✓ | 225 | | ✓ | | |
| ELECTICS | | ✓ | 450 | | ✓ | | |
| | | | | | | | |
| | | | | | | | |

**Parents will be notified of student's progress by:**

☑ Report Card
☑ Parent/Teacher Conference
☑ Progress Report
☐ Portfolio
☐ Other: _____

**EXTENDED YEAR SERVICES**

recommended:

☐ YES   ☑ NO   If YES, see attached ARD/IEP Supplement

☐ YES   ☑ NO   Special Transportation   If YES, give justification:

☐ Physical/Motor          ☐ Cognitive
☐ Emotional/Behavioral Factors   ☐ Other: _____
☐ Appropriate setting not available at home school

**\*PLACEMENT DETERMINATION**
\*The ARD committee determined that services will be provided at:

BELIA GARZA
NAME OF SCHOOL CAMPUS

RESOURCE / MAINSTREAM
NAME OF INSTRUCTIONAL ARRANGEMENT

| Qtr. | Instr. Arr. |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |

FOR HIGH SCHOOL ONLY

† Enter instructional arrangement that meets requirements listed in the *Student Attendance Accounting Handbook*.
\*Denotes required items

| | | |
|---|---|---|
| ☐ YES | ☐ NO | *This is the campus the student would attend if not disabled. If NO, identify (list or describe) the services which cannot reasonably be provided on the student's home campus. |
| ☐ YES | ☐ NO | *This is the campus which is as close as possible to the student's home. If NO, justify: |

**ASSURANCES** (Initial by representative of school district)

*The ARD committee assures that this student is being educated with student's his/her age who do not have disabilities to the maximum extent appropriate to his/her overall educational needs (including academic and developmental areas such as language and socialization).

*The committee assures that all instruction and related services specified in the IEP will be provided to the student at no cost. Fees normally charged to students without disabilities or their parents as part of the general education program may be charged (i.e., art or laboratory fees).

*NOTE:* IF APPROPRIATE, COMPLETE ARD/IEP SUPPLEMENT: OUT-OF-DISTRICT PLACEMENT VERIFICATION (ARD SUP-OD) OR REFERRAL TO A REGIONAL DAY SCHOOL PROGRAM FOR THE DEAF (ARD SUP-RDSPD).

**\*SUPPLEMENTS:**

☐ For students graduating in the coming year, attach ARD/IEP Supplement: Graduation Requirements
☐ For Visually impaired students, attach ARD/IEP Supplement Visually Impaired Form
☐ For Autistic students attach ARD/IEP Supplement Autistic Form
☐ For Auditorially Impaired, attach ARD/IEP Supplement: Communication Needs of Deaf or Hard of Hearing Students
☐ ITP Supplement
☐ ARD/IEP SUPPLEMENT: Behavioral Intervention Plan
☐ EYS Supplement
☐ Consent for initial placement

*Your rights were explained to you a year prior to reaching age of majority. (If student is not present, refer to procedural safeguards).
 Date given: _____  To:_____
                                              NAME

*Denotes required items

HV0099

ARD 12  8/99

*SIGNATURES OF COMMITTEE MEMBERS AND OTHER PARTICIPANTS

| SIGNATURES AND TITLE MEMBERS | POSITION | AGREE | DISAGREE |
|---|---|---|---|
| *[signature]* | Parent(s)/Adult Student[1] | ✓ | |
| *[signature]* | Administrator | ✓ | |
| *[signature]* | General Education Teacher | ✓ | |
| *[signature]* | Special Education Teacher | ✓ | |
| *[signature]* | Assessment[2] | | |
| OTHER PARTICIPANTS | | | |
| | Representative of LPAC[3] | | |
| | Vocational | | |
| | Interpreter, if used | | |
| | | | |
| | | | |
| | | | |

My signature indicates that I was present at the ARD meeting, participated in the discussion, and understand what was discussed.

☑   The committee mutually agreed to implement the services reflected in these proceedings.

### ·OR

☐   The members of this ARD committee have not reached mutual agreement.  The school has offered and the parent has agreed to  a recess of not more than 10 school days.  During the recess the members shall consider alternatives, gather additional data, and/or obtain  additional resource persons to enable them to reach mutual agreement.  This recess does not   apply if the student presents a danger of physcial harm to himself or herself or others, or if the     student has committed an expellable offense.  The committee will reconvene on

[4]

_____ at _____
            DATE                                    PLACE AND TIME

Information explaining why mutual agreement has not been reached may be attached.

[1] Parental consent for initial placement is required before services begin.
[2] Assessment personnel are required when assessment issues are included in the ARD committee's deliberations.
LPAC representative is required at ARD of any student who is limited English proficient.
[3] Include documentation concerning the reconvened ARD committee meeting.
Denotes required items

HV0100

ARD 13  8/99

# EXHIBIT-A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually )(
and on Behalf of her minor)(
son, ABRAHAM CANO,        )(
        Plaintiff         )(
                          )(
VS.                       )(    CIVIL ACTION NO. B-01-156
                          )(
SAN BENITO CONSOLIDATED   )(
INDEPENDENT SCHOOL        )(
DISTRICT, HERIBERTO       )(
VILLARREAL and PETER      )(
GUERRERO,                 )(
        Defendants        )(

---

ORAL DEPOSITION OF
HERIBERTO VILLARREAL
MAY 14, 2002
VOLUME 1

# ORIGINAL

---

ORAL DEPOSITION OF HERIBERTO VILLARREAL,
produced as a witness at the instance of the PLAINTIFF,
taken in the above styled and numbered cause on MAY 14,
2002, reported by DONNA McCOWN, Certified Court
Reporter No. 6625, in and for the State of Texas, at
the San Benito Consolidated Independent School District
Administrative Building, 240 North Crockett Street, San
Benito, Texas, pursuant to the Texas Rules of Civil
Procedure.

15:24:40  1    Q.   Okay.  Who has access to his health records?

15:24:43  2    A.   The nurse.

15:24:45  3    Q.   Who else?

15:24:45  4    A.   Administration, parents.

15:24:49  5    Q.   Does the ARD committee?

15:24:51  6    A.   ARD committees, if requested.

15:24:56  7    Q.   Only if requested?

15:24:57  8    A.   Only if requested.

15:24:58  9    Q.   Is --

15:24:59 10    A.   Because --

15:25:01 11    Q.   I'm sorry.  Go ahead.

15:25:02 12    A.   In a referral packet, there is a health form in

15:25:05 13    there.  So everything that is part of a referral

15:25:08 14    process, there is a health form in there where there is

15:25:12 15    documentation for that by the nurse.  So there's no

15:25:15 16    need for this unless it's specifically requested.

15:25:18 17    Q.   Okay.  There's no need to look at this

15:25:19 18    particular document unless it's particularly requested?

15:25:23 19    A.   Exactly.

15:25:24 20    Q.   But you said the ARD committee does have access

15:25:26 21    to it?

15:25:27 22    A.   If requested, yes.

15:25:28 23    Q.   And from what you were telling me, at these

15:25:30 24    seminars, that would be part of -- in trying to meet

15:25:35 25    the specific needs of students, it might be important

15:25:39 1    for the ARD committee to look at these things, correct?

15:25:43 2        A.  Again, if it's requested, yes.

15:25:45 3        Q.  No.  I'm just asking if it might be important

15:25:48 4    for the ARD committee to look at it, not whether

15:25:50 5    they're requesting it or not.

15:25:51 6        A.  If the ARD committee requests it, they deem

15:25:54 7    it's important enough for them to request it, yes.

15:25:57 8        Q.  Do you think this would have been something

15:25:59 9    that the ARD committee should have looked at at any

15:26:02 10   point during -- this particular -- this document --

15:26:05 11   this particular document refers to Abraham Cano,

15:26:08 12   correct?

15:26:09 13       A.  It could have been, yes.

15:26:10 14       Q.  No.  I mean, it does relate to Abraham Cano,

15:26:12 15   right?

15:26:12 16       A.  Yes.

15:26:13 17       Q.  Is this something that you think the ARD

15:26:14 18   committee might or should have looked at?

15:26:17 19       A.  Sure, yes.

15:26:18 20       Q.  Okay.  This document particularly identifies

15:26:20 21   his history of osteogenesis imperfecta since birth,

15:26:24 22   right?

15:26:25 23       A.  Correct.

15:26:26 24       Q.  If you go down a couple of lines, it talks

15:26:28 25   about him attending Ed Downs, one of your elementary

16:10:44 1    release records from Dr. Vargas to the school district,

16:10:49 2    correct?  That's your understanding?

16:10:51 3        A.  If I look at this correctly, Ms. Cornejo on May

16:10:57 4    21st, '97, was asking Ms. Cano to take this form over

16:11:03 5    to Dr. Vargas to release any medical records to the

16:11:07 6    district.

16:11:07 7        Q.  Okay.

16:11:08 8        A.  Now, whether we received them or not --

16:11:10 9        Q.  That was going to be my question.  It seems to

16:11:12 10   me that what they're doing here is trying to get

16:11:15 11   records from Dr. Vargas.

16:11:16 12       A.  Exactly.

16:11:16 13       Q.  I'm not aware of any records that have been

16:11:18 14   provided to me through y'all from Dr. Vargas.

16:11:22 15       A.  Right.

16:11:22 16       Q.  Are you aware of any?

16:11:23 17       A.  I'm not aware.  When I went through -- this is

16:11:26 18   a health services department form, so that would have

16:11:28 19   been the nurse trying to gather this information.  This

16:11:32 20   was not attached to his medical records.

16:11:36 21       Q.  You couldn't --

16:11:36 22       A.  The only thing I could assume is that we never

16:11:38 23   received them.

16:11:41 24       Q.  Do you feel there would have been a duty on the

16:11:41 25   part of somebody at the school district to make sure

16:11:44 1    that something was received?

16:11:45 2              MR. BYROM:  Objection, form.

16:11:48 3              THE WITNESS:  I can't speak for Ed Downs.

16:11:51 4        Q.  I'm just --

16:11:52 5        A.  Or you know --

16:11:53 6        Q.  What I'm saying is --

16:11:54 7        A.  If Ms. Cornejo is the one that was requesting

16:11:56 8    this information, I would assume that she'd be the one

16:11:59 9    to follow up to say, "Okay.  Well, where is this

16:12:01 10   information?"

16:12:02 11             MR. BYROM:  Objection, nonresponsive.

16:12:05 12             THE WITNESS:  The only thing I'm saying

16:12:06 13   is, that if this student -- and I'm not sure what grade

16:12:10 14   he was in here, fourth, fifth grade, somebody --

16:12:15 15   Ms. Cornejo should have followed up.

16:12:18 16       Q.  And that's what I was going to ask.

16:12:21 17       A.  Either that or Ms. Cano should have provided

16:12:23 18   the forms.

16:12:23 19       Q.  Ms. Cornejo or somebody -- you would have

16:12:24 20   expected Ms. Cornejo or somebody at the district at

16:12:27 21   least to follow up?

16:12:29 22             MR. BYROM:  Objection, form.

16:12:30 23       Q.  Either to get the records or to note something

16:12:32 24   in her file saying, "Hey, where are those records,"

16:12:36 25   something like that at the very least, right?

16:38:01 1     Q.  Now it's a different nurse.

16:38:01 2     A.  It's a different nurse now.

16:38:03 3     Q.  Does this authorization follow through with the

16:38:05 4  patient -- I'm sorry, with the student?

16:38:07 5     A.  I don't know.

16:38:08 6     Q.  Okay.  This stays in his file obviously because

16:38:11 7  you provided it for us.

16:38:13 8     A.  Right.

16:38:13 9     Q.  So this would have been in the file, so

16:38:16 10  couldn't Ms. Kennedy have used this to get the records

16:38:20 11  that she was looking for from the doctor?

16:38:23 12          MR. BYROM:  Objection, form.

16:38:23 13     Q.  Assuming the doctor was cooperating.

16:38:26 14          MR. BYROM:  Thank you.  Finally.

16:38:28 15          THE WITNESS:  I would assume so.

16:38:37 16     Q.  But in any case, she tried calling the doctor

16:38:40 17  from what you understand.

16:38:40 18     A.  From what I understand, and I --

16:38:47 19     Q.  Why was she trying to get the release?

16:38:49 20     A.  I believe -- because Ms. Cano did meet with me

16:38:53 21  early in sixth grade.  She came by.  We visited.  She

16:38:59 22  informed me about Abraham's condition.

16:39:06 23         At that point, I took her to the team.  We

16:39:08 24  met with his teachers, and I sat in in that meeting,

16:39:12 25  and we, you know, discussed his condition, you know,



16:39:16  1   and I said, "I'll accept it, you know."  He was in P.E.

16:39:22  2   the whole year in sixth grade until he broke his elbow.

16:39:27  3        Q.  In P.E.?

16:39:28  4        A.  I believe so.

16:39:29  5             MR. BYROM:  Objection, form.

16:39:29  6             THE WITNESS:  Based on these notes.  So at

16:39:36  7   that point when I was made aware of his condition and

16:39:40  8   after we met with the teachers, I asked the nurse, you

16:39:43  9   know, "Tell me about him.  What does his record say?"

16:39:46 10             And that's when she shared with me what

16:39:48 11   she knew based on what was passed on from Ed Downs to

16:39:52 12   us.

16:39:53 13        Q.  And that would have been at the end of the

16:39:54 14   school year in 1997, basically, May of 1997?

16:40:01 15        A.  See --

16:40:01 16        Q.  Let me put it in perspective for you --

16:40:03 17        A.  Okay.  4-98.  Okay.  Yes, this is in fifth

16:40:05 18   grade.

16:40:05 19        Q.  This was in fifth grade.

16:40:07 20        A.  Right.

16:40:07 21        Q.  In fifth grade is when he broke his arm at

16:40:10 22   home.

16:40:11 23        A.  Right.

16:40:11 24        Q.  In sixth grade, '97 to '98 school year, April

16:40:14 25   of '98, is when he broke his arm at the -- during P.E.

17:24:01 1      Q.  In other words, we have gone through a number

17:24:02 2   of these documents where they talk about these brittle

17:24:05 3   bones, going back to his time over at Ed Downs, a

17:24:10 4   number of documents in your records even when he

17:24:14 5   started at Berta Cabaza where he -- it was clear that

17:24:17 6   he had this condition osteogenesis imperfecta, which

17:24:23 7   based on -- what was her name?

17:24:27 8             MR. BYROM:  Kennedy.

17:24:28 9      Q.  Kennedy.  -- where she indicated -- she brought

17:24:31 10   that osteogenesis imperfecta description.  The specific

17:24:37 11   condition osteogenesis imperfecta refers to somebody

17:24:41 12   who's fragile.

17:24:42 13             MR. BYROM:  Objection, form.

17:24:43 14      Q.  Right?

17:24:44 15      A.  In the definition of osteogenesis imperfecta,

17:24:47 16   yes.

17:24:48 17      Q.  Okay.  Was an ARD/IEP supplement filled out?

17:24:54 18      A.  No.

17:25:04 19      Q.  Why not?  Did you just not notice that?

17:25:07 20             MR. BYROM:  Objection, form.

17:25:09 21             THE WITNESS:  The only thing that I can

17:25:11 22   assume is that at this meeting dated --

17:25:19 23      Q.  December of '99.

17:25:26 24      A.  -- we may not -- and I'm assuming that we did

17:25:29 25   not have a form that indicated that he did have

1   osteogenesis.

17:25:33  2          Everything that we had was notes from

17:25:35  3   parents, notes from mom, information from mom and from

17:25:40  4   the nurse.

17:25:41  5       Q.   We've got to hurry.  You had plenty of

17:25:51  6   indication, plenty of notice from the family saying he

17:25:52  7   had the condition.  You had an authorization to release

17:25:56  8   records from the doctor.

17:25:57  9       A.   Correct.

17:25:59 10       Q.   Every opportunity to get any type of

17:26:02 11   confirmation you might need to confirm the condition,

17:26:05 12   right?

17:26:05 13              MR. BYROM:  Objection, form.

17:26:06 14              THE WITNESS:  We provided -- we asked for

17:26:08 15   the form from the mom.

17:26:10 16       Q.   Yeah, right.

17:26:11 17       A.   Yes.

17:26:11 18       Q.   And she provided you with the authorization for

17:26:13 19   these medical records.  You had enough there, even if

17:26:16 20   it required you to stand on the doctor's office porch

17:26:20 21   step every morning until he cooperated with you, you

17:26:23 22   had enough to get it from him once he would cooperate,

17:26:26 23   right?

17:26:26 24              MR. BYROM:  Objection, form.

17:26:27 25              MR. MOORE:  Objection, form.

17:26:28 1          THE WITNESS:  We requested it, yes.

17:26:29 2      Q.  But you had enough to get it.

17:26:30 3          MR. BYROM:  Objection, form.

17:26:31 4          THE WITNESS:  No.  We had requested it.

17:26:33 5      Q.  From?

17:26:35 6      A.  The mom.

17:26:37 7      Q.  The mom and from the doctor.

17:26:38 8      A.  Correct.  Back in '97 from the doctor and then

17:26:40 9   from mom in --

17:26:43 10     Q.  Turn to page 4.

17:26:46 11     A.  Okay.

17:26:48 12     Q.  You got it?

17:26:49 13     A.  Yes, sir.

17:26:50 14     Q.  You talk about his physical condition as it

17:26:52 15  affects his physical education.  You checked off, "Yes.

17:26:56 16  Student has physical condition or disability which

17:26:59 17  would affect participation in regular instructional

17:27:03 18  setting.  If yes, describe physical condition

17:27:04 19  disability, osteogenesis imperfecta."

17:27:06 20          You're specifically saying his condition

17:27:08 21  would affect his participation in the regular

17:27:11 22  instructional setting, right?

17:27:15 23     A.  Yes.

17:27:16 24     Q.  Doctor, no doctor, mother, no mother, whatever,

17:27:19 25  you're saying you're aware of the condition.

17:27:21  1          MR. BYROM:  Objection, form.

17:27:22  2      Q.  Right?

17:27:22  3      A.  Yes.

17:27:24  4      Q.  Okay.  Then you say you're allowing him to

17:27:27  5  engage in regular physical education with

17:27:29  6  modifications.

17:27:31  7      A.  Correct.

17:27:31  8      Q.  What are those modifications?  What were the

17:27:33  9  modifications?

17:27:36 10      A.  The only thing I can say is there were none

17:27:41 11  developed.

17:27:43 12      Q.  Don't you think that would be important to

17:27:44 13  know?

17:27:46 14      A.  Yes.

17:27:48 15      Q.  Wouldn't that be important for Coach Guerrero

17:27:50 16  to know?

17:27:52 17      A.  Yes.

17:27:53 18      Q.  Did Coach Guerrero ever get provided the list

17:27:55 19  of modifications that he could follow?

17:28:03 20      A.  No.

17:28:12 21      Q.  Did you discuss the modifications with the

17:28:14 22  mother?

17:28:17 23      A.  I can't recall.

17:28:18 24      Q.  You go on to check off, "Student can

17:28:20 25  participate fully in the curriculum as is with

17:28:23 1    monitoring only."  No.  Still down here.

17:28:30 2        A.  Okay.

17:28:32 3        Q.  Still on page 4.  "Student can participate

17:28:34 4    fully in the curriculum as is with monitoring only."

17:28:36 5    What does that mean?

17:28:38 6        A.  Basically, it means that he's mainstreamed.

17:28:41 7        Q.  Okay.  What about his physical education?  Is

17:28:43 8    that where the modifications are supposed to come in?

17:28:48 9        A.  It was checked off regular physical education

17:28:50 10   with modifications.  That's what's checked off.

17:28:53 11       Q.  I'm talking about the one down in the bottom

17:28:56 12   where you're talking about the student can participate

17:28:57 13   fully in the curriculum as is with monitoring only.

17:29:01 14            Is that referring to his general -- all

17:29:03 15   classes.

17:29:04 16       A.  All classes, general ed.

17:29:04 17       Q.  Just keep an eye on him?

17:29:06 18       A.  Yeah.

17:29:06 19       Q.  As far as the physical education, that's what's

17:29:08 20   up here, "Regular physical education with

17:29:11 21   modifications."

17:29:12 22       A.  Correct.

17:29:12 23       Q.  But you don't describe the modifications.

17:29:14 24       A.  Correct.

17:29:14 25       Q.  You didn't provide that information to Coach

17:29:17 1    Guerrero.

17:29:17 2         MR. BYROM:  Objection, form.

17:29:18 3    Q.  Correct?

17:29:20 4    A.  Correct.

17:29:22 5    Q.  Then you go to page 6, but page 5 seems to be

17:29:27 6    missing, doesn't it?  And to put it in perspective, we

17:29:34 7    go from HV0091, right, to HV0092.  91 is page 4, and 92

17:29:54 8    is page 6.  Do you know what happened to page 5?  You

17:29:54 9    have to answer out loud.

17:29:54 10   A.  No.

17:29:55 11   Q.  Let's talk about --

17:29:57 12        MR. AGUILAR:  If you would look for page 5

17:29:59 13   for me.

17:30:00 14        MR. BYROM:  I will.

17:30:00 15   Q.  Page 6, the box was checked off, "Modifications

17:30:04 16   not needed or not applicable."  Is that just talking

17:30:08 17   about assistive technologies?

17:30:12 18   A.  No, sir.

17:30:12 19   Q.  What's that talking about?

17:30:14 20   A.  All classes.

17:30:16 21   Q.  Okay.  And that's talking about the general

17:30:17 22   classroom, not physical education necessarily.

17:30:23 23   A.  The way I read this is that it's modifications

17:30:27 24   not needed --

17:30:28 25   Q.  Like if he's going to be in a wheelchair

```
 1              SIGNATURE OF HERIBERTO VILLARREAL

 2      I have read the foregoing transcript of my

 3  deposition and it is a true and accurate record of my

 4  testimony given on MAY 14, 2002, except as to any

 5  corrections I have listed on page 101 herein.

 6                                 _____
                                   HERIBERTO VILLARREAL
 7

 8

 9  THE STATE OF TEXAS

10  COUNTY OF CAMERON

11              SUBSCRIBED AND SWORN TO BEFORE ME, the

12  undersigned authority on this the  20th  day of

13  ____June____, 2002.

14

15                                 _____
                                   Notary Public in and for
16                                 The State of Texas

17  My commission expires:
        3/15/06
18

19

20         REBECCA MISHAL SMITH
           MY COMMISSION EXPIRES
21           March 15, 2006.

22

23

24

25
```

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION

 3   ADELA CANO, Individually  )(
     and on Behalf of her minor)(
 4   son, ABRAHAM CANO,         )(
              Plaintiff         )(
 5                              )(
     VS.                        )(   CIVIL ACTION NO. B-01-156
 6                              )(
     SAN BENITO CONSOLIDATED    )(
 7   INDEPENDENT SCHOOL         )(
     DISTRICT, HERIBERTO        )(
 8   VILLARREAL and PETER       )(
     GUERRERO,                  )(
 9          Defendants          )(

10              REPORTER'S CERTIFICATE

11      I, Donna McCown, Certified Court Reporter, certify
     that the witness, HERIBERTO VILLARREAL, was duly sworn
12   by me, and that the deposition is a true and correct
     record of the testimony given by the witness on MAY 14,
13   2002; that the deposition was reported by me in
     stenograph and was subsequently transcribed under my
14   supervision.

15      I FURTHER CERTIFY that I am not a relative,
     employee, attorney or counsel of any of the parties,
16   nor a relative or employee of such attorney or counsel,
     nor am I financially interested in the action.

17
                    WITNESS MY HAND on this the 31st day of
18   _____May_____, 2002.

19

20        [signature]
         _____
21       DONNA McCOWN, CSR NO. 6625
         Expiration Date: 12/31/03
22       Bryant & Stingley, Inc.
         2010 East Harrison
23       Harlingen, Texas  78550
         (956)428-0755

24

25
```

# EXHIBIT-B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually    ) (
and on Behalf of her        ) (
minor son, ABRAHAM CANO     ) (
                            ) (
        Plaintiff           ) (
                            ) (
VS.                         ) (   CIVIL ACTION NO.
                            ) (      B - 01 - 156
SAN BENITO CONSOLIDATED     ) (
INDEPENDENT SCHOOL DISTRICT,) (
HERIBERTO VILLARREAL and     ) (
PETER GUERRERO              ) (
                            ) (
        Defendants          ) (

---

ORAL DEPOSITION OF
HERIBERTO VILLARREAL
VOLUME 2
MAY 15, 2002

# ORIGINAL

---

ORAL DEPOSITION OF HERIBERTO VILLARREAL,

produced as a witness at the instance of the PLAINTIFF,

taken in the above styled and numbered cause on MAY 15,

2002, reported by JODY McWHORTER, Certified Court

Reporter No. 6095, in and for the State of Texas, at

the offices of San Benito CISD Administrative Building,

240 North Crockett Street, San Benito, Texas, pursuant

to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached therein.

BRYANT & STINGLEY, INC.
McAllen         Harlingen         Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

09:32  1   nurse, that she had told him he had to go through light

09:32  2   duty -- that Abraham should only be doing like light

09:32  3   duty activities -- she gave him a list of people that

09:32  4   needed special attention.

09:32  5       A.   Uh-huh.

09:32  6       Q.   Anything more than that that he told you?

09:32  7       A.   No, sir.

09:32  8            MR. BYROM:  Can I -- just for clarity's

09:32  9   sake, you said -- you may want to ask if the list was

09:32  10  given at that time she talked to him or at a different

09:32  11  time.

09:32  12      A.   The list was given at the beginning of the

09:32  13  school year.

09:32  14      Q.   That's what I figured.

09:32  15           What I was going to ask you is, when did

09:32  16  she actually meet with Coach Guerrero?

09:32  17      A.   Right when he got the list, I presume.  I

09:32  18  wasn't --

09:32  19      Q.   When would that have been?  August?  September?

09:32  20      A.   August.

09:33  21      Q.   Okay.  August of 2000?

09:33  22      A.   Yes, sir.

09:33  23      Q.   And, at that time, do you know, did he mention

09:33  24  to you whether he made an effort to go look at

09:33  25  Abraham's school records or medical records?



09:33  1    A.  Via the nurse.  I mean --

09:33  2    Q.  Did he go look with his eyes at --

09:33  3    A.  I don't know.

09:33  4    Q.  You don't know about that one way or the other?

09:33  5    A.  I don't know.

09:33  6    Q.  Okay.  Did the nurse tell him he should?

09:33  7    A.  I don't know.

09:33  8    Q.  Did you tell him he should?

09:33  9    A.  No.

09:33  10   Q.  Did you, the nurse, or anybody else notify him

09:33  11   that he should look into the ARDs and the prior

09:33  12   discussions that the child's parents or parent had had

09:33  13   with the ARD committee?

09:33  14   A.  No.

09:33  15   Q.  Okay.  So, at that point, basically he was

09:33  16   given a list of people needing special attention, so he

09:33  17   goes to the nurse and says, "What do you mean?"

09:33  18   Something like that?

09:33  19   A.  Yes.

09:33  20   Q.  Okay.  And then the nurse says, "Well, you

09:33  21   know, he needs special attention, you need to be

09:33  22   careful with him," something like that?

09:33  23          MR. BYROM:  Objection, form.

09:33  24   A.  Right.

09:33  25   Q.  To the extent that's what you recall he told

10:35  1      Q.  And, as we discussed yesterday, the district

10:35  2  never took any action to determine what the limitations

10:35  3  of that condition were by contacting any doctor,

10:35  4  correct?

10:35  5           MR. BYROM:  Objection, form.

10:35  6      A.  We contacted the mom to bring us that

10:35  7  information.  Yes, we did.

10:35  8           MR. AGUILAR:  Objection, nonresponsive.

10:35  9      Q.  My question was, you and the district didn't

10:35  10  contact any doctor?

10:35  11      A.  No.

10:35  12      Q.  That's correct, right?

10:35  13           MR. BYROM:  Objection, form.

10:35  14      A.  That's correct.

10:35  15      Q.  To try to determine that information, right?

10:35  16           MR. BYROM:  Objection, form.

10:35  17      A.  Right.

10:35  18      Q.  However, the district was aware prior to this

10:35  19  time, prior to Abraham's incident, that he had, quote,

10:35  20  "brittle bones," correct?

10:36  21           MR. BYROM:  Objection, form.

10:36  22      A.  Based on parent information, yes.

10:36  23      Q.  Based on the information.  In other words, the

10:36  24  parent did everything she could to tell you herself

10:36  25  that he had a sensitive condition?

10:36  1    A.   Correct.

10:36  2    Q.   Okay.  And you go on, "Further, Abraham Cano

10:36  3  knew of his condition and its ramifications and

10:36  4  voluntarily participated."  What do you mean by

10:36  5  "voluntarily participated"?

10:36  6              MR. BYROM:  I want to object to the form

10:36  7  of the question, and I've already stated on the record

10:36  8  that these were also -- the lawyer is involved in the

10:36  9  answering of these questions just like you will be

10:36  10  involved in the answering of your client's

10:36  11  interrogatories.

10:36  12              MR. AGUILAR:  Objection to the sidebar.

10:36  13              MR. BYROM:  Well, it is improper to

10:36  14  attempt to use -- if you want to challenge the

10:36  15  discovery responses, then challenge them in court.  I

10:36  16  think it's improper for you now to try to challenge

10:36  17  interrogatory answers and make them as if every word of

10:36  18  it was only his direct quote, because that's not what

10:36  19  interrogatories are.

10:36  20              MR. AGUILAR:  Hey, he swore to the truth

10:36  21  of these.

10:37  22              MR. BYROM:  You know what I'm talking

10:37  23  about, Mr. Aguilar.

10:37  24              MR. AGUILAR:  He swore to the truth of

10:37  25  these.

10:40   1              MR. BYROM:  Same objection.

10:40   2       Q.  Is that it?  Is that what you understood?

10:40   3       A.  That's what I understood.

10:40   4       Q.  And so the coach basically left it up to

10:40   5  Abraham to evaluate his own condition?

10:40   6              MR. MOORE:  Objection, form.

10:40   7              MR. BYROM:  Objection, form.

10:40   8       A.  Coach Guerrero's not a doctor.  I mean, I

10:40   9  don't -- he can tell him, "How do you feel today?  Do

10:40  10  you feel you can handle it?"

10:40  11       Q.  I'm just asking --

10:40  12              MR. BYROM:  His understanding.

10:40  13       Q.  -- your understanding of what Coach Guerrero

10:40  14  was telling Abraham.

10:40  15       A.  Correct.

10:40  16       Q.  I'm not trying to justify why or whatever he

10:40  17  said.

10:40  18       A.  Right.

10:40  19       Q.  So if Abraham feels like, "Well, you know, that

10:40  20  may not be safe, so I'm not going to do it," or, "Yes,

10:40  21  this might be safe, so I can do it"?   That's basically

10:40  22  what Coach Guerrero was letting Abraham decide?

10:40  23              MR. BYROM:  Objection, form.

10:40  24       A.  Correct.

10:40  25       Q.  For example, if they're playing baseball,

10:40  1    Coach Guerrero says, "Abraham, if you feel it's okay to

10:41  2    play, then you play," right?

10:41  3              MR. BYROM:  Objection, form.

10:41  4       A.  I can't speak to -- it could have been limited

10:41  5    to -- and I'm just using this as a hypothetical

10:41  6    situation.  If he was playing baseball, it may have

10:41  7    been limited to, "You stay out in right field," or

10:41  8    center field or some position where he did not

10:41  9    necessarily have to do running or --

10:41  10      Q.  But what you just said was, after talking to

10:41  11   the nurse, Coach Guerrero's understanding was that he

10:41  12   could still say that it's still up to Abraham to do

10:41  13   whatever he felt was safe, right?

10:41  14             MR. MOORE:  Objection, form.

10:41  15             MR. BYROM:  Objection, form.

10:41  16      A.  On certain limitations, yes.

10:41  17      Q.  What were the limitations?  In other words,

10:41  18   what did you understand the limitations were?

10:41  19             MR. BYROM:  Objection, form.

10:41  20      Q.  Because what you told us a while ago was,

10:41  21   Coach Guerrero says to Abraham, "Well, you determine

10:41  22   when it's safe"?

10:41  23      A.  Correct.

10:41  24      Q.  So whatever the sport is, whatever it was,

10:41  25   basically Coach Guerrero is saying, "Abraham, if you

10:41  1   feel it's only safe to be out in right field, that's

10:42  2   where you stay."

10:42  3            MR. BYROM:  Objection, form.

10:42  4       Q.  "And if you feel it's safe to do more than

10:42  5   that, then you do more than that."  Is that your

10:42  6   understanding?

10:42  7            MR. BYROM:  Objection, form.

10:42  8            MR. MOORE:  Objection, form.

10:42  9       A.  That's my understanding.

10:42  10      Q.  And, from your understanding, that was an okay

10:42  11  thing to do?

10:42  12           MR. BYROM:  Objection, form.

10:42  13      A.  Correct.

10:42  14      Q.  Okay.  And, based on your understanding of the

10:42  15  district's approach to this situation and their

10:42  16  policies and how they were handling this matter and

10:42  17  their practices, that that was an okay approach to

10:42  18  take?

10:42  19           MR. BYROM:  Objection, form.

10:42  20      A.  Based on the information that we had, yes.  We

10:42  21  had no limitations on what he could and could not do.

10:42  22      Q.  And that was an acceptable approach to take?

10:42  23      A.  Correct.

10:42  24      Q.  So if Abraham -- let's say he's playing

10:42  25  baseball.  You understand -- you don't have the

10:59  1       Q.  So you didn't have to explain that to him?

10:59  2       A.  He had already done this.

10:59  3       Q.  Other than doing that, did you give him any

10:59  4   other instructions on doing anything else?

10:59  5       A.  No.

10:59  6       Q.  Okay.  Did you give him any other instructions

10:59  7   on what he needed to do, how he needed to do it, when

11:00  8   he needed to do it, anything else like that?

11:00  9       A.  No.

11:00  10      Q.  After this incident occurred, did you take any

11:00  11  other actions to protect other medically sensitive

11:00  12  students from this sort of -- from incidents similar to

11:00  13  what happened to Abraham?

11:00  14              MR. BYROM:  Objection, form.

11:01  15      Q.  In other words, did you take any action to

11:01  16  either modify any of the district's policies or your

11:01  17  actions following what happened to Abraham?

11:01  18      A.  No.

11:01  19      Q.  Okay.  Basically, nothing was changed

11:01  20  afterwards?  You kept by the same policies that you had

11:01  21  before?

11:01  22      A.  I can't change policies, so --

11:01  23      Q.  I understand that, but within your school in

11:01  24  terms of the way things are handled or things are done,

11:01  25  the way you controlled meetings or handled meetings or

11:01  1   anything like that, did you change any of the things

11:01  2   that you would do from the way you had done them

11:01  3   before?

11:01  4       A.  No.

11:01  5       Q.  Okay.  Basically, you're still following by the

11:01  6   same policies?

11:01  7       A.  Correct.

11:01  8       Q.  And, as you said and as the superintendent had

11:01  9   said, everything that you had done for that school year

11:01  10  was according to the school's policies?

11:01  11          MR. BYROM:  Objection, form.

11:01  12      A.  Correct.

11:01  13      Q.  And was consistent with the City's -- the

11:01  14  school's policies?

11:01  15      A.  Correct.

11:02  16          MR. AGUILAR:  Off the record.

11:02  17          (Discussion off the record)

11:03  18          MR. AGUILAR:  I'm going to go ahead and

11:03  19  pass the witness at this time, reserving the right to

11:03  20  continue with any questions we may have with the

11:03  21  additional documents you had provided to me this

11:03  22  morning, but at this point I will go ahead and pass the

11:03  23  witness.

11:03  24          MR. BYROM:  And I obviously will reserve

11:03  25  my questions until the time that we complete the

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

11:10   1   told you that he had the condition?

11:10   2                  MR. BYROM:  Objection, form.

11:10   3                  MR. MOORE:  Objection, form.

11:10   4       A.  We did modify --

11:10   5       Q.  My question is only was it sufficient for her

11:10   6   to tell you --

11:10   7       A.  Right.

11:10   8                  MR. BYROM:  Let him finish the question.

11:10   9       Q.  Let me rephrase it.  It's badly phrased.

11:10  10             Once she told you that he had that

11:10  11   condition, was that sufficient to put into play your

11:10  12   actions, the district's actions, in determining how to

11:10  13   handle or how to treat Abraham?

11:10  14                  MR. BYROM:  Objection, form.

11:10  15       A.  We modified everything that we possibly could

11:10  16   in all of his classes for him.

11:10  17       Q.  All I'm asking you is, was that sufficient --

11:11  18       A.  To modify, yes.

11:11  19       Q.  -- for you to modify?

11:11  20                  MR. BYROM:  Same objection.

11:11  21       A.  Yes.

11:11  22       Q.  In other words, in terms of how you were going

11:11  23   to treat him and things like that --

11:11  24       A.  Correct.

11:11  25       Q.  -- her simply notifying you of his condition,

11:11  1    that's sufficient to get the whole process into play,

11:11  2    right?

11:11  3        A.  To some extent, yes.

11:11  4        Q.  Okay.  To what extent was it not sufficient?

11:11  5        A.  Well, if she wanted him out of a course, out of

11:11  6    physical education, the requirement was that doctor's

11:11  7    notice that no physical activity, no physical

11:11  8    education.  But, based on her information and based on

11:11  9    ARD meetings that we had already had, we did inform

11:11  10   teachers of his possible condition or of his condition,

11:11  11   and so forth.

11:11  12       Q.  Okay.  And without the doctor's notice, the

11:11  13   district's policy is that he cannot get out of PE,

11:11  14   correct?

11:12  15       A.  Based on required courses by the TEA.

11:12  16       Q.  And that is the district's policy, right?

11:12  17       A.  Correct.

11:12  18       Q.  You also indicated that Coach Guerrero was

11:12  19   never disciplined for this incident, and I think you

11:12  20   actually said that also in some of our discovery

11:12  21   requests; is that correct?

11:12  22       A.  Correct.

11:12  23       Q.  So, as far as you and the district are

11:12  24   concerned, Coach Guerrero didn't do anything or treat

11:12  25   Abraham in any manner that would justify any

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755    (956) 542-1020

11:12    1    discipline, correct?

11:12    2        A.   Correct.

11:12    3        Q.   And I think actually what you had said earlier

11:12    4    was everything Coach Guerrero had done was consistent

11:12    5    with district policy, correct?

11:12    6              MR. BYROM:   Objection, form.

11:12    7        A.   Well, I mean, he followed policy, yes.

11:12    8              MR. AGUILAR:   That's it.   I'll reserve the

11:12    9    rest of the questions.

11:12    10              MR. BYROM:   And I'll reserve mine until a

11:12    11    later date, either at the resumption of the deposition

11:12    12    or trial.

11:12    13              MR. MOORE:   We'll reserve ours, too.

         14              (Proceedings recessed at 11:12 a.m.)

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1      <u>SIGNATURE OF HERIBERTO VILLARREAL</u>

2          I have read the foregoing transcript of my

3      deposition and it is a true and accurate record of my

4      testimony given on MAY 15, 2002, except as to any

5      corrections I have listed on Page 187 herein.

6

7                                    _____
                                     HERIBERTO VILLARREAL
8

9      THE STATE OF TEXAS

10     COUNTY OF CAMERON

11             SUBSCRIBED AND SWORN TO BEFORE ME, the

12     undersigned authority on this the _20th__ day of

13     _____June_____, 2002.

14

15                                   _____
                                     Notary Public in and for
16                                   The State of Texas

17     My commission expires:
          3-15-06
18     _____

19         ┌─────────────────────────────┐
           │  ★   REBECCA MISHAL SMITH    │
20         │      MY COMMISSION EXPIRES   │
           │         March 15, 2006       │
           └─────────────────────────────┘
21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually      ) (
and on Behalf of her          ) (
minor son, ABRAHAM CANO       ) (
                              ) (
        Plaintiff             ) (
                              ) (
VS.                           ) (    CIVIL ACTION NO.
                              ) (     B - 01 - 156
SAN BENITO CONSOLIDATED       ) (
INDEPENDENT SCHOOL DISTRICT,  ) (
HERIBERTO VILLARREAL and      ) (
PETER GUERRERO                ) (
                              ) (
        Defendants            ) (

REPORTER'S CERTIFICATE

        I, JODY McWHORTER, Certified Court Reporter,
certify that the witness, HERIBERTO VILLARREAL, was
duly sworn by me, and that the deposition is a true and
correct record of the testimony given by the witness on
MAY 15, 2002; that the deposition was reported by me in
stenograph and was subsequently transcribed under my
supervision.

        I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of the parties, nor a
relative or employee of such attorney or counsel, nor
am I financially interested in the action.

        WITNESS MY HAND on this ___30=__ day of
_____, 2002.

                    _____
                    JODY McWHORTER, Texas CSR 6095
                    Expiration Date: 12-31-02
                    Bryant & Stingley, Inc.
                    4900 North 10th, Building A, Suite 3
                    McAllen, Texas  78504
                    (956) 618-2366

BRYANT & STINGLEY, INC.
    McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

# EXHIBIT-C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually     ) (
and on Behalf of her         ) (
minor son, ABRAHAM CANO,     ) (
     Plaintiff          ) (
                 ) (
VS.                          ) (    CIVIL ACTION NO. B-01-156
                 ) (
SAN BENITO CONSOLIDATED      ) (
INDEPENDENT SCHOOL           ) (
DISTRICT, HERIBERTO          ) (
VILLARREAL and PETER         ) (
GUERRERO,                    ) (
     Defendants         ) (

---

ORAL DEPOSITION OF
PEDRO GABRIEL GUERRERO
JULY 15, 2002

**ORIGINAL**

---

     ORAL DEPOSITION OF PEDRO GABRIEL GUERRERO,

produced as a witness at the instance of the PLAINTIFF,

taken in the above styled and numbered cause on

JULY 15, 2002, reported by CORINNA N. GARCIA, Certified

Court Reporter No. 5210, in and for the State of Texas,

at the offices of Willette & Guerra, L.L.P.,

International Plaza, 3505 Boca Chica Boulevard, Suite

460, Brownsville, Texas, pursuant to the Federal Rules

of Civil Procedure.

14:54:20  1    excuse them from PE.

14:54:23  2        Q.  So if a student has a condition that would

14:54:25  3    exclude them from PE but they don't have a doctor's

14:54:33  4    excuse, you believe they should be sent to the nurse?

14:54:33  5            MR. BYROM:  Objection, form.

14:54:35  6        Q.  Correct?

14:54:35  7        A.  What was that again?

14:54:36  8        Q.  If a student comes in, they have a condition or

14:54:37  9    a problem that they're telling you they can't be in PE

14:54:43  10   and you just don't have a doctor's excuse, you believe

14:54:46  11   that what should be done is they should be sent to the

14:54:49  12   nurse?

14:54:49  13       A.  Yes, sir, for the nurse to write a letter.

14:54:53  14       Q.  And then the nurse would be the one who would

14:54:55  15   get you the doctor's excuse or get you some type of

14:54:58  16   excuse for the child, even if it's from her?

14:55:02  17       A.  Yes, sir.

14:55:02  18       Q.  And is it your understanding that the nurse can

14:55:04  19   excuse a student from physical education activities?

14:55:07  20       A.  Yes, sir.

14:55:07  21       Q.  Okay.  Even without -- I mean, she could do

14:55:10  22   whatever she needs to do, call the doctor, do whatever

14:55:13  23   she needs to do, and then if she gets satisfied that

14:55:16  24   this student shouldn't be in PE, all she does is tell

14:55:20  25   you, "Keep this student out of PE," whether it's

14:55:23  1    written or verbal, and that's good enough for you?

14:55:26  2         MR. BYROM:  Objection, form.

14:55:27  3    A.  Yes, sir.

14:55:27  4    Q.  Was that ever done for Abraham?

14:55:29  5    A.  No.

14:55:30  6    Q.  To the best of your knowledge, it was not?

14:55:33  7    A.  No, sir.

14:55:34  8    Q.  I mean, that's correct, right?

14:55:35  9    A.  Yes, sir.

14:55:51  10   Q.  I may have asked you this already, but do you

14:55:55  11   remember talking to Principal Villarreal about Abraham

14:55:58  12   before the incident of November 27, 2000?

14:56:03  13   A.  No, sir.

14:56:04  14   Q.  Okay.  Handing you what was previously marked

14:56:06  15   as Exhibit 2, have you ever seen that document before?

14:56:58  16   A.  I'm not too sure.

14:57:00  17   Q.  I'm sorry?

14:57:00  18   A.  I'm not too sure.

14:57:01  19   Q.  You might have seen it before?

14:57:03  20   A.  I might have.

14:57:04  21   Q.  Let me put it this way, did you ever see this

14:57:07  22   document before November 27, 2000?

14:57:12  23   A.  I'm not too sure.

14:57:12  24   Q.  You might have seen it, you might not?

14:57:15  25   A.  I might have.  I might not.

14:58:14 1      Q.  You don't remember?

14:58:14 2      A.  I'm not too sure, no, sir.

14:58:17 3      Q.  If you had seen it and you had -- you would

14:58:20 4  have been aware that Abraham has brittle bones, right?

14:58:28 5          MR. MOORE:  Objection, calls for

14:58:28 6  speculation.

14:58:29 7      Q.  It says brittle bones?

14:58:32 8      A.  Yes.

14:58:33 9      Q.  If a student has brittle bones, how would you

14:58:36 10  interpret that?

14:58:37 11      A.  Myself?  That he doesn't belong in PE.

14:58:40 12      Q.  Why?

14:58:40 13      A.  Because he's got brittle bones.

14:58:43 14      Q.  I'm asking the obvious, but I just need for you

14:58:45 15  to explain to me why.

14:58:47 16      A.  He would be putting himself at risk.

14:58:50 17      Q.  Obviously, a student would be putting himself

14:58:52 18  at risk by engaging in physical activities if he has

14:58:55 19  brittle bones?

14:58:57 20          MR. BYROM:  Objection, form.

14:58:58 21      A.  Yes, sir.

14:58:58 22      Q.  That's your understanding at least, right?

14:59:01 23      A.  Yes, sir.

14:59:01 24      Q.  Hand you what was previously marked as Exhibit

14:59:04 25  3.  Have you ever seen that document before?

BRYANT & STINGLEY, INC.
McAllen        Harlingen       Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

15:03:14 1      A.  Yes, sir.

15:03:15 2      Q.  And did it also say the brittle bones part?

15:03:17 3      A.  I'm not too sure.  I don't know.

15:03:19 4      Q.  Well, put it this way.  Before meeting Abraham,

15:03:20 5  had you ever heard the term osteogenesis imperfecta?

15:03:25 6      A.  Yes, sir.  As a matter of fact, I had just seen

15:03:28 7  a movie about it.  That's how I knew about it.

15:03:30 8      Q.  Unbreakable?

15:03:33 9      A.  Yes, sir.

15:03:33 10     Q.  So you knew what the term meant?

15:03:34 11     A.  Yes, sir.

15:03:34 12     Q.  And you knew what the condition meant?

15:03:36 13     A.  Yes, sir.

15:03:36 14     Q.  Basically you get this document saying "Abraham

15:03:39 15 has osteogenesis imperfecta," and the first thing you

15:03:46 16 thought was, "Hey, just like the guy in the movie"?

15:03:46 17     A.  Yes, sir.

15:03:46 18     Q.  So you already knew it meant that he has

15:03:49 19 brittle bones?

15:03:50 20     A.  Yes, sir.

15:03:51 21     Q.  So you didn't need to go back to the nurse and

15:03:52 22 say, "Hey, does that mean he's got brittle bones?"  In

15:03:52 23 other words, you didn't have to go try to get more

15:03:54 24 information from the nurse?

15:03:56 25     A.  Well, I didn't have to, but I did go back.

15:03:59  1    Q.   Okay.  And what did you go back for?

15:04:03  2    A.   I went for -- to ask the nurse if Abraham

15:04:08  3  really belonged in my class.

15:04:11  4    Q.   And what did she say?

15:04:12  5    A.   She said that he did belong there because they

15:04:14  6  did not have any documentation from a doctor excluding

15:04:19  7  him from participation in PE class.

15:04:23  8    Q.   She said -- the nurse told you that Abraham had

15:04:25  9  to stay in your class because there was no doctor's

15:04:29 10  excuse?

15:04:30 11    A.   Yes, sir.

15:04:30 12    Q.   So what did you --

15:04:32 13    A.   They were pending something from the doctor to

15:04:35 14  remove him from PE class.

15:04:37 15    Q.   Okay.  And what did you tell her?

15:04:38 16    A.   I said -- I went and asked what -- if that was

15:04:43 17  a good idea to keep him in there because, PE, you know,

15:04:46 18  you get a grade during participation and stuff, and she

15:04:50 19  said that they were still waiting for a doctor's --

15:04:53 20  that Ms. Cano had never brought anything back to them.

15:04:57 21    Q.   Okay.  Did -- it sounds like what you were

15:05:00 22  telling the nurse was, "Look, I don't care if he

15:05:03 23  doesn't have a piece of paper that says he can't do it.

15:05:05 24  It doesn't sound like a very smart idea to let him do

15:05:09 25  it anyway."  Is that what you were trying to tell them?

15:05:14  1          MR. MOORE:  Objection, misquotes the

15:05:14  2  witness.

15:05:17  3     Q.  You can answer.  They might object to different

15:05:18  4  things, but you can answer the question.

15:05:18  5     A.  What was the question?

15:05:20  6     Q.  I'll try it again.  It sounded to me like what

15:05:21  7  you were saying was, "Look, whether he has a piece of

15:05:24  8  paper from the doctor or not, it doesn't sound like

15:05:27  9  it's a very smart idea to put him in to play PE" --

15:05:31 10     A.  Yes, sir.

15:05:33 11     Q.  -- "whether he has a paper or not."

15:05:35 12          MR. MOORE:  Objection, misquotes the

15:05:36 13  witness.

15:05:36 14     A.  Yes, sir.

15:05:37 15     Q.  That was basically what you understood, what

15:05:52 16  you were thinking at the time?

15:06:07 17     A.  Yes, sir.

15:06:08 18     Q.  Okay.  You were concerned that if Abraham did

15:06:10 19  participate in sports that he could be injured?

15:06:14 20     A.  Yes, sir, I was concerned.

15:06:15 21     Q.  But the nurse said there wasn't a piece of

15:06:18 22  paper yet that said he could -- he was excused from PE?

15:06:22 23     A.  Yes, sir.

15:06:22 24     Q.  Okay.  So as far as the nurse was concerned,

15:06:27 25  you understood she was saying "Put him into play

15:06:29  1    anyway"?

15:06:32  2              MR. BYROM:  Objection, form.

15:06:32  3        Q.  I'm asking what you understood --

15:06:34  4        A.  Yes, sir.

15:06:34  5        Q.  -- she was saying.

15:06:35  6        A.  Yes, sir.

15:06:37  7              MR. BYROM:  Objection, form.

15:06:37  8        Q.  That's what you understood she was saying?

15:06:39  9        A.  Yes, sir.

15:06:42 10        Q.  Okay.  So then you went along.  Did you

15:06:44 11    actually -- I'm not asking about on the 20th -- I'm

15:06:52 12    sorry, the 27th.  I'm asking about before the injury

15:06:52 13    itself.  Did you put him into play?  In other words,

15:06:54 14    what type of activities did you do for eighth graders?

15:06:58 15        A.  Well, we would go break down skills, which

15:07:01 16    would be if we were doing basketball, it would be

15:07:04 17    dribbling, shooting.  We'd go into the history of the

15:07:08 18    game, and then we would actually go out and play and do

15:07:11 19    it.

15:07:11 20        Q.  Okay.  And that would be on the basketball

15:07:15 21    court, I presume?

15:07:15 22        A.  Basketball court or soccer field.  It depends.

15:07:18 23    Whatever we were doing.

15:07:18 24        Q.  Did you put Abraham out to do that, play

15:07:21 25    basketball, for example?

15:09:33 1        Q.   Okay.   Abraham at that point was how old?

15:09:37 2        A.   I'm not too sure, sir.

15:09:38 3        Q.   About 14?   Actually, if I'm not mistaken, he

15:09:46 4    was injured on the day before his 14th birthday.

15:09:49 5        A.   Yes, sir.

15:09:49 6        Q.   So at this time prior to that, he would have

15:09:52 7    been 13.   To what extent do you think a 13-year-old has

15:09:58 8    enough maturity to determine what is safe enough or

15:10:02 9    what activities are safe enough for him to participate

15:10:05 10   in?

15:10:05 11       A.   I don't know.

15:10:06 12            MR. MOORE:   Objection, calls for

15:10:07 13   speculation.

15:10:08 14       Q.   You don't have any idea?

15:10:09 15       A.   I don't have any idea.

15:10:10 16       Q.   For example -- let's put it in perspective a

15:10:13 17   little bit.   Playing with knives.   You and I can hold a

15:10:14 18   knife, juggle it if we want to.   It might be stupid,

15:10:18 19   but we can do it.   And we're supposed to have the

15:10:21 20   maturity to be able to know what we're doing and to

15:10:25 21   understand the risks, right?

15:10:26 22       A.   Yes, sir.

15:10:27 23       Q.   Do you think a 13-year-old like Abraham would

15:10:30 24   have that maturity?

15:10:31 25            MR. BYROM:   Objection, form.

15:10:33 1          MR. MOORE:  Objection, calls for

15:10:34 2     speculation.

15:10:35 3          A.  Yes, sir.

15:10:38 4          Q.  You think he would?

15:10:38 5          A.  Yes, sir.

15:10:39 6          Q.  You would let a 13-year-old play with knives?

15:10:42 7          MR. BYROM:  Objection.

15:10:42 8          A.  Depends.  In my classroom or --

15:10:45 9          Q.  Anywhere.

15:10:47 10         MR. BYROM:  Same objection.

15:10:49 11         Q.  Let's say it's in your classroom first.

15:10:53 12         A.  No.

15:10:53 13         Q.  Why not?

15:10:54 14         A.  Because, first of all, knives are against

15:10:56 15    school policy.  I'd have to take the knife away.

15:10:57 16         Q.  So if the child was doing it after school just

15:11:00 17    a couple of steps outside of the school campus, do you

15:11:03 18    think that's okay?

15:11:05 19         MR. BYROM:  Objection, form.

15:11:06 20         MR. MOORE:  Objection, calls for

15:11:07 21    speculation.

15:11:09 22         A.  If it was outside of school, I wouldn't.

15:11:10 23         Q.  You wouldn't get involved?

15:11:11 24         A.  I wouldn't get involved, sir.

15:11:13 25         Q.  And the only reason you would get involved in

15:11:16  1    school was because it's against school policy, right?

15:11:19  2        A.  Yes, sir.

15:11:19  3        Q.  But, otherwise, you don't think there would be

15:11:21  4    anything wrong with a 13-year-old playing with knives,

15:11:24  5    right?

15:11:25  6                MR. BYROM:  Objection, form.

15:11:27  7                MR. MOORE:  Objection, calls for

15:11:27  8    speculation.

15:11:28  9        A.  No, sir.

15:11:28 10        Q.  I mean, you agree with that, right?

15:11:30 11        A.  Yes, sir.

15:11:30 12        Q.  What about a handgun?

15:11:32 13                MR. BYROM:  Objection, form.

15:11:33 14        Q.  Go ahead.

15:11:34 15        A.  A what?

15:11:34 16        Q.  Handgun, .38 special.

15:11:37 17        A.  No.

15:11:38 18        Q.  Do you think a 13-year-old is mature enough

15:11:40 19    to --

15:11:40 20        A.  No, sir.

15:11:41 21                MR. BYROM:  Objection, form.

15:11:42 22        Q.  That's obviously a dangerous weapon, and he can

15:11:44 23    get hurt?

15:11:45 24        A.  Yes, sir.

15:11:46 25        Q.  Okay.  So, to some extent, you think a

15:11:49  1    13-year-old might be smart enough to know how to handle

15:11:53  2    a dangerous item and to some extent not?

15:11:56  3        A.   Yes, sir.

15:11:56  4        Q.   And, similarly, to be able to understand the

15:11:59  5    danger to himself?

15:12:02  6                MR. MOORE:   Objection, calls for

15:12:03  7    speculation.

15:12:03  8        A.   Yes, sir.

15:12:04  9        Q.   Because, for example, the handgun could be used

15:12:06 10    not just to accidentally shoot somebody else, but could

15:12:09 11    accidentally go off and shoot yourself or himself,

15:12:15 12    correct?

15:12:15 13        A.   Yes, sir.

15:12:15 14        Q.   All right.   Other than talking to the nurse

15:12:17 15    that one time and getting that document, did you talk

15:12:21 16    to the nurse any more about Abraham before the

15:12:24 17    incident?

15:12:28 18        A.   Not that I can remember, sir.

15:12:30 19        Q.   Okay.   Did you talk to anybody else about

15:12:31 20    Abraham's condition prior to the incident?   Let's do it

15:12:39 21    one at a time.   Did you ever talk to the principal?

15:12:41 22        A.   Yes, sir.

15:12:43 23        Q.   When did you talk to Mr. Villarreal?

15:12:44 24        A.   It was at the hall, but I don't remember what

15:12:46 25    day.

15:12:48  1      Q.  Let me try to put it in perspective then.

15:12:49  2  School year started August.  About when --

15:12:53  3      A.  It was when I talked to the nurse.  It was

15:12:55  4  about that -- around that time period, because I was

15:12:58  5  sort of uncomfortable with the situation.

15:13:00  6      Q.  Late September, early October?

15:13:02  7      A.  Yes, sir.

15:13:03  8      Q.  And what did you all talk about?

15:13:04  9      A.  I just basically asked the situation with

15:13:10 10  Abraham in PE class, and the response that Ms. -- I

15:13:14 11  believe it was Kennedy.

15:13:22 12      Q.  Was the nurse Ms. Kennedy?

15:13:23 13      A.  Yes.

15:13:24 14      Q.  And what did you all talk about?

15:13:28 15      A.  Basically what -- how to go about the

15:13:30 16  situation.

15:13:30 17      Q.  What to do?

15:13:31 18      A.  Yes, sir.

15:13:31 19      Q.  And what did he tell you?

15:13:33 20      A.  He said just to talk to Ms. Kennedy about the

15:13:36 21  situation because she had the paperwork and everything

15:13:38 22  and she knew what to do since she was -- it was a

15:13:42 23  health-related deal.

15:13:43 24      Q.  Okay.  His response was, "Do whatever the nurse

15:13:47 25  tells you"?

15:13:47  1    A.   Yes, sir.

15:13:48  2    Q.   "She's the one -- I'm tendering whatever

15:13:50  3    responsibility I have in making this decision over to

15:13:53  4    her because she's the nurse"?

15:13:54  5              MR. BYROM:  Objection, form.

15:13:55  6    Q.   Is that the understanding you got?

15:13:58  7    A.   Yes, sir.

15:14:04  8    Q.   So did you talk any more about that situation

15:14:08  9    at that time?

15:14:09 10    A.   No, sir.

15:14:11 11    Q.   Did you talk to the principal anymore after

15:14:12 12    that about Abraham?

15:14:14 13    A.   No, sir.

15:14:14 14    Q.   Okay.  So what happens is you talked to the

15:14:19 15    nurse, you talked to the principal, the principal says

15:14:22 16    "Do whatever the nurse says," and the nurse says, "Put

15:14:25 17    him into play."

15:14:26 18              MR. BYROM:  Objection, form.

15:14:27 19    Q.   Is that right?

15:14:27 20    A.   Yes, sir.

15:14:28 21    Q.   So from your understanding, based on talking to

15:14:30 22    everybody so far, your understanding is that the school

15:14:32 23    district was telling you, "Put Mr. -- put Abraham into

15:14:36 24    play"?

15:14:37 25              MR. BYROM:  Objection, form.

15:14:38 1       Q.   Is that your understanding?

15:14:39 2       A.   Yes, sir.

15:14:41 3       Q.   Okay.  Did you talk to anybody else about

15:14:48 4  Abraham prior to this incident?

15:14:51 5       A.   No, sir.

15:14:51 6       Q.   Any assistant principal, any other teacher,

15:14:55 7  anybody outside the school?

15:14:57 8       A.   No, sir.

15:14:57 9       Q.   You didn't -- I assume you didn't try to call

15:14:59 10  up Abraham's doctor?

15:15:04 11       A.   No, sir.

15:15:04 12       Q.   That's correct, right?

15:15:04 13       A.   Yes, sir.

15:15:05 14       Q.   So, otherwise, you didn't talk to anybody else?

15:15:09 15       A.   No, sir.

15:15:09 16       Q.   Okay.  During this time, early September --

15:15:13 17  late September/early October until November, during

15:15:17 18  that time period Abraham participated in some of the PE

15:15:21 19  activities?

15:15:21 20       A.   Yes, sir.

15:15:22 21       Q.   Which activities?

15:15:22 22       A.   I cannot recall.  I do remember sometimes him

15:15:28 23  dribbling the ball.  During the lecture part he would

15:15:32 24  do the written work.  But other than that, I just -- I

15:15:35 25  wouldn't be able -- I can't remember what exactly it

15:49:15 1   Q.   And, basically, the school district didn't give

15:49:21 2   him any choice in not doing that, right?

15:49:24 3   　　　　　　MR. BYROM:   Objection, form.

15:49:26 4   　　　　　　MR. MOORE:   Objection, misquotes the

15:49:27 5   witness.

15:49:28 6   A.   As far as I know.

15:49:28 7   Q.   So he falls down, you run over to him.

15:49:31 8   A.   Yes, sir.

15:49:31 9   Q.   What do you see when you get there?

15:49:33 10  A.   I see that his injuries -- at first when I

15:49:37 11  started going over, I thought he had sprained his

15:49:40 12  ankle, but when I got there, it was more severe.   I

15:49:43 13  went with him and got the students to sit down, and I

15:49:49 14  got one student to go and get the nurse, and I stayed

15:49:54 15  there with him.

15:49:54 16  Q.   Okay.   What did you see when you approached

15:49:57 17  Abraham?

15:49:57 18  A.   I saw his ankle was misplaced.

15:50:01 19  Q.   How was it misplaced?

15:50:03 20  A.   It was turned to one side.

15:50:04 21  Q.   How much to one side?   In other words, the

15:50:09 22  normal positioning of an ankle with the foot here and

15:50:12 23  the leg here, ankle here, this would be the normal

15:50:16 24  positioning of the foot.   Was it at 90 degrees or less?

15:50:24 25  A.   I'm not going to lie to you.   I know it was

15:50:27  1    bad.  That's why I got the nurse.

15:50:29  2        Q.  The foot was actually turned around almost 180

15:50:31  3    degrees, wasn't it?  In other words, the toes, instead

15:50:34  4    of pointing directly forward, were actually turned and

15:50:39  5    pointing almost completely and directly back, weren't

15:50:44  6    they?

15:50:44  7        A.  Pretty close, yes, sir.

15:50:45  8        Q.  That was on his left foot, right?

15:50:48  9        A.  I'm not too sure.  I don't remember.

15:50:50 10        Q.  On one foot?

15:50:51 11        A.  Yes, sir.

15:50:52 12        Q.  Did you look at the other foot or the other

15:50:54 13    knee?

15:50:54 14        A.  No, sir.

15:50:56 15        Q.  Do you remember if Abraham was grabbing his

15:51:00 16    knee?

15:51:00 17        A.  He was grabbing I believe it was his ankle.

15:51:02 18        Q.  You believe he was reaching all the way over to

15:51:06 19    grab his ankle?

15:51:08 20        A.  Yes, sir.  It was -- I don't know.

15:51:09 21        Q.  You're not sure, are you?

15:51:11 22        A.  I'm not too sure.

15:51:12 23        Q.  You remember he was grabbing something?

15:51:14 24        A.  Yes, sir.

15:51:14 25        Q.  Could you tell he was in pain?

15:51:16 1     A.   Yes, sir.

15:51:16 2     Q.   Did it look like he was in pain?

15:51:19 3     A.   Yes, sir.

15:51:19 4     Q.   Did it look like he was in excruciating pain?

15:51:22 5     A.   Yes, sir.

15:51:22 6     Q.   His foot was turned back almost 180 degrees.

15:51:26 7   He was grabbing some part of his body.  Did you

15:51:29 8   actually see his knee?

15:51:30 9     A.   No, sir.

15:51:30 10    Q.   Do you remember seeing his knee?

15:51:32 11    A.   No, sir.

15:51:33 12    Q.   Okay.  Do you know what ultimately happened to

15:51:35 13  his knee?

15:51:36 14    A.   No, sir.

15:51:37 15    Q.   Okay.  You saw him grabbing some part of his

15:51:39 16  body, the student runs and calls the nurse.  What

15:51:43 17  happens next?

15:51:43 18    A.   I stayed there with Abraham trying to make the

15:51:46 19  situation -- trying to console him, telling him to hang

15:51:51 20  in there, that help was coming.

15:51:52 21    Q.   Was Abraham conscious or unconscious, or could

15:51:55 22  you tell?

15:51:56 23    A.   Conscious, yes.

15:51:58 24    Q.   Was he twisting and turning?

15:52:01 25    A.   He was on the ground, yes, sir.

15:52:03  1    Q.  Kind of --

15:52:04  2    A.  Yeah.

15:52:04  3    Q.  Did you understand he was twisting and turning

15:52:09  4    because of the pain?

15:52:09  5    A.  Yes, sir.

15:52:09  6    Q.  Okay.  So you're trying to tell Abraham, "Hang

15:52:13  7    in there.  The nurse is coming"?

15:52:15  8    A.  Yes, sir.

15:52:15  9    Q.  What do you remember happening next?

15:52:17 10    A.  I remember the kids sitting down.  I told the

15:52:21 11    kids to sit down.  One of the students went and got the

15:52:25 12    nurse.  The PE teacher, other PE teacher came over

15:52:30 13    because I sent one of the students to call him over

15:52:33 14    also.  He came over and the nurse got there, and she's

15:52:36 15    the one who started putting ice on it.  She called the

15:52:41 16    principal and the emergency vehicle to come over.

15:52:43 17    Q.  So the nurse brings ice and calls EMS?

15:52:47 18    A.  Yes, sir.

15:52:48 19    Q.  And the principal?

15:52:48 20    A.  The assistant principal.

15:52:50 21    Q.  Who is the assistant principal?

15:52:52 22    A.  I'm going to say Mr. Rojas or Rosas, something

15:52:56 23    like that.

15:52:56 24    Q.  Rojas or Rosas?

15:52:58 25    A.  It's the same person.  I just don't remember if

16:29:30 1    was dangerous for Abraham or could be dangerous for

16:29:32 2    Abraham to participate in physical education because of

16:29:35 3    his condition of osteogenesis imperfecta?

16:29:41 4              MR. MOORE:  Objection, misquotes the

16:29:42 5    witness.

16:29:44 6              MR. BYROM:  Objection, form.

16:29:44 7         A.  Yes, sir.

16:29:47 8         Q.  As an alternative, during PE, could a student

9    be sent to like a different class, like an art class or

16:29:48 10   something like that?

16:29:48 11        A.  I'm not too sure, sir.

16:29:50 12        Q.  Could it be done?

16:29:51 13        A.  I'm not too sure.

16:29:52 14        Q.  I'm not asking if it ever was done.  I'm asking

16:29:55 15   is that something that could be done?

16:29:59 16        A.  To art class?

16:30:01 17             MR. BYROM:  Objection, form.

16:30:02 18             MR. MOORE:  Objection, calls for

16:30:04 19   speculation.

16:30:04 20        Q.  Or some other class.

16:30:05 21        A.  I'm not too sure about that, sir.

16:30:06 22        Q.  Did you mention something about going to the

16:30:08 23   library --

16:30:10 24        A.  Yes, sir.

16:30:10 25        Q.  -- if they couldn't do PE?

16:30:12  1      A.  Yes, sir.

16:30:12  2      Q.  Can you explain that again?

16:30:15  3      A.  I would give them a certain research paper,

16:30:18  4  short research paper to do on the history of a sport or

16:30:21  5  a certain athlete.  That way I could get something for

16:30:25  6  their grade for the day.

16:30:26  7      Q.  In other words, you had the duty to try to give

16:30:28  8  them a grade?

16:30:30  9              MR. MOORE:  Objection, misquotes.

16:30:31 10      A.  Yes, sir.

16:30:31 11      Q.  And if you didn't feel comfortable with them

16:30:34 12  participating in physical education activities, you

16:30:36 13  could send them to the library and have them do some

16:30:39 14  type of research on a physical education thing, like

         15  research the rules on basketball or something like

16:30:42 16  that, right?

16:30:43 17      A.  Yes, sir.

16:30:43 18      Q.  And through that, you could give them a grade?

16:30:46 19      A.  Yes, sir.

16:30:47 20      Q.  Even though they wouldn't physically

16:30:48 21  participate in physical education activities?

16:30:50 22      A.  Yes, sir.

16:30:51 23      Q.  But you didn't do that with Abraham, right?

16:30:53 24      A.  No, sir.

16:31:01 25      Q.  Did Principal Villarreal ever talk to you about

16:31:05 1   why you didn't send Abraham to the library to do some

16:31:09 2   type of other project?

16:31:13 3      A.  No, sir.

16:31:35 4      Q.  Did anyone else ever talk to you about doing

16:31:41 5   that?

16:31:41 6      A.  No, sir.

16:31:43 7      Q.  In other words, nobody from the district ever

16:31:45 8   talked to you about that either?

16:31:47 9      A.  No, sir.

16:31:53 10      Q.  So every indication you got was that having him

16:31:58 11   participate in the physical education activity, even

16:32:01 12   with his condition of osteogenesis imperfecta, would

16:32:04 13   have been proper and that you did not need to send him

16:32:07 14   to the library, as far as either Principal Villarreal

16:32:11 15   or the district was concerned?

16:32:13 16          MR. BYROM:  Objection, form.

16:32:15 17      A.  When he felt comfortable, yes, sir.

16:32:18 18      Q.  My question has to do with just the response

16:32:21 19   you got from the district and from Principal

16:32:26 20   Villarreal.  Is everything they led you to believe and

16:32:26 21   understand was that your handling of this situation was

16:32:28 22   proper, correct?

16:32:30 23          MR. BYROM:  Objection, form.

16:32:31 24      A.  Yes, sir.

16:32:31 25      Q.  And that you didn't need to send him over to

16:32:34 1   the library or anywhere else?  Doing it this way was

16:32:36 2   proper?

16:32:37 3                   MR. BYROM:  Objection, form.

16:32:38 4       A.  Yes, sir.

16:33:11 5                   MR. AGUILAR:  I'll pass the witness.

16:33:11 6   Thank you.

7                       EXAMINATION

8   BY MR. BYROM:

16:33:13 9       Q.  Coach Guerrero, my name is Jim Byrom.  I

16:33:17 10  introduced myself to you today.  You understand I

16:33:19 11  represent Principal Villarreal and the district,

16:33:21 12  correct?

16:33:22 13      A.  Yes, sir.

16:33:22 14      Q.  We had not met before today, had we, sir?

16:33:25 15      A.  No, sir.

16:33:26 16      Q.  Okay.  I want to talk to you about several

16:33:27 17  things, and I'm going to skip around because

16:33:29 18  Mr. Aguilar has covered a lot of it.  But I want to

16:33:33 19  start with questions regarding Principal Villarreal

16:33:37 20  talking to you.  Did you ever get the impression that

16:33:41 21  anybody with the district was trying to get you to tell

16:33:45 22  something that wasn't the truth?

16:33:47 23      A.  No, sir.

16:33:47 24      Q.  Okay.  You had every expectation that what they

16:33:53 25  intended for you to do was to tell the truth?

```
                      ERRATA SHEET/SIGNATURE PAGE

   PAGE LINE  CHANGE                              REASON
```

BRYANT & STINGLEY, INC.
RECEIVED
8-16-02
DATE

8-16-02

TN-1581
DDB-8/29/02

I, PEDRO GABRIEL GUERRERO, have read the foregoing
deposition and hereby affix my signature that same is
true and correct, except as noted above.

PEDRO GABRIEL GUERRERO

THE STATE OF TEXAS

COUNTY OF CAMERON

BEFORE ME, Pedro Gabriel Guerrero , on this day
personally appeared PEDRO GABRIEL GUERRERO, known to me
or proved to me to be the person whose name is
subscribed to the foregoing instrument and acknowledged
to me that said witness executed the same for the
purposes and consideration therein expressed.

Given under my hand and seal of office this 14th
day of August , 2002.

Chris D. Gonzalez

Notary Public in and for the State of Texas

CHRIS D. GONZALEZ
MY COMMISSION EXPIRES
March 12, 2006

ORIGINAL

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF TEXAS
 2                         BROWNSVILLE DIVISION

 3    ADELA CANO, Individually  )(
      and on Behalf of her       )(
 4    minor son, ABRAHAM CANO,   )(
              Plaintiff           )(
 5                                )(
      VS.                         )(    CIVIL ACTION NO. B-01-156
 6                                )(
      SAN BENITO CONSOLIDATED     )(
 7    INDEPENDENT SCHOOL          )(
      DISTRICT, HERIBERTO         )(
 8    VILLARREAL and PETER        )(
      GUERRERO,                   )(
 9            Defendants          )(

10                      REPORTER'S CERTIFICATE

11              I, CORINNA N. GARCIA, Certified Court
      Reporter, certify that the witness, PEDRO GABRIEL
12    GUERRERO, was duly sworn by me, and that the deposition
      is a true and correct record of the testimony given by
13    the witness on JULY 15, 2002; that the deposition was
      reported by me in stenograph and was subsequently
14    transcribed under my supervision.
                I FURTHER CERTIFY that I am not a
15    relative, employee, attorney or counsel of any of the
      parties, nor a relative or employee of such attorney or
16    counsel, nor am I financially interested in the action.
                WITNESS MY HAND on this the 29th day of
17    July                      , 2002.

18                         Corinna N. Garcia
                           CORINNA N. GARCIA, CSR NO. 5210
19                         Expiration Date: 12/31/03
                           Bryant & Stingley, Inc.
20                         2010 East Harrison
                           Harlingen, Texas  78550
21

22

23

24

25
```

BRYANT & STINGLEY, INC.
McAllen         Harlingen        Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

# EXHIBIT-D

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually    ) (
and on behalf of her minor  ) (
son, ABRAHAM CANO           ) (
      Plaintiff          ) (
                    ) (
VS.                         ) ( CIVIL ACTION NO. B-01-156
                    ) (
SAN BENITO CONSOLIDATED     ) (
INDEPENDENT SCHOOL          ) (
DISTRICT, HERIBERTO         ) (
VILLARREAL, AND PETER        ) (
GUERRERO                    ) (
      Defendants         ) (

---

ORAL DEPOSITION OF
OFELIA CORNEJO
AUGUST 28, 2003

---

ORAL AND VIDEOTAPED DEPOSITION OF OFELIA

CORNEJO, produced as a witness at the instance of the

PLAINTIFF, taken in the above styled and numbered cause

on AUGUST 28, 2003, reported by DONNA McCOWN, Certified

Court Reporter No. 6625, in and for the State of Texas,

at the San Benito Consolidated Independent School

District Administrative Building, 240 North Crockett

Street, San Benito, Texas, pursuant to the Federal

Rules of Civil Procedure.

ORIGINAL

09:12:35  1      A.   No.

09:12:39  2      Q.   Okay.  I'm handing you what was marked as

09:12:41  3   Exhibit 5.

09:12:49  4            Do you recognize that document?

09:12:51  5      A.   Yes, I do.  This is where Mrs. Cano gave

09:12:54  6   permission for Dr. Vargas to release the diagnosis, the

09:12:58  7   information to the school district.

09:13:04  8      Q.   Okay.  At this point, did you believe Abraham

09:13:07  9   could participate in regular physical education

09:13:10 10   activities?

09:13:11 11            MR. BYROM:   Objection, calls for

09:13:11 12   speculation.

09:13:15 13            MS. LEEDS:   Join.

09:13:15 14      Q.   This is dated May 21, '97, right?

09:13:19 15      A.   Yes, it's dated 5-21-97.

09:13:24 16      Q.   Okay.  And who fills out this form?  Is it

09:13:26 17   somebody at the school, or does Mrs. Cano?

09:13:34 18      A.   It looks like Mrs. Cano's writing.  I don't

09:13:37 19   know.

09:13:38 20      Q.   Okay.  And then what happens with the form?

09:13:41 21   Once she fills out the form, does she give it to

09:13:45 22   somebody at the school?

09:13:45 23      A.   (Moving head up and down)

09:13:46 24      Q.   Who does she give it to?

09:13:47 25      A.   She was supposed to take this to the doctor,

09:13:49  1    but I went ahead and delivered it to Dr. Vargas.

09:13:53  2         Q.   You took it to Dr. Vargas?

09:13:55  3         A.   This is because of the time frame, that it was

09:13:59  4    towards the end of the school year.  We were trying to

09:14:09  5    get all the papers ready so that he would be on

09:14:09  6    homebound.

09:14:09  7         Q.   Okay.  So either the parent or the nurse or

09:14:11  8    somebody else at the school could deliver it over to

09:14:14  9    the doctor, right?

09:14:15 10              MR. BYROM:  Objection, form.

09:14:17 11              MS. LEEDS:  Objection, form.

09:14:18 12              THE WITNESS:  It's supposed to be the

09:14:19 13    parent --

09:14:19 14         Q.   Okay.

09:14:19 15         A.   -- to go get the information.

09:14:21 16         Q.   That's what the school prefers?

09:14:23 17              MS. LEEDS:  Objection, form.

09:14:24 18              MR. BYROM:  Objection, form.

09:14:25 19         Q.   Go ahead.

09:14:26 20         A.   I don't know.

09:14:27 21         Q.   Okay.  Well, in this particular circumstance,

09:14:29 22    you delivered it over to the doctor.

09:14:32 23         A.   Mr. Cano requested that I --

09:14:34 24         Q.   Your principal?

09:14:35 25         A.   -- deliver it.

09:14:36  1          The principal requested that I deliver it.

09:14:37  2      Q.  Okay.  So the principal can ask the nurse to go

09:14:41  3  deliver it to the doctor to try get the information you

09:14:43  4  need --

09:14:44  5      A.  Yes, sir.

09:14:44  6      Q.  -- in certain circumstances?

09:14:46  7      A.  In certain circumstances.

09:14:48  8      Q.  Okay.  And in this particular circumstance, he

09:14:50  9  did?

09:14:50 10      A.  Yes.

09:14:52 11      Q.  Okay.  And this is authorizing Dr. Vargas to

09:14:54 12  turn over medical information to you -- I'm sorry, to

09:14:56 13  the school.

09:14:56 14      A.  To the school.

09:14:59 15      Q.  Do you remember whether you stayed there and

09:15:01 16  waited for the information, or did you just drop this

09:15:04 17  off and come back later?

09:15:06 18      A.  I don't remember.

09:15:08 19      Q.  Okay.  Do you remember what happened when you

09:15:10 20  did take it over?

09:15:13 21      A.  I don't remember.

09:15:24 22      Q.  Okay.  As of this time, Abraham had -- May 21

09:15:28 23  of '97, Abraham had just broken his arm.

09:15:31 24      A.  According to the record, yes.

09:15:33 25      Q.  Okay.  So I presume you did not feel he should

Q. Who makes that decision?

A. The parent and doctor.

Q. Okay. If the parent --

A. Especially the doctor.

Q. If the parent says that they don't want him participating in contact activities and the nurse agrees he shouldn't be in contact activities, what should happen at that point?

A. After the parent has brought something from the doctor?

Q. No. Is that what happens next? Is that -- you're saying what should happen then is they should contact the doctor?

A. Yes, contact the doctor.

Q. Now, either the nurse or the parent can contact the doctor, right?

        MR. BYROM: Objection, form.

        THE WITNESS: Preferably the parent.

Q. Right. But the nurse can do it also, right?

        MR. BYROM: Objection, form.

        THE WITNESS: I don't know.

Q. You were given permission to contact the doctor earlier by your principal, right?

A. Yes, sir.

Q. Okay. So the nurse can contact the doctor in

| | |
|---|---|
| 09:57:16 | 1 |
| 09:57:17 | 2 |
| 09:57:20 | 3 |
| 09:57:23 | 4 |
| 09:57:23 | 5 |
| 09:57:27 | 6 |
| 09:57:32 | 7 |
| 09:57:33 | 8 |
| 09:57:34 | 9 |
| 09:57:35 | 10 |
| 09:57:36 | 11 |
| 09:57:37 | 12 |
| 09:57:39 | 13 |
| 09:57:41 | 14 |
| 09:57:43 | 15 |
| 09:57:44 | 16 |
| 09:57:48 | 17 |
| 09:57:50 | 18 |
| 09:57:54 | 19 |
| 09:57:55 | 20 |
| 09:57:57 | 21 |
| 09:57:58 | 22 |
| 09:57:59 | 23 |
| 09:57:59 | 24 |
| 09:58:02 | 25 |

1  some circumstances.

2      A.  But it was for release -- I mean, getting a

3  diagnosis for homebound.

4      Q.  Okay.

5      A.  It was not a release for medical information.

6      Q.  Right.  Okay.  But to get that, if you got the

7  mother's permission, filled out a similar form --

8      A.  Release of information.

9      Q.  -- like you have here in Exhibit -- what is

10  that?  5?

11      A.  Uh-huh.

12      Q.  You could have done the same thing, right?

13      A.  Yes.

14      Q.  Okay.  And a nurse can do that is what I'm

15  asking.

16      A.  I believe so.

17      Q.  Okay.  Without that doctor's excuse, are you

18  saying the student has to participate in contact

19  physical activities --

20          MR. BYROM:  Objection, form.

21          MS. LEEDS:  Object to form.

22      Q.  -- without that doctor's excuse?

23      A.  It may take a few days to get a doctor's

24  appointment.

25      Q.  Right.

09:58:03 1      A.  So common sense would tell you.

09:58:05 2      Q.  He shouldn't be participating?

09:58:07 3              MR. BYROM:  Objection, form.

09:58:08 4              THE WITNESS:  He should be in PE, but

09:58:10 5      maybe -- I don't know.  It depends on what the parent

09:58:12 6      wants too.

09:58:13 7      Q.  If the parent doesn't want him to participate

09:58:15 8      in any --

09:58:16 9      A.  Then you don't sent him to PE.

09:58:16 10     Q.  He just should not be sent to PE?

09:58:18 11             MR. BYROM:  Objection, form.

09:58:18 12             THE WITNESS:  Until --

09:58:20 13     Q.  Until you straighten out the issue?

09:58:22 14     A.  You know what?  I would let the principal

09:58:23 15     handle it.  We would have a conference.

09:58:23 16     Q.  Okay.

09:58:25 17     A.  You know, "What are we going to do here?"

09:58:28 18     Q.  Okay.  That's what should happen is you just

09:58:28 19     approach the principal?

09:58:29 20     A.  Yes.  I mean, I cannot make a decision on the

09:58:32 21     child being absent from PE.  That's one of the required

09:58:34 22     courses.

09:58:35 23     Q.  Okay.  So you think the proper procedure would

09:58:38 24     be contact the principal --

09:58:39 25     A.  Contact the principal.

09:58:42  1      Q.  -- and say, "Look, we don't have a doctor's

09:58:43  2   excuse, but at the same time we know he's got this

09:58:46  3   condition where he shouldn't be having contact

09:58:49  4   activities"?

09:58:49  5      A.  Yes, sir.

09:58:50  6      Q.  And at that point, leave it up to the principal

09:58:52  7   to decide yes or no?

09:58:54  8                MR. BYROM:  Objection, form.

09:58:55  9                MS. LEEDS:  Join.

09:58:55 10      Q.  Or to do something?

09:58:56 11                MR. BYROM:  Same objection.

09:58:58 12                MS. LEEDS:  Same objection.

09:58:59 13      A.  To do something.  I don't know what they do.

09:59:02 14                MR. AGUILAR:  I'll go ahead and pass the

09:59:02 15   witness.

09:59:02 16                Thank you.

09:59:02 17                      EXAMINATION

09:59:04 18   BY MS. LEEDS:

09:59:04 19      Q.  I just have one question to fix thing -- to

09:59:08 20   clarify something.

09:59:09 21                Mr. Aguilar was asking you about, you

09:59:13 22   know, going to a doctor and getting a doctor's excuse

09:59:15 23   as to what the limitations could be, right?

09:59:18 24      A.  Yes.

09:59:18 25      Q.  This document, document No. 5, which he kept

09:59:22 1    referring to that Mrs. Cano could have signed that

09:59:25 2    document, that document will only get records that

09:59:28 3    already exist, right?

09:59:31 4        A.  They already exist where?

09:59:33 5        Q.  In the doctor's office.

09:59:33 6        A.  In the doctor's office, yes.

09:59:35 7        Q.  That document will not get a list of

09:59:37 8    limitations from the doctor.

09:59:39 9        A.  Not this one, no.

09:59:41 10       Q.  Okay.  So that even if you go to Mrs. Cano and

09:59:43 11   have her fill out one little document there, that's not

09:59:45 12   enough to get a list of limitations.

09:59:47 13       A.  No.  There's a different form.

09:59:49 14       Q.  Okay.

09:59:50 15       A.  Or even just a prescription pad from the doctor

09:59:52 16   or something in writing from the doctor.

09:59:54 17       Q.  Okay.  But you need something from the doctor

09:59:57 18   that says, "This is what he can and this is what he

09:59:59 19   cannot do"?

10:00:00 20       A.  That's correct.

10:00:01 21       Q.  And it's the parent's responsibility.

10:00:04 22           MR. AGUILAR:  Objection, leading.

10:00:05 23           THE WITNESS:  It's the parent's

10:00:06 24   responsibility.

10:00:07 25           MS. LEEDS:  Okay.  Thank you.

```
 1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF TEXAS
 2                         BROWNSVILLE DIVISION

 3    ADELA CANO, Individually   ) (
      and on behalf of her minor ) (
 4    son, ABRAHAM CANO          ) (
                Plaintiff        ) (
 5                               ) (
      VS.                        ) ( CIVIL ACTION NO. B-01-156
 6                               ) (
      SAN BENITO CONSOLIDATED    ) (
 7    INDEPENDENT SCHOOL         ) (
      DISTRICT, HERIBERTO        ) (
 8    VILLARREAL, AND PETER      ) (
      GUERRERO                   ) (
 9            Defendants         ) (

10                   REPORTER'S CERTIFICATE

11        I, Donna McCown, Certified Court Reporter, certify
      that the witness, OFELIA CORNEJO, was duly sworn by me,
12    and that the deposition is a true and correct record of
      the testimony given by the witness on AUGUST 28, 2003;
13    that the deposition was reported by me in stenograph
      and was subsequently transcribed under my supervision.
14
          I FURTHER CERTIFY that I am not a relative,
15    employee, attorney or counsel of any of the parties,
      nor a relative or employee of such attorney or counsel,
16    nor am I financially interested in the action.

17                   WITNESS MY HAND on this the   2   day of
      September            , 2003.
18

19

20    _____
      DONNA McCOWN, CSR NO. 6625
21    Expiration Date: 12/31/03
      Bryant & Stingley, Inc.
22    2010 East Harrison
      Harlingen, Texas  78550
23    (956) 428-0755

24

25
```

# EXHIBIT-E

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually  )(
and on Behalf of her minor)(
son, ABRAHAM CANO,        )(
     Plaintiff         )(
                   )(
VS.                       )(    CIVIL ACTION NO. B-01-156
                   )(
SAN BENITO CONSOLIDATED   )(
INDEPENDENT SCHOOL        )(
DISTRICT, HERIBERTO       )(
VILLARREAL and PETER      )(
GUERRERO,                 )(
     Defendants         )(

---

ORAL DEPOSITION OF
DONALD VARGAS, M.D., P.A.
SEPTEMBER 25, 2002

---

     ORAL DEPOSITION OF DONALD VARGAS, M.D., P.A.,

produced as a witness at the instance of the DEFENDANTS

SAN BENITO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT AND

HERIBERTO VILLARREAL, taken in the above styled and

numbered cause on SEPTEMBER 25, 2002, reported by DONNA

McCOWN, Certified Court Reporter No. 6625, in and for

the State of Texas, at the offices of Valley Orthopedic

Clinic, 1901 Pease Street, Harlingen, Texas, pursuant

to the Federal Rules of Civil Procedure.



18:17:05  1   And I've been in this 30 years.  It's an unusual break.

18:17:07  2       Q.  So seeing an avulsion fracture indicates to you

18:17:11  3   a higher likelihood of something like osteogenesis?

18:17:15  4       A.  Yes.

18:17:21  5       Q.  Okay.  If a patient had osteogenesis

18:17:25  6   imperfecta, you would not recommend that they

18:17:27  7   participate in any contact sports, I'd presume?

18:17:31  8       A.  Yes.  I think I answered that question before.

18:17:33  9   Contact sports should not be done on children with

18:17:37 10   osteogenesis imperfecta.

18:17:39 11       Q.  And that includes sports such as soccer?

18:17:41 12       A.  Yes.

18:17:42 13            MR. BYROM:  Objection, form.  Calls for

18:17:44 14   speculation.

18:17:45 15       Q.  Do you believe a child with osteogenesis

18:17:48 16   imperfecta should participate in soccer?

18:17:54 17       A.  No.  I think soccer as it's played now is a

18:17:57 18   contact sport, so I don't think I would let him play

18:18:00 19   soccer.

18:18:03 20       Q.  Okay.  Did Abraham -- anybody from Abraham's

18:18:06 21   school ever try to contact you to ask whether it's okay

18:18:09 22   for Abraham to play baseball, soccer, basketball, or

18:18:15 23   any of these other contact sports?

18:18:18 24       A.  I don't remember if they did or not.

18:18:20 25       Q.  If they had, would you have made a note in your

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF TEXAS
 2                       BROWNSVILLE DIVISION

 3     ADELA CANO, Individually  )(
       and on Behalf of her minor)(
 4     son, ABRAHAM CANO,        )(
                Plaintiff        )(
 5                               )(
       VS.                       )(    CIVIL ACTION NO. B-01-156
 6                               )(
       SAN BENITO CONSOLIDATED   )(
 7     INDEPENDENT SCHOOL        )(
       DISTRICT, HERIBERTO       )(
 8     VILLARREAL and PETER      )(
       GUERRERO,                 )(
 9              Defendants       )(

10                    REPORTER'S CERTIFICATE

11        I, Donna McCown, Certified Court Reporter, certify
       that the witness, DONALD VARGAS, M.D., P.A., was duly
12     sworn by me, and that the deposition is a true and
       correct record of the testimony given by the witness on
13     SEPTEMBER 25, 2002; that the deposition was reported by
       me in stenograph and was subsequently transcribed under
14     my supervision.

15        I FURTHER CERTIFY that I am not a relative,
       employee, attorney or counsel of any of the parties,
16     nor a relative or employee of such attorney or counsel,
       nor am I financially interested in the action.
17
                        WITNESS MY HAND on this the 27th day of
18     September          , 2002.

19

20

       DONNA McCOWN, CSR NO. 6625
21     Expiration Date: 12/31/03
       Bryant & Stingley, Inc.
22     2010 East Harrison
       Harlingen, Texas  78550
23     (956)428-0755

24

25
```

# EXHIBIT-F

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually  )(
and on Behalf of her  )(
minor son, ABRAHAM CANO,  )(
     Plaintiff  )(
 )(
VS.  )(   CIVIL ACTION NO. B-01-156
 )(
SAN BENITO CONSOLIDATED  )(
INDEPENDENT SCHOOL  )(
DISTRICT, HERIBERTO  )(
VILLARREAL and PETER  )(
GUERRERO,  )(
     Defendants  )(

---

ORAL DEPOSITION OF
ABRAHAM CANO
JULY 16, 2002



---

     ORAL DEPOSITION OF ABRAHAM CANO, produced as a

witness at the instance of the DEFENDANT SAN BENITO

CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, taken in the

above styled and numbered cause on JULY 16, 2002,

reported by CORINNA N. GARCIA, Certified Court Reporter

No. 5210, in and for the State of Texas, at the Law

Office of J. Arnold Aguilar, Artemis Square, Suite H-2,

1200 Central Boulevard, Brownsville, Texas, pursuant to

the Federal Rules of Civil Procedure.

BRYANT & STINGLEY, INC.
McAllen     Harlingen     Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

10:58:49 1      A.  I don't remember.

10:58:49 2      Q.  You don't remember.  But you didn't play?

10:58:52 3      A.  No.

10:58:52 4      Q.  Okay.  Prior to soccer, did you participate in

10:58:57 5  the PE class in terms of actually playing the games?

10:59:01 6      A.  Sometimes.

10:59:02 7      Q.  Sometimes.  Who decided when you played and

10:59:04 8  when you didn't?

10:59:06 9      A.  No.

10:59:06 10     Q.  Who did?  Who made that decision?

10:59:09 11     A.  Coach Guerrero.

10:59:11 12     Q.  Okay.  He would actually tell you, "Sit down"

10:59:12 13 or "Don't play" or "Don't" --

10:59:15 14     A.  No, it's when I -- I wouldn't dress out

10:59:17 15 sometimes just so I wouldn't have to play.

10:59:20 16     Q.  Okay.  Who made the decision of you not

10:59:22 17 dressing out?

10:59:24 18     A.  I did.

10:59:24 19     Q.  Okay.  I'm going to come back to that in just a

10:59:27 20 second.  Let me ask you specifically how did the day

10:59:30 21 start in PE?  What class was it?

10:59:33 22     A.  Second period.

10:59:34 23     Q.  Okay.  Did you all do block scheduling so it

10:59:37 24 rotated every day or was it always the second period?

10:59:38 25     A.  Always the same.

10:59:41  1     Q.  And tell me what would happened when you got to

10:59:43  2  class.

10:59:43  3     A.  We would go into the locker room and change

10:59:46  4  into our PE clothes and wait for him to tell us what to

10:59:51  5  do.

10:59:51  6     Q.  Okay.  And what you're saying is there were

10:59:52  7  times that you would come in and not dress out?

10:59:55  8     A.  Yes.

10:59:56  9     Q.  And that meant you weren't going to participate

10:59:58 10  in the actual game?

11:00:03 11     A.  Yes.

11:00:03 12     Q.  Okay.  How often did that happen that you

11:00:03 13  didn't dress out?

11:00:05 14     A.  Often, pretty often.

11:00:07 15     Q.  As many as 10 or 15 times that fall?

11:00:11 16     A.  Maybe more.

11:00:12 17     Q.  Maybe more?

11:00:12 18     A.  Yes.

11:00:13 19     Q.  What's your best estimate?

11:00:16 20     A.  I don't know.

11:00:16 21     Q.  And would you know before you got to class what

11:00:22 22  you were going to do for that day?

11:00:22 23     A.  No.

11:00:23 24     Q.  How would you know that you wanted to sit out

11:00:25 25  on a particular day?

11:00:27 1      A.  I wouldn't.  I just --

11:00:33 2      Q.  I misunderstood.  I thought the first thing you

11:00:35 3  all did was dress out.

11:00:37 4      A.  Yes.

11:00:40 5      Q.  Okay.  How would you know -- and you said the

11:00:41 6  days you didn't dress out, you wouldn't play.

11:00:45 7      A.  Yes.

11:00:45 8      Q.  Okay.  How would you know before you got

11:00:46 9  there --

11:00:47 10      A.  It was like you said at the beginning, the

11:00:50 11  pinkton, it would -- for two or three weeks we'd do the

11:00:54 12  same thing.

11:00:54 13      Q.  Got you.  So because of what -- you would sort

11:00:57 14  of know what was coming ahead a little bit?

11:00:59 15      A.  Yes.

11:00:59 16      Q.  Okay.  On what occasions did you then decide

11:01:03 17  not to dress out?  What was going on on those

11:01:06 18  particular days?

11:01:09 19      A.  I don't remember.

11:01:10 20      Q.  Do you remember why you would have chosen not

11:01:13 21  to dress out?

11:01:14 22      A.  Yes.

11:01:15 23      Q.  Why?

11:01:15 24      A.  I didn't want to play.

11:01:16 25      Q.  Is it because you didn't want to play or

| | |
|---|---|
| 11:01:19 | 1 | because you were afraid you were going to be hurt? |
| 11:01:21 | 2 | A. Both. |
| 11:01:22 | 3 | Q. Sometimes is it just because you didn't like |
| 11:01:25 | 4 | the game? |
| 11:01:26 | 5 | A. No. |
| 11:01:26 | 6 | Q. Okay. Was it always related to your physical |
| 11:01:29 | 7 | condition? |
| 11:01:29 | 8 | A. Yes. |
| 11:01:30 | 9 | Q. All right. Would you go to Coach Guerrero and |
| 11:01:34 | 10 | say, "I'm not going to play today"? |
| 11:01:35 | 11 | A. Yes. |
| 11:01:35 | 12 | Q. And he would say? |
| 11:01:38 | 13 | A. Nothing. Told me to -- if I wouldn't dress |
| 11:01:42 | 14 | out, he would tell me to run laps. |
| 11:01:44 | 15 | Q. Okay. |
| 11:01:45 | 16 | A. Yes. |
| 11:01:46 | 17 | Q. So you didn't want to run laps? |
| 11:01:47 | 18 | A. No. |
| 11:01:48 | 19 | Q. Is that because of your physical condition or |
| 11:01:51 | 20 | because you just don't like to run laps? |
| 11:01:53 | 21 | A. Both. |
| 11:01:54 | 22 | Q. Okay. Did it hurt you? |
| 11:01:56 | 23 | A. Yes. |
| 11:01:56 | 24 | Q. What did it hurt when you ran laps? |
| 11:01:58 | 25 | A. My asthma. |



11:02:00 1      Q.  Okay.  Well, let me go back a step.  I

11:02:02 2  appreciate you clearing that up.  You didn't want to

11:02:05 3  run laps, not because of the osteogenesis imperfecta,

11:02:08 4  but because of the asthma?

11:02:09 5      A.  Yes.

11:02:10 6      Q.  Okay.  So if you dressed out and said, "I'm not

11:02:12 7  going to play," you were concerned "He's going to make

11:02:15 8  me run laps, and my asthma will act up"?

11:02:18 9      A.  Yes.

11:02:18 10      Q.  Okay.  So you would -- when you anticipated

11:02:22 11  something was coming that you didn't want to do, you

11:02:25 12  would just not dress out?

11:02:27 13      A.  Yes.

11:02:27 14      Q.  Okay.  And what -- let me ask it again, and I

11:02:30 15  hope that I'm not repeating myself, but was it always

11:02:33 16  that you were -- that it was related to your

11:02:38 17  osteogenesis imperfecta, or sometimes you just didn't

11:02:40 18  want to play?

11:02:42 19      A.  About all the time it was osteogenesis

11:02:44 20  imperfecta.

11:02:44 21      Q.  Okay.  And you would say -- you would make the

11:02:50 22  decision, "I don't think I ought to do this today

11:02:53 23  because of my condition"?

11:02:54 24      A.  Yes.

11:02:57 25      Q.  And Coach Guerrero honored that?



11:03:55 1    said to Coach Guerrero, "I'm not going to do this

11:03:58 2    today," would he say, "Okay.  Don't"?

11:04:03 3        A.  When I wouldn't dress out?

11:04:06 4        Q.  Yes.

11:04:06 5        A.  Yes.

11:04:06 6        Q.  Okay.  He never made you dress out when you

11:04:08 7    said, "I'm not going to dress out today"?

11:04:10 8        A.  Sometimes he would say that he would give me a

11:04:13 9    referral.

11:04:13 10        Q.  A referral?

11:04:14 11        A.  Yes.

11:04:14 12        Q.  Where would you go?

11:04:17 13        A.  Excuse me?

11:04:17 14        Q.  What is a referral?

11:04:18 15        A.  A referral is a paper that they give you to

11:04:20 16    take to the office.

11:04:21 17        Q.  Okay.  And what did that referral say?

11:04:24 18        A.  You have detention.

11:04:25 19        Q.  Okay.  Did you have detention?

11:04:26 20        A.  No.

11:04:29 21        Q.  Okay.  Did you ever have detention because you

11:04:31 22    sat out of PE class?

11:04:33 23        A.  No.

11:04:34 24        Q.  How many times did you get a referral from

11:04:35 25    Coach Guerrero?

11:04:36 1      A.   None.

11:04:37 2      Q.   None?

11:04:37 3      A.   No.

11:04:39 4      Q.   I misunderstood you then.  I thought you said

11:04:42 5  he gave you --.

11:04:42 6      A.   No, I said he said that he would.

11:04:44 7      Q.   Oh, I'm sorry.  He said he would give you a

11:04:47 8  referral, but he never did?

11:04:47 9      A.   No.

11:04:48 10      Q.   Okay.  Are you saying that he said he would

11:04:52 11  give you a referral, and so, based on that, you suited

11:04:56 12  out?

11:04:56 13      A.   Yes.

11:04:56 14      Q.   Okay.  How many times did that happen, as best

11:04:58 15  you can remember?

11:05:02 16      A.   I don't remember.

11:05:03 17      Q.   Okay.  On those occasions did you end up having

11:05:09 18  to do laps?

11:05:10 19      A.   No, I ended up having to play.

11:05:12 20      Q.   Okay.  And -- but you don't remember how many

11:05:16 21  times that happened?

11:05:16 22      A.   No.

11:05:17 23      Q.   Do you remember what games it was?

11:05:20 24      A.   Football.  That's the only one I remember.

11:05:29 25      Q.   Okay.  Is it your testimony that you all played

11:05:29  1    football in the fall of 2000?

11:05:31  2         A.   Yes.

11:05:31  3         Q.   Before the soccer?

11:05:33  4         A.   Yes.

11:05:33  5         Q.   Okay.  And when you played football, what did

11:05:38  6    you do?

11:05:39  7         A.   Excuse me?

11:05:41  8         Q.   When you played football, what did you do?

11:05:44  9    What position were you?  What did you do?

11:05:45 10        A.   Nothing.  They just left it up to us what

11:05:49 11    position we wanted to play.

11:05:50 12        Q.   And what would you say?

11:05:51 13        A.   Excuse me?

11:05:51 14        Q.   What would you say if you were asked, "What

11:05:54 15    position do you want to play?"

11:05:55 16        A.   They wouldn't ask me.  They just put it in and

11:05:58 17    play.

11:05:59 18        Q.   Okay.  And where would you play when you did

11:06:01 19    play?

11:06:02 20        A.   When?

11:06:02 21        Q.   Where?  What position would you play when you

11:06:06 22    played?

11:06:08 23        A.   Anything that didn't involve doing much.

11:06:11 24        Q.   Okay.  So you would make sure even out in the

11:06:13 25    field you were taking care of yourself?

11:06:15 1    A.  Yes.

11:06:15 2    Q.  Would that ordinarily be a lineman or a

11:06:20 3  receiver or a --

11:06:24 4    A.  A receiver.

11:06:24 5    Q.  Okay.  You'd run out for the passes?

11:06:27 6    A.  Yes.

11:06:27 7    Q.  And would they throw them to you?

11:06:30 8    A.  No.

11:06:30 9    Q.  Okay.  Did they not throw them to you because

11:06:33 10  of your condition?

11:06:34 11    A.  Yes.

11:06:34 12    Q.  Did you say, "Don't throw it to me"?

11:06:37 13    A.  Yes.

11:06:37 14    Q.  Okay.  And how many times did that occur that

11:06:42 15  Coach Guerrero made you suit up and then you played?

11:06:48 16    A.  I don't remember.

11:06:50 17    Q.  When he told you to suit up and you didn't want

11:06:54 18  to play because you were concerned about your

11:06:56 19  condition, what did you say to him?

11:07:00 20    A.  I told him that I couldn't, but he really

11:07:06 21  didn't say much.  He just told us he would deal with it

11:07:11 22  outside, when we get outside.

11:07:15 23    Q.  Okay.  Have the doctors told you it's important

11:07:18 24  for you to stay active?

11:07:19 25    A.  Can you repeat the question?

11:10:49  1    A.  Football.

11:10:50  2    Q.  Okay.  There were times he said, "Go in the

11:10:52  3  game"?

11:10:52  4    A.  Yes.

11:10:53  5    Q.  What did you say?

11:10:54  6    A.  I didn't tell him anything.

11:10:56  7    Q.  Why not?

11:10:58  8    A.  I didn't feel like I could question his

11:11:01  9  authority.

11:11:01  10    Q.  But you knew you'd already had a conversation

11:11:03  11  with him?

11:11:03  12    A.  Yes.

11:11:06  13    Q.  And you many times sat out because of your

11:11:14  14  condition?

11:11:14  15    A.  Yes.

11:11:14  16    Q.  Based on your own choice?

11:11:14  17    A.  Yes.

11:11:15  18    Q.  And you knew you had the opportunity to tell

11:11:17  19  him again, "I have this condition.  I can't play"?

11:11:22  20    A.  Yes.

11:11:23  21    Q.  But what you're saying is you didn't?

11:11:25  22    A.  No.

11:11:26  23    Q.  Okay.  He had told you at the beginning of the

11:11:35  24  year he would be careful?

11:11:37  25    A.  Yes.

11:31:04 1    wait for Coach Guerrero to get there.

11:31:07 2        Q.   Did you know what was coming that day?

11:31:10 3        A.   Soccer.

11:31:10 4        Q.   You knew you were going to play --

11:31:10 5        A.   Yes.

11:31:10 6        Q.   That people were going to play soccer?

11:31:14 7        A.   Yes.

11:31:14 8        Q.   Did you make any attempt not to suit up that

11:31:18 9    day?

11:31:18 10        A.   Yes, I didn't.

11:31:19 11        Q.   At all?

11:31:21 12        A.   No.

11:31:21 13        Q.   Okay.  Because you were choosing not to

11:31:23 14    participate?

11:31:24 15        A.   Yes.

11:31:25 16        Q.   Ultimately, did you suit up?

11:31:28 17        A.   No.

11:31:28 18        Q.   At all?

11:31:29 19        A.   No.

11:31:30 20        Q.   Okay.  When you don't suit up, do you still go

11:31:36 21    out to the field where everybody goes?

11:31:38 22        A.   Yes.

11:31:38 23        Q.   So you are in street clothes?

11:31:40 24        A.   Yes.

11:31:41 25        Q.   Do you remember what you had on?



11:31:42 1          A.  I had a pair of blue jeans and a wrestling

11:31:46 2     shirt.

11:31:48 3          Q.  Wrestling?

11:31:48 4          A.  Yes.

11:31:49 5          Q.  Like WWF or something?

11:31:51 6          A.  Yes.

11:31:51 7          Q.  T-shirt?

11:31:52 8          A.  Yes.

11:31:53 9          Q.  Who was on it?

11:31:54 10         A.  Stone Cold.

11:31:54 11         Q.  Okay.  Good for you.

11:31:57 12              MR. AGUILAR:  Who?

11:31:58 13              MR. BYROM:  Stone Cold.

11:32:02 14         Q.  Were there any other students in the class that

11:32:05 15    were not suited out?

11:32:06 16         A.  My friend, John Joe.

11:32:10 17         Q.  John?

11:32:10 18         A.  John Joe.

11:32:12 19         Q.  What is his full name?

11:32:14 20         A.  John Joe Colunga.

11:32:16 21         Q.  I'm sorry.  Say it again.

11:32:18 22         A.  John Joe Colunga.

11:32:20 23         Q.  Okay.  Is John Joe two words?

11:32:23 24         A.  Yes.

11:32:23 25         Q.  Okay.  And why wasn't he suited out?



11:32:28 1     A.  Because he doesn't play.

11:32:29 2     Q.  He doesn't play anything?

11:32:31 3     A.  No, he has an artificial leg.

11:32:34 4     Q.  Okay.  Because of his artificial leg.  He is in

11:32:39 5 the class?

11:32:39 6     A.  Yes.

11:32:39 7     Q.  And he gets credit for the class, as far as you

11:32:42 8 know?

11:32:42 9     A.  Yes.

11:32:42 10    Q.  But he doesn't play the sports?

11:32:44 11    A.  Yes.

11:32:44 12    Q.  Okay.  Tell me what happened in the game.

11:32:51 13    A.  In the game?

11:32:53 14    Q.  You all are out on the field.

11:32:55 15    A.  Yes.

11:32:55 16    Q.  The game starts, right?

11:32:58 17    A.  Yeah.

11:32:59 18    Q.  Tell me how it went.

11:33:00 19    A.  I was just pretty much standing around with my

11:33:03 20 friends talking about my birthday, which was the very

11:33:06 21 next day.

11:33:06 22    Q.  Right.

11:33:07 23    A.  And they were telling me that I'd better come

11:33:10 24 to school so they could give me a gift, and --

11:33:17 25    Q.  Decorate your locker and all that kind of

11:33:17 1    stuff?

11:33:17 2         A.   We didn't have lockers.

11:33:19 3         Q.   Okay.  Paddle you 14 times?

11:33:19 4         A.   Huh?

11:33:19 5         Q.   They going to paddle you 14 times?

11:33:21 6         A.   No.  And we were just pretty much standing

11:33:24 7    around, and we were just moving along with them, with

11:33:29 8    whoever was playing.

11:33:30 9         Q.   Watching the game?

11:33:31 10        A.   Yeah.  But we were out there, and we were

11:33:34 11   moving along with the crowd as they kicked the ball,

11:33:38 12   trying to act like we were playing, and one of the

11:33:41 13   students kicked it to the goalie, and the goalie kicked

11:33:48 14   it to Coach Guerrero, and he kicked the ball and it

15            flew right past me.  And I turned around as I saw the

11:33:52 16   ball passing, and I turned back around to see, and I

11:33:52 17   was the closest one to the ball.  So I turned around to

11:33:56 18   go get it.  And that's all remember.  The next thing, I

11:33:58 19   was on the ground.

11:33:59 20        Q.   Okay.  Did it happen when you kicked the ball?

11:34:02 21        A.   No, I didn't actually get to the ball.

11:34:05 22        Q.   Okay.  Do you know if you stepped in a hole or

11:34:09 23   anything like that?

11:34:09 24        A.   No.

11:34:10 25        Q.   Do you have any idea why it broke?

11:34:12 1  A. No.

11:34:13 2  Q. This was your ankle, right?

11:34:15 3  A. Yes, and my knee.

11:34:16 4  Q. And your knee?

11:34:17 5  A. Yes.

11:34:18 6  Q. Right ankle?

11:34:19 7  A. Left ankle, right knee.

11:34:21 8  Q. Right knee.  Okay.  I knew it was opposite, but

11:34:23 9 I wasn't sure which one.  Okay.  So you were not

11:34:26 10 actually playing in the game?

11:34:28 11  A. I was playing, but I wasn't --

11:34:30 12    MR. AGUILAR:  Objection, mischaracterizing

11:34:30 13 the witness' testimony.  Go ahead.

11:34:33 14  Q. You were standing on the sidelines?

11:34:35 15  A. No, I was playing.

11:34:36 16    MR. AGUILAR:  Objection, mischaracterizing

11:34:38 17 the witness' testimony.  Go ahead.

11:34:39 18  A. I was playing, but me and my friend were just

11:34:42 19 standing around not doing anything.

11:34:45 20  Q. You were on the playing field in street

11:34:48 21 clothes?

11:34:48 22  A. Yes.

11:34:50 23  Q. Was John Joe on the field in street clothes?

11:34:54 24  A. No.

11:34:56 25  Q. Why were you on the field?

11:34:58  1       A.   Because Coach Guerrero told me that I was

11:35:01  2   playing.

11:35:01  3       Q.   Okay.  How many people were on each side?

11:35:04  4       A.   I don't know.

11:35:05  5       Q.   Did they pick the teams before you got started?

11:35:08  6       A.   I don't remember.

11:35:11  7       Q.   How long had the game been going on before the

11:35:15  8   incident occurred where you fell?

11:35:16  9       A.   Not very long.

11:35:18 10       Q.   Any idea?

11:35:18 11       A.   No.

11:35:22 12       Q.   Tell me how the conversation with Coach

11:35:24 13   Guerrero went.

11:35:26 14       A.   Which one, at the beginning?

11:35:28 15       Q.   At the beginning of the class.

11:35:29 16       A.   They went out there, and I stood over here with

11:35:31 17   my friend John Joe on the sidelines, and they started

11:35:35 18   doing their warm-ups, and after they finished, he just

11:35:40 19   turned around and said, "Abraham, you're playing."

11:35:42 20       Q.   And what did you say?

11:35:44 21       A.   Nothing.

11:35:45 22       Q.   You didn't say, "I'm not even dressed out"?

11:35:47 23       A.   Well, he could see that.

11:35:48 24       Q.   Okay.  So you didn't have to say that?

11:35:50 25       A.   No.

| | |
|---|---|
| 11:35:52 1 | Q.  Did you say, "I'm not supposed to"? |
| 11:35:54 2 | A.  No. |
| 11:35:55 3 | Q.  Did you say, "I don't think I can"? |
| 11:35:59 4 | A.  No. |
| 11:35:59 5 | Q.  Why not? |
| 11:36:00 6 | A.  He told me to play.  I just went out there and |
| 11:36:03 7 | played. |
| 11:36:05 8 | Q.  Knowing the risks, right? |
| 11:36:08 9 | A.  Yes. |
| 11:36:09 10 | Q.  You knew what the risks were? |
| 11:36:10 11 | A.  Yes. |
| 11:36:12 12 | Q.  And because he said, "Come out here," you chose |
| 11:36:15 13 | to play? |
| 11:36:16 14 | A.  Yes. |
| 11:36:23 15 | Q.  Without saying anything about it to him? |
| 11:36:25 16 | A.  No. |
| 11:36:28 17 | Q.  You had already had conversations with him |
| 11:36:29 18 | about your condition? |
| 11:36:32 19 | A.  Excuse me? |
| 11:36:33 20 | Q.  You had already had conversations about him -- |
| 11:36:35 21 | I'm sorry.  Let me say it again.  You'd already had |
| 11:36:38 22 | conversations with Coach Guerrero about your condition? |
| 11:36:41 23 | A.  Yes. |
| 11:36:41 24 | Q.  And had already spent many days not suited up |
| 11:36:45 25 | and not playing the games at all? |

| | | |
|---|---|---|
| 11:36:48 | 1 | A.  Yes. |
| 11:36:49 | 2 | Q.  On this particular day, not suited up, because |
| 11:36:54 | 3 | he said, "You're in," you chose to play? |
| 11:36:57 | 4 | MR. AGUILAR:  Objection, vague and |
| 11:36:59 | 5 | mischaracterizing the witness' testimony. |
| 11:37:02 | 6 | A.  I didn't want to play, but I didn't feel like I |
| 11:37:05 | 7 | could say anything to him. |
| 11:37:06 | 8 | Q.  Why not? |
| 11:37:06 | 9 | A.  He already knew. |
| 11:37:07 | 10 | Q.  Do you have any idea why he wanted you to play |
| 11:37:11 | 11 | anyway? |
| 11:37:11 | 12 | A.  No. |
| 11:37:11 | 13 | Q.  Do you think he was being mean to you? |
| 11:37:14 | 14 | A.  I don't know. |
| 11:37:14 | 15 | Q.  Was he angry at you for something that you know |
| 11:37:17 | 16 | about? |
| 11:37:17 | 17 | A.  No, not that I know about. |
| 11:37:19 | 18 | Q.  Did he say it in an angry way? |
| 11:37:22 | 19 | A.  Not really. |
| 11:37:24 | 20 | Q.  Did he yell, "Get in there"? |
| 11:37:26 | 21 | A.  No, but it was loud enough so I could hear.  I |
| 11:37:31 | 22 | was pretty far away. |
| 11:37:32 | 23 | Q.  Okay.  He said, "You're playing"? |
| 11:37:33 | 24 | A.  Yes. |
| 11:37:38 | 25 | Q.  Did he actually say, "Get out on the field and |

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   ADELA CANO, Individually  )(
     and on Behalf of her       )(
 4   minor son, ABRAHAM CANO,    )(
              Plaintiff          )(
 5                               )(
     VS.                         )(    CIVIL ACTION NO. B-01-156
 6                               )(
     SAN BENITO CONSOLIDATED     )(
 7   INDEPENDENT SCHOOL          )(
     DISTRICT, HERIBERTO         )(
 8   VILLARREAL and PETER        )(
     GUERRERO,                   )(
 9            Defendants         )(

10                    REPORTER'S CERTIFICATE

11              I, CORINNA N. GARCIA, Certified Court
     Reporter, certify that the witness, ABRAHAM CANO, was
12   duly sworn by me, and that the deposition is a true and
     correct record of the testimony given by the witness on
13   JULY 16, 2002; that the deposition was reported by me
     in stenograph and was subsequently transcribed under my
14   supervision.
              I FURTHER CERTIFY that I am not a
15   relative, employee, attorney or counsel of any of the
     parties, nor a relative or employee of such attorney or
16   counsel, nor am I financially interested in the action.
              WITNESS MY HAND on this the  29th  day of
17   ___July_____, 2002.

18              Corinna N. Garcia
              CORINNA N. GARCIA, CSR NO. 5210
19            Expiration Date: 12/31/03
              Bryant & Stingley, Inc.
20            2010 East Harrison
              Harlingen, Texas  78550
21

22

23

24

25
```

# EXHIBIT-G

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ADELA CANO, Individually    )(
and on Behalf of her        )(
minor son, ABRAHAM CANO,    )(
      Plaintiff          )(
                            )(
VS.                         )(    CIVIL ACTION NO. B-01-156
                            )(
SAN BENITO CONSOLIDATED     )(
INDEPENDENT SCHOOL          )(
DISTRICT, HERIBERTO         )(
VILLARREAL and PETER        )(
GUERRERO,                   )(
      Defendants         )(

---

ORAL DEPOSITION OF
ADELA CANO
JULY 16, 2002



---

     ORAL DEPOSITION OF ADELA CANO, produced as a

witness at the instance of the DEFENDANT SAN BENITO

CONSOLIDATED INDEPENDENT SCHOOL DISTRICT, taken in the

above styled and numbered cause on JULY 16, 2002,

reported by CORINNA N. GARCIA, Certified Court Reporter

No. 5210, in and for the State of Texas, at the Law

Office of J. Arnold Aguilar, Artemis Square, Suite H-2,

1200 Central Boulevard, Brownsville, Texas, pursuant to

the Federal Rules of Civil Procedure.

15:46:15  1        A.  Mr. Villarreal from the beginning was very
15:46:19  2    rude.  He would say stuff like, "Well, maybe you should
15:46:23  3    just take him to South Texas since he does have all
15:46:27  4    these problems," just -- every time I left
15:46:34  5    Mr. Villarreal's office, I was crying.
15:46:37  6        Q.  Were you ever rude to Mr. Villarreal?
15:46:39  7        A.  Yes, I was.
15:46:40  8        Q.  Did it at times get heated?
15:46:46  9        A.  Yes.
15:46:46 10        Q.  Both sides?
15:46:46 11        A.  Yes, but he's supposed to be the -- you know, I
15:46:49 12    would think he's supposed to be the professional.
15:46:51 13        Q.  So it's okay for you, but not him?
15:46:54 14        A.  Oh, no, but the thing was that he was
15:46:56 15    aggressive.
15:46:57 16        Q.  Okay.  So it was Mr. Villarreal you're talking
15:47:01 17    to in sixth grade?
15:47:02 18        A.  Yes.
15:47:02 19        Q.  Saying he's not supposed to be playing?
15:47:05 20        A.  Yes.
15:47:06 21        Q.  What did he tell you?
15:47:09 22        A.  That maybe I should just take Abraham out to
15:47:14 23    South Texas.
15:47:14 24        Q.  Did he tell you that they needed a doctor's
15:47:17 25    excuse?

15:47:17 1    A.  Yes.

15:47:17 2    Q.  Did you try to get one?

15:47:18 3    A.  Yes.

15:47:19 4    Q.  Same issue, tried to get one and Dr. Vargas

15:47:23 5    said, "You're going to have to come in and pay $400"?

15:47:28 6    A.  Yes.

15:47:28 7    Q.  At that time did you owe him money?

15:47:30 8    A.  Yes.

15:47:30 9    Q.  How much?  Do you know?

15:47:31 10    A.  About $1,000.

15:47:34 11    Q.  Did he ever say to you, "I'm not going to treat

15:47:37 12    your son anymore until you pay me"?

15:47:41 13    A.  No.

15:47:42 14    Q.  Did he ever insinuate that?

15:47:43 15    A.  Not the doctor, but the clerks.

15:47:46 16    Q.  The clerks insinuated that to you?  Or at least

15:47:49 17    that's the meaning you took from what they were saying?

15:47:49 18    A.  That we needed to pay something on the account.

15:47:53 19    At least bring it -- pay half to be able to --

15:47:55 20    Q.  So were you aware of any other place you could

15:47:59 21    have taken Abraham to get an excuse?

15:48:02 22    A.  No.

15:48:02 23    Q.  Any charity hospital anywhere?

15:48:04 24    A.  No.

15:48:05 25    Q.  Do you know any doctors that you could have

15:48:07  1    taken him to?

15:48:09  2        A.  Not orthopedic doctors.

15:48:13  3        Q.  Okay.  So it was going to be Dr. Vargas giving

15:48:16  4    the excuse or nothing?

15:48:17  5        A.  Or Dr. Keillor.

15:48:22  6        Q.  Dr. Keillor's stay out of PE came after the

15:48:27  7    soccer incident, didn't it?

15:48:29  8        A.  Yes.

15:48:30  9        Q.  Did you see Dr. Keillor before the soccer

15:48:34 10    incident?

15:48:35 11        A.  No.

15:48:36 12        Q.  Ever?

15:48:36 13        A.  No.

15:48:36 14        Q.  Okay.  You had said something about he had been

15:48:38 15    hurt and been seen by Dr. Keillor because he was the

15:48:42 16    doctor on call.

15:48:44 17        A.  At the emergency room.

15:48:45 18        Q.  Which time?

15:48:46 19        A.  When the broken toe.

15:48:48 20        Q.  Which was before the incident?

         21        A.  Yes.

15:48:51 22        Q.  Okay.  Did you talk to Dr. Keillor at all at

15:48:53 23    that time about physical education?

15:48:57 24        A.  No.

15:48:58 25        Q.  Why not?

```
 1                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE SOUTHERN DISTRICT OF TEXAS
 2                         BROWNSVILLE DIVISION

 3   ADELA CANO, Individually   )(
     and on Behalf of her       )(
 4   minor son, ABRAHAM CANO,    )(
            Plaintiff            )(
 5                               )(
     VS.                         )(   CIVIL ACTION NO. B-01-156
 6                               )(
     SAN BENITO CONSOLIDATED     )(
 7   INDEPENDENT SCHOOL          )(
     DISTRICT, HERIBERTO         )(
 8   VILLARREAL and PETER        )(
     GUERRERO,                   )(
 9          Defendants           )(

10                       REPORTER'S CERTIFICATE

11               I, CORINNA N. GARCIA, Certified Court
     Reporter, certify that the witness, ADELA CANO, was
12   duly sworn by me, and that the deposition is a true and
     correct record of the testimony given by the witness on
13   JULY 16, 2002; that the deposition was reported by me
     in stenograph and was subsequently transcribed under my
14   supervision.
                 I FURTHER CERTIFY that I am not a
15   relative, employee, attorney or counsel of any of the
     parties, nor a relative or employee of such attorney or
16   counsel, nor am I financially interested in the action.
                 WITNESS MY HAND on this the 29th day of
17   _____July_____, 2002.

18                              Corinna N. Garcia
                                CORINNA N. GARCIA, CSR NO. 5210
19                              Expiration Date: 12/31/03
                                Bryant & Stingley, Inc.
20                              2010 East Harrison
                                Harlingen, Texas  78550
21

22

23

24

25
```

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366   (956)428-0755   (956)542-1020